**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>               PLAINTIFF<br><br>VS.<br><br>BEAUTY ENTERPRISES, INC.,<br>AAA INDUSTRIAL TEMPORARIES, INC.,<br>ESSENTIAL TEMPORARIES, INC.,<br><br>               DEFENDANT | CIVIL ACTION<br>NO. 3:01-CV-378 (AHN) |
| MIGUEL ANGEL ALVAREZ and<br>WILLIAM TORRES,<br><br>             PLAINTIFF-INTERVENORS,<br><br>v.<br><br>BEAUTY ENTERPRISES, INC.,<br><br>               DEFENDANT | APRIL 30, 2004 |

**DEFENDANT BEAUTY ENTERPRISES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY OF ERNEST F. HARPER**

The subject of this litigation is defendant Beauty Enterprises, Inc.'s ("BEI"s) "English-only" workplace rule. The rule requires BEI employees to speak only in English while on the premises and "on the clock." Plaintiff, EEOC, claims that the rule is illegal; that it constitutes disparate impact national origin discrimination against BEI's

Hispanic warehouse workers in violation of Title VII of the Civil Rights Act of 1964. BEI disagrees.[1]

The parties also disagree about the legal standard that controls this issue. They do agree, however, that a particular inquiry is, or at least could be, relevant under each of the standards they espouse; that is, whether the English only rule is necessary for the safety of BEI's warehouse employees – whether it is justified [in this sense] by business necessity.[2]  Certainly, the EEOC will try to prove that the rule is "unjustified by business necessity."  (Complaint, para. 7(a)).  To this end, it seeks to present the opinion of a safety expert, Ernest F. Harper of Boise, Idaho.

The Court should exclude Mr. Harper's opinion under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.  As his report and deposition demonstrate, Mr. Harper did nothing more

---

[1] BEI is a wholesale distributor of beauty products for the black consumer.  The employees in its warehouse pick orders from shelves, pack them, check them and ship them to customers.  They also receive the products and place them on the shelves.  The warehouse workforce has always been diverse.  Hispanics – mostly Puerto Ricans – have traditionally been about a third of the workforce.  The rest of the workforce has been comprised of immigrant Russians, Poles, Bosnians, Vietnamese and others, as well as Jamaicans, Guyanese and African-Americans.

[2] The EEOC asserts that its Guideline on the point furnishes the applicable standard.  29 CFR Sec. 1606.7.  Under that Guideline, English-only rules, such as BEI's, are presumptively invalid, and it is the employer's burden to overcome that presumption by showing that the rule is "justified by business necessity."  BEI's position is that traditional disparate impact analysis applies, and that the EEOC's Guideline is not a sound interpretation of Title VII. See, Garcia v. Spun Steak, 998 F.2d 1480 (9th Cir. 1993); Garcia v. Gloor, 618 F.2d 264 (5th Cir. 1980).  Under traditional disparate impact analysis, business necessity is to be considered only if the plaintiff establishes a prima facie case (show that the rule has a substantial adverse impact on a  privilege of the alleged victim's employment).  Id.

than an untrained layperson would have done to determine intelligently and to the best possible degree the matter in issue.  His opinion, therefore, is not relevant in the <u>Daubert</u> sense.  It will not help the trier.  In Rule 702 terms, it will not "assist" the trier "to understand the evidence or to determine a fact in issue."  Moreover, his opinion – that the rule is not necessary for employee safety - is also unreliable under <u>Daubert</u>'s standards.  It is based on a methodology that is either questionable or non-existent and on "experience" without the required explanations.

In addition, the EEOC wants Mr. Harper to opine on another issue this case may present – whether BEI's rule is necessary to eliminate or reduce ethnic tension in its warehouse and make for a harmonious workplace.  The Court should exclude this testimony, not only because it lacks relevancy and reliability, but also because the witness is unqualified to opine as an expert on this topic.

BEI has moved to exclude Mr. Harper's testimony.   Its Motion should be granted.

## I.   <u>THE PERTINENT LEGAL PRINCIPLES</u>

The legal principles pertinent to this Motion are familiar and easy to describe. The party offering expert testimony has the burden of establishing its admissibility "by a preponderance of proof."  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592

n. 10 (1993).  Rule 702 of the Federal Rules of Evidence identifies the elements the proponent must so establish.  The rule provides:

> *If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

Daubert charges the court with the responsibility to act as a gatekeeper in applying this Rule "to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  Wechsler v. Hunt Health Systems, Ltd., No. 94 Civ. 8294(PKL), 2003 WL 22358807, at *3 (S.D.N.Y. Oct. 16, 2003) (citation omitted).  The court's gate-keeping function applies both to scientific expert testimony and to expert testimony based on technical or other specialized knowledge.  See id.

### A.    Relevancy

The relevancy requirement compels the court to determine whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Royal Ins. Co. v. Joseph Daniel Construction, Inc., 208 F.Supp.2d 423, 425 (S.D.N.Y. 2002) (citation omitted).  That is, "[f]or expert testimony to be admissible, it must help the jury" comprehend the evidence before it" or intelligently evaluate the facts.  Raskin v. Wyatt Co., 125 F.3d 55, 67 n. 5 (2d Cir. 1997) (citation omitted); Fed.

4

R. Evid. 702, Advisory Committee Notes.  "Such testimony is unhelpful when it . . . deals with a proposition that is not beyond the ken of common knowledge."  <u>Zuzula v. ABB Power T & D Co., Inc.</u>, 267 F.Supp.2d 703, 711 (E.D. Mich. 2003); <u>see</u> <u>also</u> <u>U.S. v. Lester</u>, 254 F.Supp.2d 602, 607 (E.D. Va. 2003) ("[I]n determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission . . . the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors") (citation omitted); <u>WBC v. Cosell</u>, 715 F.Supp. 1259, 1264 (S.D.N.Y. 1989) (excluding expert testimony where it would "discourage the fact finder from using his own judgment on an issue for which the fact finder is amply suited to make his own judgment").  As the Advisory Committee Notes describe it, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702, Advisory Committee Notes (citing Ladd, Expert Testimony, 5 Vand. L.Rev. 414, 418 (1952)).

### B.    Reliability

The reliability requirement asks the court to decide "whether a reliable methodology was used by the expert witness in reaching his conclusion."  <u>Royal Ins.</u>

Co. v. Joseph Daniel Construction, Inc., 208 F. Supp. 2d 423, 425 (S.D.N.Y. 2002) (citation omitted).  In Daubert, the Supreme Court created a non-exclusive list of factors that a district court may consider in addressing this issue.  The factors are:

> (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

509 U.S. at 592-593; Fed. R. Evid. 702 Advisory Committee Notes (2000 Amendments).  "Other factors found to be relevant include: (1) whether the expert proposes to testify about matters derived from research independent of the litigation; (2) whether the expert has adequately accounted for obvious alternative explanations; (3) whether the expert has employed the same level of intellectual rigor in the courtroom as in the relevant field of expertise; (4) the non-judicial uses to which the method has been put; and (5) whether the expert's discipline itself lacks reliability."  Blanchard v. Eli Lilly & Co., 207 F. Supp.2d 308, 316 (D. Vt. 2002) (internal citations omitted).

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and

the conclusion, et alia."  <u>Pugliano v. U.S.</u>,  No. 3:95cv1171(AHN), 3:95cv1330(AHN), 3:95cv1145(AHN), CR. H90-18 (AHN), 2004 WL 213028, at *1 (D. Conn. Jan. 30, 2004) (citation omitted).  "In deciding whether a step in an expert's analysis is reliable, the court must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand." <u>Id.</u>

## II.   <u>DISCUSSION</u>

### A.   <u>Mr. Harper's Opinion That The English-Only Rule Is Not a Business Necessity For Safety Purposes Is Not Helpful to the Jury And, Hence, Is Not Relevant</u>

Even if the issue were amenable to expert analysis (and it is not at all clear that it is), Mr. Harper did not employ any expertise to conclude that the English-only rule is not a business necessity for safety at BEI.  Instead of using "technical or other special knowledge," he did what any reasonably intelligent layperson would have done under the circumstances.  He examined the discovery record and used common sense.

This becomes crystal clear when the bases for Mr. Harper's conclusion are considered.  According to Mr. Harper, the English-only rule is not a business necessity for safety purposes at BEI because:

> *(a) alternate communication strategies are numerous, (b) claimants with limited or no English fluency were already performing the essential functions of the job, five for a total of 98 years, and (c) because BEI's relatively poor safety performance is clearly not related to language but*

7

> *can, and will be, shown to reflect a failure of management to provide an*
> *effective safety program essential to any successful business strategy.*

(See Exhibit A, Report at pp. 2-3.)

By his own admission, Mr. Harper used only common sense to arrive at his

"alternate communication strategies" basis.

> Q.    *. . . [A] basis for your opinion that the English-only rule isn't*
> *necessary [is] because there are alternate communication*
> *strategies to communicate with people at BEI?*
>
> A.    *Yes.  That is one.*
>
> Q.    *So then necessarily you must have thought to yourself, if I can't*
> *make them all speak in English, what other ways do I have of*
> *communicating with this diverse workforce? . . . Was that what*
> *you were thinking, what other choices would there have been for*
> *the employer besides this English-only rule to effectively*
> *communicate safety information to employees and provide the*
> *communication necessary for them to be safe in this work*
> *environment? . . .*
>
> A.    <u>*I go into this case knowing in advance that there is multiple ways*</u>
> <u>*to communicate to people*</u>.  *And that's all I did.  I mean, it's not a*
> *question I ask myself.  It's simply preknowledge.*
>
> Q.    *Common sense?*
>
> A.    <u>*Common sense*</u>.  <u>*Preknowledge, yes*</u>.

(See Exhibit B, Harper Depo. at pp. 102-103) (emphasis added).

This admission is hardly earth shattering.  It makes perfect sense.  If a

layperson were asked whether an English only rule is necessary for safety at BEI,

where the workforce consists of people with a variety of native languages, and everyone has at least a working knowledge of English, he or she would naturally reason that the rule is a device for communicating safety-related messages and ask whether there are other ways to communicate these messages to this workforce, ways other than through spoken English.  And it would not take brilliance, or any special experience, to answer yes and identify a host of other ways – bilingual supervisors, translators, multilingual texts, etc.  In short, a reasonably intelligent layperson could do precisely what Mr. Harper did to analyze the issue and reach a conclusion.[3]  Therefore, the fact finder does not need, and would not be helped in the slightest, by Mr. Harper's reasoning in this instance.

The same can be said for Mr. Harper's reasoning that the rule is not necessary for safety because "claimants [the Hispanic employees for whom the EEOC is suing] with limited or no English fluency[4] were already performing the essential functions of the job, five for a total of 98 years."  Harper's deposition testimony leaves no doubt in this regard.

---

[3]  The conclusion should not be that the rule is unnecessary.  While it is both natural and obligatory to identify alternate strategies, common knowledge also instructs that the mere availability of alternate strategies is an insufficient basis for a conclusion on the ultimate issue.  The extent of the efficacy of these alternate strategies needs to be considered.  BEI's position is that there are safety risks where the alternate strategies are insufficient or totally inapplicable and that the English-only rule is just about the only help.

[4] BEI disputes the assertion that there are underlying claimants - employees on whose behalf the EEOC is suing – who have no English proficiency.

Q.    *And lastly on this basis for your opinion that the English-only rule isn't necessary for safety at Beauty Enterprises, the basis being that claimants with little or no English fluency were already performing the essential functions of the job, let me ask you this: Isn't this a conclusion that a lay person familiar with the facts could reach on his own without the aid of a safety professional?*

. . .

A.    *The answer is maybe. Yeah. Possible. I don't know for sure, but yeah, it's possible.*

Q.    *Well, I mean, the facts that you're relying on for this basis for the conclusion are that there are a lot of people with little or no English fluency who work successfully at Beauty Enterprises?*

A.    *That is true.*

Q.    *Without getting hurt?*

A.    *That is true.*

Q.    *If a lay person knew that fact, they could reach the same conclusion you could, right?*

A.    *Okay. Phrased that way, yes, I would agree.*

Q.    *So is there any part of your expertise as opposed to your general intellect and common sense and knowledge of the facts that you relied on in this particular instance?*

A.    *Yes. There is more to it, sure.*

Q.    *What?*

A.    *The average [juror] wouldn't have access to all the injury data. the average [juror] wouldn't necessarily know what could have been*

10

> *done to have avoided exposing people to hazards, regardless of language and so on.*
>
> Q.  *But that's not what you are - - that's not the basis  - -  that's not this particular basis for your ultimate conclusion here.  This particular basis is simply the fact that there are a lot of people working at Beauty Enterprises, so you say, with limited or no English fluency and they don't get hurt.*
>
> A.  *That's a true statement.*
>
> Q.  *And you don't have to be an expert to figure that out?*
>
> A.  *If they have that data.*
>
> Q.  *Right.  If they knew those facts?*
>
> A.  *That's correct.*

(See Exhibit B, Harper Depo. at pp. 115-118.)

There will be testimony at trial concerning the claimants' safety records.  If this testimony is consistent with Mr. Harper's reading of the discovery record, the trier will have before it what Mr. Harper had before him in preparing his opinion and will be just as able as he was to invoke common sense and draw a conclusion about whether this evidence supports the EEOC's position.  Again, the fact finder does not need, and would not be helped, by Mr. Harper's work here.  It is "amply suited" to make its own judgment and should not be discouraged from doing so by hearing Mr. Harper's "expert" testimony on the issue.  See Nichols v. Continental Airlines, No. Civ. 01-232-BS, 2002 WL 1724017, at *3 (D. Me. July 23, 2002) (excluding safety expert's

11

testimony regarding the lighting and walk-through policy of an airline where the expert's testimony provided the jury "with no assistance as to how dark it was on the plane [and] [l]ay witnesses who were actually present [could] describe the degree of darkness [allowing] the jury [to] sort it out based on common experience").

As to the third basis for Mr. Harper's "not necessary for safety" opinion (that "BEI's relatively poor safety performance is clearly not related to language but . . . reflect[s] a failure of management to provide an effective safety program"), its unhelpfulness is not a function of Mr. Harper doing only what a layperson would have done.  It is a function of Mr. Harper doing what no one would have done -- asserting a connection between BEI's safety performance and his view that BEI failed to create an effective safety program, on the one hand, and the necessity, or lack of necessity, of the English-only rule for safety purposes, on the other.  There is no logical connection between these things.  See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (opinion irrelevant when "there is simply too great an analytical gap between the data and the opinion proffered").

Certainly Mr. Harper is unable to furnish such a connection between BEI's "safety performance" and the necessity, or lack of necessity, of the English-only rule. He says that by "safety performance," he means the type of injuries warehouse workers suffer at BEI and whether the rate of those injuries increased over time.  (See

12

Exhibit A, Report, pp. 7-8; Exhibit B, Harper Depo. pp. 118-119.)  He then notes that the type of injuries these employees typically suffer – back strains, sprains, cuts – have nothing to do with language; that is, they were not caused by "a failure to adhere to" the English-only rule (Exhibit A, Report, pp. 3, 7), and presumably could not have been prevented by adherence to the rule.  (See also, Exhibit B, Harper Depo., p. 119, "If you look at their injuries, their sprains, cuts, [these are] things that have no bearing or no provable bearing or connection to English or a lack of English.")  From this he reasons that the English-only rule is irrelevant and, hence, unnecessary.  (Exhibit B, Harper Depo. pp. 123-124.)

The flaw in this reasoning is apparent.  It is premised on injuries that happened and fails to account for injuries avoided.  It may well be that language, or the failure to adhere to the English-only rule, did not cause, or could not have prevented, injuries that actually happened, but this does not mean that language and adherence to the English-only rule did not prevent injuries that could otherwise have happened.  For example, Mr. Harper admits that employees at BEI face the hazards of ladder falls, materials falling from high shelves and moving forklifts.  (Exhibit B, Harper Depo., p. 85.)  Common sense and experience teach that the ability to warn others of the imminence of these hazards using words that everyone understands ("look out," "watch out," "get out of the way") can be helpful in avoiding the injuries those hazards

13

produce.  Even Mr. Harper admits that it "may help," that this "may be." (Id., pp. 84, 86.)  Indeed, the absence of these injuries at BEI, with its English-only rule, suggests that the rule has helped to prevent these injuries.  This precludes the conclusion that the rule is irrelevant, destroys the linchpin of Mr. Harper's "not necessary for safety" opinion and exposes the illogic of his third basis.

Mr. Harper is also unable to furnish a logical connection between BEI's failure, in his view, to fashion an effective safety program and the necessity, or lack of necessity, of the English-only rule.[5]  He certainly was unable to do this at his deposition.

> Q:    . . . I know that you are very critical in your report of Beauty Enterprises' safety practices and the priority you seem to think that Beauty Enterprises places on safety, is that right?
>
> A:    Well, they - -
>
> Q:    Is that right? Yes or no.
>
> A.    Yes, I am critical.
>
> Q:    Okay.  And what I'm trying to understand from you is the connection between that and your opinion about the necessity of the English only rule from a safety perspective.  Can you explain it to me?
>
> A:    Did they hold classes in safety?  They had a little new employee orientation.  That was it.  They didn't try to communicate safety in English

---

[5] BEI disputes Mr. Harper's assessment of its safety program and its attitude towards safety.

*or any other language.  I mean, how can communication be an issue if I don't try to put it to use in terms of reducing injuries.*

Q:    *So is this your logic then?  Let me try this on you:  Beauty Enterprises does virtually no safety training and communicates little or no safety information.*

A:    *That appears to be - -*

Q:    *Therefore, the employees don't need to know any language in order to get along in the workplace and therefore the English-only rule can't be viewed as a business necessity for safety reasons.*

A:    *That's such an extreme hypothetical.  I just don't know how to relate to that . . .*

Q:    *. . . After all that, can you explain to me how you reason that a poor safety performance not related to language can lead to the conclusion that the English-only rule isn't necessary from a safety perspective?  . . .*

A:    *I come from the standpoint of the site visit to a great extent.  The site visit allowed me to look at the environment that they worked in.  And what I saw was conditions and an environment that allowed a certain level of exposures to potential risk.  And that is a management responsibility, not an employee responsibility.*

*So the first step in the exercise in arriving at various professional opinions is:  Are the employees being asked to work in an environment that tends to expose them perhaps a little bit more than, say, a differently managed environment might?  So the conclusion is that could have been addressed [but] were not.  . . .*

Q:    *And so what does that have to do with the conclusion that the English-only rule isn't necessary for safety purposes?*

A:    *Because the English-only rule was not consistently followed because people still spoke in a variety of languages at the site, including even supervisors, by testimony; therefore, they were not strictly adhered to. The English-only was mostly - - well, I shouldn't use the term "mostly,"*

15

> *but the English-only policy was not strictly adhered to or followed throughout the period.*

(Exhibit B, Harper Depo., pp. 126-129.)

The incomprehensibility of this testimony does not reflect a personal failing on Mr. Harper's part – a personal inability to explain.  No one could explain the connection between BEI's attitude toward safety, as Mr. Harper sees it, and the need, or lack of need, for an English only rule at BEI, because there is none.  What Mr. Harper is really expressing here is incredulity.  He simply cannot believe that an employer with, in his view, so little interest in safety can have a rule the purpose of which (or a purpose of which) is safety; that safety must be a pretext for discrimination.  Suffice it to say, Mr. Harper's view of BEI's intent is neither relevant in the <u>Daubert</u> sense, nor the product of any "scientific, technical or other specialized knowledge" within the meaning of Rule 702.

Based solely on its lack of relevancy, then, Mr. Harper's "not necessary for safety" opinion must be excluded.

### B.    <u>Mr. Harper's Opinion That The Rule Is Not Necessary For Safety Purposes Is Unreliable Under Daubert's Standards</u>

That Mr. Harper did no more than a reasonably intelligent layperson would have done to determine whether the English-only rule is necessary for safety purposes at BEI not only establishes that his opinion is irrelevant in the <u>Daubert</u> sense, but also

16

that it is unreliable under <u>Daubert</u>'s standards.  The essence of the <u>Daubert</u> standards is that an expert must arrive at his opinion using a method and an analysis that are objective and recognized in his field.  At a minimum, the expert should be able to point to something authoritative in his field that recognizes his method and informs his analysis.  Otherwise, his approach is, in the Supreme Court's words, simply subjective and conclusory – and thus, unworthy of consideration.  <u>Daubert,</u> 509 U.S. at 592.

Mr. Harper can point to nothing beyond his own common sense in this regard.

Q.    *Okay.  Now, to arrive at your opinion regarding the English-only rule not being necessary for safety, did you read and rely on any text regarded as authoritative in the field?*

A.    *No.*

Q.    *Did you read and rely on any journal articles?*

A.    *No.*

Q.    *Did you conduct any experiments?*

A.    *No.*

Q.    *. . . What, if anything, did you rely upon in choosing the method that you used to develop your opinion?*

. . .

A.    *I think it a proper answer would be is [sic] 30 years of accumulated experience, a flow of data that covered this same period, personal investigation experience and a composite of that.*

. . .

17

> Q.    *You didn't rely on any formal protocol issued by the - - one of the safety engineering organizations you are in, did you?*
>
> A.    *No.*
>
> Q.    *Did you review your methodology with any of your - - used in this case with any of your peers you have in the safety profession?*
>
> A.    *No.*
>
> Q.    *Did you have any of your peers review your conclusions?*
>
> A.    *No.*

(See Exhibit B, Harper Depo. at pp. 86-88.)

Where, as here, expert opinion evidence "is connected to existing data only by the *ipse dixit* of the expert," it should be excluded. Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). Where, as here, an expert's opinion is based on a nonexistent or unreliable methodology, it must be excluded. See id.

This is not to say that experience can never be the basis for an opinion drawn from facts. It can. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.") But where, as here, the expert claims that he is relying on his experience, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how

18

that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (citation omitted).

Here, Mr. Harper has never attempted to explain these things.  He failed to do so in his report.  He failed to do so at his deposition.  And the reason is evident:  He has no explanations.  He really does want the Court to "take his word for it." This it cannot do.

Mr. Harper's "not necessary for safety" opinion is neither relevant, nor reliable. It cannot be permitted to pass through the proverbial gate.

**C.    Mr. Harper is Not Qualified to Provide Expert Testimony on "Workplace Harmony and Ethnic Tension" at BEI**

Unwilling to limit his testimony to safety issues, the EEOC intends to have Mr. Harper opine on whether the English-only rule achieved its (BEI's stated) purpose  – to reduce ethnic tension amongst its ethnically diverse workforce and create a workplace where the rank and file workers are able to work in harmony with one another.  The opinion it wants, of course, is that the rule did not achieve this purpose.  Mr. Harper does not shrink from the task.  In his Report, he boldly pronounces that:

> . . . it is my opinion that the English-only policy not only failed to provide a harmonious workplace or reduce ethnic tensions, but in fact created a system of **fix the worker**, rather than **fix the system**, that in my experience could only result in a continuation of poor outcomes including <u>less</u> worker harmony and <u>increased</u> ethnic tension.

19

(See Exhibit A, Report at pp. 2) (emphasis in original).  While Mr. Harper's eagerness to give his customer what it wants is commendable, and his willingness to go where no safety expert has gone before is courageous, his utter lack of qualifications is ultimately fatal to his efforts.

Mr. Harper effectively conceded his lack of qualification when the topic was raised at his deposition:

> Q.    *Let's cut right to the chase.  That's not your area of expertise, is it sir?*
> . . .
>  A.    *It certainly could be.*
>
> Q.    *You are a safety professional, right?*
>
> A.    *Yes.*
>
> Q.    *You're not a human relations person, are you?*
>
> A.    *No, I'm not.*
>
> Q.    *You're not a psychologist, are you?*
>
> A.    *Thankfully, no.*
>
> Q.    *You're not a specialist in industrial relations, are you?*
>
> A.    *I think not.*

(See Ex. B, Harper Depo. at p. 142.)  On this basis alone, this opinion of Mr. Harper's must be excluded.

20

Yet, even if Mr. Harper had the requisite qualifications, the EEOC's effort to admit this opinion must fail. The testimony is neither relevant, nor reliable in <u>Daubert</u> terms. As he did in rendering his "not necessary for safety" opinion, Mr. Harper did nothing more here than any reasonably intelligent layperson would have done. He drew what supposedly are common sense conclusions from the record presented to him. (See Exhibit B, Harper Depo., p. 145.) This is hardly a reliable methodology, nor has it produced anything that would enable the trier to do something it could not do equally well on its own.

The catalogue of flaws does not end here, however. Mr. Harper's "tension and harmony" opinion is ultimately ridiculous. The following testimony graphically demonstrates this.

> Q:    *Let's talk about that part of your opinion that the English-only policy failed to provide a harmonious workplace. I'm trying to figure out what you're saying here. Are you saying that the workplace wasn't harmonious at any time that the rule was in effect?*
>
> A:    *That's not what I'm saying.*
>
> Q:    *What are you saying?*
>
> A:    *At any time, I don't know.*
>
> Q:    *You don't know what you're saying?*
>
> A:    *No, I don't know what you mean by 'any time.' I mean, we're talking about a 30-plus, 40-plus year company here. So any time means – I'm*

*sure there were a lot of periods of harmonious whatever. But there were periods where there probably wasn't based on the testimonies that I saw.*

Q:    *Well, where is the disharmony that you see?*

A:    *I can't answer that without reference to some of the documents. The disharmony is the lawsuit, I would assume, the discrimination lawsuit. That's the major disharmony here. So it's almost self-evident. So I guess that's why I'm struggling with the question.*

Q:    *Well, wouldn't it be fair to say that a group of employees suing the company over a workplace rule contrary to the company's wishes and contrary to the wishes of other employees explains whatever disharmony you perceived and not the English-only policy itself?*

A:    *I'm not sure how to answer that? . . . .*

Q:    *. . . if you understand Beauty Enterprises' position, we're [it's] trying [through the rule] to prevent employees from fighting with one another verbally or otherwise, feeling that they've been insulted by another. . . . [I]f I define harmonious as limited to that situation, did you find any evidence of disharmony? . . .*

A:    *I don't know how to answer that? . . .*

Q:    *. . . Did you find any evidence of ethnic tension?*

A:    *There appears to be ethnic tension just based on testimony, and, you know, in the depositions.*

Q:    *If I told you that virtually all the employees who are charging parties in this case say that there is no ethnic tension at Beauty Enterprises, there was no ethnic tension before the lawsuit, there is no ethnic tension after the lawsuit, there was never any ethnic tension –*

A:    *So no reason for –*

Q:    *Would you agree with that?*

> A:    *From the employees, no, I'd say that's fine. They apparently got along to their - - you know, to their satisfaction.*
>
> Q:    *Do you accept that? Is that your recollection of the testimony?*
>
> A:    *Yes.*

(Exhibit B, Harper Depo., pp. 142-149.)

BEI maintains that its English-only rule has been in place for perhaps thirty years. The EEOC will concede that the rule has been in existence since at least the late '80's or the early '90's. Yet, the only disharmony Mr. Harper gleans from the record is disharmony from the time this lawsuit commenced, and the disharmony he gleans is "the lawsuit itself." It is ridiculous to conclude from this that the rule failed to create a harmonious workplace. In fact, the testimony he admittedly recollects concerning the absence of employee v. employee ethnic tension suggests that indeed, the rule has achieved its purpose. And in light of the testimony that there never was ethnic tension at BEI, it is simply absurd to conclude, as Mr. Harper does, that the rule failed to reduce, and actually increased, ethnic tension there.

This also explains the absurdity of Mr. Harper's additional conclusion that BEI's "fix the worker, rather than fix the system" approach produced increased ethnic tension. The following testimony provides a further explanation:

> Q:    *How could a system of fix the worker rather than fix the system produce increased ethnic tension?*

> *A:    If I'm working in an unsafe environment and have no program to reduce exposures, it can't make a positive work environment. Usually, there is going to be people who are either afraid to speak up, afraid for their work, their jobs.*
>
> *Q:    So it would create tension, tension among – tension with anybody?*
>
> *A:    With the employment - - employer.*
>
> *Q:    With the employer?*
>
> *A:    Right.*
>
> *Q:    And how would that tension be ethnic in nature?*
>
> *A:    I can't answer that at the moment.*

(Exhibit B, Harper Depo., p. 152.)

Mr. Harper's "tension and harmony" opinion must be excluded. It should not be permitted even to approach the gate.

**D.    Mr. Harper's Other Opinions Suffer From One Or More Admissibility Flaws**

Embedded in Mr. Harper's Report are two other opinion-like statements that should be addressed even though it is not clear that the EEOC will seek to present them at trial.

The first is on page three, where Mr. Harper suggests that the English-only rule does not promote productivity. Arguably, an expert opinion on productivity could be germane, because BEI maintains that in considering whether to adopt the rule, it

24

recognized that the rule would enhance productivity in its warehouse.  The EEOC may

thus attempt to prove that the rule is not a business necessity for productivity at BEI.

Yet, it is perfectly clear that Mr. Harper is not qualified to opine as an expert on this

subject.

> Q:    *Are you a productivity expert, sir?*
>
> A:    *I don't know what would constitute an expert level?*
>
> Q:    *Do you list it here on your stationary [where he lists his areas of expertise] .*
>
> . .
> A:    *I do not.*
>
> Q:    *Did you identify productivity as one of the areas of expertise - - [earlier in our deposition]?*
>
> A:    *I did not.  . . .*
>
> Q:    *Now, to be fair with you I imagine as a safety professional you're able to speak as an expert about the impact safety improvements or safety issues can have on worker productivity; am I right about that?*
>
> A:    *Absolutely.*
>
> Q:    *And that's because people in your field study these things, yes?*
>
> A:    *We perform the work and measure the change.*
>
> Q:    *Why can't you just answer my question.  Is that because people in your field study these things?*
>
> A:    *Yes. . .*

Q:      *And it's because people in your field write about these things in the professional literature, yes?*

A:      *Yes.*

Q:      *And some professionals actually have experience in dealing with these things on a professional basis, yes?*

A:      *Yes.*

Q:      *Okay. Now, how is it that you can speak as an expert about the impact of an English-only rule on productivity?  In other words, what education, training or experience do you have with productivity that doesn't involve safety or the absence of safety?*

A:      *I've been involved with the development processes, product equipment, new installation of equipment.  All of these things have an impact on productivity.*

Q:      *From a safety perspective, right?*

A:      *From a safety, human factors, ergonomics standpoint.  All of that.  For years.*

Q:      *So what education, training or experience do you have in productivity that does not involve safety?*

A:      *It's hard to find a subject matter that doesn't have anything to do with safety when you're involved in this process from top to bottom.*

Q:      *But you're not saying because you have an expertise in safety that you are an expert in everything that goes on within a workplace, are you?*

A:      *No, I'm not an expert in every aspect.*

(Exhibit B, Harper Depo., pp. 154-158.)

Consistent with his lack of expertise, Mr. Harper did none of the things an expert would customarily do to render a reliable opinion on English-only rules and productivity.  He failed to search the literature.  He conducted no studies.  In fact, he essentially admits that his statement on productivity is not really an opinion; it is simply a comment that he has seen no evidence that an English-only rule promotes productivity.  (Exhibit B, Harper Depo., pp. 154-155.)

Where, as here, the witness is not an expert, the opinion is not reliable and the opinion is not even an opinion, the testimony is not only excludable under <u>Daubert</u> and Rule 702; it is excludable as irrelevant under Rules 401 and 402.  Fed. R. Evid 401 and 402.

The second of Mr. Harper's other opinion-like statements also appears on page three of his Report.

> *Limited English is at most a minor inconvenience for employees.  However, not permitting reasonable native language discussions between two individuals clearly performing a legitimate task during working hours often results in less efficiency and higher risk of injury.*

Suffice it to say, Mr. Harper lacks the requisite education or training to qualify these statements as expert opinions.  He earned an associates degree from a California community college in 1977, but took no courses there in industrial engineering, the factors that make a workplace harmonious or anything of that ilk.  (Exhibit B, Harper Depo., pp. 13-15.)  He did a "degree completion program" and earned a bachelor's

27

degree from George Fox University in 1997, but once again took no courses devoted to industrial engineering or other similar subjects.  (Id., pp. 15-17.) And he never took any course at any time that covered the issues faced by limited or non-English speakers in the American workplace.[6] (Id., p. 63.)

His experience is equally unavailing, as the following testimony ably demonstrates.

Q.    *Have you ever supervised any employees who didn't speak English?*

A.    *I've had responsibility for employees that haven't spoken English?*

Q.    *What does that mean?*

A.    *Well, as a plant – or a site safety engineer, I have responsibilities that cover all areas of the site and plant.  And we have a lot of people that either speak limited English over the years or no English.  And so I've worked - - directly with supervisors who had them under their direct charge.*

Q.    *Okay.  But you've never supervised employees who didn't speak English.*

A.    *Not one on one.*

Q.    *Okay.  Have you ever supervised any employees whose English language skills were negligible?*

---

[6] He claims that he has attended "seminars" on this subject.  He is not sure how many.  He remembers one.  It was at the professional development conference of the American Society of Safety Engineers.  It was focused on training limited or non-English speakers.  And he had reached his opinion in this case before he attended that seminar.  (Exhibit B, Harper Depo., pp. 63-67.)

28

> A.    Yes.  I'm sorry, I'm not sure what we mean by "negligible."  We were able to communicate?
>
> Q.    By using English words.
>
> A.    English, yes.
>
> Q.    Have you ever worked with any employees who were bilingual?
>
> A.    Many times.
>
> Q.    How have you communicated with them?
>
> A.    In English.

(See Ex. B, Harper Depo. at pp. 62-63.)

> Q:    And the fact is, sir, that you've never had any experience in a workplace where native language discussions were prohibited while on the clock, have you?
>
> A:    That's correct.

(Id., p. 159.)

Yet, once again, lack of expertise is not the only admissibility flaw present in this "opinion."  There is no methodology, reliable or otherwise.  And even more remarkably, it conflicts with another statement Mr. Harper made in his Report and deposition.

The conflict is with the opinion that "not permitting reasonable native language discussions . . . often results . .. in a higher risk of injury."  The conflicting statement is at page 6, subparagraph A of his Report.  "Language did not contribute in any way to

29

injuries that employees experienced at Beauty Enterprises."  Asked at his deposition whether he saw any conflict between these statements, Mr. Harper answered candidly, "Potentially so, yes."  (Exhibit B, Harper Depo., p. 160.)

As with the other opinions, exclusion is the only fitting outcome here.

**IV.    CONCLUSION**

For the reasons discussed, BEI respectfully requests that its Motion to Exclude be granted.

THE DEFENDANT
BEAUTY ENTERPRISES, INC.

By: _____
Richard C. Robinson (ct04321)
Brian C. Roche (ct17975)
Pullman & Comley, LLC
90 State House Square
Hartford, CT 06103
Telephone: (860) 541-3333
Facsimile: (860) 424-4370

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record.

**Plaintiff Equal Employment Opportunity Commission:**
Katherine Bissell, Esq.
EEOC - New York District Office
7 World Trade Center, 18th Floor
New York, NY 10048-1102

Rosa Lilliana Palacios, Esq.
525 FDR Avenue
Plaza Las Americas, Suite 1202
San Juan, Puerto Rico 00918-8001

Markus L. Penzel, Esq.
EEOC - Boston Area Office
J.F.K. Federal Building, Room 475
Boston, MA 02203-0506

**Intervenors:**

Barbara E. Gardner
843 Main Street, Suite I-4
Manchester, CT  06040
Julia Morris Paul
Marte, Plepler, Falkenstein, Keith, Meggers & Paul, P.C.
113 East Center Street
Manchester, CT  06040

_____
Brian C. Roche
Richard C. Robinson

HTFD/65094.1/RCR/137949v1

31