# ISC SERVICE

INDUSTRIAL SAFETY CONSULTING SERVICE

ACCIDENT RECONSTRUCTION * ERGONOMICS
EXPERT WITNESS * INDUSTRIAL SAFETY
PRODUCT SAFETY/REGULATIONS * PROCESS SAFETY
SAFETY AUDITS * NOISE ASSESSMENTS
OSHA COMPLIANCE * FIRE AND BUILDING CODES



# REPORT ON
## SAFETY & RELATED ASPECTS IN
## EEOC vs. Beauty Enterprises, INC.

### December 11th, 2003





**EARNEST F. HARPER, CSP, BCFE, DACFET**
Board Certified Safety Professional
Board Certified Forensic Examiner
Diplomate, American College of Forensic Engineering and Technology
ASSE Fellow; ACFE Fellow

# REPORT ON
## SAFETY AND RELATED ASPECTS
## IN
## EEOC vs. Beauty Enterprises, Inc.
By EARNEST F. HARPER, CSP, BCFE, DACFET
December 11, 2003

## Background:

My name is Earnest F. Harper and I reside at 11263 W. Bodley Drive, Boise, Idaho 83709. I am a Certified Safety Professional and Board Certified Forensics Examiner with over 30 years experience in industrial safety, accident reconstruction, human factors (*the study of people in their work environment, performing a task*), loss prevention, code compliance and design safety in machinery, processes, products and buildings. My experience includes working with limited or no-English speaking individuals. A CV is attached or otherwise included with additional detail.

## Synopsis:

In my opinion there was no safety, health or operational (i.e., equipment safety) reason for BEAUTY ENTERPRISES, Inc., hereafter referred to as BEI, to implement an English-Only Policy or rule. Furthermore, it is my opinion that the English-only policy not only failed to provide a harmonious workplace or reduce ethnic tensions, but in fact created a system of *fix the worker*, rather than *fix the system*, that, in my experience can only result in a continuation of poor outcomes including less worker harmony and increased ethnic tension. It will be shown below that BEI's safety problems clearly indicate a failure of the management system and lack of a coordinated safety program and **not** a failure of the employee workforce. These opinions are based upon my background and experience along with the following.

1. There is nothing inherently unsafe or unusual about multilingual workforces. In fact, according to the 1990 U.S. Census, 25.5 million people (13 percent) earn a living without ever speaking much English. Despite increases in the percentage of limited English workers in the U.S., overall worker safety has not been affected as evidenced by declining U.S. injury rates over the last decade.

2. There is clear evidence that BEI's English-Only policy is not a business necessity, especially for safety, because (a) alternate communication strategies are numerous, (b) claimants with limited or no English fluency were already performing the essential functions of the job, five for a total of 98 years, and (c) because BEI's relatively poor safety performance is clearly not related to language but can, and will be, shown to reflect a failure of management to

2

provide an effective safety program essential to any successful business strategy.

3. In the safety profession, it can be shown that effective <u>safety</u> improvements usually result in increased productivity, particularly in moderate to high physically demanding jobs such as found in many warehousing occupations. In my 30+ years with industry and the safety profession I have personally neither experienced nor seen studies suggesting that productivity would improve simply by requiring English-Only in the workplace. Improved safety, on the other hand, when done properly, typically translates to lower fatigue, shorter reach distances, more mechanical aids for very heavy loads; less need to seek help with large packages, less obstructive clutter in aisles, fewer minor injuries to treat during the shift and a sense that management really cares for the worker, to name a few elements of smart business strategies.

4. Based on BEI's OSHA logs 01/1990 to 6/2001, the injury rate clearly was rising despite the alleged existence of BEI's English-only rule years before it became a written rule in March 2001. In fact, the injury rate increased 201.3 % in the ten years from 1990 to 2000.

5. Not a single BEI injury can be traced to a failure to adhere to an English-Only Policy. Slightly over 58 % of all injuries from 1990 through June 2001 involved sprains, strains or cuts. Despite a consistent pattern of injury by type, BEI failed to adequately address underlying material handling factors leading to their most common and reoccurring injuries.

6. Although elimination of hazards would be one of the first goals of an effective safety program, there is no evidence that BEI put any serious effort into creating a formal, documented and staffed organization to make this happen. There was no Safety Manual, safety was mentioned in a few lines covering housekeeping and injury reporting in the policy manual and Supervisors like Fabian Pineros, the Warehouse Manager, were even unaware of basic facts like OSHA Logs and Material Safety Data Sheets (MSDS). A safety committee was formed around 1998-1999, but met less than an hour per year, may not have published minutes and, according to Chairman Tom Buonocore, never discussed the English only policy. Although CPR and First Aid may have been taught, outside of some 2001 forklift training upgrades, major training issues like material handling were handled poorly, if at all. Although the communication of safe operating procedures and plant safety rules is also important it can be amply accomplished by demonstration, use of bilingual coworkers to assist with some communication or multilingual labeling and by other means. <u>Limited English is at most a minor inconvenience</u> for employees. However, not permitting reasonable native language discussions between two individuals clearly performing a legitimate task during working hours often results in less efficiency and higher risk of injury. (Inefficiency can mean more frequent handling of heavy boxes, for example, thus

increasing stress and fatigue with more opportunity for harm to the less experienced worker.)

7. Compliance with most safety requirements and plant safety rules is easily validated by direct observation. There is no evidence that a failure to adhere to the English-Only Policy or "limited English" was a barrier to safe behavior. Certainly, no Federal OSHA code requires a written test in order to certify that an adequate level of safety knowledge has been achieved.

8. Finally, <u>the case for an English-Only Policy</u> as a means of reducing ethnic tension, increasing harmony, somehow being better for BEI's business climate or safety, in my opinion simply has not been made by BEI. In fact, based on BEI management testimony, no studies or comparisons were ever made to determine the effect of such a policy, if any. There is every indication that BEI had continued to hire limited or non-English speaking employees throughout the years and these employees performed pulling, packing, forklift driving and other tasking that BEI considered challenging. Native languages continued to be allowed on breaks and lunch hours even though, logically, that would be a time most vulnerable to spawning tension. In addition, deposition testimony of Claimants and Supervisors supports the fact that the English-Only Policy was frequently violated during work hours without incident. On the other hand, BEI took no action to remove leadership, informational, work environment or cultural barriers. Similarly, there is no indication that BEI attempted to build team dynamics, establish shared employee ownership for work goals or any of the leadership tactics typically used to build a healthy employee-management team. In my opinion, the English-Only Policy only made things worse.

## Preparatory Work:

I have examined various documents, including but not limited to, over 40 depositions, interrogatories, OSHA Logs, job descriptions, photos, the Employee Policy Manual, OSHA Citations and Complaints. A site visit was made on December 6th, 2001 as part of the evaluation process. On December 7th, 2001 I participated in the interviews of a few employees. Based upon the preponderance and content of material reviewed to this date, it seems incredible that any conclusion can be reached other than **there was no safety basis for the implementation of BEI's English-Only Policy.**

## Safety Information needed by employees:

An employee's work environment and assigned work or tasking determines the level of specific or even mandatory training that may be required. However, since regulatory training requirements cannot anticipate routine hazards responsible for most, if not all, injuries in a given work environment, employee safety is dependant upon multiple factors. These include, but are not limited to, proper equipment and process design, safe work procedures, control and monitoring of materials that may cause harm,

4

<u>proactive hazard assessment</u> (in particular) and follow-up by the employer and employee awareness of on-the-job risk factors. The employer is not only free to use any effective communication and training method available to them, but is, in fact, obligated to use any reasonable means to assure that the employee comprehends the basic data necessary for their safety. Companies like BEI would be well advised to train their supervisory staff to be open and approachable even while being fair, firm and consistent on matters of safety. This encourages open dialog and a non-threatening work environment where employees are unlikely to fear the reporting of injuries or unsafe conditions. There is no evidence that BEI provided this type of leadership training or people skills to their key managers and supervisors.

A. <u>**Risks present in the environment:**</u>

1. **The site visit of December 6th, 2001:** (Observations, comments, risk factors)

   A. The Hartford site is typical of warehousing and shipping and receiving environments with ordinary hazards commonly associated with material handling-intensive occupancies. There are no "High-Hazard" operations or materials requiring extra-ordinary care, training or design.

   B. Chemical use, overall, is minor and primarily used for cleaning. These chemicals are not hazardous when handled with reasonable care. The claimants have little direct involvement with chemicals and no observed involvement with hazardous plant chemicals or gases.

   C. Work areas are full with warehousing product, many tall racks, some lower gravity-feed racks, and various pallets staged on open floor areas, loose boxes, forklift activity, stock ladders, work tables and computer stations. The primary risks involve material handling hazards such as lifting, pushing and pulling stresses along with knife cuts, falling material, ladder falls and forklift traffic. This is further supported by available injury data.

   D. BEI employees have not been trained in emergency procedures such as <u>FIRE</u> or <u>EARTHQUAKE</u> emergencies. In my opinion, this is a serious management failure considering that many safety professionals including myself see this warehouse as a <u>20-MINUTE BUILDING</u>, that can be destroyed by an uncontrolled fire in 20 minutes or less. Fire traveling horizontally through the storage racks could easily and quickly overwhelm the high ceiling sprinklers, particularly when the system is poorly maintained.

   E. The primary structure is divided into multiple warehouses, showroom, lobby, an office, garages and shipping and receiving. Separating walls are uneven and exit signage and pathways are not always open and obvious due to the high storage racks and exits routes not lined up with exit doors. Floors are not marked to show exit pathways. BEI has shown no evidence that Fire

Drills have been held. Upon questioning, one 18-year BEI manager could not recall what the evacuation alarm sounded like, bell, horn or siren.

2. **General Safety:**

   A. After reviewing depositions, injury logs and other material, it is clear that BEI's employees who did not adhere to the English-Only Policy did not cause any reduction in safety, nor did language contribute in any way to those injuries. Data clearly shows that hazards were independent of language. There is no evidence that a lack of knowledge or specific job skill on the part of the plaintiffs' was a direct causal factor in <u>any</u> injury.

   B. Most warehouse layouts, operational safety and protective features require an effective safety management program, much of which can be shown to be lacking at the Hartford facility. This is reflected, in part, by a lack of safety meetings, no written safety program, no site-wide safety audits, untested fire systems with sprinkler valves not locked "open," employees not being told what to do in emergencies, untrained (i.e., not trained by certified trainers) supervisors driving forklifts, untrained supervisors "teaching" employees to drive forklifts and a failure to aggressively address their number one injury, material handling strains and sprains. BEI property insurers apparently did not audit, nor were they asked to audit, safety in the plant. Employees often were uncertain that they had permission to use stock ladders and frequently were exposed to hazards such as a stair without a handrail and another stair with improperly designed handrails that partially blocked an exit. None of these examples reflect problems with employee's limited English abilities or reflect a failure to adhere to an English-Only Policy.

   C. Warning signs and labels appeared to be infrequent at BEI and while their effectiveness is limited, nevertheless safety signage can be an indication that safety is being addressed on some level. In today's workplace, safety signage, labeling and Material Safety Data Sheets (MSDS's) can be acquired in a variety of languages or can be created directly by bilingual co-workers under direct guidance of a knowledgeable safety expert. Many times, graphic/pictorial international hazard symbols can be used in lieu of text (e.g., a hand near a flame symbol to signify a "HOT" surface).

   D. Availability of bilingual employees, including some supervisors, existed as a valuable resource at the BEI facility, yet weren't utilized because of the English-Only Policy. Limiting communications when it isn't necessary would almost certainly decrease workplace efficiencies and therefore, safety. This is clearly counter-productive in my view. Contrarily, there is no evidence that a failure to comply with the English-Only Policy created unsafe conditions within BEI's facility or externally when we include BEI truck drivers.

E.  Safety is a shared responsibility with management. This responsibility is, however, greater with management since it has the authority to effect change, enforce safe procedures, ensure that machinery and equipment meet safety standards and are properly maintained. Management can also move freely about the plant to observe conditions that may otherwise fail to be noticed by employees going about their daily work routine.

F.  Many ordinary plant hazards are open and obvious to most employees _regardless of language_, yet still can and do cause injury if not corrected. These may include oil on the floor or tasks requiring frequent lifting, poor housekeeping, and objects stacked too high, crowded aisles and more. When management creates artificial barriers such as English-Only, employees with limited English, especially if they perceive it to be a punitive or somewhat threatening work environment, often become reluctant to speak up.

3. **Injury Experience:**

The type, nature and extent of injuries and illnesses reported on the BEI OSHA 200 Logs were reviewed for the period ranging between **January 1990 and June 2001**.

Several facts become apparent immediately. But, most importantly, **it is clear that Injuries were not based on a lack of knowledge or by any issue related to poor English or a failure to adhere to the English-Only Policy.** In short, language clearly is not a causal factor in any of these 193 injuries.

Conclusions therefore are based in part, as follows:

A.  BEI's OSHA 200 Injury and Illness logs from 1990 – 2001 do not indicate any accidents that were caused in whole or in part by any lack in English proficiency or because of a failure to adhere to an English-Only Policy.

B.  A breakdown of injury by type shows injuries typical of material handling operations. None of the following reflect causes based upon language.

| BEI INJURY BREAKDOWN BY TYPE – 90 TO 01 | |
|---|---|
| STRAINS/SPRAINS (85) | 44.0 % |
| CUTS/PUNCTURES (28) | 14.5 % |
| STRUCK BY/BRUISED (27) | 14.0 % |
| NON-SPECIFIC PAIN (26) | 13.5 % |
| EYE INJURIES (7) | 03.6 % |
| REPETITIVE (6) | 03.1 % |
| FALLS (5) | 02.6 % |
| MISC (9) | 04.7 % |

7

C. Over that period, only four of the twenty-three (23) Plaintiffs had a recordable entry (injury) and only three had lost time away from work.

D. **Several points can be highlighted from BEI's OSHA LOGS**: (Note that OSHA Logs are based on a calendar year rather than a fiscal year.)

1. The injury rate over the last ten years and six months beginning January 1990 through June 2001 clearly shows an upward trend. Objectively, one can conclude there is little cause to assume English-Only exerted a downward influence on injuries. It more likely that BEI's failure to provide an effective safety program or address the leading causes of injuries acted as an underlying reason for overall increases in injuries.

2. The injury rate indicated below increased 201.3 % from 1990 to 2000.

| OSHA LOG YEAR | BEI INJURY TOTALS | BEI LOST TIME DAYS | BEI INJURY RATE/100 EMP'S |
|---|---|---|---|
| 1990 | 09 | 01 | 7.8 |
| 1991 | 11 | 12 | 9.6 |
| 1992 | 13 | 18 | 11.3 |
| 1993 | 15 | 03 | 13.0 |
| 1994 | 18 | 51 | 15.7 |
| 1995 | 18 | 49 | 15.7 |
| 1996 | 23 | 38 | 20.0 |
| 1997 | 14 | 12 | 12.2 |
| 1998 | 14 | 48 | 12.2 |
| 1999 | 18 | 93 | 15.7 |
| 2000 | 27 | 28 | 23.5 |
| 2001* | 13 | 13 | 22.6 |

* FIRST SIX MONTHS ONLY. RATE BASIS ADJUSTED ACCORDINGLY

Note: The injury rate calculation is based upon 100 employees per year or its equivalent in hours, 200,000 hours/year. The formula is:

$$\text{Injury Rate} = \frac{(\# \text{ Injured}) \times (200{,}000 \text{ hours})}{(\text{Total hours actually worked})}$$

8

3. In summary, BEI's injury rates went up over the years examined above after it adopted the English-Only Policy in 1984. Since the 23 claimants had fewer than 10 % of BEI's total injuries over that period and less than 7 % of the lost days, it is very unlikely that this group had a negative influence over the upward trend in injuries. <u>Based on this and related data from BEI's OSHA logs, there is no evidence supporting the idea that plaintiffs were unsafe workers due to limited English or a failure to adhere to the English-Only Policy</u>.

**<u>OSHA And Identified Risks</u>:**

As an employer, BEI was required under Federal (**OSHA**) General Industry Safety Regulations to provide a workplace reasonably free from hazards. This obligation can include various requirements to train, instruct or advise employees on how to work safely around equipment (*e.g. battery chargers and forklifts*) or job safety (*e.g. lifting*).

- OSHA, <u>where training is mandatory</u>, requires only that it be appropriate to the risk and effectively communicated. *Pursuant to the OSHA Compliance (CPL) Directives, training must be in the foreign language or by other suitable methods if required for comprehension. (E.g., CPL-2-2.38D and CPL 2-2.44C).* Employers are held accountable.

- Training in English (only) is nowhere mandated and formal instruction is not limited to classrooms. Knowledge verification does not require written tests.

- Material Safety Data Sheets (MSDS) for chemicals need not be provided **only** in English. Employers are permitted to supplement English language chemical labeling with non-English equivalents.

**Mandated OSHA** training is limited to very specific exposures such as electrical shock (e.g. Federal OSHA 1910.332) and like similar mandatory training, often exempts employees protected by other means. When training is required, any effective method including non-English methods or means (e.g. classroom or OJT), may be used. **To further reduce** dependency on arbitrary factors such as "reading ability," codes and national standards provide guidelines for everything from designing equipment to personal protective equipment (*PPE*) and fire protection.

<u>Additionally</u>:

- There is no regulation requiring English proficiency under General Industry Standards (29 CFR 1910).

9

- There is no barrier to using non-English methods for training. In fact, pursuant to the OSHA Compliance (CPL) Directives, training must be in the foreign language or by other suitable methods if required for comprehension. (Examples: CPL 2-2.38D and CPL 2-2.44C)

- Under the HAZ-COM OSHA standard [Part 1910.1200(g)(2)], Material Safety Data Sheets (MSDS) and Labels are to be provided at least in English, **but employers are permitted many additional ways to communicate essential information from the MSDS to the employee, including in other languages.**

- There is no regulation requiring written tests for verifying comprehension of training, in any language. Any reliable method-establishing employee understanding can be used including use of interpreters or by certifying their knowledge after observing proper behaviors on the manufacturing floor.

- By performing safety training in English-only followed by an English-only test *(e.g. when BEI arbitrarily required a written forklift test thereby failing Mr. Acosta)* with no evidence that other means were used to ensure comprehension, BEI imposed an arbitrary and punitive training format "not" supported by any code or standard.

1. **Training:**

   In my opinion, BEI's weak efforts in providing employee safety training is indicative of their lack of focus on reducing injuries. The English-Only Policy has not been shown to be any factor what so ever in increasing safety and BEI made no studies or efforts to follow up on the owner's belief. A partial summary follows:

   a. <u>Forklifts (Powered Industrial Trucks)</u>. (1910.178) BEI got cited by OSHA in August 2001 for failing to ensure that the performance of Forklift Operators was evaluated every three years [29 CFR 1910.178(l)(4)(iii).] BEI complied with the citation by holding refresher training provided by supervisors who may or may not be considered competent trainers as required under 29 CFR 1910.178(l)(2)(iii). One employee, Mr. Harold Acosta, a 14 – plus year experienced forklift operator with no incidents, failed the test and was removed from forklift operator status even though the test was given only in English.

   b. <u>A Safety Orientation video</u>: Mr. Tom Buonocore, viewed as having responsibility for BEI's safety believes there "may have been" a video. As of this report, I do not have information on the existence of such a video. If it exists, it would be a minor part of the overall program.

Case 3:01-cv-00378-AHN   Document 68-2   Filed 04/30/2004   Page 11 of 12

c. <u>CPR and First Aid</u>: Other than this training and forklift training, there does not appear to be any other regular training provided by BEI.

d. <u>Other factors relative to employee safety and training</u>:

- There's no evidence employees had **emergency evacuation** training.

- There's no evidence employees had training in **proper lifting**, a major source of injuries at the Hartford facility.

- Despite having some chemicals, there is no evidence that BEI taught employees about **Material Safety Data Sheets (MSDS's)** as required by the Hazard communication standard when potential exposure may exist.

- Even though **ladders** were a primary tool, employees were not instructed in their use when handling materials.

- There is no indication that **safety committee** members received instructions or training with respect to duties or responsibilities. It is unclear whether or not minutes were kept.

- Managers remained mostly uninformed with respect to the relevance or even the existence of **OSHA 200 logs or MSDS** documents.

2. **Verifying Employee Knowledge:**

In my opinion as a safety professional, it was seldom necessary to do written testing at all. Written Safety tests often cover material that added difficulty but contributed very little to personal safety on the job.

Further, not making any effort to effectively communicate hazards using reasonable and verifiable methods that enhance basic understanding clearly may put employees at risk of serious injury.

3. **Non-English languages no barrier to training:**

Training materials, videos, job descriptions (etc.) are available that cover all manner of safety in other languages, especially Spanish. Some examples:

a. MSDS Unlimited, > 12 languages. (http://users.aol.com/RTNmsds/home.html)
b. The AFL-CIO's Web site has Spanish language safety and health resources.
c. MARCOM products, including many taped video general safety programs.
d. CULVER on electrical safety – Spanish.

11

  e. Total Language Solutions PLC can translate, or interpret, any language.
  f. Albany TRANSCOM International can translate or interpret 30 languages.
  g. American Red Cross disaster safety, includes Asian languages.
  h. Bi-lingual or multilingual Instructors. Including qualified co-workers.
  i. Any routine GOOGLE search under (Language) Translation Services will turn up hundreds of thousands of hits leading to help with language issues.

**Plaintiff's presented no risk to others:**

Training on safe job procedures was an on-the-job (OJT) learning process. These skills could not be taught in the classroom, nor did they need to take written exams. Supervisors could determine performance by direct observation and product output. Language was no barrier to performance or safety out on the warehouse floor as proven by an absence of associated incidents and by statistics.

Consider:

  A. **Injury Rates:** These clearly demonstrated that being limited in English or failing to adhere to BEI's English-Only Policy did not result in increased injuries. While employees could bring harm to other employees, for example by dropping a package on someone while attempting to take it off a rack, limited English or failing to adhere to BEI's English-Only Policy was never a causal factor.

  B. **Safety by design:** Plant equipment and processes were/are subject to OSHA standards for safety as, for example, protective enclosures (1910.212) that isolate electrical and mechanical hazards from operator areas. Safety is therefore not reliant on English only.

  C. **Stable and routine:** Plaintiff's testified that they often learned their job after only a few days despite language differences.

**In conclusion:**

In my opinion there is no safety, health or safety of equipment basis upon which to justify the necessity of an English-Only Policy at BEI. This opinion is based upon my background and experience and reflects a preponderance of the conclusions derived from material previously discussed above and indeed, supported by a complete absence of any compelling argument to the contrary.

*[signature]*

**Earnest F. Harper, CSP, BCFE, DACFET**
**December 11, 2003**