```
                                                                    Page 1
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
 2
       * * * * * * * * * * * * * * * * *
 3     EQUAL EMPLOYMENT OPPORTUNITY       )
       COMMISSION,                        )
 4                                        )
                Plaintiff,                )   Civil ActionNo.
 5         -vs-                           )   3:01CV378 (AHN)
       BEAUTY ENTERPRISES, INC.,          )
 6     AAA INDUSTRIAL TEMPORARIES, INC.,  )
       and ESSENTIAL TEMPORARIES, INC.,   )
 7              Defendants.               )
       * * * * * * * * * * * * * * * * *
 8     MIGUEL ANGEL ALVAREZ, WILLIAM      )
       TORRES, LUZ ANDUJAR, EVA DIAZ and  )
 9     WALESKA MIRANDA,                   )
                Plaintiff Intervenors,    )
10         -vs-                           )
       BEAUTY ENTERPRISES, INC.           )
11              Defendant.                )
       * * * * * * * * * * * * * * * * *
12     LUZ ANDUJAR, EVA DIAZ and          )
       WALESKA MIRANDA,                   )
13              Plaintiff Intervenors,    )
           -vs-                           )
14     ESSENTIAL PERSONNEL, INC.,         )
                Defendant.                )
15     * * * * * * * * * * * * * * * * *

16

17          Deposition of EARNEST F. HARPER, taken before
       Bethany A. Carrier, a Court Reporter and Notary Public
18     within and for the State of Connecticut, pursuant to
       Subpoena, Notice and the Federal Rules of Civil
19     Procedure, at the offices of Pullman & Comley, 90 State
       House Square, Hartford, Connecticut, taken on
20     February 5, 2004, commencing at 10:59 a.m.

21

22

23
                    Bethany A. Carrier, LSR 071
24                Brandon Smith Reporting Service
                         44 Capitol Avenue
25                 Hartford, Connecticut  06106
```

Page 2

```
 1              APPEARANCES
 2
    Representing the Plaintiff Equal Employment
 3  Opportunity Commission:
 4  EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    John F. Kennedy Federal Building
 5  Government Center - Room 475
    Boston, Massachusetts 02203-0506
 6    By: ROSA LILIANA PALACIOS, ESQ.
 7
 8
 9  Representing the Defendant Beauty Enterprises,
    Inc.
10
    PULLMAN & COMLEY, LLC
11  90 State House Square
    Hartford, Connecticut 06103-3702
12    By: RICHARD C. ROBINSON, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              STIPULATIONS
 2
 3     It is stipulated by counsel for the parties that
 4  all objections are reserved until the time of trial,
 5  except those objections as are directed to the form of
 6  the question.
 7
 8     It is stipulated and agreed between counsel for
 9  the parties that the proof of the authority of the
10  commissioner before whom this deposition is taken is
11  waived.
12
13     It is further stipulated that any defects in the
14  notice are waived.
15
16     It is further stipulated that the deposition may
17  be signed before any notary public.
18
19
20
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2  WITNESS              DIRECT    CROSS
 3
    Earnest F. Harper       5        --
 4
 5
 6          HARPER EXHIBITS
            (For Identification)
 7
    EXHIBIT                    PAGE NO.
 8
 9   1   Curriculum vitae.        18
10   2   Expert report of Mr. Harper.   26
11   3   Letter to EEOC from Mr. Harper.  132
12   4   String of e-mails, 10-21-03.   132
13   5   Fax cover sheet with case list.  133
14   6   File folder entitled, "BEI."   173
15   7   File folder entitled,
         "OSHA/Stats/Notes-200s."      176
16
     8   File folder entitled, "Site
17       visit and interviews."        177
18
19  ** Reporter's Note: Exhibits retained by counsel.
20
21
22
23
24
25
```

Page 5

```
 1         (The deposition commenced at 10:59 am.)
 2
 3         EARNEST F. HARPER, Deponent, of 11263
 4  West Bodley Drive, Boise, Idaho 83709, being first duly
 5  sworn by Bethany A. Carrier, a Notary Public within and
 6  for the State of Connecticut, was examined, and
 7  testified on his oath as follows:
 8
 9         DIRECT EXAMINATION
10
11  BY MR. ROBINSON:
12    Q   What's your name?
13    A   My name is Earnest F. Harper, E-A-R-N-E-S-T,
14  and I reside at 11263 West Bodley Drive in Boise,
15  Idaho.
16    Q   What's your date of birth?
17    A   13 October 1940.
18    Q   And are you a high school graduate?
19    A   I am.
20    Q   What year did you graduate from high
21  school?
22    A   '58.
23    Q   What did you do after high school?
24    A   I had a couple of scholarships but elected to
25  go ahead and join the Navy. They weren't full-ride
```

Page 6

1  scholarships, so I joined the Navy in 1958.
2     Q   And how long did your service -- how long was
3  your service in the Navy?
4     A   I had nine active duty years, then was out
5  for nineteen, went back into the reserves
6  approximately -- I think it was 11/86, finished up with
7  23 years and retired three years ago.
8     Q   Let's talk about the nine years of active
9  duty.
10    A   Uh-huh.
11    Q   You went in with what rank?
12    A   Airman recruit and boot camp.
13    Q   And you left with what rank?
14    A   Navy lieutenant, Mustang.
15    Q   What does "Mustang" mean?
16    A   Well, I left the Navy as an electronics crew
17 chief after the nine years, came back in as pay grade
18 E6, then went up for one of the commissioning programs
19 and made that at about the three-year mark, back into
20 the Naval Reserve and was commissioned as an ensign in
21 the United States Navy. And I was promoted into
22 lieutenant at appropriate time, and then I was up for
23 lieutenant commander, but I ran out of age. I had to
24 retire at the age of 60.
25    Q   Okay. My question was: What does "Mustang"

Page 7

1  mean?
2     A   Oh, I apologize. Basically that means from
3  enlisted to officer.
4     Q   What jobs did you do in the Navy?
5     A   I was an electronics technician, aviation
6  electronics technician. I was a crew chief flying
7  airborne early warning. I was also shop supervisor in
8  the Navy. I had duties that involved managing a shift
9  of maintenance personnel in the Navy. This is just in
10 the active duty part the first nine years.
11    Q   That's all I'm talking about. Right.
12        Were any of the jobs you had in the Navy
13 during your active duty years in the safety field?
14    A   They weren't in the safety field. We
15 received a lot of training because we were working
16 around very high voltage equipment and we had
17 responsibility for our own people to make sure that
18 they stayed safe. So we had collateral duties as
19 safety. And again, I'm just talking about the first
20 nine years now. It was considerably more in the
21 reserve component.
22    Q   Okay. And when you say you were a shop
23 supervisor, what kind of shop was that?
24    A   This was where the flight line aircraft would
25 come in and they're full of electronics, radar patrol,

Page 8

1  et cetera, type equipment, communications. So it was
2  equipment that required calibration, maintenance,
3  repair would flow into the shop for higher level repair
4  calibration. So I would run a crew that would accept
5  those, get them fixed, whatever it took to put the
6  plane back on line. And that's what we did.
7     Q   Be fair to call it equipment repair shop -- I
8  mean an airplane repair shop?
9     A   We wouldn't be repairing the airplane itself,
10 we'd be repairing the things that were on the plane.
11    Q   Which things? The electronic things?
12    A   That's correct.
13    Q   Okay. What did you do after you -- your --
14 after your active duty with the Navy?
15    A   I went to work for Hewlett Packard after the
16 active duty component.
17    Q   And what year was that?
18    A   1967.
19    Q   And are you still at Hewlett Packard?
20    A   I am.
21    Q   Are you still there working full time?
22    A   I am.
23    Q   What's the most efficient way for you to tell
24 me about your career at Hewlett Packard, including the
25 jobs that you had there, the duties that you performed

Page 9

1  in those jobs, how long you were at each job?
2     A   It's really not that difficult to
3  encapsulate. I entered HP with my background in
4  electronics very extensive. I came in as a couple pay
5  grades above the entry level in the electronics area.
6  And I was hired shortly -- within about a couple of
7  years into a new start-up division in which they were
8  making the first ever computer-based stimulus and
9  response equipment.
10        There was a lot of high voltage, high current
11 large product handling and I was hired to run the
12 technical support systems which basically helped put
13 those products into the system, keep them there so they
14 could be then shipped to customers.
15    Q   Technical support for development of what?
16    A   Computer-based stimulus and response
17 electronic systems.
18    Q   For what kind of -- stimulus and response
19 what?
20    A   Stimulus and response electronic systems.
21    Q   Electronic systems?
22    A   Yes, sir.
23    Q   For what kind of applications?
24    A   They were testing and measuring for the most
25 part. For example, a large customer like Hughes or

Page 10

1 General Dynamics, for example, might require some high
2 current source to run some sort of a test on avionics
3 perhaps, or some other system. Or they may just need
4 to test capacitors like Hughes did. So sometimes
5 they'd require voltages up to a thousand volts,
6 sometimes current up to 300 amps and so forth.
7     So there was a lot of issues of safety which
8 actually was the impetus to my beginning to get into
9 the field of safety at that point, which I was able to
10 help found the safety program in HP at that point.
11   Q   Okay. My only question to you was: What
12 were the applications for the -- these stimulus and
13 response electronic systems? And have you answered
14 that question?
15   A   I gave you two examples where they would need
16 high voltage to apply to something under a unit under
17 test, or perhaps high or low current for testing things
18 as small as small capacitors that would go into
19 different products.
20   Q   Okay. And when you say you were hired to run
21 technical support for the development of these things,
22 what do you mean by "technical support"?
23   A   When you put a piece of an electronics gear
24 into a system, the temperature tends to run 20 degrees
25 hotter inside the system. So products would often fail

Page 11

1 or they would be miscalibrated because they weren't
2 used to that environment. So they needed -- or they
3 would just simply fail. And they had to be screened
4 and tested and calibrated prior to shipping to
5 customers. And they had to be somewhat reliable.
6     So they needed an on-site capability to do
7 that. And so I was hired in with my background to take
8 care of that, put together a crew and to work on
9 this.
10   Q   Isn't that a quality control function?
11   A   No, it's not. It's a direct electronics
12 support and maintenance and calibration.
13   Q   Okay. So you started in electronics and now
14 you're doing tech support for the development of these
15 computer-based stimulus and response systems. And
16 continue with your description of your career.
17   A   About that same time we began to have a lot
18 of our technicians and engineers who were very
19 concerned about their personal safety, because one,
20 people were learning programming for the first time.
21 So now these high voltage products, high current
22 products were under computer control. And so that
23 means that if the software or the programming was not
24 appropriate, instead of zero volts on a set of
25 terminals, you may have 500 volts. So -- and there

Page 12

1 were computer programmers --
2   Q   Mr. Harper, can I stop you for a second?
3   A   Yes.
4   Q   We're going to be here all day if your
5 answers are as -- I know you want to be helpful and I
6 appreciate that, but we're going to be here all day and
7 maybe into the night if --
8   A   I understand. I can shorten it up. I will
9 do that.
10   Q   Okay. I'm just looking -- my questions --
11 can you describe it in an efficient way what positions
12 you held there?
13   A   Okay.
14       MS. PALACIOS: Just the positions
15 maybe.
16 BY MR. ROBINSON:
17   Q   And what the duties and responsibilities and
18 dates and stuff like that.
19   A   I appreciate that.
20   Q   Like you were writing a list.
21   A   Okay. Because of the on-the-floor safety
22 problems and because of my abilities to understand the
23 equipment, I was also getting into the safety aspects
24 because it related to hardware.
25       OSHA came along in 1971 and the Consumer

Page 13

1 Products Safety Commission came along in 1972. We had
2 already established a need for a safety program. So
3 myself and a few others got together and convinced HP
4 management to do this. So from that point on --
5   Q   What point on?
6   A   This point, which would have been 1969, 1970.
7 At this point I began to have major duties as a
8 safety -- we called it a coordinator in the early days.
9 And that evolved into product safety engineering, that
10 evolved into safety engineering, and for approximately
11 30 years that's been my job as safety engineer.
12   Q   Would it be fair to say that in 1969 or 1970
13 safety coordination became one of a number of your
14 responsibilities, most of which were not safety
15 related, and then over time your position evolved into
16 a full-time safety engineer?
17   A   By 1971 my position was full-time safety.
18   Q   Okay. Now, according to your CV, it appears
19 that in 1977 you received an Associate's degree from
20 the institution known as West Valley College in
21 Saratoga, California?
22   A   Yes, sir.
23   Q   What kind of institution is that?
24   A   It's a junior college in California. Junior
25 college.

Page 14

1  Q  When did you first enroll there?
2  A  I don't remember for sure.
3  Q  Were you working at the time?
4  A  Yes. Full time.
5  Q  Did you attend classes at night?
6  A  I did.
7  Q  Did you finish the program in two years?
8  A  Very close to that, I think.
9  Q  What was your degree in?
10 A  I had an Associate's degrees in science, in
11 both math and physics.
12 Q  So would it be fair so say you didn't study
13 industrial safety or safety engineering at West Valley
14 College?
15 A  No.
16 Q  It would not be fair to say that?
17 A  I didn't take a course entitled safety
18 engineering.
19 Q  Or industrial safety?
20 A  That's correct.
21 Q  Okay. Did you have any courses at West
22 Valley College that dealt with the factors that make a
23 workplace harmonious?
24 A  I did not.
25 Q  Would it also be fair to say that West Valley

Page 15

1  College is a two-year community college?
2  A  That's correct.
3  Q  Okay. How far is Saratoga, California from
4  Boise, Idaho?
5  A  I was living in California at the time.
6  Q  And working for HP?
7  A  That's correct.
8  Q  Now, in 1997, according to your CV, you
9  received a Bachelor's degree from George Fox
10 University?
11 A  That's correct.
12 Q  And where is George Fox University?
13 A  It's in California.
14 Q  Did you go to California to go to school
15 there?
16 A  They had a satellite community -- well, let's
17 see, they had a satellite --
18 Q  Let me ask the question again.
19 A  I'm not sure how to answer it.
20 Q  You can answer it yes or no. Did you go to
21 California to go to school there?
22 A  I did.
23 Q  You did. Did you go to California -- is
24 California the only place that you went to go to school
25 there?

Page 16

1  A  No, it is not.
2  Q  Where did -- where were you physically most
3  of the time when you were studying there?
4  A  In Boise.
5  Q  And is that because George Fox University
6  offered programs in Boise?
7  A  They had a satellite campus there.
8  Q  That offered programs?
9  A  It was a regular attend class type of
10 setup.
11 Q  Could you describe the program that you
12 pursued at that school?
13 A  The program was entitled management and
14 organizational leadership.
15 Q  Would it be fair to describe that as a degree
16 completion program in the department of professional
17 studies?
18 A  I believe that would be accurate.
19 Q  Would it also be fair to characterize it as a
20 program for nontraditional students to complete their
21 Bachelor degrees in a nontraditional cohort model?
22 A  It would.
23 Q  And did you receive any credit -- withdrawn.
24    Did George Fox University offer credit as
25 part of this program for something called life

Page 17

1  learning?
2  A  If you required it, they did.
3  Q  And that means that in part that one can
4  obtain college credits without actually taking courses
5  and completing courses?
6  A  It could. It didn't apply to me, but it
7  could.
8  Q  I'm going to get there. I'll be fair to you.
9  Don't worry about that.
10 A  Okay.
11 Q  Did you receive any such credits for life
12 learning?
13 A  There may have been six. I'm not sure.
14 Q  What courses did you actually take there?
15 A  I don't recall. It was a full curriculum. I
16 mean, I can provide that detail, but I don't -- I don't
17 have it right offhand.
18 Q  Did you take any classes in industrial safety
19 there?
20 A  No.
21 Q  Did you take any classes in safety
22 engineering there?
23 A  No.
24 Q  Did you take any classes that dealt with the
25 factors that make for a harmonious workplace?

Page 18

1   A   I would say yes.
2   Q   What courses did you take there?
3   A   I don't recall. The subject was leadership.
4   Involved a variety of things in that genre.
5       MR. ROBINSON: Can we mark this.
6
7       (Harper Exhibit 1: Marked for
8        identification.)
9
10  BY MR. ROBINSON:
11  Q   The document that we've marked as Exhibit 1
12  and is now before you, that's your CV, is it not?
13  A   Yes, sir.
14  Q   Now, I note in looking at your -- over your
15  CV that under education on the first page it lists
16  ergonomics, colon, USC, Harvard, University of Michigan
17  semi colon 1981 dash 1994. What does that mean?
18  A   It means I attended all together perhaps over
19  200 hours of on-campus instruction, classes at those
20  institutions at various times.
21  Q   Were these seminars?
22  A   No, sir. They were classes. College
23  campuses. One correction. There was a seminar at USC.
24  There was one seminar at USC.
25  Q   I mean, you don't claim that you were an

Page 19

1   enrolled student at the University of Southern
2   California, do you?
3   A   I was enrolled for the purpose of attending
4   various summer offerings that ran a variety of weeks in
5   length.
6   Q   Were you in a degree program at USC?
7   A   I was not.
8   Q   Did you have to apply to get into USC?
9   A   I did not.
10  Q   Okay. Were you a matriculated student at
11  Harvard University?
12  A   I attended classes there and lectured once.
13  Q   Okay. But did you have to take any exams to
14  get into Harvard?
15  A   I did not.
16  Q   Okay. And you didn't receive any degrees
17  from Harvard?
18  A   That's correct.
19  Q   And the same is true with University of
20  Michigan?
21  A   That's correct. Certificates.
22  Q   And were these programs sort of continuing
23  education programs for people in industry?
24  A   They were for my own benefit and professional
25  training.

Page 20

1   Q   But were they -- would it be fair to
2   characterize them as continuing education programs for
3   people in industry?
4   A   I would characterize it probably, yes. I
5   don't know about the term "in industry." I don't know
6   what you mean by that.
7   Q   What's ergonomics?
8   A   It's the study of people in their workplace
9   performing tasks under a variety of environments.
10  Q   Well, I'm involved in a disability
11  discrimination case now where --
12      MS. PALACIOS: No free legal advice.
13  BY MR. ROBINSON:
14  Q   The claim is that my client failed to
15  reasonably accommodate an employee who needed and
16  requested ergonomic changes. And what he meant by that
17  is he was a radiologist and he needed some physical
18  changes in the environment so he didn't have to bend as
19  much and reach as much. Is that the kind of things
20  that we're talking about when we're talking about
21  ergonomics?
22  A   Yes, sir, it is.
23  Q   Does it include anything else?
24  A   Well, it's the entire -- yes, it does. I
25  mean, that particular thing would also be covered under

Page 21

1   the Americans With Disabilities Act, reasonable
2   accommodation. But in order to get there, you need to
3   have some understanding of anthropometric data that
4   limits an individual. You need to understand some
5   mechanisms of physical limits, interactions,
6   lighting --
7   Q   Be fair to say that it's concerned with the
8   physical conditions under which people perform work and
9   the concern is to hope for -- the goal is to enable
10  them to work in circumstances where they're not going
11  to be subject to undue physical stresses and strains?
12      MS. PALACIOS: Objection.
13  A   That is certainly part of it. The human
14  factors is a very wide range, ranging from stress
15  factors, both mental and physical, to the physical.
16  BY MR. ROBINSON:
17  Q   Now, also in education on your CV you list
18  specialized safety training, Liberty Mutual's Advanced
19  Safety Institute, Boston, Massachusetts, 1984. What's
20  that?
21  A   It was a course -- at that time Liberty
22  Mutual was covering Hewlett Packard, and so one of the
23  offerings for -- that Liberty Mutual made was to safety
24  professionals in HP to attend various training. And
25  they had a number of advanced safety courses in

Page 22

1  Boston.
2  Q  So you went there as part of your job for
3  Hewlett Packard?
4  A  That's correct.
5  Q  And Hewlett Packard paid for that?
6  A  That's correct.
7  Q  By the way, did Hewlett Packard pay for the
8  classes in ergonomics you attended at USC, Harvard and
9  University of Michigan?
10  A  Yes, they did.
11  Q  And did you do that as part of your job?
12  A  Yes, sir.
13  Q  All right.  Now, in 1986, according to your
14  CV, you started something called Industrial Safety
15  Consulting Service; is that right?
16  A  That's correct.
17  Q  And its address is 11 -- 11263 West Bodley
18  Drive in Boise, yes?
19  A  Yes, that would be correct.
20  Q  And that's your home?
21  A  That's my home office.
22  Q  That's your home?
23  A  That's my home.  I'm sorry.
24  Q  You have an office in the home?
25  A  I do.

Page 23

1  Q  Okay.  And is Industrial Safety Consulting
2  Service your own business?
3  A  Yes, sir, it is.
4  Q  Is it in business to make a profit?
5  A  Not initially.  Initially I took it because
6  it gave me a wider field of experience and skills.
7  Q  Did there come a time when it -- its goals
8  included making a profit?
9  A  I don't think I've ever had a goal until I
10  retire of making a profit.  Again, the primary and
11  principal goal is to continue growing and learning in
12  my field.  But the profit certainly is a good thing.
13  Q  Well, you charge for your services, don't
14  you?
15  A  Yes, sir.  I'm still full time employed with
16  HP.
17  Q  I'm going to get to that in a second.  I'm
18  trying to figure out how that works.  But who receives
19  the income that Industrial Safety Consulting Service
20  generates?
21  A  I do.
22  Q  How do you report that on your tax return?
23  A  I report it as income.
24  Q  And the expenses of Industrial Safety
25  Consulting Service, do you deduct those from your

Page 24

1  personal tax return as well?
2  A  I do.
3  Q  And do the -- does the income exceed the
4  expenses?
5  A  Some years, yes; some years, no.
6  Q  Now, let's get to the question that you
7  predicted a few moments ago.  How are you able to
8  operate this business?  How are you able to be here
9  today if you work full time at Hewlett Packard?
10  A  I've been at HP approaching 37 years, so I
11  have a fair amount of vacation time.  And most of the
12  work that I do can be done in the evenings, weekends,
13  in terms of reviewing documents, you know, the typical
14  things do you in a case.  And the times that I need to
15  visit a site, attend depositions, most of which tend to
16  be more local than far off, is not that difficult to
17  work around.  And HP understands what I'm doing.
18  Q  Today, for example, are you being paid for
19  today by Hewlett Packard?
20  A  I am taking three personal vacation days
21  which I have coming, so they're paid.
22  Q  Are those paid days?
23  A  They are.
24  Q  Okay.  And is that the case for all of the
25  days -- the day time that you spent on this Beauty

Page 25

1  Enterprises case?
2       MS. PALACIOS:  Objection.
3  A  Much of that time I spend working on this
4  case on my own time.
5  BY MR. ROBINSON:
6  Q  At night?
7  A  At night or weekends.
8  Q  Right.
9  A  That's correct.
10  Q  But you have spent some time during a regular
11  workday on this case, have you not, in addition to the
12  day?
13  A  I don't believe I have at this point.  I
14  can't remember working during the day -- during the
15  weekday, for example, on this case at this point, other
16  than this trip, of course.
17  Q  Well, you were here once before, weren't
18  you?
19  A  Oh, I apologize.  There was the trip out to
20  the site.
21  Q  I know it wasn't very memorable, but --
22  A  My apologies.  I did forget that for a
23  moment.  But that's true, I think I took some vacation
24  time for that.
25  Q  Okay.  Would it be unfair of me to say that

Page 26

1  you -- that this business is a moonlighting business of
2  yours?
3  A   You could probably characterize it as that.
4       MR. ROBINSON: Why don't we mark
5  this.
6       MS. PALACIOS: Let me object. I'm not
7  really sure what "moonlighting" means anymore.
8
9       (Harper Exhibit 2: Marked for
10       identification.)
11
12 BY MR. ROBINSON:
13 Q   By the way, do you know how much revenue you
14 generated for yourself through Industrial Safety
15 Consulting Service in 2003?
16 A   Actually, the numbers are just coming back
17 in. I mean, I keep a log. I just haven't summed up
18 the year yet. My CPA is not scheduled until probably
19 sometime in March, so I don't have the final numbers in
20 yet.
21 Q   Do you have a best approximation of the
22 amount?
23 A   Just before I left to come here I got a 1099
24 from EEOC that covered, I think, a couple of cases.
25 And I believe that was $14,000 and something.

Page 27

1  Q   Do you think you made more than $20,000 --
2  you generated more than $20,000 worth of revenue from
3  your activities through Industrial Safety Consulting
4  Service in 2003?
5  A   I believe 2003 may have been my highest
6  income year to date because it was extremely busy.
7  Unusually so.
8  Q   Highest income from consulting?
9  A   I believe that's true.
10 Q   Okay. My question is: Is it more than
11 $20,000?
12 A   The question was answered yes.
13 Q   It is?
14 A   Yes, sir.
15 Q   Is it more than $50,000?
16 A   No, sir.
17 Q   Is it more than $40,000?
18 A   I don't believe so.
19 Q   More than 30?
20 A   I can only estimate at this point, but it
21 could be in the 25 area. That's uncertain.
22 Q   Now, what's before you is Exhibit 2 is the
23 report you filed in this case, true?
24 A   That is correct.
25 Q   Now, don't turn the page yet. We're going to

Page 28

1  spend some time on the first page.
2  A   Okay.
3  Q   In the upper right-hand corner there is some
4  content, is that fair to say?
5  A   Yes, sir.
6  Q   What's the purpose of that content?
7  A   Just to indicate some of the things that I
8  would tend to get involved with in the consulting
9  arena.
10 Q   Be fair to say these are all the various
11 services that you provide in your business?
12 A   In good part they are.
13 Q   So you do more than just these things?
14 A   Usually there is different subsets of various
15 aspects of safety.
16 Q   Okay. Well, one of the things that Exhibit 2
17 reflects you as doing is accident reconstruction.
18 A   That's correct.
19 Q   Okay. You consider yourself an expert in
20 accident reconstruction?
21 A   In most arenas, yes.
22 Q   What kinds of accidents have you
23 reconstructed? Just give me general categories.
24 A   Electrical, mechanical, slips and falls. A
25 variety in the field of human factors, ergonomics, such

Page 29

1  as lifting strains, visual, environmental factors that
2  lead to accidents, machinery, equipment, mobile or
3  stationary.
4  Q   How about auto accidents?
5  A   I've actually testified as an expert in a
6  couple of auto cases.
7  Q   Now, what is it that makes you an expert in
8  accident reconstruction?
9  A   Well, over 30 years I probably investigated 2
10 or 3,000 injury accidents.
11 Q   At Hewlett Packard?
12 A   The bulk of them were Hewlett Packard over
13 the 30-year period.
14 Q   Anything else that makes you an expert in
15 accident reconstruction?
16 A   Since working in the consulting since '86,
17 I've had a lot of cases involving everything from
18 electrical burns to fatalities. Again, with the idea
19 of enhancing my skill set.
20 Q   Anything else?
21 A   Well, there is a lot of different cases
22 involved in that, from falls to the auto we talked
23 about, the forklifts. I've worked in timber paper
24 forest industrial, a variety -- including up to Morton
25 Thiekel, for example. Those are some of the different

Page 30

```
 1  arenas that I've done safety reconstruction in.
 2    Q  Okay.  You list ergonomics on Exhibit 2 as
 3  one of the services you provide.
 4    A  Yes.
 5    Q  Is ergonomics the same thing as human factors
 6  design?
 7    A  I look at ergonomics as a subset of human
 8  factors.  Human factors covers everything from
 9  physiological to psychological issues, as well as the
10  various hard sciences.  Ergonomics is basically a fit
11  of people to their work or to their task or, you know,
12  basically the environment.
13    Q  So human factors design is -- includes
14  ergonomics but is broader than ergonomics, yes?
15    A  I would say yes.
16    Q  Do you consider yourself an expert in
17  ergonomics?
18    A  I do.
19    Q  What makes you an expert in ergonomics?
20    A  Thirty -- well, probably close to 25 years of
21  hands-on experience in solving ergonomic issues on
22  production, manufacturing, maintenance, office, and a
23  variety of environments.
24    Q  Okay.  By the way, do you have any education
25  in accident reconstruction?
```

Page 31

```
 1    A  Yes.
 2    Q  What education do you have in accident
 3  reconstruction?
 4    A  There have been seminars, one, two, three-day
 5  seminars in various approaches to accident
 6  reconstruction.  There have been hands-on experience
 7  issues, of course.
 8    Q  I'm just asking you about your education.  I
 9  mean, I understand people -- I'm talking about formal
10  education.
11    A  If you count seminars and workshops as formal
12  education, then there is -- it spans, you know, most of
13  the 30 years.
14    Q  Can you remember the last seminar or workshop
15  you attended in an accident reconstruction?
16    A  Not precisely, but probably within the last
17  three years.  Every year I attend professional
18  development conference that lasts three, four, five --
19  about five days in length.
20    Q  Now, other than the sessions you attended at
21  USC, Harvard and University of Michigan that we've
22  talked about earlier, have you had any other education
23  in ergonomics?
24    A  Yes.
25    Q  What other education have you had on that
```

Page 32

```
 1  topic?
 2    A  Could be 10, 15, 20 seminar sessions ranging
 3  anywhere from hours to days over the period.
 4    Q  And the last one you attended is what?
 5    A  I don't recall exactly, because usually I'm
 6  lecturing in the field of ergonomics.
 7    Q  Have you written in the field of accident
 8  reconstruction?  Are you published in the field of
 9  accident reconstruction?
10    A  I am not.
11    Q  Are you published in the field of
12  ergonomics?
13    A  Just internal to the company.
14    Q  Now, you also list industrial safety on this
15  first page of the report as one of the services that
16  you provide.  Is industrial safety a recognized field
17  of study?
18    A  I believe it is.
19    Q  Are there undergraduate programs in American
20  colleges and universities in industrial safety?
21    A  There are today.  There was not when I got
22  into the field.  I'm sorry, I believe there were two
23  exceptions.  Arizona and USC, I believe, had graduate
24  or undergraduate programs in safety.  To the best of my
25  knowledge, they were the only two.
```

Page 33

```
 1    Q  The only two when?  When you started?
 2    A  About 1970 time frame.
 3    Q  Okay.  And there are other American colleges
 4  that have these kinds of programs?
 5    A  They're quite numerous today.
 6    Q  And they represent an undergraduate major?
 7    A  They do.
 8    Q  And what's the major called or what are the
 9  various names it can be called?
10    A  It can be called -- in the health industrial
11  field it can be called safety management.  I don't know
12  that I'm familiar with all the potential major
13  references, but safety engineering is also one.
14    Q  Are you familiar with the curriculum that
15  these majors in these American colleges and
16  universities cover?
17    A  To some extent.
18    Q  What do they cover?
19    A  Well, they cover various codes.  They cover
20  fire presentation.  They cover some ergonomics, human
21  factors stuff.  They cover the basic sciences that are
22  deemed appropriate, math, physics.  Some of the
23  underpinnings that you need to be an appropriate safety
24  professional.
25    Q  And are there graduate programs in this
```

Page 34

1  field?
2      A   Yes, sir.
3      Q   And where are the graduate programs in this
4  field?
5      A   Well, I think there is a number of places
6  now. The American Society of Safety Engineers has an
7  accreditation program so we get kind of a flow of
8  information there. As far as I know, they're fairly
9  widespread.
10     Q   You don't have a graduate degree in
11 industrial safety?
12     A   I do not.
13     Q   Now, industrial safety seems to me, someone
14 who is not terribly initiated in this stuff, a pretty
15 broad category.
16     A   Yes, sir.
17     Q   Is that fair to say?
18     A   Yes.
19     Q   What does it cover?
20     A   If we can agree on the basic understanding
21 what industry is, people produce products for market,
22 that ranges everything from plastic pipe to electronic
23 products to medical devices, the industry that produces
24 products of this type have production floors,
25 manufacturing floors. They have R&D. They have

Page 35

1  marketing areas. They have offices. They also live on
2  sites that have buildings, so there is infrastructure
3  in terms of floors and cafeterias and -- so industry
4  basically is all those support services in addition to
5  just the manufacturing process and the marketing
6  process that sells them.
7      Q   Okay. That's what industry is. Now, what's
8  industrial -- now that we have -- we've agreed that's
9  an appropriate definition of industry, what's covered
10 by the term "industrial safety"?
11     A   That's not a real short answer, but I can
12 probably sum it up in this fashion. You can't build a
13 building without safety involved. That goes from
14 adequate lighting to adequate exits to adequate aisle
15 space. You can't have an office space without a
16 situation where people have to sit for hours on end
17 where there is glare on the computers. So that's also
18 industrial safety.
19         If I have manufacturing, I have powered
20 equipment that has moving parts or electrical issues.
21 That's also industrial safety. If I have people
22 working conveyor, loading and offloading conveyors,
23 there is lifting involved. That's industrial safety.
24 If I have a chemistry process, then I've got perhaps
25 fumes, I've got handling of chemicals that can be

Page 36

1  hazardous or cause dermatitis, that's also industrial
2  safety. I have shipping and receiving, so I have
3  forklift activity. That's forklifts and people
4  intermixing, that's industrial safety. I have people
5  walking on working surfaces, climbing stairs or
6  ladders. That's also industrial safety.
7      Q   Is there any way to sum it up in a broad
8  statement?
9      A   There isn't anything that you can put into a
10 building, including this one, that doesn't have
11 something to do with safety. Industrial safety is that
12 segment that we usually think of as an environment
13 that's producing some product that goes out to the
14 world.
15     Q   And the safety -- does it refer to the safety
16 of anybody in particular or any group of people in
17 particular?
18     A   No, sir.
19     Q   Well, it certainly includes the people who
20 work in the -- at an industrial setting, yes?
21     A   It includes people who work there, people who
22 visit there. It includes support personnel.
23     Q   Does it include consumers?
24     A   It does sometimes.
25     Q   And do you consider yourself an expert in all

Page 37

1  aspects of industrial safety?
2      A   Close. There are some exceptions perhaps in
3  industrial hygiene, for example. While I've done a lot
4  of work associated with industrial hygiene, I don't
5  necessarily treat myself as an expert in all of their
6  field.
7      Q   Now, you list product safety slash
8  regulations in the upper right-hand corner of the first
9  page of Exhibit 2; is that right?
10     A   That's correct.
11     Q   You consider yourself an expert in these
12 subjects?
13     A   I do.
14     Q   And what is it that makes you an expert
15 here?
16     A   I was involved in beginning the program with
17 Hewlett Packard in product safety engineering and I
18 served in that function for nine years.
19     Q   What education do you have in product safety
20 regulations?
21     A   It's an accumulation of education involving
22 physics, math, study of the regulations, hands-on
23 experience, and working with the safety agencies day in
24 and day out for many years.
25     Q   Have you taken any courses in product safety

Page 38

1  slash regulations?
2  A  There were seminars, work sessions, annual
3  meetings for many years in which product safety was the
4  topic.
5  Q  Have you published in the field of product
6  safety or regulations?
7  A  Internal to HP.
8  Q  Only?
9  A  That's correct.
10 Q  You also list process safety as one of the
11 services you provide, true?
12 A  True.
13 Q  Well, what's process safety?
14 A  If I'm -- process safety is more in the
15 manufacturing area. For example, I may have a chemical
16 plating line. That's a process. In other words, you
17 put raw material into the front end and you come out
18 the back end with some kind of a printed circuit board,
19 for example. That would be a process and it could be a
20 chemical process or it can be a manufacturing
21 process.
22 Q  And do you consider yourself an expert in
23 process safety?
24 A  I do.
25 Q  What makes you a process safety expert?

Page 39

1  A  Thirty years of experience, education and a
2  variety of ways.
3  Q  Well, what education have you had in process
4  safety?
5  A  We've already talked about a large part of it
6  in the sense of physics, seminars, human factors,
7  experience on the lines, working with these problems
8  day in and day out, and being successful at providing
9  solutions and getting feedback. So it was a continual
10 learning process.
11 Q  When you say "physics," what physics -- have
12 you taken more than one physics course in -- after high
13 school?
14 A  I had the Associate's science degree in
15 physics.
16 Q  Well, how many physics courses did you
17 take?
18 A  Well, it was a two-year program and then I do
19 my own study, my own research, my own work.
20 Q  Let me ask the question again. How many
21 physics courses did you take in your Associate's
22 program?
23 A  I have an Associate's degree in it, so it
24 would have been whatever it took to get that degree.
25 Q  So you don't remember?

Page 40

1  A  That was 30 years ago. I don't remember
2  precisely.
3  Q  You also list safety audits as among the
4  services you provide. What's that?
5  A  That is having the knowledge and ability to
6  perform basically safety inspections in all areas.
7  Q  All areas?
8  A  This would be walking through offices and
9  looking for hazards. This would be walking through
10 manufacturing facilities or climbing into maintenance
11 spaces and understanding enough code and regulations,
12 plus what you know beyond the codes and regulations,
13 which are always minimal.
14 Q  You list noise assessments here. What's
15 noise assessments -- what are noise assessments?
16 A  That's an ability to operate various sound
17 equipment to know how to properly set them up, take
18 measurements, and write reports on it or take
19 corrective action in excessive cases, or I have -- or
20 to, in the consulting arena, I've taken a variety of
21 cases involving noise.
22 Q  What makes you a noise assessment expert?
23 Well, do you consider yourself an expert in noise
24 assessment?
25 A  I do.

Page 41

1  Q  What makes you a noise assessment expert?
2  A  Noise is just part of the safety engineering
3  bag of skills that you need to develop.
4  Q  Okay. You list OSHA compliance and fire and
5  building codes on this first page of Exhibit 2 as
6  services that you provide. Do you consider yourself an
7  expert on those topics?
8  A  I do.
9  Q  And what makes you an expert on those
10 things?
11 A  Well, since April 29th, 1979, we've had to --
12 '72, excuse me, we've had to live with the OSHA regs.
13 That's a constant companion. Fire and building codes
14 are something that I've worked with over the 30-year
15 period and worked with the planning and zoning people
16 and building and fire inspectors over that period of
17 time.
18 Q  So it's experience that makes you an expert
19 in those things?
20 A  A lot of experience.
21 Q  Okay. Do you consider yourself an expert in
22 anything else?
23 A  I don't know exactly how to answer that.
24 We've covered certainly major disciplines. There are a
25 variety of skill sets, I suppose. I think we've

Page 42

1  covered most of it.
2     Q  Do you consider yourself an expert in
3  equipment safety?
4     A  I do.
5     Q  Do you consider yourself an expert in tooling
6  design?
7     A  I do.
8     Q  Do you consider yourself an expert in
9  chemical safety?
10    A  To a degree.
11    Q  Do you consider yourself an expert in laser
12 safety?
13    A  I do.
14    Q  Do you consider yourself an expert in fire
15 prevention?
16    A  Yes.
17    Q  Now, you list in this report in the area
18 we've been examining among the services you provide are
19 expert witness services; isn't that right?
20    A  That's correct.
21    Q  In fact, if you go into your CV -- go back to
22 your CV. It was Exhibit 1. There is a section on
23 seminars, conferences, courses and workshops on the
24 first page, 1970 through 2000. Did I read that
25 right?

Page 43

1     A  Yes, sir.
2     Q  And below that are the topics of those --
3  general topics of those seminars, conferences, courses
4  and workshops, yes?
5     A  Yes.
6     Q  And among those seminars, conferences,
7  courses and workshops, are those on expert testimony?
8     A  There is none listed, but this is not
9  necessarily all inclusive.
10    Q  When you say there is none listed, take a
11 look at page 1. You see the section --
12    A  I'm sorry.
13    Q  Seminars, courses --
14    A  I'm sorry, I do. And it says expert
15 testimony.
16    Q  It says expert testimony?
17    A  That's correct.
18    Q  Can I conclude that you've actually gone to
19 school, so to speak, to learn to be an expert to give
20 expert testimony?
21    A  I have attended --
22    Q  Is that right?
23       MS. PALACIOS: Objection.
24    A  I don't know how broad you want to interpret
25 school, so I'm hesitating.

Page 44

1  BY MR. ROBINSON:
2     Q  Let me withdraw the question. Have you been
3  to seminars, conferences, courses and/or workshops to
4  learn how to be an expert witness?
5     A  Yes.
6     Q  And what specifically did those courses
7  cover?
8     A  How to conduct yourself. A little bit about
9  what goes on in a case, that type of thing.
10    Q  Anything else?
11    A  General discussions on how some cases would
12 have you write reports, some would not. And so it
13 just -- kind of the workings of a case and different
14 aspects.
15    Q  How about handling cross-examination?
16    A  Probably only once.
17    Q  Now, put this aside for a second. The
18 opinion that you -- the opinions that you've given here
19 today you've given as an industrial safety expert, is
20 that fair to say?
21    A  I would assume that's probably accurate.
22    Q  Okay. Are there any texts that are generally
23 recognized as authoritative in the field of industrial
24 safety?
25    A  I don't know. I know that there are texts

Page 45

1  out there. I don't know that you would say that any
2  one or two or three would be considered dominant
3  texts.
4     Q  Well, I'm not talking about dominant. I mean
5  authoritative. Do you understand the difference
6  between dominant and authoritative?
7     A  Authoritative probably means it was written
8  by someone who is an expert in some aspect or several
9  aspects of industrial safety.
10    Q  It's recognized by the folks in the industry
11 as an authority capable of being cited reliably.
12    A  I would say there are probably a few.
13    Q  Okay. What are they?
14    A  This isn't an area I spend much time on so I
15 don't know if I can provide any names. Name like
16 Peterson comes to mind. I think he was more in the
17 product safety arena.
18    Q  Peterson?
19    A  Peterson would be one.
20    Q  What's the name of his text?
21    A  Product Safety. Different -- he's been
22 published quite a bit over the early years. There are
23 others, but again, I can't recall their names.
24    Q  Did you cite any of these authoritative texts
25 in the report you wrote for this case?

Page 46

1    A    I did not.
2    Q    Did you consult any of these texts in
3    preparing your report?
4    A    I did not.
5    Q    Are there any journals that are generally
6    regarded as the leading journals in the field of
7    industrial safety?
8    A    There are a variety of things in safety.
9    There is occupational safety. The American Society of
10   Safety Engineers comes out with --
11   Q    Let's stop for a second. Yes or no, are
12   there any journals that are generally regarded as
13   leading journals in the field of industrial safety?
14   A    I would say yes.
15   Q    Okay. Approximately how many are there?
16   A    No idea.
17   Q    Did you cite any articles from these journals
18   in your report for this case?
19   A    I did not.
20   Q    Did you consult any of these journals in
21   preparing your report?
22   A    I did not.
23   Q    Have you written any textbooks in the field
24   of industrial safety?
25   A    I have not.

Page 47

1    Q    Other than for internal use at Hewlett
2    Packard, have you written any articles that were in
3    this field that were published?
4    A    I believe there were a couple, mostly on the
5    electrical side.
6    Q    And where were they published?
7    A    I don't recall.
8    Q    If they were noteworthy, you would have
9    included them on your CV; is that right?
10   A    Not necessarily. I'm not in the publishing
11   business. That's not what I do.
12   Q    In fact, you haven't listed any publications
13   on your CV, have you?
14   A    I have not.
15   Q    Now, you say that you're a certified safety
16   specialist; is that right?
17   A    Certified safety professional, board
18   certified.
19   Q    Okay. And who is it that has so certified
20   you?
21   A    The Board of Certified Safety Professionals,
22   which is an off branch of the American Society of
23   Safety Engineers. They are the oldest and largest
24   society in the world in safety.
25   Q    Where are they located?

Page 48

1    A    Chicago, North Brook -- well, it's the
2    Chicago area. I don't know if it's North Brook is a
3    subset of Chicago or what exactly. I think that's
4    right.
5    Q    When did you obtain this certification?
6    A    I believe this was 1983.
7    Q    What did you have to do to acquire the
8    certification?
9    A    You go through two -- well, three stages.
10   First of all you have to apply, so you have to meet
11   certain minimum qualifications. Then the next stage is
12   you take what we call the ASP exam, Associate Safety
13   Professional. Once you get past that, or if you get
14   past that, then there is at least a six-month delay
15   before you can exam -- take an exam for the CSP. And
16   that's the process.
17   Q    And did you successfully pass the exam the
18   first time you took them?
19   A    I missed one section on the ASP exam. I just
20   missed my time, so I had to retake one section. You're
21   allowed to do that if you only miss one section. The
22   final exam I passed first time. And I passed that
23   retake easily.
24   Q    And is this something -- you received this
25   certification before you even started your consulting

Page 49

1    business, right?
2    A    That would be true.
3    Q    So is this something that Hewlett Packard
4    wanted you to get?
5    A    No. It's something I felt I needed to do.
6    Even though technically I was not being required to
7    have this CSP, I felt it was just another step in my
8    professional growth. So I felt that it was time to do
9    it, even though I had been working in the field for
10   years.
11   Q    Did it help you in compensation terms at
12   Hewlett Packard?
13   A    I don't know that it did. I think my
14   performance and job -- on-the-job took care of that.
15   Q    Now, you say -- also say that you're a
16   certified forensic examiner.
17   A    That's correct.
18   Q    Let's go back for a second.
19        The exams you took to be certified as a
20   safety professional, did they cover issues regarding
21   harmony in the workplace?
22   A    I don't think so.
23   Q    Now, you also say that you're a certified
24   forensic examiner; is that right?
25   A    That's correct.

Page 50

1  Q  What's a forensic examiner?
2  A  It's an investigation -- forensics is a
3  technical study involving some aspect of investigating
4  an incident. It can be criminal, it can be
5  noncriminal. There are forensic experts, for example,
6  everything from handwriting to safety to, you know,
7  like Dr. Lee in the DNA field and so forth.
8  Q  He's one of our boys.
9  A  Really?
10 Q  He's from Connecticut, Dr. Henry Lee.
11 A  Oh, I didn't know that.
12 Q  Who certified you as a forensic examiner?
13 A  The board of -- the American College of
14 Forensic Examiners.
15 Q  And when did you acquire this
16 certification?
17 A  I think that was perhaps around the '93, '94
18 time frame.
19 Q  What did you have to do to get it?
20 A  The front loading was much more extensive.
21 You had to provide a lot of documentation in the
22 application. Oh, the application was not something I
23 just -- could just go out and ask for. You had to be
24 recommended by someone. Someone apparently turned my
25 name into the college and I was sent this package that

Page 51

1  said, Would you like to join? And I thought about it
2  and I said, I'll give it a shot.
3         So you fill out a lot of paperwork and I
4  provided documentation. And then that was either
5  accepted or not accepted. And then you took an exam
6  and the board reviewed everything and certified you.
7  Q  Okay. I assume that you're not a, you know,
8  a DNA expert?
9  A  No, sir.
10 Q  And you're not an expert in trace evidence
11 and things like that, right?
12 A  In the -- the way we normally think of
13 forensics on TV and movies and Dr. Lee level, no.
14 Q  Right. So does your certification as a
15 forensic examiner suggest that you are or is there some
16 limitation on your certification?
17 A  The way it comes out is my certification is
18 considered -- let's see if I can remember this
19 correctly. It's board certified safety -- excuse me,
20 board certified forensic examiner in the area of
21 accident reconstruction, human factors and safety
22 engineering.
23 Q  All right. Now, the case that brings us here
24 today isn't the first case that you've had with the
25 EEOC, is it?

Page 52

1  A  No, sir.
2  Q  How many cases did you have for the EEOC
3  before this one?
4  A  I believe it's two. If there is a third, I'm
5  not recalling it right off the top of my head.
6  Q  What's the name of the first one?
7  A  That would be the Amalgamated case.
8  Q  That's an Idaho case, isn't it?
9  A  That's an Idaho case, yes, sir.
10 Q  Now, is that a case where the EEOC was
11 claiming that an employer was guilty of national origin
12 discrimination, if you know?
13 A  Yes, it was.
14 Q  And who were the alleged victims of the
15 national origin discrimination in that case?
16 A  I believe in that case it was mostly Spanish
17 speaking.
18 Q  And was language involved in that case?
19 A  It was.
20 Q  How so?
21 A  This dealt with the general plant safety
22 issues and mostly maintenance and entry level
23 individuals over a period of time. I don't remember,
24 you know, exactly -- I'm not sure how to explain it
25 beyond that at this point. Did I answer your question

Page 53

1  or --
2  Q  Well, you answered it. I don't know if I
3  understand your answer. But that's -- let me ask
4  another one and maybe I'll help myself.
5         Is -- was it -- withdrawn.
6         Were Hispanic employees let go in that case?
7  A  Yes, sir.
8  Q  And was the claim -- or were they let go
9  because they couldn't speak English?
10 A  Yes.
11 Q  And was the employer's rationale for
12 terminating the employees on that basis, that they had
13 to know English to operate safely in the environment?
14 A  That was one of the elements. I don't --
15 that was certainly one of the elements.
16 Q  And is that the one you addressed?
17 A  I would say yes.
18 Q  Okay. Who contacted you from the EEOC about
19 serving as an expert in that case?
20 A  It was someone out of the -- I'm not sure I
21 remember exactly if they were from the Seattle office
22 or the Portland office. It was one of the -- it was
23 one of the two. And they may have gotten that
24 information from a local attorney perhaps. I'm not
25 sure.

Page 54

```
 1    Q  So you don't know how they came to you?
 2    A  Well, I was contacted. Again --
 3    Q  It's a lot easier if you answer my questions.
 4  So you don't know how they came to you?
 5    A  Sorry. No, I don't.
 6    Q  With whom did you deal from the EEOC in that
 7  case?
 8    A  Mr. -- shoot. I believe he was a
 9  Japanese-American and I can't recall the name at the
10  moment. I'm sorry, I don't remember.
11    Q  What were you asked to opine on in that
12  case?
13    A  Essentially whether the firing was justified
14  on the basis of safety and considered in the context of
15  limited English.
16        MR. ROBINSON: Can you read that back?
17
18        (The testimony was read.)
19
20  BY MR. ROBINSON:
21    Q  And what opinions did you render in that
22  case?
23    A  There did not appear to be any justification
24  for the release of these people based on safety of the
25  environment and their tasking that they were asked to
```

Page 55

```
 1  perform.
 2    Q  Let me see if I can put it in different words
 3  that you can agree to.
 4        Did you testify -- did you opine in that case
 5  that the ability to speak and understand English was
 6  not necessary for the employees to operate safely in
 7  that work environment, given the risks inherent in the
 8  environment or present in the environment?
 9    A  Yes.
10    Q  Did you give any other opinions in that case?
11    A  They would have been related to that
12  foundation point.
13    Q  And was the basis for your opinion in that
14  case that there were alternative ways to communicate
15  safety information to the employees involved?
16    A  Yes.
17    Q  Now, what was the second -- do you know what
18  happened with that case?
19    A  The case was -- I don't have a definitive
20  resolution on what happened with the case.
21    Q  Okay. You gave a deposition in that case?
22    A  I did.
23    Q  But you haven't testified in any trial, any
24  court, have you?
25        MS. PALACIOS: In that case.
```

Page 56

```
 1  BY MR. ROBINSON:
 2    Q  In that case?
 3    A  I might be able to check. I don't recall for
 4  sure at this point. I can check quickly if you'd like,
 5  I think. No, that was back too far. I don't have that
 6  paper with me. It seems to me that I did testify in
 7  that case.
 8    Q  In court?
 9    A  In court.
10        MR. ROBINSON: Off the record.
11
12        (Off-the-record discussion.)
13
14    A  I really should answer I don't recall for
15  sure. I'm trying to remember. I really don't.
16  BY MR. ROBINSON:
17    Q  What's the -- would you like to take a break?
18  Any time you want, just tell me.
19    A  I could probably use a drink of water.
20        MS. PALACIOS: Yes. We've been going
21  for about an hour. Maybe we can take a break and keep
22  going.
23
24        (Recess: 12:17 pm to 12:25 pm.)
25
```

Page 57

```
 1  BY MR. ROBINSON:
 2    Q  The Amalgamated case you said was the first
 3  case you had for the EEOC before the Beauty Enterprises
 4  case. What was the next one?
 5    A  I would believe it was the NIBCO case, but I
 6  think that -- that's how I remembered it initially, but
 7  I think it's the employment -- Equal Employment Law --
 8        MS. PALACIOS: Equal Employment Law
 9  Center for the record. It's not the same.
10        THE WITNESS: Yes. That's correct.
11  BY MR. ROBINSON:
12    Q  NIBCO, is that N-I-B-C-O?
13    A  N-I-B-C-O.
14    Q  And that's Rivera against NIBCO?
15    A  That's correct.
16    Q  And that's not a case for the EEOC?
17    A  I was thinking it was, but I'm not -- I don't
18  think it is.
19    Q  Okay. Was that case funded -- or withdrawn.
20        Were you hired by the Legal Aid Society?
21    A  At this point, I believe that to be
22  correct.
23    Q  Okay. And do you know how the Legal Aid
24  Society got to you?
25    A  I do not.
```

Page 58

1   Q   Do you know if the EEOC referred you to the
2   Legal Aid Society?
3   A   There is a chance that's true, but I don't
4   know for sure.
5   Q   Okay. Who first contacted you from the Legal
6   Aid Society?
7   A   I don't recall. I'm sorry, that might be
8   Chris Ho.
9   Q   Chris Ho?
10  A   H-O. I am reasonably sure.
11  Q   How do you spell Chris?
12  A   C-H-R-I-S, Christopher.
13  Q   It's a gentleman?
14  A   Gentleman.
15  Q   What was the Rivera case about or what is the
16  Rivera case about?
17  A   It's a plastic pipe manufacturing group and
18  they had a fairly large number of employees who could
19  not pass a recent change in company -- I'm not sure if
20  policy or procedures, where they had to pass
21  English-only exams, safety class exams.
22  Q   And?
23  A   They were terminated based on their limited
24  English.
25  Q   Because they -- so is this Rivera case pretty

Page 59

1   much like the Amalgamated case in the sense that the
2   employer believed that English language proficiency was
3   necessary for employees' safety and the employees were
4   let go because they lacked the English language
5   proficiency?
6   A   It was definitely related to that.
7   Q   Okay. And you were asked to opine in that
8   case that English language proficiency wasn't necessary
9   for the safety of these employees in that particular
10  environment, true?
11  A   Demonstratively true.
12  Q   No --
13  A   Yes, sir.
14  Q   Okay. You were asked to render that
15  opinion?
16  A   Yes, I was.
17  Q   And did you render that opinion?
18  A   I did.
19  Q   Did you give any other opinions in the
20  case?
21  A   I don't know how to answer that question. I
22  mean, there is just not one opinion. I mean, there is
23  levels regarding everything from --
24  Q   Ultimate opinion.
25  A   The ultimate opinion was that.

Page 60

1   Q   As I described it?
2   A   Essentially, yes, sir.
3   Q   Okay. Have you ever opined that the ability
4   to speak and understand English was necessary to the
5   workplace safety of any employees whose native language
6   was other than English?
7   A   I have not. Excuse me. We are referring to
8   actual cases at this point, just the cases that I've
9   been involved with personally?
10  Q   Why are you asking me that question?
11  A   I just wanted to clarify that if that --
12  actually, let me withdraw that. I'll just leave my
13  answer as it stands.
14  Q   Okay. Is it your opinion that the ability to
15  speak and understand English can never be helpful in a
16  diverse workforce in dealing with at least some
17  workplace hazards?
18  A   That is not my opinion.
19  Q   Do you think there are circumstances where
20  the ability to speak and understand English can at
21  least be helpful in dealing with some workplace hazards
22  where the workforce is diverse?
23  A   I think an ability to converse and
24  communicate better is always going to be helpful.
25  Q   Well, let me ask you -- let me pose the

Page 61

1   question to you again and I'd like you to answer it yes
2   or no, if you can.
3       Do you think there are circumstances where
4   the ability to speak and understand English can at
5   least be helpful in dealing with some workplace hazards
6   where the workforce is diverse?
7   A   Helpful, yes.
8   Q   Sitting here today, can you give me any
9   examples of where it might be helpful?
10  A   Well, I'll give you an example right off the
11  top where it's mandatory in that the only place I know
12  that it's mandatory, based on codes or regulations, is
13  for commercial drivers driving hazardous materials on
14  public roads. They have to be able to read, interpret,
15  communicate in English.
16  Q   Why?
17  A   As far as I know --
18  Q   Do you have an understanding of why?
19  A   Simply for public safety. For --
20  Q   What are the public safety risks of -- that
21  the English requirement addresses?
22  A   As to why it's a hard regulation?
23  Q   That's not what I asked you. I asked you
24  what are the risks -- what are the safety risks in that
25  context that the English language requirement