Page 62

1  addresses?
2  A  I'm not sure that it is an absolute
3  requirement in all cases, but it's certainly one that's
4  regulated. Now, the regulation may have been generated
5  for political reasons, it may have been generated by a
6  sense of just enhancing the safety of the public.
7  Q  How would it do that?
8  A  I'm not sure.
9  Q  Do you speak any languages other than
10 English?
11 A  I do not.
12 Q  Have you ever supervised any employees who
13 didn't speak English?
14 A  I've had responsibility for employees that
15 haven't spoken English.
16 Q  What does that mean?
17 A  Well, as a plant -- or a site safety
18 engineer, I have responsibilities that cover all areas
19 of the site and plant. And we have a lot of people
20 that either speak limited English over the years or no
21 English. And so I've worked with -- directly with
22 supervisors who had them under their direct charge.
23 Q  Okay. But you've never supervised employees
24 who didn't speak English?
25 A  Not one on one.

Page 63

1  Q  Okay. Have you ever supervised any employees
2  whose English language skills were negligible?
3  A  Yes. I'm sorry, I'm not sure what we mean by
4  "negligible." We were able to communicate?
5  Q  By using English words.
6  A  English, yes.
7  Q  Have you ever worked with any employees who
8  were bilingual?
9  A  Many times.
10 Q  How have they communicated with you?
11 A  Usually in English.
12 Q  And how have you communicated with them?
13 A  In English.
14 Q  Have you taken any courses at any time that
15 covered the issues faced by limited or non-English
16 speakers in the American workplace?
17 A  Seminars.
18 Q  Seminars?
19 A  Uh-huh. One-day, two-day type courses.
20 Q  How many seminars did you attend that covered
21 these topics?
22 A  I'm not really sure. The last --
23 Q  Can you remember one of them?
24 A  Last year.
25 Q  Where?

Page 64

1  A  At the Professional Development Conference.
2  Q  Where?
3  A  Where was it last year? Baltimore. I'm
4  sorry, I don't remember what the last conference was,
5  the location.
6  Q  Who sponsored the conference?
7  A  American Society of Safety Engineers.
8  Q  How would you describe this conference?
9  A  It's a multi-day conference held every year,
10 usually in June, always -- almost always in June.
11 Q  Is it the annual conference? A mid-year
12 conference?
13 A  Annual conference.
14 Q  If I wanted to get the program -- withdrawn.
15    I take it there are a lot of different
16 programs and seminars at this conference, yes?
17 A  Yes, sir.
18 Q  And if I wanted to get the list of programs
19 and seminars, what would I -- what could I do?
20 A  Easily done.
21 Q  Tell me.
22 A  ASE has a website and, for example, this
23 year's conference should be up by now, so they'll show
24 you all the breakout for this year's conference, which
25 is in Las Vegas. And I see, as far as I know, you can

Page 65

1  go back and get that. You can also just simply call
2  them and I'm sure they would send you any given year.
3  Q  And where are they?
4  A  They're in Chicago.
5  Q  Okay. And do you remember the name of this
6  seminar that dealt with the issues faced by bilingual
7  workers -- faced by limited or non-English speakers in
8  the American workplace?
9  A  I don't think I remember the exact title, but
10 it had to do with training non-English speaking
11 employees.
12 Q  What did you learn at that seminar about
13 training non-English speaking employees?
14 A  General discussions and content had to do
15 with how you might go about communicating effectively
16 with, for example, Spanish-speaking employees.
17 Q  Well, beyond communicating with them in
18 Spanish, through one device or another, did this
19 seminar tell you anything else about training
20 non-English speaking Hispanic employees?
21 A  Well, it was kind of a wholistic seminar, so
22 it covered, you know, different angles.
23 Q  Different angles of what?
24 A  Centered around training methods, issues
25 associated with training individuals who speak English

Page 66

1   poorly or not at all.
2       Q   Well, how does one train these people?
3       A   Obviously it depends on the nature of
4   training that is needed. But you can use bilingual
5   instructors. You can -- there are thousands of people
6   out there that have ways of writing text in different
7   languages and so forth. So there is a variety of media
8   out there.
9       Q   Yes, but common to all of that is using
10  Spanish as the language to communicate to them with?
11      A   Certainly.
12      Q   Now, my question to you was: Had you taken
13  any courses that covered the issues faced by limited or
14  non-English speakers in the American workplace? Do you
15  consider the seminar you went to on training
16  non-English speaking employees to be one that covered
17  issues faced by limited or non-English speakers in the
18  American workplace?
19      A   In the content of training, I would say
20  yes.
21      Q   Have you been to any other courses or
22  seminars or workshops that covered the issues faced by
23  limited or non-English speakers in the American
24  workplace?
25      A   I'm sorry, did you say issues again? I

Page 67

1   apologize.
2       Q   Yes. Issues.
3       A   Okay. I don't think so.
4       Q   And had you reached the opinion you made in
5   the Amalgamated case before you went to this American
6   Society of Safety Engineers seminar on training
7   non-English speaking employees?
8       A   That's correct.
9       Q   You had?
10      A   I'm sorry, I had not been to this course
11  before the Amalgamated --
12      Q   -- opinion was render?
13      A   Opinion was rendered prior to this course.
14      Q   And was your opinion in this case -- well,
15  and your opinion in the Rivera/NIBCO case, was that
16  rendered before you went to this course or seminar?
17      A   It seems to me that the deposition in that
18  case came after that seminar.
19      Q   But you had reached your opinion before you
20  gave the deposition, right?
21      A   Yes, sir.
22      Q   And you reached your opinion before you went
23  to this seminar?
24      A   That's correct.
25      Q   And did you render your opinion in this case,

Page 68

1   this Beauty Enterprises case before you went to this
2   seminar?
3       A   The case covers about two years, so I'm not
4   exactly sure, you know, when it culminated.
5       Q   Have you read anything that wasn't produced
6   by the EEOC about the issues faced by limited or
7   non-English speakers in the American workplace?
8       A   A lot of data passes through from journals,
9   articles, from various places that deal or talk about
10  things of this general nature. So I would say over
11  time I've probably read a variety of things along that
12  line.
13      Q   Would it also be fair to say that you can't
14  remember any specific thing you've read?
15      A   It's not something I would memorize or retain
16  or put in my file just so I could use it for this
17  case.
18      Q   Okay. Have you read anything about the
19  methods available to assess the issues faced by limited
20  or non-English speakers in a workplace?
21      A   Pretty much same answer.
22      Q   You might have, but you certainly can't
23  identify anything in particular that you read, fair to
24  say?
25      A   Fair to say.

Page 69

1       Q   Do you consider yourself an expert on the
2   issues faced by limited or non-English speakers in the
3   American workplaces?
4       A   I consider myself --
5       Q   Just answer my question. Do you consider
6   yourself an expert on the issues faced by limited or
7   non-English speakers in American workplaces?
8       A   I can't answer that. It's too broad.
9       Q   What makes it too broad?
10      A   What issues are we talking about? Home
11  issues? Safety issues? Industrial workplace? Work
12  environment? I can address those things. I'm not
13  necessarily an expert on income or financial issues and
14  so on.
15      Q   Are you an expert on the potential emotional
16  issues that may arise that aren't necessarily related
17  to safety -- well, no, let me ask you: Are you aware
18  of the -- do you consider yourself an expert in the
19  emotional issues that may or may not arise for limited
20  or non-English speakers in an American workplace?
21          MS. PALACIOS: Objection.
22      A   Expert on emotion, no.
23  BY MR. ROBINSON:
24      Q   And if I -- just to save time, if I went
25  through the same list of questions about bilingual

Page 70

1  workers, would your answers essentially be the same?
2         MS. PALACIOS: Objection.
3      A   I'm aware of emotion. I wouldn't consider
4  myself an expert. I'm certainly --
5  BY MR. ROBINSON:
6      Q   Hopefully you're aware of emotion.
7      A   I'm definitely aware of emotion.
8      Q   You even probably had some in your life,
9  right?
10     A   Yes, sir. But in that context, I think your
11 question was no, I don't consider myself a psychologist
12 or any of the related fields in the emotion arena.
13     Q   Do you consider yourself an expert on the
14 factors that make for a harmonious workplace in places
15 where the workforce is diverse in national origin
16 terms?
17     A   I honestly don't know how far to carry the
18 term "expert." I've certainly got much experience in
19 that area, having lived it, worked it, had
20 responsibility for it.
21     Q   Was that a yes or a no or I don't know?
22     A   Could you read that original question back?
23     Q   I'll repeat it.
24         MS. PALACIOS: Well, objection. I
25 mean, I think he answered the question. Maybe not the

Page 71

1  way you wanted him to.
2  BY MR. ROBINSON:
3      Q   Okay. Do you consider yourself an expert on
4  the factors that make for a harmonious workplace in
5  places where the workforce is diverse in national
6  origin terms?
7         MS. PALACIOS: Objection.
8      A   Again, knowledgeable, I'm not sure at what
9  degree one would become an expert.
10 BY MR. ROBINSON:
11     Q   So you don't know?
12        MS. PALACIOS: Objection.
13     A   I don't know about the term expert. I do
14 have knowledge --
15 BY MR. ROBINSON:
16     Q   Well, you've been to school on expert
17 witnesses. You know what an expert witness is?
18     A   On emotion? Harmonious workplace?
19     Q   Right.
20     A   I would say I approach an expert level.
21     Q   Approach an expert level. And what training
22 do you have that gives you this expertise?
23     A   Thirty years of on-the-job training day in
24 and day out.
25     Q   What formal training do you have that gives

Page 72

1  you this expertise?
2      A   Leadership training, Navy, leadership. A lot
3  of in company on related subjects.
4      Q   When you served in the Navy, did you serve
5  with people who couldn't speak English or whose English
6  was really limited --
7      A   Certainly --
8      Q   -- during your nine years of active duty?
9      A   There were a few individuals that could
10 communicate, but difficult -- with difficulty.
11     Q   So again, what formal training do you have
12 that gives you this expertise or almost expertise in
13 the factors that make for a harmonious workplace in
14 places where the workforce is diverse in national
15 origin terms?
16     A   If you consider company training in various
17 areas of management, leadership, human relations
18 courses, personality -- let's see, if you consider
19 those formal education, then I probably had those type
20 of training.
21     Q   And where did you have that training?
22     A   Mostly with Hewlett Packard.
23     Q   So this wasn't in a degree program in
24 school?
25     A   No, sir.

Page 73

1      Q   Now, you say you've had on-the-job training
2  in the factors that make for a harmonious workplace in
3  the place where the workplace is diverse in national
4  origin terms. What, if anything, have you read that
5  gives you this expertise?
6      A   I can't quote anything. It's continual data
7  stream over the 30 years.
8      Q   What experience do you have as a supervisor
9  or a manager of a workforce that's diverse in national
10 origins? And I don't mean just third generation Irish
11 and fourth generation Italian.
12     A   My Navy crews often came from diverse
13 backgrounds and cultures.
14     Q   But they all spoke English?
15     A   Yes. Also in the -- I had direct
16 manager/supervisor responsibilities roughly the first
17 ten years with HP, even though my tasking kind of
18 evolved. And so there were opportunities where I had
19 diverse individuals.
20     Q   Diverse how?
21     A   Hispanic, African-American. I think I had a
22 Vietnamese young fellow at one time.
23     Q   Any language problems that you had to
24 encounter with these folks?
25     A   Not with those experiences involving direct

Page 74

1  supervision.
2     Q  Because they spoke English?
3     A  Adequately.
4     Q  Have you done any work for the EEOC on cases
5  other than Amalgamated and this case, or are you doing
6  any work for the EEOC in cases other than Amalgamated
7  and this case?
8     A  There is a case in progress that's been quiet
9  for a while.  I refer to it as EEOC versus Remedy.
10    Q  Versus who?
11    A  Remedy.
12    Q  How do you spell Remedy?
13    A  R-E-M-E-D-y.
14    Q  Where is that case?
15    A  I believe it's in Iowa.
16    Q  Any other cases?
17    A  I don't recall right off the top of my head.
18 There was an LA case, but there is a chance that that's
19 related to the Iowa case because I think they moved the
20 plant.  There may be others and I can't recall right
21 now.
22    Q  What's the Remedy case about?
23    A  A deaf employee.
24    Q  Who was fired -- who was fired over safety
25 concerns?

Page 75

1     A  Originally discriminated against in the
2  hiring process.  And I don't recall the other detail
3  right offhand.
4     Q  Was the claim that the ability to hear was a
5  bona fide occupational qualification?
6     A  It turned on safety, if I was deaf working in
7  that environment.
8     Q  Okay.  So you were asked to testify whether
9  you needed to hear to be safe in the environment?
10    A  This case is still in progress, but at some
11 point I will testify.
12    Q  About that?
13    A  About that.
14    Q  You haven't done it yet?
15    A  No, sir.
16    Q  Okay.
17       MR. ROBINSON:  Do you want to break for
18 lunch?  Take a half hour, three quarters of an hour?
19       MS. PALACIOS:  How do you feel?
20       THE WITNESS:  Whenever you folks want
21 to break.
22       MR. ROBINSON:  We usually do 1:00.
23 Take 45 minutes, something like that.
24
25       (Recess: 12:54 pm to 1:49 pm.)

Page 76

1
2  BY MR. ROBINSON:
3     Q  We're back on the record after lunch.  And
4  let's start talking about the opinions you've rendered
5  in this case.  And it might be helpful if you had your
6  report in front of you.
7        Now, on page 2 it says that, "In my opinion,
8  there was no safety, health or operational, paren,
9  i.e., equipment safety, end paren, reason for Beauty
10 Enterprises to implement an English-only policy or
11 rule."  Did I read that right?
12    A  That's correct.
13    Q  Now, I want to understand what you mean by
14 that.  One could interpret this to mean that safety,
15 health, et cetera, was not actually in the
16 institutional mind of Beauty Enterprises or of its
17 owner when a decision was made to adopt an English-only
18 rule.  That's not what you mean here, is it?
19       MS. PALACIOS:  Objection.
20    A  I don't know what's in their personal mind.
21 BY MR. ROBINSON:
22    Q  So that's not what you mean here?
23    A  No.  I don't think it is, if I understand.
24    Q  So what you really mean here I guess is that
25 an English-only rule isn't a business necessity for

Page 77

1  safety purposes, right?
2     A  In my opinion, that's true.
3     Q  Now, how do you define business necessity?
4     A  I can't make a profit because people don't
5  speak English.
6     Q  Well, to be honest with you, I don't
7  understand that.  So why don't you do it this way.
8  Complete this sentence.  A business necessity is --
9     A  I can't make a profit.  I can't perform my
10 businesses in some level of performance or other
11 because somebody simply doesn't speak English.  And
12 we're talking about our plaintiffs and the workforce in
13 general here.
14    Q  So your definition of business necessity is
15 if there is somehow, some way a business can make a
16 profit without requiring all of its employees to speak
17 and understand English, then the ability to speak and
18 understand English isn't necessary?
19    A  Not for the safety, health or operational
20 efficiencies.
21    Q  Can we go back -- I want you to listen to the
22 last few questions and answers.  And I want to tell you
23 why.  I want to be fair with you.  I'm asking you to
24 define business necessity in this particular context.
25 You gave me a definition that had absolutely nothing to

20 (Pages 74 to 77)

EEOC vs Beauty Enterprises

2/5/2004                                                                Earnest Harper

Page 78

1  do with safety or was so broad that safety could have
2  been a part of it, was only a part of it. And then you
3  qualified your answer, your last answer, limiting it to
4  safety. And so on the one hand we have the ability to
5  make profit as a standard, on the other hand we have
6  safety as a standard. And I don't think that they're
7  necessarily related. So maybe we can go through this
8  again and you can be more precise in telling me what I
9  want to know.
10
11         (The testimony was read.)
12
13 BY MR. ROBINSON:
14    Q  Have you heard the rereading of the questions
15 and answers?
16    A  I did.
17    Q  Do you understand my problem?
18    A  Well, I think so. If I can paraphrase, you
19 ask a very broad, general question, is English
20 necessary for business proficiency.
21    Q  Necessity.
22    A  And I said the bottom line is making a
23 profit. And that stands a general reply to the general
24 question. As we keep talking about it, I assume you
25 wanted a little bit deeper response, so I made an

Page 79

1  attempt to do that.
2     Q  Okay.
3     A  And there is a tie between safety and all
4  those other things and profit.
5     Q  But maybe we'd get a better answer if I did
6  it this way. What is, in your view -- well, how do you
7  define a business necessity in the safety context?
8     A  First of all, you start out with a general
9  term, safety is fundamental to business success
10 ultimately. If I have a fire situation, the plant
11 burns down, obviously I'm not going to make a profit.
12 So safety is germane -- excuse me, profit is germane to
13 safety.
14        If I have a workforce that gets injured,
15 can't perform, et cetera, same thing. Ultimately it
16 cuts into my profit.
17    Q  Did the EEOC -- I mean, obviously the
18 opinions you've given in this report are the opinions
19 the EEOC has asked you to give, yes?
20    A  These are my opinions based on the details
21 and information available.
22    Q  I understand. But the EEOC wanted you to
23 give these opinions, yes?
24           MS. PALACIOS: Objection.
25 BY MR. ROBINSON:

Page 80

1     Q  They wanted to know if you could give these
2  opinions?
3     A  They wanted an opinion in this area based on
4  the information provided.
5     Q  Right. And you know what opinion they would
6  have liked you to have rendered, right?
7     A  Didn't matter.
8     Q  No, that's not my question. You know what
9  opinion they wanted you to render, true? Do you know
10 that? Yes or no, sir.
11    A  Yes, sir.
12    Q  And you gave them -- and for one reason or
13 another, you gave them the opinion that they wanted to
14 have?
15    A  I gave them my opinion.
16           MS. PALACIOS: Objection.
17 BY MR. ROBINSON:
18    Q  And that was -- that's consistent with the
19 opinion they were looking for?
20    A  It may be.
21    Q  Okay. Now, when the EEOC asked you for your
22 opinion on these matters, did anyone there define for
23 you the term business necessity?
24    A  No.
25    Q  Now, is it your testimony that an

Page 81

1  English-only policy can never be helpful in avoiding
2  accidents of any sort?
3     A  Never? Without limits? What do you mean by
4  "never"? Just for Beauty Enterprises? Or an atomic
5  plant? I don't know where your constraints are or do
6  you mean literally never?
7     Q  Literally never.
8     A  There would be places in high tech -- perhaps
9  nuclear power plants where you definitely in critical
10 areas may want English-only individuals for different
11 reasons.
12    Q  Such as?
13    A  People writing the panels that flag alarms,
14 run-away -- thermal run-aways. Or there might be some
15 other issues there.
16    Q  And why would an English-only policy be
17 helpful there?
18    A  Background training, reading gauges which
19 can't be too complicated because there is so many of
20 them. That's just -- that's probably a poor answer,
21 but -- and that's a possibility.
22    Q  Would you agree with me that the ability to
23 warn others of the imminence of certain kinds of
24 hazards by using a language everyone understands, or at
25 least using words that everyone understands, can

21 (Pages 78 to 81)

Page 82

```
 1  sometimes be helpful in avoiding at least certain kinds
 2  of accidents?
 3          MS. PALACIOS: Objection.
 4      A   Probably very rare.
 5  BY MR. ROBINSON:
 6      Q   Your answer to this question is very rare?
 7      A   Probably very rare, yes.
 8      Q   Why?
 9      A   What does "look out" mean? Look out. What
10  does that mean? Something falling off on my head or is
11  the forklift right behind me and I can't hear it
12  because it's too noisy or I think it's in the next
13  aisle. What does it mean?
14      Q   How about "be careful"?
15      A   What does that mean? I'm lifting too much?
16  I'm getting ready to cut my hand on something? I'm
17  getting ready to touch something hot? What does it
18  mean? Or does it mean walk around and be careful?
19      Q   Would you agree with this statement, that the
20  simple thing of communicating in a language everyone
21  understands, "Be careful on the ladder," could really
22  help to avoid a safety problem?
23      A   Easily taken care of.
24      Q   Easily taken care of does not answer the
25  question. Let me repeat it. I'm asking you yes or no,
```

Page 83

```
 1  would you agree with the statement that, quote, The
 2  simple thing of communicating in a language everyone
 3  understands, Be careful on the ladder, could really
 4  help to avoid a safety problem?
 5      A   Not necessarily.
 6      Q   And what do you mean by "not necessarily"?
 7  You mean sometimes it can and sometimes it can't?
 8      A   What does "be careful on a ladder" mean?
 9  Don't go too high? Don't step on the top rung? Does
10  it mean the proper angle? Does it mean I shouldn't
11  handle boxes on there? Be careful doesn't tell you
12  anything. It's just a general --
13      Q   I'm sorry, go ahead.
14      A   It's too general.
15      Q   Have you ever made the statement, The simple
16  thing of relating to communicating in languages that
17  everyone understands, saying, "Be careful on the
18  ladder" could really help to avoid a safety problem?
19      A   No.
20      Q   Because you think that statement is
21  inaccurate?
22      A   Doesn't mean anything.
23      Q   So if you knew what "watch out" meant and I
24  knew what "watch out" meant and we were in an aisle at
25  Beauty Enterprises and I saw a box about to fall from
```

Page 84

```
 1  one of the shelves potentially on your head and I
 2  yelled, "Watch out" to you, that wouldn't perhaps help
 3  you avoid having a box fall on your head?
 4          MS. PALACIOS: Objection.
 5      A   Not necessarily. Which way --
 6  BY MR. ROBINSON:
 7      Q   I didn't say necessarily.
 8      A   No.
 9      Q   Could it help?
10      A   No.
11      Q   It wouldn't help at all?
12      A   It may help. It's not automatic that it
13  would help.
14      Q   I didn't ask whether it was automatic.
15      A   That's my answer.
16      Q   It may help?
17      A   It may help.
18      Q   Okay. And if I said -- do you understand
19  Spanish?
20      A   I do not.
21      Q   If I said to you in Spanish words "watch
22  out," could that help at all in avoiding the
23  accident?
24      A   Same answer.
25      Q   It may?
```

Page 85

```
 1      A   It may.
 2      Q   Even though you don't understand -- you don't
 3  understand the Spanish word?
 4      A   Well, I'm assuming if I use Spanish that the
 5  individual I'm hollering at understands Spanish or I
 6  probably wouldn't use it. Same answer though, it may
 7  not help.
 8      Q   Why not?
 9      A   Which way do I jump?
10      Q   I don't know. It may not be perfect, but it
11  could help. It could help, right?
12          MS. PALACIOS: Objection.
13      A   It could help. I've answered that.
14  BY MR. ROBINSON:
15      Q   And one of the hazards in the environment at
16  Beauty Enterprises is a ladder fall hazard, yes?
17  Ladder fall hazard, yes?
18      A   That would be appropriate.
19      Q   Yes?
20      A   Yes.
21      Q   And there is also a hazard of falling
22  material at Beauty Enterprises; isn't that right?
23      A   That's correct.
24      Q   And there are hazards at Beauty Enterprises
25  arising from forklift movements, true?
```

Page 86

1   A   That's correct.
2   Q   And you're aware, are you not, that at any
3   given time Beauty Enterprises' workforce could include
4   immigrants from a number of different countries who
5   have native languages that are different from each
6   other and not English?
7   A   That's correct.
8   Q   Spanish isn't the only language besides
9   English that Beauty Enterprises workers speak; isn't
10  that right?
11  A   Correct.
12  Q   And wouldn't you agree with me that it would
13  at least be helpful from a safety perspective, maybe
14  not a guarantee, but at least be helpful from a safety
15  perspective if everyone could say, understand and use
16  in this context the English words "watch out" or "look
17  out"?
18  A   It may be.
19  Q   Okay. Now, to arrive at your opinion
20  regarding the English-only rule not being necessary for
21  safety, did you read and rely on any texts regarded as
22  authoritative in the field?
23  A   No.
24  Q   Did you read and rely on any journal
25  articles?

Page 87

1   A   No.
2   Q   Did you conduct any experiments?
3   A   No.
4   Q   What, if anything, did you rely on in
5   choosing a method -- withdrawn.
6       What, if anything, did you rely upon in
7   choosing the method that you used to develop your
8   opinion?
9   A   Could you read that question back?
10
11      (The testimony was read.)
12
13  A   I think a proper answer would be is 30 years
14  of accumulated experience, a flow of data that covered
15  this same period, personal investigation experience and
16  a composite of that.
17  BY MR. ROBINSON:
18  Q   You didn't rely on any formal protocol issued
19  by the -- one of the safety engineering organizations
20  you're in, did you?
21  A   No.
22  Q   Did you review your methodology with any of
23  your -- used in this case with any of the peers you
24  have in the safety profession?
25  A   No.

Page 88

1   Q   Did you have any of your peers review your
2   conclusions?
3   A   No.
4   Q   Now, one of the bases for your opinion that
5   the English-only rule isn't a business necessity for
6   safety at Beauty Enterprises is that alternate
7   communication strategies are numerous; isn't that
8   right?
9   A   They are.
10  Q   Isn't that a basis for your opinion?
11  A   It's one of several bases for my opinion.
12  Q   That's what I said. The question is: One of
13  the bases for your opinion that the English-only rule
14  is not a business necessity for safety is that -- at
15  Beauty Enterprises is that alternate communication
16  strategies are numerous?
17  A   Yes, sir, that is right.
18  Q   This was also the basis that you gave to the
19  EEOC for your opinion in the Amalgamated case, yes?
20  A   It was one of the reasons.
21  Q   And was it one of the bases for your opinion
22  in the other cases?
23      MS. PALACIOS: What other cases? The
24  ones that we talked about earlier?
25      MR. ROBINSON: Yes.

Page 89

1   A   I think the answer is yes, if I recall the
2   exact framing.
3   BY MR. ROBINSON:
4   Q   Now, what do you mean by "alternate
5   communication strategies"?
6   A   If you have information that you perceive is
7   necessary to communicate to someone who may not
8   possibly understand, and by the way this applies with
9   English on English as well, in this case non-English,
10  you can have bilingual instructors, you can have texts,
11  you can have video, you can have video with various
12  language imposed on the video. There is just almost an
13  infinite variety of ways to communicate certain
14  fundamental things that you want to communicate.
15  Q   Let me see if I understand what you're saying
16  here. Are you saying that a communication strategy is
17  a business necessity for safety in the workplace?
18  A   I think perhaps it's a little more
19  complicated than that, but yes, fundamentally.
20  Q   Okay. Are you also saying that the
21  English -- withdrawn.
22      Are you also saying that an English-only rule
23  is a communication strategy?
24  A   I think a very poor one if that's your only
25  approach, but --

Page 90

1    Q   Is the answer to my question yes?
2    A   It's a communication, yes.
3    Q   And are you saying that there are
4   communication strategies for safety other than an
5   English-only rule?
6    A   Yes.
7    Q   Okay. So now we have -- would you agree that
8   you and I have just established that there are a number
9   of communication strategies available to achieve this
10  particular goal that we've been talking about, yes?
11   A   Yes.
12   Q   Did you research the literature to determine
13  whether there are any studies that address the
14  question, for example, of whether an English-only rule
15  is a less successful strategy for safety than, say, one
16  of the other strategies that you've identified?
17   A   Yes, I believe there was.
18       MR. ROBINSON: I'm going to have the
19  question read back to you again.
20
21       (The testimony was read.)
22
23   A   The answer is no.
24  BY MR. ROBINSON:
25   Q   Did you conduct any tests or perform any

Page 91

1   studies to determine whether an English-only rule is a
2   less successful strategy for safety than some of the
3   other strategies you've identified?
4    A   No.
5    Q   Isn't it a fact, sir, that the opinion you've
6   given to the EEOC reflects a value judgment on your
7   part about English-only rules that has nothing to do
8   with safety?
9    A   It is not true.
10   Q   It's not true. Do you believe that
11  English-only rules are bad social policy?
12   A   It's not my opinion as to whether it's a
13  social problem or not.
14   Q   That's not what I asked you. Do you believe
15  that English-only rules are bad social policy?
16   A   I tend to believe, yes, they tend to be
17  bad.
18   Q   Okay. Do you believe that English-only rules
19  are illegal?
20   A   No. I'm not a lawyer, but there is no code
21  or regulation that says I have to teach in English or
22  not teach in English or test in English.
23   Q   Has the government -- has the EEOC told you
24  that English-only rules are illegal?
25   A   No.

Page 92

1    Q   Have they said anything to you about the
2   legality of English-only rules?
3    A   Never been a discussion.
4    Q   Okay. But you understood that in this case
5   at least the EEOC was challenging the legality of
6   Beauty Enterprises' English-only rule, yes?
7    A   I don't exactly know what their legal
8   challenge was in those terms.
9    Q   Well, you knew that the -- that the challenge
10  was -- the claim was that the English-only rule
11  represented national origin discrimination?
12   A   Discrimination, yes.
13   Q   And discrimination is illegal, right?
14   A   That's correct.
15   Q   And you knew that not just from this case,
16  but from the earlier cases that you worked on for the
17  EEOC and for the Legal Aid Society, true?
18   A   That's correct.
19   Q   So isn't it fair to say, sir, that in your
20  mind the choice was between an alternative that's
21  illegal or bad social policy and alternatives that are
22  neither illegal nor socially undesirable?
23   A   I don't understand the question.
24       MS. PALACIOS: Objection.
25  BY MR. ROBINSON:

Page 93

1    Q   Did the EEOC tell you that English-only rules
2   are illegal unless they are justified by business
3   necessity?
4    A   If they did, I have no recollection of it. I
5   doubt it.
6    Q   Would your opinion that the rule isn't
7   justified by business necessity at Beauty Enterprises
8   be different if you were told this about the law, that
9   English-only rules are legal in the workplace where the
10  employees have sufficient proficiency in English to
11  obey the rule and do their job safely?
12   A   It would make no difference on my opinion.
13   Q   Why not?
14   A   I leave the -- that level of the legalities
15  up to the attorneys. My job was just to see if English
16  only had an impact based on the facts of the case.
17   Q   Would you agree that the alternate strategies
18  you've identified impose burdens on the employers or
19  this employer?
20       MS. PALACIOS: I'm sorry, I didn't
21  catch the question. Can you just read it back?
22
23       (The testimony was read.)
24
25   A   Yes, they probably did.

Page 94

1  BY MR. ROBINSON:
2    Q   Okay. Well, let's be a little bit more
3  specific. One of the alternate strategies is bilingual
4  supervisor, yes?
5    A   That would be one.
6    Q   Okay. And when you say that alternate
7  strategies are available and a bilingual supervisor is
8  one, do you say that a bilingual supervisor is an
9  alternate strategy because there happen to be bilingual
10 supervisors that Beauty Enterprises employs, or are you
11 saying that they can go out and find a bilingual
12 supervisor if they don't have one, or both?
13   A   They had them.
14   Q   So it's just the fact that they had them?
15   A   Well, that's certainly one of the facts. It
16 doesn't cost them anything if they're already paying
17 his wages.
18   Q   Sir, I'm just trying to understand what you
19 mean by alternate communication strategies, one of
20 which being bilingual supervisor. I take it that in
21 theory, at least, if I'm an employer and I'm looking
22 for an alternate communication strategy and I don't
23 have any -- and one of those theoretically available
24 strategies is a bilingual supervisor and I don't have
25 any bilingual supervisors on my staff, I can go out and

Page 95

1  get one, right?
2    A   You could.
3    Q   Okay. And that would be within your concept
4  of alternate business strategies in this context,
5  yes?
6    A   Yes, it would.
7    Q   Okay. So to implement this particular
8  alternative, the employer, if it didn't have one on
9  staff, would have to go out and find one?
10   A   If you didn't have a bilingual employee that
11 was not a supervisor.
12   Q   You mean -- you wouldn't have to go -- even
13 though he doesn't have a bilingual supervisor on staff,
14 that in your view he wouldn't be placed with the burden
15 of going out to get a bilingual supervisor as long as
16 he had some bilingual employee who could serve the
17 communications function?
18   A   Sure.
19   Q   Is that what you're saying?
20   A   That's correct.
21   Q   But let's just stay with your bilingual
22 supervisor alternative. If what you wanted was a
23 bilingual supervisor and you didn't have one, you have
24 to go out and get one, yes?
25   A   If you brought in a bilingual person from the

Page 96

1  outside, they wouldn't be a supervisor, they would be a
2  bilinguist, if that's the proper term.
3    Q   Well, you said one of the alternatives is a
4  bilingual supervisor.
5    A   That's correct.
6    Q   So let's just follow that.
7    A   Okay.
8    Q   And there other alternatives to that, too?
9    A   Many.
10   Q   Okay. But let's just follow the bilingual
11 supervisor alternative. And you'd agree with me if you
12 don't have one on staff, you have to go out and get
13 one, yes?
14   A   If that's your choice.
15   Q   Yes. Okay. And at Beauty Enterprises we've
16 already established there are several languages other
17 than English that are spoken there, yes?
18   A   Yes.
19   Q   So in order to get a supervisor who could --
20 in order to have an alternate communication strategy
21 that involved supervisors with language skills, we
22 either have to get a single supervisor who could speak
23 all the languages, or a supervisor -- or a number of
24 supervisors who in total would speak all the languages,
25 yes?

Page 97

1    A   In that hypothetical, yes.
2    Q   Don't you think it would be hard for an
3  employer to locate and hire a group of supervisors who
4  collectively spoke all the native languages of all the
5  employees at Beauty Enterprises?
6    A   Yes.
7    Q   Wouldn't it also be hard for employers to
8  find signs in the many different languages that are
9  spoken at Beauty Enterprises?
10   A   No.
11   Q   Do you know how many different languages are
12 spoken at Beauty Enterprises?
13   A   I think there was four or five.
14   Q   Do you know what they are?
15   A   Russian. Obviously Spanish. I'm not sure
16 right off the top. I remember the others -- seemed to
17 me Loatian may have been one. I don't remember.
18   Q   Now, you say use of interpreters, employee
19 interpreters, is another alternate communication
20 strategy, yes?
21   A   That's correct.
22   Q   Wouldn't you agree with me that having to
23 find and use an interpreter is a less efficient way for
24 two people to communicate than conversing in one on one
25 in a language that each understands?

Page 98

1   A   Yes.
2   Q   That's just common sense?
3   A   Absolutely.
4   Q   And wouldn't you -- and one of -- one of
5   your -- didn't you write in here at some point that
6   just teaching them English is another of the alternate
7   communication strategies, alternate to an English-only
8   rule?
9   A   I don't recall if I said it in that fashion.
10  That would certainly be way down on my list.
11  Q   And -- but you'd agree with me that teaching
12  them English alternative would impose a burden on the
13  employer, right?
14  A   Sure.
15  Q   And of course teaching them English as an
16  alternative presumes that the employees don't know
17  enough English to do their job safely, doesn't it?
18  A   No, it doesn't.
19  Q   Why not?
20  A   There is no evidence to that.
21  Q   Well, why would you have to teach them
22  English if they already knew it?
23  A   You wouldn't.
24  Q   Right. Did you consider any of these burdens
25  that we've talked about in reaching your opinion about

Page 99

1   alternate communication strategies?
2   A   I did not.
3   Q   Why not?
4   A   They're not burdens necessarily in all cases.
5   If I end up with people that can more efficiently
6   conduct their work, however that might come about, also
7   if there is less exposure to hazards, then my long-term
8   gains offset any temporary burdens. So you can't just
9   make a flat statement to that effect.
10  Q   Before we leave this topic of alternate
11  communication strategies, I want to ask you a few more
12  questions.
13        How would the existence on staff of a
14  bilingual supervisor help to avoid an imminent box
15  falling accident in Aisle A, for example, at Beauty
16  Enterprises when that supervisor isn't in Aisle A at
17  the time?
18  A   Wouldn't have anything to do with it.
19  Wouldn't prevent it at all.
20  Q   Right.
21  A   If there is an exposure.
22  Q   How would a sign in several languages help to
23  avoid an imminent box falling accident?
24  A   Probably wouldn't.
25  Q   How would an interpreter help to avoid an

Page 100

1   imminent box falling accident?
2   A   One way, if employees could speak to him
3   without fear of retribution or any of those other
4   things that occasionally happens and says, Look, this
5   whole rack is unstable, then communicating to this
6   bilingual person and that bilingual person turns around
7   and goes to a manager and says, We need to put some
8   bracing up there, we need to stack better, we need to
9   make the boxes smaller, that prevents the exposure.
10  That's how that would happen.
11  Q   But what if the exposure was -- not
12  withstanding the best efforts of everyone involved,
13  there was nevertheless an imminent box falling
14  accident, not one that could happen in the future, but
15  one that was about to happen then and there, how would
16  an interpreter help to avoid a imminent box falling
17  accident? You would have to go get an interpreter to
18  issue a warning to someone in a language they
19  understood?
20  A   It's the same answer I would give for
21  English.
22  Q   Which is?
23  A   What does "watch out" mean? If it's imminent
24  and somebody sees it, it doesn't suddenly just happen,
25  it's been on the edge. I mean, it's an obvious thing

Page 101

1   that a supervisor walking around in English or Spanish
2   or Russian would recognize presumably if they had that
3   intent and they would have fixed it.
4   Q   Okay. Would you say that in your mind when
5   you were dealing with this problem that the way you
6   thought about it was to ask yourself the question, what
7   could Beauty Enterprises do to create communication
8   amongst its diverse workforce if it couldn't have an
9   English-only rule?
10  A   I'm sorry, could you read that one back?
11        MS. PALACIOS: And what do you mean by
12  "problem"? You said problem.
13        MR. ROBINSON: I don't know.
14        THE WITNESS: First read it back maybe.
15
16        (The testimony was read.)
17
18  A   No, I never asked myself that question.
19  BY MR. ROBINSON:
20  Q   Well, are you sure you didn't ask yourself
21  that question perhaps in different words?
22  A   You know, I look at the exposures, I look at
23  the job they're doing, I look at their safety records,
24  I look at all of that and I observe them doing the job
25  that they've been doing for a long time in most cases

26 (Pages 98 to 101)

Page 102

1  and I come to these conclusions. I don't sit there and
2  ask myself, you know, if this English-only thing would
3  somehow make it better or worse -- well, that's not
4  even true.
5      I just don't think quite in that fashion so I
6  can't really answer that question as posed.
7      Q  Well, you've come up -- let's try to get
8  there by backing into it. The basis of your opinion or
9  a basis for your opinion that the English-only rule
10 isn't necessary is because there are alternate
11 communication strategies to communicate with people
12 there?
13     A  Yes. That is one.
14     Q  People that speak a variety of different
15 languages?
16     A  Yes, sir. That's true.
17     Q  So then necessarily you must have thought to
18 yourself, if I can't make them all speak in English,
19 what other ways do I have of communicating with this
20 diverse workforce?
21     A  Don't hire them in the first place. If
22 you're hiring people that don't speak a certain level
23 of English, don't hire them in the first place. That's
24 an alternate method.
25     Q  Okay. You didn't suggest that, did you?

Page 103

1      A  No, sir.
2      Q  Okay. But was that -- was that the analysis
3  you were making, what other choices would I have had?
4      A  Eliminate the hazards.
5      Q  No, no. Yes or no. Was that what you were
6  thinking, what other choices would there have been for
7  the employer besides this English-only rule to
8  effectively communicate safety information to employees
9  and provide the communication necessary for them to be
10 safe in this work environment?
11         MS. PALACIOS: Objection.
12     A  I go into this case knowing in advance that
13 there is multiple ways to communicate to people. And
14 that's all I did. I mean, it's not a question I ask
15 myself. It's simply preknowledge.
16     Q  Common sense?
17     A  Common sense. Preknowledge, yes.
18     Q  And so if what you were relying on was
19 essentially common sense, is there any part of your
20 expertise that you can tell me that you drew on to
21 reach the conclusion that there were other ways of
22 communicating?
23     A  The data is all over the place as to multiple
24 language sources. There is international symbology for
25 signs that would -- that you could use. There are

Page 104

1  literally thousands of sources out there. I mean, this
2  is fairly -- this is a fairly knowable thing.
3      Q  What's knowable?
4      A  I've got multiple ways of interpreting. I
5  can have texts written. I can have a video made. I
6  can do all of this. One-time expenses in a lot of
7  cases.
8      Q  But what I'm asking you is what part of your
9  expertise did you draw on to arrive at what you've
10 already told us is essentially the common sense
11 conclusion?
12     A  I think I've said more than that. But I have
13 personally worked with people who spoke no English
14 whatsoever and quite successfully over many years.
15     Q  Quite successfully what? They spoke no
16 English whatsoever or you've worked with them
17 successfully over --
18     A  No, they've worked safely. They performed
19 their work. They helped make money for the company and
20 so on. So all of the above. And it's done by
21 utilizing a variety of methods.
22     Q  So anybody whose worked in that kind of
23 environment would have the ability to reach the kind of
24 conclusions that you've reached?
25         MS. PALACIOS: Objection.

Page 105

1      A  I have more experience than most, more --
2  BY MR. ROBINSON:
3      Q  More experience with working with people who
4  don't speak English?
5      A  No, I don't think I was getting ready to say
6  that. You asked me about a skill or an expert
7  background. Well, I'm sorry, I'm going to have to go
8  back to the question.
9          MR. ROBINSON: Why don't you read back
10 the last few questions.
11     A  I think I answered it, but maybe not.
12 BY MR. ROBINSON:
13     Q  Do you want it read back?
14     A  Please, if you want an answer.
15
16         (The testimony was read.)
17
18     A  I think the correct --
19 BY MR. ROBINSON:
20     Q  And you answer?
21     A  I'm sorry, I think the correct answer would
22 have been no.
23     Q  All right. Let's turn to another of the
24 bases for your opinion. That Beauty's English-only
25 rule isn't a business necessity for safety. On page 2

Page 106

1  of your report you say, do you not, near the bottom,
2  that, "Claimants with little or no English fluency were
3  already performing the essential functions of the job.
4  Five for a total of 98 years." Did I read that
5  right?
6     A   That's correct.
7     Q   Do you mean by this that these folks were
8  capable of performing their job safely and avoiding
9  injury even though they had limited or no English
10 fluency, and therefore, the conclusion must be that the
11 English-only rule cannot be necessary for safety?
12    A   That's certainly one of the aspects, yes.
13    Q   But sir, wasn't the English-only rule in
14 effect throughout the tenure of these employees at
15 Beauty Enterprises?
16    A   It appears to have been an informal policy
17 back some time.
18    Q   Okay. And wouldn't you agree with me, sir,
19 that your conclusion, this particular conclusion that
20 we're just talking about now, depends upon a finding, a
21 factual finding that employees actually have limited or
22 no English fluency, correct?
23    A   No.
24    Q   How can it be no? Do you understand the
25 question?

Page 107

1     A   I think so. The implication -- read the
2  question back and I'll try to enlarge on it.
3
4         (The testimony was read.)
5
6     A   It is a fact that there are employees here
7  that have limited English fluency.
8  BY MR. ROBINSON:
9     Q   And what you're saying is -- I didn't mean to
10 interrupt.
11    A   It is also a fact that in looking at hard
12 data, such as the actual injuries that occurred over a
13 ten-year period and represent the typical injuries
14 found in warehouses and which also happen to English
15 fluent people, that the language in and of itself does
16 not indicate that not being able to speak English
17 causes accidents or injuries to be more severe. Safety
18 is almost a neutral issue in that sense.
19    Q   Well, that may be so. But what you wrote
20 here, sir, as grounds for your opinion, is that
21 claimants with little or no English fluency were
22 already performing the essential functions of the job.
23 Five for a total of 98 years. Hence --
24    A   There is no hence. That simply stands on
25 itself. They were simply performing the job without

Page 108

1  being proficient in English.
2     Q   I haven't finished. Hence, as you've already
3  told me, English, limited or English -- fluency in
4  English is not necessary for safety at Beauty
5  Enterprises?
6     A   That's correct.
7     Q   Okay. And because the evidence you're
8  relying on, because this reason refers to -- is based
9  on people with limited or no English fluency, in order
10 for this basis to be a valid basis, there have to be
11 people at Beauty Enterprises with limited or no English
12 fluency, correct?
13    A   Yes.
14    Q   Okay. Because it stands to reason, I guess,
15 that if someone has little or no English fluency, you
16 really can't obey an English-only rule, can you?
17    A   That's -- well, I don't know. I mean, can
18 you perform your job without speaking? I don't know.
19 In some cases.
20    Q   Well, he can't speak and obey the
21 English-only rule, would you agree?
22    A   Correct.
23    Q   Now, was Harold Acosta -- you know the name
24 Harold Acosta?
25    A   Yes, sir.

Page 109

1     Q   Was Harold Acosta one of the five employees
2  whose collective tenure at Beauty Enterprises was
3  within this 98 years that you refer to?
4     A   He had been driving forklift, if memory
5  serves, around the 14-year period. So yes, he would be
6  one of the five, I believe.
7     Q   Did you consider him a, quote, no English
8  fluency, end of quote, person, or a quote, limited
9  English fluency person?
10    A   I believe it was limited English.
11    Q   And what do you mean by -- how did you define
12 the term "limited English fluency"?
13    A   I don't know all the words in English. I may
14 speak in half sentences. When I come back from Europe,
15 sometimes I speak in half sentences as well and I'm
16 only speaking English.
17    Q   So you have limited English fluency?
18    A   I probably do.
19    Q   I mean, we all have limited English fluency,
20 unless you're William F. Buckley or something like
21 that.
22        Did you read Harold Acosta's deposition?
23    A   I did.
24    Q   Were you aware that he testified -- were you
25 aware at the time you wrote this record that Harold

28 (Pages 106 to 109)

Page 110

1  Acosta testified at his deposition on pages 38 and 39
2  that he had the ability to obey the English-only
3  rule?
4     A   I don't have direct memory of that reading at
5  this point. There are about 40 depositions or
6  something like that.
7     Q   Did you come across anything in Mr. Acosta's
8  deposition that you can remember today that suggested
9  to you that his need to obey the English-only rule
10 jeopardized his safety at work?
11    A   No.
12    Q   Did you come across anything in the
13 deposition that suggested to you that the English-only
14 rule was unhelpful to him from a safety perspective?
15    A   Unhelpful from a safety perspective? I don't
16 recall.
17    Q   By the way, do you have a file on this
18 matter?
19    A   I do.
20    Q   Did you bring it with you today?
21    A   Obviously I left all the depositions and
22 everything back there. I brought some of the lesser
23 files that are associated with those depositions.
24    Q   Did you make notes on the depositions?
25    A   In some cases I underlined or circled or do

Page 111

1  that sort of thing as I'm reading through.
2     Q   But you don't write notes about the
3  depositions on a separate piece of paper?
4     A   Some I do.
5     Q   Do you have those with you today?
6     A   I think I probably have two or three or so.
7     Q   Okay. We'll get to that later.
8         Was Miguel Alvarez another of the employees
9  included in this 98-year group?
10    A   I believe he was.
11    Q   And what was he in your view, a no English or
12 a limited English person?
13    A   I believe he was limited English.
14    Q   Were you aware that he testified -- did you
15 read his deposition?
16    A   I did some time ago.
17    Q   Were you aware at the time you wrote this
18 report that he testified at his deposition that he
19 always spoke English when supervisors were around?
20    A   Yes, I do.
21    Q   Were you aware that he testified at his
22 deposition that he spoke English when supervisors were
23 around out of respect and that this was not difficult
24 for him?
25    A   I think I remember, but I'm not sure. It

Page 112

1  sounds familiar.
2     Q   Did that influence you at all in putting him
3  into this category of limited English fluency people in
4  order to establish this basis for your opinion?
5     A   No.
6     Q   Did you come across anything in Mr. Alvarez's
7  deposition that suggested to you that his need to obey
8  the English-only rule jeopardized his safety at work?
9     A   I don't recall.
10    Q   Did you come across anything in his
11 deposition that suggested to you that the English-only
12 rule was unhelpful from a safety perspective?
13    A   I don't recall.
14    Q   Was Eva Diaz another of the five individuals
15 in this 98-year group?
16    A   I certainly remember the name. It seemed to
17 me she may have been one of the five, but I'm not
18 sure.
19    Q   Do you remember if she was a limited English
20 or a no English person in your view, or you
21 characterized her as limited or no English?
22    A   I didn't automatically characterize the
23 deponents. I look for the information they provided.
24 At the time obviously based on the deposition I would
25 have known if they were limited or no. I believe that

Page 113

1  probably everybody had a few words that they picked up
2  just by being around.
3     Q   Few words of what?
4     A   Of English. Maybe hello, goodbye, you
5  know.
6     Q   No. But was --
7         MS. PALACIOS: He's just asking about
8  Eva.
9  BY MR. ROBINSON:
10    Q   I'm just asking about Eva Diaz.
11    A   I think I answered I don't remember or I
12 don't know or I'm not sure.
13    Q   You think you answered. If you did, it was
14 40 words ago.
15    A   It probably was. Sorry.
16    Q   Do you remember whether she testified in her
17 deposition that she was unable to obey the English-only
18 rule?
19    A   I don't recall that.
20    Q   Did you come across anything in her
21 deposition that suggested to you that her need to obey
22 the English-only rule jeopardized her safety at work?
23    A   I don't recall that.
24    Q   Did you come across anything in her
25 deposition that suggested to you that the English-only

EEOC vs Beauty Enterprises

2/5/2004                                                                                    Earnest Harper

Page 114

1  rule was unhelpful to her from a safety perspective?
2     A    I don't recall.
3     Q    Was William Torres another of the five
4  depositions you referred to?
5     A    It's a name that's familiar. I can't recall
6  if he was one of the five right offhand.
7     Q    Okay. Do you remember if he was a limited
8  English person or a no English person?
9     A    Not for sure.
10    Q    Do you remember anything in his deposition?
11    A    With 23, it's hard to remember exactly. He
12 may have been the driver.
13    Q    Do you remember anything else?
14    A    I don't want to say at this time. It's not
15 clear.
16    Q    Do you remember if he testified at his
17 deposition that he had the ability to obey the
18 English-only rule throughout his employment at Beauty
19 Enterprises?
20    A    I don't remember.
21    Q    If he said he did, would that have changed
22 your conclusion in any way?
23    A    No.
24    Q    Do you remember who the fifth of the five
25 people were whose collective tenure at Beauty

Page 115

1  Enterprises was 98 years?
2     A    No, sir, I don't.
3     Q    Sitting here today, can you identify any of
4  the claimants or charging parties whom you considered
5  to be unable to obey the English-only rule?
6     A    No.
7     Q    And lastly on this basis for your opinion
8  that the English-only rule isn't necessary for safety
9  at Beauty Enterprises, the basis being that claimants
10 with little or no English fluency were already
11 performing the essential functions of the job, let me
12 ask you this: Isn't this a conclusion that a lay
13 person familiar with the facts could reach on his own
14 without the aid of a safety professional?
15    A    I'm sorry, I didn't expect that turn at the
16 back. Could you read that one more time, please?
17
18           (The testimony was read.)
19
20    A    I don't know how to answer that.
21 BY MR. ROBINSON:
22    Q    Yes or no would be good, or I don't know
23 would be acceptable as well.
24          MS. PALACIOS: Objection.
25    A    I do know, but I don't know how to answer

Page 116

1  that.
2  BY MR. ROBINSON:
3     Q    You do know but you don't know how to express
4  your answer?
5     A    I don't think that's true either.
6     Q    Okay.
7     A    You're asking me -- let me see if I can
8  rephrase it perhaps. Would they have to be a safety
9  professional for the record to know that they can work
10 safely? Or is that kind of what you're asking? I'm
11 really not clear as to what you're asking me.
12    Q    Let me go back and do it again. Why don't we
13 have her read it back again.
14
15           (The testimony was read.)
16
17    A    The answer is maybe. Yeah. Possible. I
18 don't know for sure, but yeah, it's possible.
19 BY MR. ROBINSON:
20    Q    Well, I mean, the facts that you're relying
21 on for this basis for the conclusion are that there are
22 a lot of people with little or no English fluency who
23 work successfully at Beauty Enterprises?
24    A    That is true.
25    Q    Without getting hurt?

Page 117

1     A    That is true.
2     Q    If a lay person knew that fact, they could
3  reach the same conclusion you could, right?
4     A    Okay. Phrased that way, yes, I would
5  agree.
6     Q    So is there any part of your expertise as
7  opposed to your general intellect and common sense and
8  knowledge of the facts that you relied on in this
9  particular instance?
10    A    Yes. There is more to it, sure.
11    Q    What?
12    A    The average employee wouldn't have access to
13 all the injury data. The average employee wouldn't
14 necessarily know what could have been done to have
15 avoided exposing people to hazards, regardless of
16 language and so on.
17    Q    But that's not what your -- that's not the
18 basis -- that's not this particular basis for your
19 ultimate conclusion here. This particular basis is
20 simply the fact that there are a lot of people working
21 at Beauty Enterprises, so you say, with limited or no
22 English fluency and they don't get hurt.
23    A    That's a true statement.
24    Q    And you don't have to be an expert to figure
25 that out?

30 (Pages 114 to 117)

**Page 118**

1  A  If they had that data.
2  Q  Right. If they knew those facts?
3  A  That's correct.
4  Q  And you don't have to be an expert to find
5  that fact, do you?
6     MS. PALACIOS: Objection.
7  BY MR. ROBINSON:
8  Q  Let me withdraw that.
9     Now, according to your report, at least as I
10 read it, there is a third basis for your opinion that
11 the English-only rule isn't necessary for safety. And
12 that is -- and I'm on page 2 -- "Beauty Enterprises'
13 relatively poor safety performance is clearly not
14 related to language but reflects a failure of
15 management to provide an effective safety program." Is
16 my understanding correct in this regard?
17 A  That's correct.
18 Q  Okay. Now, I'm not sure that I really follow
19 you here. So let me test the first possibility. Are
20 you saying that Beauty Enterprises has a relatively
21 poor safety performance with an English-only rule in
22 place and therefore it follows that the presence of an
23 English-only rule hasn't had a positive effect on
24 safety?
25 A  I think the answer would be yes.

**Page 119**

1  Q  Well, how do you know that Beauty
2  Enterprises' safety performance wouldn't be worse
3  without an English-only rule?
4  A  It made no effort -- they had back strains,
5  one of the common more numerous injuries. They had no
6  effort to teach lifting in any language. They didn't
7  do it. Why not, if that's one of your injury
8  experiences? They didn't do it.
9  Q  Anything else?
10 A  If you look at their injuries, their sprains,
11 strains, cuts, things that have no bearing or no
12 provable bearing or connection to English or a lack of
13 English. Why? You know, if you have exposures to
14 those problems, why don't you have a safety program
15 that would eliminate the program that diminishes any
16 importance of training or special case communication.
17 Q  But your conclusion doesn't account for -- I
18 want to say accidents that don't happen, but obviously
19 that's a non sequitur. It doesn't account for
20 performances done safely, does it?
21 A  If I'm performing unsafe, I'm going to have
22 more accidents.
23 Q  No, done safely.
24 A  That would depend on the injury experience,
25 which was not in evidence.

**Page 120**

1  Q  You cited it. You just talked about it.
2  A  I'm sorry, I mean with respect to the way you
3  phrased the question, unless I did it again. I'm
4  sorry. We can read the question back, make sure I
5  answered it.
6  Q  Let's back up. You told me that you agreed
7  that you were saying -- that your reasoning was as
8  follows -- at least one aspect of your reason was as
9  follows: That Beauty has a relatively poor safety
10 performance with an English-only rule in place and
11 therefore it follows that the presence of the
12 English-only rule hasn't had a positive effect on
13 safety. I asked you then: How do you know that
14 Beauty's safety performance wouldn't be worse without
15 an English-only rule? And you told me of a number of
16 accidents and injuries that occurred saying they had
17 nothing to do with language. Do you think that answers
18 the question of how do you know that Beauty
19 Enterprises' safety performance wouldn't be worse
20 without an English-only rule?
21 A  I think it probably would not have been
22 better because the character of injuries never changed.
23 If I was effectively communicating what's hurting
24 people, it would have improved. It didn't. It got
25 worse; demonstratively worse.

**Page 121**

1  Q  Let me ask you this: You told us already,
2  have you not, that there is a hazard of falling boxes
3  at Beauty Enterprises, boxes falling from high places,
4  yes?
5  A  There is a potential, yes.
6  Q  Have you seen in the injury data that was
7  provided to you any injuries from falling boxes?
8  A  There is some struck-by injuries, but not
9  necessarily from falling boxes. But I believe there
10 might have been a few over the ten-year period.
11 Q  Can you show me in your report where you've
12 identified any?
13 A  Page 7.
14 Q  Where?
15 A  Bottom.
16 Q  Where?
17 A  That lists the breakdown for injuries. Now,
18 there is one that says struck by or bruised. That can
19 be a variety of things, including maybe in one or two
20 cases somebody had a box fall on them.
21 Q  But you don't know for sure?
22 A  Well, yes. Well, perhaps. The OSHA law --
23 Q  You don't know for sure, perhaps?
24    MS. PALACIOS: Let him finish.
25 BY MR. ROBINSON:

Page 122

1  Q  Perhaps you don't know for sure?
2  A  I get in trouble because I try to be as
3  credible and honest as I can, so sometimes it gets me
4  in trouble. But when you go back to the OSHA line
5  item, it sometimes will be more specific so you can get
6  an idea of whether it was a box or not. Now -- you
7  know, falling on them. "Struck by" could mean I turned
8  around too quick and I hit my hand on had a piece of
9  metal. Or the forklift brushed by me and I got struck
10 by it and I fell down and I hurt my arm. That's what
11 all those mean.
12     But -- so that's 14 percent of all injuries.
13 And we know that those occurred from a variety of
14 sources.
15 Q  But that's the most you know about that, fair
16 to say?
17 A  Sure.
18 Q  Let's assume that there were no injuries over
19 the last ten years at Beauty Enterprises from falling
20 boxes. How do you know that some of those -- that
21 situation wasn't the result at least in certain cases
22 of warnings being given in English by people whose --
23 from one to another whose native language wasn't
24 English?
25 A  So the boxes on its own is getting ready to

Page 123

1  fall and how do I know that my inability to holler at
2  somebody allowed that box, which is already unstable,
3  to suddenly fall?
4  Q  I mean, you can't rule out the possibility
5  that a warning in English could have prevented that
6  accident.
7  A  Can't rule it out. I can't make any
8  professional conclusion based on that.
9  Q  Are you also saying that the injuries or
10 accidents that you've actually found to have occurred
11 at Beauty Enterprises aren't caused by speech or by the
12 use of one language as opposed to another, and
13 therefore it follows that the English-only rule is
14 totally irrelevant to safety, that it really doesn't
15 matter?
16 A  I think you could have not had the rule and
17 it wouldn't have changed very much, given other factors
18 being the same.
19 Q  So is the answer to my question, Yes, that's
20 what I'm saying?
21 A  I'm sorry, one more time.
22 Q  I'll -- are you saying that the injuries or
23 accidents at Beauty Enterprises aren't caused by speech
24 or by the use of one language as opposed to another?
25 We'll stop there. Yes?

Page 124

1  A  Yes, I'm convinced that they're not
2  related.
3  Q  And are you saying that therefore it follows
4  that the English-only rule is totally irrelevant to
5  safety but it doesn't really matter?
6  A  I have difficulty with the use of extremes.
7  I don't believe the English rule had anything
8  fundamentally to do with the safety.
9  Q  Okay. Isn't it just as logical to conclude
10 from the absence of any injuries or accidents at Beauty
11 Enterprises caused by speech or by the use of one
12 language as opposed to another, that the English-only
13 rule has been effective at preventing those kinds of
14 accidents or injuries?
15 A  There is no evidence to support that.
16 Q  Well, are you saying it could be logical but
17 there is no evidence to support that or it's
18 illogical?
19 A  There is no evidence to support it.
20 Q  I didn't ask you whether there was evidence.
21 I'm asking you, isn't it just as logical to conclude
22 from the absence of injuries or accidents at Beauty
23 Enterprises caused by speech or the use of one language
24 as opposed to another, that the English-only rule has
25 been effective at preventing those kinds of accidents

Page 125

1  or injuries?
2  A  I think my answer was no. That's so long I'm
3  having trouble remembering which way you're phrasing
4  it.
5  Q  Do you want to read it? You can read it.
6  A  I'll just try to listen carefully again. It
7  just kind of runs so long I have the answer about
8  halfway through. If you wouldn't mind one more time.
9
10     (The testimony was read.)
11
12 A  No, it's not a basic logic issue.
13 BY MR. ROBINSON:
14 Q  What do you mean by it's not a basic logic
15 issue?
16 A  I mean, the average person off the street
17 using common knowledge may or may not arrive at those
18 conclusions. There is no evidence to support the
19 English-only rule had any beneficial effects in terms
20 of injuries.
21 Q  Is there any evidence that it didn't?
22 A  Yes. There is no pattern of injury change.
23 If back-lifting issues are my number one, or sprains
24 and strains are my number one injury and I do nothing
25 about it, regardless of the language, then language is