EEOC vs Beauty Enterprises

2/5/2004                                                          Earnest Harper

---

**Page 126**

1    not the issue here, it's the program or lack of a
2    program.
3        Q   See, I've got to tell you, I'm having a great
4    deal of -- I know that you are very critical in my
5    report of Beauty Enterprises' safety practices and the
6    priority you seem to think that Beauty Enterprises
7    places on safety; is that right?
8        A   Well, they --
9        Q   Is that right?  Yes or no.
10       A   Yes, I am critical.
11       Q   Okay.  And what I'm trying to understand from
12   you is the connection between that and your opinion
13   about the necessity of the English-only rule from a
14   safety perspective.  Can you explain it to me?
15       A   I haven't seen any evidence that the
16   English-only policy had any bearing on safety.
17       Q   What do you mean by "bearing on safety"?
18       A   Did they hold classes in safety?  They had a
19   little new employee orientation.  That was it.  They
20   didn't try to communicate safety in English or any
21   other language.  I mean, how can communication be an
22   issue if I don't try to put it to use in terms of
23   reducing injuries.
24       Q   So is this your logic then?  Let me try this
25   on you:  Beauty Enterprises does virtually no safety

---

**Page 127**

1    training and communicates little or no safety
2    information.
3        A   That appears to be --
4        Q   Therefore, the employees don't need to know
5    any language in order to get along in the workplace and
6    therefore the English-only rule can't be viewed as a
7    business necessity for safety reasons.
8            MS. PALACIOS:  Objection.
9        A   That's such an extreme hypothetical.  I just
10   don't know how to relate to that.  Obviously I can
11   communicate with nonverbal means for a lot of things.
12   If I'm a petite lady and that weighs 50, 60 pounds, I
13   don't have to speak any language to have Mr. Richard --
14   and I'm gesturing, you know -- can you help me pick
15   this up?  I mean, it's pretty self-evident what I'm
16   asking.
17       So there is a whole manner of ways you can
18   communicate.  And if that wasn't 50, 60 pounds sitting
19   on the floor, I wouldn't have to lift it in the first
20   place so I don't have to communicate it at all.
21       Q   Okay.  That's fine.  But --
22           MS. PALACIOS:  Can I make a suggestion?
23   Let's take a two-minute break.  Off the record.
24
25           (Recess:  3:10 pm to 3:17 pm.)

---

**Page 128**

1
2            MS. PALACIOS:  Just for the record, we
3    were having a discussion about previous testimony given
4    this morning about whether or not Mr. Harper had given
5    expert testimony at the trial of EEOC versus
6    Amalgamated Sugar.  And I guess the issues were not
7    sure.  So we'll find out and let Mr. Robinson know by
8    letter.
9            MR. ROBINSON:  Thank you.
10   BY MR. ROBINSON:
11       Q   So I guess my question is:  After all that,
12   can you explain to me how you reason that a poor safety
13   performance not related to language can lead to the
14   conclusion that the English-only rule isn't necessary
15   from a safety perspective?
16       A   Is not necessary to a safety perspective, is
17   that's correct?
18       Q   Is not necessary from a safety perspective.
19       A   I come from the standpoint of the site visit
20   to a great extent.  The site visit allowed me to look
21   at the environment that they worked in.  And what I saw
22   was conditions and an environment that allowed a
23   certain level of exposures to potential risk.  And that
24   is a management responsibility, not an employee
25   responsibility.

---

**Page 129**

1        So the first step in the exercise in arriving
2    at various professional opinions is:  Are the employees
3    being asked to work in an environment that tends to
4    expose them perhaps a little bit more than, say, a
5    differently managed environment might?  So the
6    conclusion is that there was exposures that could have
7    been addressed were not.
8        Q   Exposures unrelated to language could have
9    been addressed that were not?
10       A   Physical hazards.
11       Q   And so what does that have to do with the
12   conclusion that the English-only rule isn't necessary
13   for safety purposes?
14       A   Because the English-only rule was not
15   consistently followed because people still spoke in a
16   variety of languages at the site, including even
17   supervisors, by testimony; therefore, they were not
18   strictly adhered to.  The English-only was mostly --
19   well, I shouldn't use the term "mostly," but the
20   English-only policy was not strictly adhered to or
21   followed throughout the period.
22       Q   Okay.  I might have asked you this already
23   but did you learn of any forklift pedestrian accidents
24   or injuries at Beauty Enterprises?
25       A   I can't remember for sure.  It seemed to me

---

33 (Pages 126 to 129)

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                          Earnest Harper

Page 130

1  that there was, but I don't recall right offhand.
2      Q   Can you recall if there were many?
3      A   There were not many.
4      Q   Can you say with assurance that the
5  English-only rule wasn't helpful in the low incidents
6  of forklift pedestrian accidents or injuries?
7      A   There is no evidence that it contributed to a
8  safer forklift history.
9      Q   That's not what I asked you. Can you say
10 with assurance that the English-only rule was not
11 helpful in achieving that result?
12     A   A great deal of assurance, yes.
13     Q   So you can say, I can assure you, ladies and
14 gentlemen, that the English-only rule had absolutely
15 nothing to do with Beauty Enterprises' apparently
16 favorable experience in avoiding forklift and
17 pedestrian accidents and injuries?
18     A   Yes. Tremendous assurance.
19     Q   Did the EEOC ask you to opine on whether the
20 presence of an English-only rule made Beauty
21 Enterprises a harmonious workplace?
22     A   It came up in the course of reading
23 interrogatories, various communications. If there was
24 a specific commentary from EEOC, I really don't recall
25 at this point. It was probably a composite of a lot of

Page 131

1  data.
2      Q   Do you have -- did you exchange any
3  correspondence with the EEOC?
4      A   There was some correspondence.
5      Q   Have you brought your exchange of
6  correspondence with you today?
7      A   Some of it, yes. Should I?
8      Q   Should you what?
9      A   I have a little bit in my briefcase.
10     Q   Show me what you've got.
11     A   There are some fax cover sheets here. Site
12 visit.
13         MS. PALACIOS: By "correspondence," are
14 you also including documents that were produced to him
15 as part of the litigation?
16         MR. ROBINSON: No.
17     A   This may be the -- that may be the only one I
18 have with me. Here's something. This was -- this just
19 had to do with some depositions.
20 BY MR. ROBINSON:
21     Q   Don't talk because she's writing all this
22 down. Why don't you just hand me everything.
23     A   Oh, I can certainly do that. You're welcome
24 to certainly -- I apologize. That makes sense.
25         MR. ROBINSON: Let's mark this as the

Page 132

1  next exhibit.
2
3          (Harper Exhibit 3: Marked for
4           identification.)
5
6  BY MR. ROBINSON:
7      Q   Showing you Exhibit 3. Is that something
8  that the EEOC sent to you?
9      A   Yes, it is.
10         MR. ROBINSON: Mark this as the next
11 one.
12
13         (Harper Exhibit 4: Marked for
14          identification.)
15
16 BY MR. ROBINSON:
17     Q   Is this an e-mail exchange?
18         MS. PALACIOS: Try to identify the
19 exhibit.
20         MR. ROBINSON: Who's David Cullen?
21         MS. PALACIOS: He's my clerk.
22 BY MR. ROBINSON:
23     Q   Let me show you Harper Exhibit 4. What is
24 it?
25     A   It is an e-mail I sent. When I started kind

Page 133

1  of laying out the depositions or accounting for them,
2  it appeared that I was missing some.
3      Q   Just tell me what it is. It's an e-mail you
4  sent?
5      A   It is an e-mail I sent on October 21st,
6  2003.
7          MR. ROBINSON: Mark this as the next
8  exhibit.
9
10         (Harper Exhibit 5: Marked for
11          identification.)
12
13     A   I'm sorry, it's not an e-mail I sent, this is
14 in response -- this is from Ms. Palacios.
15 BY MS. ROBINSON:
16     Q   Is it an e-mail -- is it an e-mail from you
17 to Ms. Palacios and from Ms. Palacios to you, right, on
18 that piece of paper?
19     A   That's correct.
20     Q   And which one is first in chronology?
21     A   Apparently I had raised a question about the
22 deposition, so Rosa Palacios.
23     Q   Which one is first?
24     A   Sent this to me at 8:43 a.m. on October 21st.
25 I responded.

34 (Pages 130 to 133)

Page 134

1   Q   Hers is first?
2   A   Hers is first.
3   Q   Okay.  It's a lot easier if you say hers is
4   first.
5       What's Exhibit 5?
6   A   It's a fax sheet cover.
7   Q   From whom to whom?
8   A   To Ms. Palacios from myself.
9   Q   And are you transmitting something?
10  A   Apparently I sent a case list.
11  Q   And what's that?
12  A   Oh, this probably was the reference to cases
13  covered in the last four years, I believe.
14  Q   Okay.  Now, I will represent to you that I
15  looked through your file that -- which you brought here
16  today and I see no engagement letter or contract
17  between you and the government.  Is there an engagement
18  letter or a contract between you and the government?
19  A   Yes, there is and there was.  And I don't --
20  I never got a copy of the original contract, so I
21  actually never had -- I don't think I have a copy of
22  that original contract.  I have the latest one which
23  was sent to me this month for a continuation.
24  Q   I'm going to make a request that I be
25  provided with all the communications, in whatever form,

Page 135

1   any notes on those communications that were exchanged
2   between you and the EEOC.
3   A   Yup.
4   Q   Who first contacted you for this case from
5   the EEOC?
6   A   I don't really remember.  It might have been
7   Lili, or Ms. Palacios here, but I honestly don't
8   remember.
9   Q   Do you remember the -- was it on the phone?
10  A   I believe it was a phone call.  I believe I
11  had a message on my home office phone and I either
12  responded to it or happened to be there when it came
13  in.
14  Q   Okay.  And as a result of that you had a
15  conversation with Lili or somebody else from the
16  EEOC?
17  A   That's the way I remember it.  It is fuzzy.
18  Q   Okay.  And give me your best recollection of
19  the conversation.
20  A   We have a case in Hartford or in this part of
21  the country.  It involves the basics that we see here
22  that we have some plaintiffs with limited English, you
23  know, just the basic foundation or sketch of the case.
24  I really don't remember details.  Discrimination, that
25  was a term used.  Issues of safety.  We'd like you to,

Page 136

1   you know, render an opinion based on these facts, site
2   visits, et cetera.
3   Q   Opinion about what?  About whether the rule
4   was necessary from a safety perspective?
5       MS. PALACIOS:  Objection.
6   A   I don't remember how it was phrased.
7   BY MR. ROBINSON:
8   Q   Well --
9   A   Probably in that general vein.  But I don't
10  remember it being phrased in that -- I don't recall the
11  exact phrasing.
12  Q   Okay.  Did you make notes of that original
13  conversation?
14  A   Usually I'll write the name of the individual
15  talking.  Usually I'll mention the date, just so I have
16  a starting point.
17  Q   Did you understand my question?  Did you make
18  notes?
19  A   Yes, I made some level of notes.
20  Q   Okay.  Did you retain those notes?
21  A   I don't know at this point.
22  Q   If you did, would they be in your files on
23  this matter?
24  A   Yes, they would.
25  Q   And they would be included within the

Page 137

1   requests that I made already?
2   A   Absolutely.
3   Q   Now, what was the next step in the process of
4   your dealing with the EEOC?
5   A   There was some initializing of a contract
6   agreement.  Then at some point, and I don't know which
7   came first, since it was treated as it was going to
8   happen and ongoing, that -- and they began to send me
9   various material and documents.
10  Q   Okay.  To your recollection, is there any
11  document that you've received from the EEOC that asks
12  you to render either certain opinions, specified
13  opinions or a specified opinion, or to opine on a
14  certain issue that's specified or issues?
15  A   Well, I was certainly asked to render --
16  Q   That's not what I asked you.  I said a
17  document that says that.
18  A   If there is, I don't recall a specific
19  document.
20  Q   Okay.  Now, all this started because I wanted
21  to know -- I mean, obviously the EEOC asked you to
22  render an opinion as a safety expert on whether this
23  English-only rule is necessary from a safety
24  perspective, yes?
25  A   Yes.

35 (Pages 134 to 137)

EEOC vs Beauty Enterprises

2/5/2004                                                              Earnest Harper

Page 138

1    Q   And my question to you is: Did they ask you
2  to also opine on whether the presence of an
3  English-only rule made Beauty Enterprises a harmonious
4  workplace?
5    A   I don't recall.
6    Q   Did they ask you to opine on whether the
7  English-only rule reduced ethnic tensions?
8    A   I don't recall.
9    Q   Is there anything you can look at that would
10 assist you in recalling these things?
11   A   If I can find some of the original notes,
12 I'll certainly look at them.  It was put to me in a
13 little different fashion than that.  I just don't
14 recall the terminology.
15   Q   It was put to me in a little different
16 fashion.  What's "it"?
17   A   I don't know.  Look, I received 40
18 depositions, I received some phone conversations, I
19 received interrogatories.  So I see what the
20 defendant's comments and statements were and I see the
21 questions that were asked and answered and responses.
22 So I guess what I'm trying to be honest about here is I
23 don't really recall how these things come up or arrived
24 as to whether EEOC specifically used those terms in any
25 of the original discussion.  Usually they set the

Page 139

1  general flavor of what they want me to do and back off
2  and let me examine the material and the data and, you
3  know, we kind of go from there.  The ultimate thing
4  being, is the English-only germane?  That's a bad
5  phrasing, but that's the only way I can phrase it at
6  this point.  And how does it relate to safety, and so
7  on?
8        Certainly in the investigation those other
9  issues tend to arrive because they're in the
10 testimony.
11   Q   But why did you comment on them?  You
12 commented on them on your own, didn't you?
13       MS. PALACIOS:  What are we talking
14 about with "them"?
15       MR. ROBINSON:  On the issue of --
16       MS. PALACIOS:  You're talking about the
17 harmony?
18       MR. ROBINSON:  Yeah.
19 BY MR. ROBINSON:
20   Q   I mean, take a look at your report.  Exhibit
21 2, page 2, under synopsis.  You first say, "In my
22 opinion, there were no safety, health or operational,
23 i.e., equipment safety reason for Beauty Enterprises to
24 implement an English-only policy or rule."  And we've
25 discussed that, right?

Page 140

1    A   Correct.
2    Q   Then you go on to say, "Furthermore, it is my
3  opinion that an English-only rule -- or English-only
4  policy not only failed to provide a harmonious
5  workplace or reduce ethnic tensions, but, in fact" --
6  and you go on.  Okay?
7    A   Correct.
8    Q   Isn't it true, sir, that you decided on your
9  own to express this opinion about harmonious workplace
10 and reduction of ethnic tensions?
11   A   No, it's not true.
12   Q   It's not true?
13   A   No.  It was not testimony of the management.
14 I mean, it was brought up in several depositions that
15 this was one of the reasons of -- for the rule.  And so
16 I responded to that.
17   Q   Well, if one of the reasons for the rule was
18 good dental health, would you have responded to that?
19       MS. PALACIOS:  Objection.
20   A   Hypothetical.  It didn't apply.
21 BY MR. ROBINSON:
22   Q   You can't point to anything in writing from
23 the EEOC or some note from several depositions where you were
24 asked to opine about harmony in the workplace and
25 reduction of ethnic tensions or anything of that

Page 141

1  nature, can you?
2    A   I don't think so.
3    Q   Okay.  Did you rely on anything specific from
4  your formal education to form those opinions regarding
5  harmonious workplace and the reduction of ethnic
6  tensions?
7    A   Possibly.
8    Q   How about can you say probably?  Anything is
9  possible.
10   A   The term you used was formal.  So I'm trying
11 to tack that back to all the leadership management
12 training, human relations courses.  So the term is
13 probably, yes.
14   Q   And what is it from your formal education
15 that you relied on in forming these opinions?
16   A   We appear to have workplace conflict.
17   Q   We appear?
18   A   With regard to -- "we" being this --
19 Beauty.
20   Q   I'm glad you're identifying with them now at
21 least.
22   A   It's hard not to a little bit.  I think what
23 I was doing was responding to the depositions I had
24 been given and some of the terminology and stuff that
25 was used, because it certainly -- I don't know if

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                                                    Earnest Harper

**Page 142**

1  anybody asked me specifically to comment on it or not
2  but it was certainly in the documentation.
3      Q   Let's cut right to the chase. That's not
4  your area of expertise, is it, sir?
5              MS. PALACIOS: Objection.
6      A   It certainly could be.
7  BY MR. ROBINSON:
8      Q   You're a safety professional, right?
9      A   Yes.
10     Q   You're not a human relations person, are
11 you?
12     A   No, I'm not.
13     Q   You're not a psychologist, are you?
14     A   Thankfully, no.
15     Q   You're not a specialist in industrial
16 relations, are you?
17     A   I think not.
18     Q   Let's talk about that part of your opinion
19 that the English-only policy failed to provide a
20 harmonious workplace. I'm trying to figure out what
21 you're saying here. Are you saying that the workplace
22 wasn't harmonious at any time that the rule was in
23 effect?
24     A   That's not what I'm saying.
25     Q   What are you saying?

**Page 143**

1      A   At any time. I don't know.
2      Q   You don't know what you're saying?
3      A   No, I don't know what you mean by "any time."
4  I mean, we're talking about a 30-plus, 40-plus year
5  company here. So any time means -- I'm sure there were
6  a lot of periods of harmonious whatever. But there
7  were periods where there probably wasn't based on the
8  testimonies that I saw.
9      Q   Well, where is the disharmony that you see?
10     A   I can't answer that without reference to some
11 of the documents. The disharmony is the lawsuit, I
12 would assume, the discrimination lawsuit. That's the
13 major disharmony there. So it's almost self-evident.
14 So I guess that's why I'm struggling with the
15 question.
16     Q   Well, wouldn't it be fair to say that a group
17 of employees suing the company over a workplace rule
18 contrary to the company's wishes and contrary to the
19 wishes of other employees explains whatever disharmony
20 you perceived and not the English-only policy itself?
21     A   I'm not sure how to answer that. There
22 obviously are a lot of reasons why other employees may
23 not complain or anything and why some do. As a safety
24 professional working in various environments, there
25 isn't a safety professional who is approachable that

**Page 144**

1  doesn't usually know fairly quickly when there is an
2  area where people are having problems and they can't
3  always talk to their supervisors because --
4      Q   Problems of what nature?
5              MS. PALACIOS: Let him finish what he's
6  saying.
7  BY MR. ROBINSON:
8      Q   I don't understand. Before you go on,
9  Problems of what nature? so I can understand what you
10 say.
11     A   Usually safety concerns. I'm at risk. My
12 back is hurting. I'm afraid to tell the supervisor.
13 For what it's worth, I also have problems occasionally
14 where managers and supervisors go, I don't really want
15 to be the bad guy. Can you help me out here? So we're
16 deeply involved in employee situations. So it's not a
17 strange area to delve into. It is related to safety in
18 many ways. Again, my comment here stems from some of
19 the testimony given and the facts that we've already
20 discussed.
21     Q   Is that your answer?
22     A   I'm not even sure anymore exactly where we
23 were going, but it's the best I can do.
24     Q   Do you want to hear the question again?
25     A   No, I don't think so.

**Page 145**

1      Q   I don't blame you.
2              MS. PALACIOS: Do you want another
3  question?
4  BY MR. ROBINSON:
5      Q   Yeah. Here's another one. What specific
6  evidence do you have that there was disharmony in the
7  workplace at any given time?
8      A   Testimonies. Deposition testimony.
9      Q   Can you be a little more specific than
10 that?
11     A   No. Not at this time. I would have to go
12 back through and find some of the references. I can do
13 that.
14     Q   And when you use the word -- when you use the
15 phrase "harmonious workplace," do you mean one where
16 management and employees are working in harmony?
17     A   And employees and employees. The terms
18 actually came out of Beauty's various statements and
19 stuff starting back in -- I think some of the
20 interrogatories and was continued in one form or
21 another by deposition.
22     Q   Right. Beauty's position is, and as you well
23 know, that the -- that the reason for the rule and its
24 justification is that in a diverse workplace like this
25 where there are a lot of different people speaking a

37 (Pages 142 to 145)

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                                                    Earnest Harper

Page 146

1  lot of different languages and there had been ethnic
2  tension historically because of people speaking
3  languages that others couldn't understand and feelings
4  of being insulted, that the adoption of an English-only
5  rule would overcome that, promote harmony and avoid
6  ethnic tension. You're aware of that, yes?
7      A   I'm aware of the claim.
8      Q   Right. And you felt some obligation to
9  respond to that claim?
10     A   Well, there was no studies. There was
11  nothing to back it up.
12     Q   Did you feel some obligation to respond to
13  that claim? Yes or no.
14     A   Yes.
15     Q   And one of the things that you say in
16  response to that claim is that the English-only policy,
17  in your opinion, failed to provide a harmonious
18  workplace, yes?
19     A   Yes.
20     Q   Which means that you must have concluded that
21  the workplace was not harmonious, yes?
22     A   Yes.
23     Q   Was there any particular time the workplace
24  wasn't harmonious or was it periodically harmonious
25  over the last 30 years?

Page 147

1          MS. PALACIOS: Objection.
2  BY MR. ROBINSON:
3      Q   Go ahead.
4          MS. PALACIOS: I'm sorry, go ahead.
5      A   The testimony was pretty consistent that
6  employees had to conceal times when they talked in
7  their language; that there was testimony given that
8  some employees felt harassed because of the supervisor
9  trying to, you know, follow them around and catch them
10  speaking. This is not a sign of a harmonious
11  workplace. It just isn't.
12  BY MR. ROBINSON:
13     Q   Did you find any evidence that amongst the
14  employees, forgetting supervisors, forgetting managers,
15  there was disharmony one to another?
16     A   From the testimony, depositions.
17     Q   Well, did you?
18     A   Yes.
19     Q   What did you find there?
20     A   They were afraid to speak anything when they
21  were on the job except English or they didn't speak. I
22  mean, that's hardly a harmonious situation.
23     Q   That's not what I asked you. I mean, we're
24  talking about -- if you understand Beauty Enterprises'
25  position, we're trying to prevent employees from

Page 148

1  fighting with one another verbally or otherwise,
2  feeling that they've been insulted by another. We're
3  not talking about the conduct of supervisors, we're not
4  talking about the conduct of management.
5      Q   Did you find -- if I define harmonious as
6  limited to that situation, did you find any evidence of
7  disharmony?
8          MS. PALACIOS: Objection.
9      A   I found no evidence of fist fights.
10  BY MR. ROBINSON:
11     Q   There is no evidence of fist fights. Did you
12  find any evidence of disharmony?
13     A   Disharmony?
14     Q   Yes.
15     A   I've answered that several times.
16     Q   No, no, but as I've just defined it, employee
17  to employee.
18     A   I don't know how to answer that.
19     Q   Okay. That's fine.
20     A   Beyond what I've already answered.
21     Q   That's fine. Did you find any evidence of
22  ethnic tension?
23     A   There appears to be ethnic tension just based
24  on testimony, and, you know, in the depositions.
25     Q   If I told you that virtually all the

Page 149

1  employees who are charging parties in this case say
2  that there is no ethnic tension at Beauty Enterprises,
3  there was no ethnic tension before the lawsuit, there
4  is no ethnic tension after the lawsuit, there was never
5  any ethnic tension --
6      A   So no reason for --
7      Q   -- would you disagree with that?
8      A   From the employees, no, I'd say that's fine.
9  They apparently got along to their -- you know, to
10  their satisfaction.
11     Q   Do you accept that? Is that your
12  recollection of the testimony?
13     A   Yes.
14     Q   Then how can you say that the English-only
15  policy failed to reduce ethnic tension? Because there
16  was never any to reduce, is that your position?
17     A   The employees had a different ethnic
18  background than the supervisors in some cases. There
19  was apparently tension between them with regard to this
20  English-only rule.
21     Q   You visited Beauty Enterprises only once;
22  isn't that right?
23     A   That's correct.
24     Q   You were there only a few hours?
25     A   That's correct.

38 (Pages 146 to 149)

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

Page 150

1    Q   And you were there to identify the risks
2  present in the environment?
3    A   That's correct.
4    Q   And to learn what you could about how Beauty
5  Enterprises dealt with those risks?
6    A   Where we could, yes.
7    Q   You weren't there to observe whether the
8  workplace was harmonious, were you?
9    A   No.
10    Q   And you weren't there to observe whether or
11  not there was ethnic tension in the place, were you?
12    A   Not there to do that.
13    Q   Right. And you didn't see any disharmony
14  there when you were there?
15    A   I saw a workforce that wasn't
16  communicating.
17    Q   Did you see any disharmony when you were
18  there? Yes or no?
19    A   Yes.
20    Q   You did?
21    A   I perceived that there was some stress issues
22  because employees were not --
23    Q   Yes answers the question. Let me ask the
24  next one. What is it that led you to that
25  perception?

Page 151

1    A   Lack of conversation among the employees.
2  Just -- and it could have been because of the fact that
3  they had us in there and they were prepared for our
4  visit and instructed in one way or another. I don't
5  know for sure. It just didn't appear to be a kind of a
6  normal, gregarious --
7        MS. PALACIOS: Hang on. Let him
8  finish.
9    A   There just appeared to be -- it just didn't
10  seem natural. People weren't walking around. They
11  were just simply quietly doing their job. It doesn't
12  seem the way you would normally see an environment.
13  I've been in a lot of environments, including
14  warehouses and so on, so it just appeared to be a
15  little different than that for whatever reason.
16  BY MR. ROBINSON:
17    Q   And there could be many explanations for
18  that, wouldn't you agree?
19    A   I would agree.
20    Q   And disharmony can -- might perhaps be one of
21  them?
22    A   It could.
23    Q   Were you able to observe, on the occasion of
24  your visit, any ethnic tension in the place?
25    A   No.

Page 152

1    Q   You say that what we did created a system
2  of -- what Beauty Enterprises did created a situation
3  of fix the worker rather than fix the system, which in
4  your experience could only result in, among other
5  things, less worker harmony and increased ethnic
6  tension; is that right?
7    A   That's correct.
8    Q   How could a system of fix the worker rather
9  than fix the system produce increased ethnic tension?
10    A   If I'm working in an unsafe environment and
11  have no program to reduce exposures, it can't make a
12  positive work environment. Usually there is going to
13  be people who are either afraid to speak up, afraid for
14  their work, their jobs.
15    Q   So it would create tension, tension among --
16  tension with anybody?
17    A   With the employment -- employer.
18    Q   With the employer?
19    A   Right.
20    Q   And how would that tension be ethnic in
21  nature?
22    A   I can't answer that at the moment.
23    Q   What personal experiences do you have with
24  ethnic tensions in workplaces?
25    A   I do have some.

Page 153

1    Q   Could you remember any?
2    A   Well, I've -- yeah, from time to time.
3  Usually it was, you know, smoothed over with just
4  working with the individuals involved. I've had a
5  couple of military experiences. We had a Hispanic who
6  felt that everyone was prejudicial to that gentleman,
7  and as the officer in charge, it fell to me to deal
8  with it. So on and off over the years I've had some
9  experience in this.
10    Q   You mean an individual who felt that he or
11  she was being mistreated because of his ethnicity?
12    A   That was their viewpoint. That's what they
13  told me.
14    Q   No, but that's the nature of your experience
15  with ethnic tension, a particular individual --
16    A   Well, yeah. The ones that come to mind.
17  There is probably a handful.
18    Q   A handful of incidents like that?
19    A   Uh-huh. That's true.
20    Q   Never a situation where -- where the blacks
21  in the place hated the Puerto Ricans in the place and
22  the Puerto Ricans in the place hated the Vietnamese in
23  the place, stuff like that?
24    A   I think most of us have been in communities
25  with those types of problems.

39 (Pages 150 to 153)

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                      Earnest Harper

Page 154

1    Q    Okay. Have you ever been in a workplace like
2    that?
3    A    I don't think so.
4    Q    Are you on the human relations commission of
5    Boise, Idaho?
6    A    No.
7    Q    Are you a productivity expert, sir?
8    A    I've worked with productivity for a long
9    time.
10   Q    Are you a productivity expert, sir?
11   A    I don't know what would constitute an expert
12   level.
13   Q    Do you list it here on the stationery,
14   Exhibit 2, in the upper right-hand corner "productivity
15   expert"?
16   A    I do not.
17   Q    Did you identify productivity as one of the
18   areas of expertise --
19   A    I did not.
20   Q    -- earlier in our deposition?
21       Do you read The Harvard Business Journal?
22   A    Not for some time. I have in the past.
23   Q    Do you subscribe to it?
24   A    No.
25   Q    Page 3 of your report, Number 3, are you

Page 155

1    opining here that requiring English only in the
2    workplace does not help productivity?
3    A    I'm just saying that I have never seen any
4    evidence that it does.
5    Q    Have you ever seen any evidence that it
6    doesn't?
7    A    I believe I have. Let me --
8    Q    Did you cite it here?
9    A    Hold on. No, I did not cite it.
10   Q    Can you cite it now?
11   A    I think I can provide it -- provide the
12   article that addressed a case study in one location
13   where they did have an English-only requirement, they
14   weren't getting anywhere, and they took a total upside
15   down approach and did improve relations, did improve
16   productivity and did improve safety. So that is an
17   article that's out there. And I did read it and I
18   think I can produce it. So I can put that in evidence
19   if you'd like.
20   Q    Where was it?
21   A    It was in one of the professional journals.
22   Q    Okay. Can you be a little more specific than
23   that?
24   A    I think it was in Professional Safety.
25   Q    Did you cut it out?

Page 156

1    A    I may have.
2    Q    Is it in your file for this case?
3    A    It's probably in my file -- well, I think it
4    may be in my file because I remember making a copy at
5    Hewlett Packard and so I'm assuming I still have it.
6    Q    Do you know who wrote it?
7    A    I do not.
8    Q    Wouldn't it have been natural if such a study
9    existed and you saw it for you to have mentioned it
10   here in this Paragraph 3?
11   A    There was nothing to prevent me from doing
12   it. I just simply didn't do it.
13   Q    Why didn't you do it? Can you identify any
14   reason why you didn't do it?
15   A    No. I will produce it.
16   Q    Now, to be fair with you I imagine as a
17   safety professional you're able to speak as an expert
18   about the impact safety improvements or safety issues
19   can have on worker productivity; am I right about
20   that?
21   A    Absolutely.
22   Q    And that's because people in your field study
23   these things, yes?
24   A    We perform the work and measure the change.
25   Q    Why can't you just answer my question? Is

Page 157

1    that because people in your field study these things?
2    A    Yes.
3    Q    It's not the only reason, but that's part of
4    it, right?
5    A    Right.
6    Q    And it's because people in your field write
7    about these things in the professional literature,
8    yes?
9    A    Yes.
10   Q    And some professionals actually have
11   experience in dealing with these things on a
12   professional basis, yes?
13   A    Yes.
14   Q    Okay. Now, how is it that you can speak as
15   an expert about the impact of an English-only rule on
16   productivity? In other words, what education, training
17   or experience do you have with productivity that
18   doesn't involve safety or the absence of safety?
19   A    I've been involved with the development of
20   production processes, product equipment, new
21   installation of equipment. All of these things have an
22   impact on productivity.
23   Q    From a safety perspective, right?
24   A    From a safety, human factors, ergonomics
25   standpoint. All of that. For years.

40 (Pages 154 to 157)

EEOC vs Beauty Enterprises

Page 158

1    Q   So what education, training or experience do
2  you have in productivity that does not involve
3  safety?
4    A   It's hard to find a subject matter that
5  doesn't have anything to do with safety when you're
6  involved in the process from top to bottom.
7    Q   But you're not saying because you have an
8  expertise in safety that you are an expert in
9  everything that goes on within a workplace, are you?
10 Are you?
11   A   No, I'm not an expert in every aspect.
12   Q   Fine.  And you go on -- let's turn your
13 attention to page 3, Paragraph 6.  The bottom where you
14 say, "Not permitting reasonable native language
15 discussions between two individuals clearly performing
16 a legitimate task during working hours often results in
17 less efficiency and higher risk of injury."
18       Did I read that right?
19   A   That's correct.
20   Q   Again, sir, you're not an efficiency expert,
21 are you?
22   A   I probably am to a certain extent.
23   Q   You haven't cited any text or article of this
24 proposition, have you?
25   A   No, I have not.

Page 159

1    Q   And the fact is, sir, that you've never had
2  any experience in a workplace where native language
3  discussions were prohibited while on the clock, have
4  you?
5    A   That's correct.
6    Q   And in any event, didn't you tell us earlier
7  that language -- earlier in the report, I'm quoting
8  from page 6, Subparagraph A, that, "Language did not
9  contribute in any way to injuries that employees
10 experienced at Beauty Enterprises."  Is that right?
11   A   That's essentially correct, yes.
12   Q   Okay.  So how then could not permitting
13 reasonable native language discussions between two
14 individuals clearly performing legitimate tasks during
15 working hours result in a higher risk of injury?
16   A   I didn't imply that it did.
17   Q   Maybe I'm misunderstanding this.  I'll read
18 again what you wrote.  "However, not permitting
19 reasonable native language discussions between two
20 individuals clearly performing legitimate tasks during
21 working hours often results in" -- dot dot dot -- "a
22 higher risk of injury."  Did I read that right?
23   A   I'm sorry.  That's true.
24   Q   Did you say that?
25   A   Yes, I did.

Page 160

1    Q   And you're the same person that says two
2  pages later, "Language did not contribute in any way to
3  the injuries that employees experienced at Beauty
4  Enterprises"?
5    A   Correct.
6    Q   Do you see any conflict between those two
7  statements?
8    A   Potentially so, yes.
9    Q   So what kind of injuries are you referring to
10 when you say, "Not permitting reasonable native
11 language discussions often results in a higher risk of
12 injury"?
13   A   First of all, it needs to be understood that
14 that was a situational exposure which I found no hard
15 evidence for.
16   Q   That was a situational?  What's that?
17   A   If people are handling -- more frequently
18 handling packages, for example, where they might be
19 able to hand off or deal with it in some other fashion,
20 the exposure is greater.  There is a potential for a
21 higher risk of injury.
22   Q   What does language have to do with that?
23   A   It may not have very much to do with it.
24   Q   Okay.  So again, what kind of injuries are
25 you referring to when you say that not permitting

Page 161

1  reasonable native language discussions often results in
2  a higher risk of injury?
3    A   Well, I don't remember exactly at this point
4  what examples I was using for that.
5    Q   Okay.  Now, you told us earlier that you
6  agree with my impression that you spent a good chunk of
7  your report criticizing Beauty Enterprises' safety
8  program and your sense of the low priority Beauty
9  Enterprises attaches to safety; is that right?
10   A   That's right.
11   Q   Are you trying to make Beauty Enterprises
12 look bad?
13       MS. PALACIOS:  Objection.
14   A   It didn't enter into it.
15 BY MR. ROBINSON:
16   Q   Do you think you're being fair to Beauty
17 Enterprises by including this in your report?
18   A   Yes.
19   Q   Now, take a look at page 10 of your report
20 where you say that, in italics, that Beauty
21 Enterprises, BEI arbitrarily required a written
22 forklift test thereby failing Mr. Acosta.  Do you see
23 that?
24   A   I do.
25   Q   I have a number of questions for you about

41 (Pages 158 to 161)

Brandon Smith Reporting

EEOC vs Beauty Enterprises

2/5/2004                                                                                          Earnest Harper

Page 162

1    that statement. First of all, what do you mean by
2    "arbitrarily"?
3        A    They didn't have to qualify or certify this
4    gentleman by having him do an English exam -- written
5    exam.
6        Q    Do you know what -- what's your definition of
7    arbitrary?
8        A    Just doing it for the hell of it.
9        Q    For no reason? Arbitrarily generally means
10   for no reason.
11       A    Okay.
12       Q    Do you think you used the word correctly in
13   that context if that's the definition?
14       A    I'm not sure. I probably could have phrased
15   it a different way. They had options. They didn't
16   have to test the gentleman with an English test.
17       Q    Well, how do you know that?
18       A    Because it's not required by code. Because
19   the man has a history of driving correctly. The
20   gentleman has a --
21       Q    But how do you know that they knew that?
22            MS. PALACIOS: You guys are talking
23   over each other. I know you're excited to get into
24   this topic.
25            MR. ROBINSON: To finish, yes.

Page 163

1            MS. PALACIOS: Let him finish before
2    you --
3        A    By direct observations. Because they can
4    perform performance tests observed by the supervisors
5    or other people qualified to run forklifts. In fact,
6    the supervisors were not certified in forklift driving
7    themselves, yet they still drove. There was no reason
8    for this written test for this gentleman.
9    BY MR. ROBINSON:
10       Q    Did you study the -- did you make some
11   determination independent of the record in this case
12   about whether a written forklift test was unnecessary
13   to satisfy the OSHA requirements regarding the
14   certification of forklift drivers?
15       A    Yes.
16       Q    What did you do?
17       A    I know the standards. I know the codes.
18   It's been covered before in the past.
19       Q    Covered before where?
20       A    In OSHA regulations. It's not required that
21   it be written English exams.
22       Q    Where does it say that?
23       A    It says it in the codes. The OSHA codes,
24   Section 29 in the Code of Federal Regulations. Section
25   1910 in the forklift subset section.

Page 164

1        Q    Says you don't have to give a written test?
2        A    That's correct.
3        Q    Does it say you can't give a written test?
4        A    No. It allows you to do any way you want to
5    certify, but you don't have to do it in a written
6    test.
7        Q    Are you aware in this case, in this
8    situation, do you know how -- withdrawn.
9            What's your understanding of how Beauty
10   Enterprises came to give a written test here?
11       A    They were cited by OSHA for failing to comply
12   with the regulations.
13       Q    Anything else?
14       A    I thought that was enough. I mean, there was
15   detail of the citation. They weren't performing the
16   required training and periodic training that these
17   fellows required.
18       Q    Did you see the testimony --
19       A    I saw the citation.
20       Q    I haven't finished. Did you see the
21   testimony in Tom Buonocore's deposition, among others,
22   that they didn't know by reading the citation or the
23   regulations how to satisfy the OSHA certification
24   requirements and so they went to their forklift vendor
25   to find out and he told them you got to give a written

Page 165

1    test? Were you aware of that?
2        A    I remember the testimony. All they had to do
3    is ask.
4        Q    They did ask.
5        A    They could have asked OSHA. They could have
6    had a safety person that looked it up in the standards.
7    That's very easy to do if you have a safety program.
8        Q    Did you read Harold Acosta's deposition?
9        A    I did.
10       Q    Did you see his admission in that deposition
11   that he never complained about the exam being in
12   English and never used it as an excuse to explain his
13   failure? Did you see that?
14       A    I did.
15       Q    Did that influence your writing in any way?
16       A    No. The test was --
17       Q    Obviously you didn't.
18       A    The test was not required.
19       Q    Are you aware that other Hispanic individuals
20   took the test and passed it?
21       A    I am.
22       Q    Are you aware that the test was given to
23   people who spoke languages other than English and
24   Spanish?
25       A    I don't remember for sure.

42 (Pages 162 to 165)

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                          Earnest Harper

Page 166

1    Q   Are you aware that of all the people, of all
2  ethnic groups who took this test, only Harold Acosta
3  failed?
4    A   I'm aware that he was probably the only
5  failure.
6    Q   And how do you know if he wasn't given that
7  test in English -- withdrawn.
8         How do you know if he wasn't given that test
9  in Spanish that the same result would have obtained or
10 would not have obtained?
11   A   Beyond doubt, I don't.
12   Q   You don't know?
13   A   No.
14   Q   You can't know, can you, sir?
15   A   That's not necessarily true.  Not with 14
16 years of driving experience without incident.
17        MS. PALACIOS:  How are you doing?
18 Okay?
19        THE WITNESS:  Yes, I'm doing okay.  My
20 brain is getting a little fuzzy.
21        MS. PALACIOS:  Do you want to take a
22 little break?
23        THE WITNESS:  No.  I think we should
24 push ahead.
25 BY MR. ROBINSON:

Page 167

1    Q   Are you leaving tonight?
2    A   No.  Thank you for asking.
3    Q   You go on in this bullet point that we've
4  been talking about on page 10 to say that, "BEI imposed
5  an arbitrary and punitive training format not supported
6  by any code or standard."
7         Were you intending to convey the impression
8  by this language that Beauty Enterprises intentionally
9  had the intention of punishing Harold Acosta?
10   A   Why wouldn't they accommodate --
11   Q   Just answer my question.
12   A   I am answering the question the best I can.
13   Q   No, answer it yes or no.  Are you saying
14 that, sir?
15   A   I said it right here, yes.  The answer is
16 yes.
17   Q   Yes, so they intended to punish Harold
18 Acosta?
19   A   How else would you explain it?  They could
20 have worked with the individual who they knew to be a
21 good driver.
22   Q   What do you mean by that?
23   A   If I have somebody who maybe can't read
24 English or fails an English-only test and I feel that
25 he's done the job for all that time, would I not find

Page 168

1  another way to certify him or to check out his
2  qualifications even if I had a test to do it in Spanish
3  or whatever, wouldn't I work with that individual a
4  little bit and see if it was just because the English
5  test?  Of course I would.  If I just don't give him an
6  opportunity to show that he has the knowledge in some
7  way, then what else is it but punitive?
8    Q   I've got 18 reasons for that, but that answer
9  is fine.
10        Now, you're also complaining not about the
11 test, but about the video that the test takers were
12 shown before the test to prepare them for the test,
13 right?
14        MS. PALACIOS:  Objection.
15   A   Where are you?
16 BY MR. ROBINSON:
17   Q   Says, "By performing safety training in
18 English only followed by an English-only test."  You're
19 referring to a video, right?
20   A   I'm sorry.  You're on?
21   Q   Same place.
22   A   B?  Yes.
23        MS. PALACIOS:  Where are you?
24        MR. ROBINSON:  Page 10, the last bullet
25 point before training.

Page 169

1         MS. PALACIOS:  Same bullet?
2         MR. ROBINSON:  Same bullet.
3    A   Oh, up above training.  I'm sorry.
4         MS. PALACIOS:  Where do you see
5  something about videos?
6         MR. ROBINSON:  Says, "By performing
7  safety training in English only followed by an
8  English-only test."
9  BY MR ROBINSON:
10   Q   I assume that the -- what happened here is
11 that a video was shown before the test and that was in
12 English only, so I just drew the conclusion that what
13 you meant by safety training in that context was the
14 video.  Am I wrong?
15   A   I address that a little bit in Section 1-B at
16 the bottom of the page, safety orientation video.  I
17 question -- or the testimony by Mr. Tom Buonocore
18 believes there may have been a video.  As of this
19 report I do not have the information on the existence
20 of such a video.  If it exists, it would be a minor
21 part of the overall program problem.
22   Q   It wasn't a safety -- well, I'm sorry.
23 That's not what we're talking about here.  Go back to
24 the bullet point that I'm --
25   A   Just above the word "training"?

43 (Pages 166 to 169)

EEOC vs Beauty Enterprises

2/5/2004                                                          Earnest Harper

Page 170

1      Q   Just above the word training.  It reads, "By
2  performing safety training in English only followed by
3  an English-only test."  What are you referring to by
4  the safety training in English only there?  It's the
5  forklift safety training, isn't it?
6      A   I believe it probably is.  And I think the
7  instruction book was English.  I may have to go back to
8  my notes.
9      Q   I'm going to tell you.  I'm going to
10  stipulate it was a video.
11      A   Okay.  I realize I remember a video.
12      Q   Okay.  And so what I interpret you saying
13  here is that not only was -- were these guys bad by
14  giving the test in English alone, but they were just as
15  bad by giving the training -- by showing a training
16  video that was only English to these guys, yes?
17      A   Yes, unless you followed up with some method
18  by which you make sure that they understand what was on
19  the video and that method happened to be the
20  English-only test, which is not a good proof that he
21  understood what he saw on the video.
22      Q   But are you saying here the showing of an
23  English language training -- you are saying here, are
24  you not, that the showing of an English language
25  training video is not supported by any code or

Page 171

1  standard; is that right?
2      A   No.  Only that part dealing with the written
3  test.
4      Q   Okay.  All right.  Well, is the showing of a
5  video in English supported by any code or standard?
6      A   No.  You can use a variety of training
7  methods to get the idea across.
8      Q   It's not prohibited by any code or standard,
9  is it?
10      A   No.
11      Q   So if Mr. Acosta understood the video, the
12  fact that it was in English shouldn't be a problem,
13  should it?
14      A   If he understood it, that's correct.
15      Q   Right.  And if Mr. Acosta understood the
16  test, even though he couldn't answer the questions
17  correctly, that shouldn't be a problem either, should
18  it?
19      A   That's the question.
20      Q   That's the question.  We don't know whether
21  he couldn't understand the questions or he just didn't
22  know the answers, do we?
23      A   It's hard to argue that with 14 years of
24  experience on the job, plus passing a performance
25  test.

Page 172

1      Q   Did you provide any questions for the EEOC's
2  lawyers to ask when they took depositions of Beauty
3  Enterprises people?
4      A   I provided some questions right after the --
5  or at the end of the visit.
6      Q   Why?
7      A   Just to get some more information.
8      Q   Why?
9      A   That's what I'm doing is gathering
10  information to render an opinion.
11      Q   So it was information for you to help you?
12      A   It's information for the case so I can arrive
13  at as close to the truth as I can.
14      Q   What questions did you have them ask?
15      A   I don't remember precisely, but we can
16  provide that.
17      Q   How?  What could you provide me with --
18      A   In fact, I think you have it in there if you
19  want to pull that out.
20      Q   Okay.  I'll go through that.  So you think
21  it's in here?
22      A   Yes.  I'm sure it is.
23      Q   Okay.
24      A   I can assist you if you'd like, I think.
25      Q   I'm going to -- I guess --

Page 173

1      A   I'm sorry.  You might try the site visit
2  folder first if you're looking for that particular --
3      Q   No.  I'll get to that.  What I'm going to do
4  is I'm going to mark as an exhibit and make copies for
5  us and I'll give you back the original, if you don't
6  mind, the -- these file folders rather than marking
7  individual pieces of paper within them because there
8  are a lot of pieces of paper.  So here's a file folder
9  that says BEI, and in it there is a handwritten note on
10  Hewlett Packard note paper and five pieces of paper
11  with what look like notes of yours.  Is that a fair
12  characterization?
13      A   That's correct.
14
15          (Harper Exhibit 6:  Marked for
16          identification.)
17
18  BY MR. ROBINSON:
19      Q   The note on the Hewlett Packard note paper in
20  the Exhibit 6 file says, "Testimony indicated
21  supervisors such as Paul Lopes would attempt to spy --
22  dot dot -- not to -- dot dot dot -- see work
23  safely."  Did I read that right?
24      A   I believe that's -- yes, that's correct.
25      Q   Safety or safely?

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                                Earnest Harper



Page 174

1    A   It probably should be safety.
2    Q   "See work safety or see tasks done but to
3  catch Spanish." Did I read that right?
4    A   Yes.
5    Q   How did you come to write this?
6    A   It's unusual for me to write an aside note,
7  but the fact that it's on the HP note pad suggests that
8  I might have been reading something briefly at HP and
9  not have my usual, you know, green sheets. So I may
10  have just written something I wanted to go back to or
11  check out. That's one of those little work product
12  things you do to jog your memory or to make a note.
13    Q   Okay. So your testimony is that I made a
14  note of this as I was reading his deposition?
15    A   I believe that to be true. Right.
16    Q   And you're sure it's not a report, you're
17  making a note of something somebody told you?
18    A   No, no. No one worked with me on any part of
19  that.
20    Q   I'm going to show you another piece of paper
21  from this Exhibit 6. It has your notes on them. Can
22  you explain what's here?
23    A   The top of the page was just -- it was
24  probably a convenient sheet facing up. It's just where
25  I estimated trend from the 1990 injury rate of 7.8 to

Page 175

1  2000. And I calculated the growth. The rest of it
2  appears to be notes based upon -- well, it starts off
3  success of multi-language workforces. And these are
4  probably -- I think these are issues that I believed
5  would enhance harmony, if you would, with regard
6  workplace.
7    Q   Does this just reflect your thoughts or are
8  you taking notes from something?
9    A   This is kind of like work product at this
10  point. Just kind of summarizing my thoughts or trying
11  to pull together my experience --
12    Q   Okay. So you weren't --
13    A   -- and organize my thinking. I'm sorry.
14    Q   These weren't notes of yours from some book
15  or article or Internet site that you were reading?
16    A   No.
17    Q   And are the other pieces of paper notes of
18  depositions?
19    A   These are --
20    Q   Yes, are they notes of depositions?
21    A   Yes.
22    Q   Thanks.
23       MS. PALACIOS: Are both sheets notes of
24  depositions? Did you look at both sheets?
25       THE WITNESS: Yes. There are two

Page 176

1  sheets for each --
2  BY MR. ROBINSON:
3    Q   One was Tom Buonocore and one was Fabian
4  Pineros?
5    A   That's correct.
6
7       (Harper Exhibit 7:  Marked for
8        identification.)
9
10  BY MR. ROBINSON:
11    Q   Exhibit 7 is a file called -- that you've
12  written on entitled OSHA slash stats slash notes dash
13  200s. Did I read that right?
14    A   That's correct.
15    Q   It includes some of the schedules that you
16  have in your final report?
17    A   Yes, sir, it does.
18    Q   It includes the OSHA log that Beauty
19  Enterprises produced to the government?
20    A   Yes, sir.  OSHA 200 logs.
21    Q   And it includes a three-page document
22  entitled, "Worksheet Injuries and Related Details."
23  And is this essentially some attempt to analyze the
24  types and incidents of injuries at Beauty Enterprises
25  over whatever period of time?

Page 177

1    A   Yes.
2    Q   I'm holding in my hand a piece of paper
3  that's handwritten content on Hewlett Packard note
4  paper. It comes from one of your subfiles or files
5  called BEI report and CV, but doesn't seem to belong
6  there. And with your permission, I'm just going to put
7  it, for convenience sake, so I don't have to mark it,
8  this little piece of paper, in Exhibit 7. And what's
9  written here -- is that your writing?
10    A   Yes, it is.
11    Q   And it says, "Language translation services,"
12  yes?
13    A   Yes.
14    Q   And does this reflect some attempt to
15  identify from the Internet how many Spanish translation
16  services there are in the world?
17    A   And Bosnian and Russian and Italian.
18  Curiosity search just to see what kind of numbers I
19  would turn up based on that search language.
20
21       (Harper Exhibit 8:  Marked for
22        identification.)
23
24  BY MR. ROBINSON:
25    Q   Exhibit 8 is a file called site visit and

45 (Pages 174 to 177)

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                                      Earnest Harper

---

Page 178

1  interviews. And there is a stapled set of papers in
2  here, the first page of which seems to be headed site
3  visit dash 06 dash December dash 01. And it seems to
4  record observations you had and thoughts that you
5  developed during the course of your observation.
6      A   That's correct.
7      Q   Does it reflect -- does it include items that
8  you wrote down after the site visit was over?
9      A   As far as I know, these were all done during
10 the site visit. And some of the things -- the column
11 on the right that I think you're referring to, these
12 are extracted during the visit. So most of these
13 should have been written the same day or even the same
14 hour. Yes, I believe that's an accurate statement.
15     Q   Well, what prompted my question was there
16 seem to be -- the last three pages seem to be
17 different. Are they?
18     A   That is correct. These were stapled together
19 at the time. One, two, three, four, five -- the first
20 five pages -- let me make sure that's right. Yes,
21 there is eight pages total on this one. And so the
22 first five pages are all from the site observations.
23     Q   Right.
24     A   And the last three are the form that I made
25 up for interviewing individuals. And the two sheets

Page 179

1  were like question and blank. The last sheet was a
2  little enlargement on basically what one might ask.
3      Q   Who did you interview?
4      A   I think --
5      Q   Would it be in here?
6      A   I believe they're in there.
7      Q   Okay. You have a printout of some
8  information from a website on earthquakes in New
9  England.
10     A   Oh, yes.
11     Q   Does that have anything to do with this
12 case?
13     A   Yes, sir, it does. The reason it's in there
14 is because I really didn't know what the earthquake
15 status or risk factor was in this area and would a
16 reasonable person have some reason to be concerned.
17     Q   Now, are these notes, these documents stapled
18 together in here, notes of the interviews you conducted
19 with charging parties?
20     A   Maria -- yes. That first one is Maria is
21 carried over to part of the second page, then followed
22 by Rosa, and then a copy, a Xerox copy of the
23 questionnaire this time filled in.
24     Q   Here is a single piece of paper with
25 handwritten notes on both sides, or actually looks like

Page 180

1  a handwritten memo, I don't know if it was delivered,
2  to Lili from Earnie. Lili is the pretty young lady on
3  your left?
4      A   Most definitely.
5      Q   And you're Earnie?
6      A   I'm Earnie.
7      Q   Okay. And you're telling her things that you
8  want her to get for you?
9      A   I think -- yeah. I'm don't even know why I
10 refer to it in a formal to and from fashion here. But
11 this is notes. It was never transmitted as such. It
12 was probably something I might have covered on the
13 phone. Need drawings of the buildings.
14         Oh, I know what this was. This was --
15 probably ended up being a phone call prior to the
16 visit. But let's see. 7 December.
17     Q   Don't think out loud. Just collect your
18 thoughts and then speak.
19     A   Okay. What this is -- if memory serves, what
20 this is was follow on questions that occurred to me on
21 7 December. And we were still --
22     Q   Okay. Fine. Hold on to it. Tell me why you
23 wanted the pieces of information that are on there that
24 are listed there?
25     A   More background for the site visit. Should I

Page 181

1  go on?
2      Q   Well, you could be a little more specific
3  than that.
4      A   Well, I had a very inaccurate sketch, you
5  know, the first white sketch you saw in one of these
6  files. And then I had my own hand-drawn sketch as we
7  went through the building. So it would have been nice
8  to have a drawing that had dimensions and length and,
9  you know, scale on it as it were. Just background
10 information to get information from the contracting
11 company that delivered propane that serviced fire
12 extinguishers.
13     Q   What kind of information would you want from
14 them?
15     A   Sprinkler systems. Just to see if it was
16 being done or not. Trying to get information on
17 building maintenance. Basically looking into
18 information to tell me they had a program on some of
19 these fire prevention issues or not.
20     Q   Did you get any of that stuff?
21     A   I got answers to some of it, I recall.
22     Q   From whom?
23     A   I believe through EEOC's office at some
24 point, who would have gone back to the employer, to
25 Beauty.

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

Page 182

| | | |
|---|---|---|
| 1 | Q | Are you sure? |
| 2 | A | That was my channel, so yes. |
| 3 | Q | Yes, you're sure? |
| 4 | A | Yes. |
| 5 | Q | Well, for example, did you get a list of the |
| 6 | | companies that delivered propane tanks for the |
| 7 | | forklifts in Warehouse 5? |
| 8 | A | I don't believe I did. |
| 9 | Q | Did you get a list of the companies that |
| 10 | | serviced Beauty's fire extinguishers and sprinkler |
| 11 | | systems? |
| 12 | A | The response I got was that they didn't have |
| 13 | | that information. |
| 14 | Q | The EEOC didn't have that information? |
| 15 | A | Who would have asked through the employer. |
| 16 | Q | You don't know what they would have done? |
| 17 | | You don't -- |
| 18 | A | No, that's true, I don't.  I don't.  I don't |
| 19 | | know how they would have proceeded. |
| 20 | Q | Did anybody from the EEOC ask you why you |
| 21 | | needed this stuff? |
| 22 | A | I don't recall. |
| 23 | Q | Did anybody from the EEOC tell you, You don't |
| 24 | | really need this stuff, do you? |
| 25 | A | Few attorneys tell me that. |

Page 183

| | | |
|---|---|---|
| 1 | Q | A few attorneys or a lot of attorneys? |
| 2 | A | No attorneys ever tell me that. |
| 3 | Q | Oh, okay.  I am done, sir.  Thank you for |
| 4 | | coming here today all the way from Boise, Idaho to |
| 5 | | spend the day. |
| 6 | A | I appreciate that. |
| 7 | | MR. ROBINSON:  Let me get this stuff |
| 8 | | copied. |
| 9 | | |
| 10 | | (The deposition concluded at 4:49 pm.) |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 184

```
 1              J U R A T          BAC
 2
 3
 4
 5
 6
 7
 8
 9
10          _____
11              EARNEST F. HARPER
12
13
14
15
16          Subscribed to and sworn before me
17   on this _____ day of _____,
18   2004.
19
20
21
22
23
24   My Commission Expires:
25
```

Page 185

```
 1              E R R A T A
 2
 3   I,_____, do hereby certify that the
     following corrections and additions are true and
     accurate to the best of my knowledge and belief.
 4
 5   CORRECTION        PAGE   LINE   REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   DATE              EARNEST F. HARPER
21
22   At_____ in said County of _____,
23   this _____ day of _____, 2004, personally
24   appeared _____, and he made oath to the
25   truth of the foregoing corrections by him subscribed.
```

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4

EEOC vs Beauty Enterprises

2/5/2004                                                                    Earnest Harper

Page 186

1           STATE OF CONNECTICUT
2       I, Bethany A. Carrier, LSR 071, a Notary Public,
3   duly commissioned and qualified in and for the State of
4   Connecticut, do hereby certify that pursuant to Notice,
5   there came before me on the 5th day of February, 2004,
6   the following-named person, to wit:  EARNEST F. HARPER,
7   who was by me duly sworn to testify to the truth and
8   nothing but the truth; that he was thereupon carefully
9   examined upon his oath and his examination reduced to
10  writing under my supervision; that this deposition is a
11  true record of the testimony given by the witness.
12      I further certify that I am neither attorney nor
13  counsel for nor related to nor employed by any of the
14  parties to the action in which this deposition is
15  taken, and further that I am not a relative or employee
16  of any attorney or counsel employed by the parties
17  hereto, or financially interested in this action.
18      IN WITNESS THEREOF, I have hereunto set my hand
    this _____ day of _____, 2004.
19
20
21
            _____
22                Bethany A. Carrier
                   Notary Public
23
    My Commission Expires:
24  October 31, 2008
25

Page 188

1
2
3   CASE NAME:    EEOC
4                    -vs-
5           BEAUTY ENTERPRISES
6
7   DEPONENT NAME:    EARNEST F. HARPER
8
    DATE TAKEN:    February 5, 2004.
9
10
11
12
13  __XX___    Original transcript enclosed in
                protective sealed white envelope.
14
15  _____    Exhibits attached to original
    transcript.
16
17
    __XX___    Reading and signing not waived.
18
19
20
21          _____
                Bethany A. Carrier
                Court Reporter
22
23
24
25

Page 187

1           Bethany A. Carrier
            Brandon Smith Reporting Service
2                44 Capitol Avenue
            Hartford, Connecticut 06106
3                (860) 549-1850
4
5
    February 23, 2004
6
    Rosa Liliana Palacios, Esq.
7   Equal Employment Opportunity Commission
    John F. Kennedy Building
8   Government Center - Room 475
    Boston, Massachusetts 02203-0506
9
10  Dear Ms. Palacios:
11
    Enclosed, please find your copy of the deposition of
12  EARNEST F. HARPER, taken on February 5, 2004.
13  The jurat and errata sheets are enclosed. Please note
    the witness has 30 days to read and sign the
14  transcript, as the rules provide.
15  After the jurat and errata sheets have been signed,
    send those sheets only to Attorney Robinson for filing,
16  along with a copy to all counsel present.
17  If you have any question, please don't hesitate to
    call.
18
    Sincerely,
19
20  Bethany A. Carrier
21
22
    cc: Richard C. Robinson, Esq.
23
24
25

48 (Pages 186 to 188)

Brandon Smith Reporting

650021c0-f0c6-40bf-b060-ae80f118b9e4