**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br>             PLAINTIFF <br><br>      VS. <br><br> BEAUTY ENTERPRISES, INC., <br> AAA INDUSTRIAL TEMPORARIES, INC., <br> ESSENTIAL TEMPORARIES, INC., <br><br>             DEFENDANT | CIVIL ACTION <br> NO. 3:01-CV-378 (AHN) |
| MIGUEL ANGEL ALVAREZ and <br> WILLIAM TORRES, <br><br>         PLAINTIFF-INTERVENORS, <br><br> v. <br><br> BEAUTY ENTERPRISES, INC., <br><br>             DEFENDANT | APRIL 30, 2004 |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF ROSEANN D. GONZALEZ, PH.D.**

     The subject of this litigation is defendant Beauty Enterprises, Inc.'s ("BEI's")

"English-only" workplace rule.  The rule requires BEI employees to speak only in

English while on the premises and "on the clock."[1]  Plaintiff, EEOC, claims that the rule

is illegal, that it constitutes disparate impact national origin discrimination against BEI's

Hispanic warehouse workers in violation of Title VII of the Civil Rights Act of 1964.

BEI disagrees.[2]

The parties also disagree about the legal standard that controls this issue.[3]

They do agree, however, that there are particular factual inquiries that are, or at least

could be, relevant under one or both of the standards they espouse.  One is whether

the English-only rule is "justified by business necessity."  A second concerns the

relationship between the rule and the purpose for which it was adopted, primarily the

reduction or elimination of ethnic tension in the warehouse and secondarily, the

promotion of safety and productivity there.  Finally, there is the question of the rule's

---

[1] The rule does not apply while employees are at lunch or on break.

[2] BEI is a wholesale distributor of beauty products for the black consumer.  The employees in its warehouse pick orders from shelves, pack them, check them and ship them to customers.  They also receive the products and place them on shelves.  The warehouse workforce has always been diverse. Hispanics – mostly Puerto Ricans – have traditionally been about a third of the workforce.  The rest of the workforce has been comprised of immigrant Russians, Poles, Bosnians, Vietnamese and others, as well as Jamaicans, Guyanese and African-Americans.

[3] The EEOC asserts that its Guideline furnishes the applicable standard.  29 CFR Sec. 1606.7.  Under that Guideline, English-only rules, such as BEI's, are presumptively invalid, and it is the employer's burden to overcome that presumption by showing that the rule is "justified by business necessity."  BEI's position is that traditional disparate impact analysis applies, and that the EEOC's Guideline is not a sound interpretation of Title VII.  The position is based on the only Court of Appeals decisions that have considered the issue presented in this case.  See Garcia v. Spun Steak, 998 F.2d 1480 (9th Cir. 1993); Garcia v. Gloor, 618 F.2d 264 (5th Cir. 1980).  Under traditional disparate impact analysis, business necessity is to be considered only if the plaintiff establishes a prima facie case.  To establish a prima facie case, a plaintiff must show that the rule has a substantial adverse impact on a term, condition or privilege of the complainant's employment.  Id.

impact on employees – does it have a substantial and adverse impact on the Hispanic employee's terms, conditions or privileges of employment.

The EEOC will try to prove that the rule is not justified by business necessity – that it is not necessary to do the jobs the warehouse workers do, nor is it necessary to avoid ethnic tension, promote safety and enhance productivity.  It also will try to show that the rule does have a substantial and adverse impact on the terms, conditions and privileges of the Hispanic workers' employment.  The proof it intends to present in this regard includes opinions from Roseann Duenas Gonzalez, Ph.D., an expert in a relatively new social science called sociolinguistics.[4]  Dr. Gonzalez is a professor of English at the University of Arizona and is the Director of its National Center for [Courtroom] Interpretation, Testing, Research and Policy .

For the reasons discussed in this Memorandum, the Court should exclude Dr. Gonzalez' opinions under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.[5]

I.    **THE PERTINENT LEGAL PRINCIPLES**

The legal principles pertinent to this Motion are familiar and easy to describe. The party offering expert testimony has the burden of establishing its admissibility "by

---

[4] See, Exhibit B, Gonzalez Depo., p. 41 (the field was named in the 1960's, and its "father" is still alive).

a preponderance of proof."  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592 n.

10 (1993).  Rule 702 of the Federal Rules of Evidence identifies the elements the

proponent must so establish.  The rule provides:

> *If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

<u>Daubert</u> charges the court with the responsibility to act as a gatekeeper in applying

this Rule "to 'ensure that any and all scientific testimony or evidence admitted is not

only relevant, but reliable.'"  <u>Wechsler v. Hunt Health Systems, Ltd.</u>, No. 94 Civ.

8294(PKL), 2003 WL 22358807, at *3 (S.D.N.Y. Oct. 16, 2003) (citation omitted).  The

court's gate-keeping function applies both to scientific expert testimony and to expert

testimony based on technical or other specialized knowledge.  <u>See</u> <u>id.</u>

### A.    <u>Relevancy</u>

The relevancy requirement compels the court to determine whether the

testimony will "assist the trier of fact to understand the evidence or to determine a fact

in issue."  <u>Royal Ins. Co. v. Joseph Daniel Construction, Inc.</u>, 208 F.Supp.2d 423, 425

---

[5] The EEOC will also ask Dr. Gonzalez to explain to the trier a sociolinguistic phenomenon known as code switching.  She discusses this in Section 2 of her report, starting on page 14 and concluding on page 31.  BEI does not seek to exclude this testimony.

(S.D.N.Y. 2002) (citation omitted).  That is, "[f]or expert testimony to be admissible, it must help the jury" comprehend the evidence before it" or intelligently evaluate the facts.  Raskin v. Wyatt Co., 125 F.3d 55, 67 n. 5 (2d Cir. 1997) (citation omitted); Fed. R. Evid. 702, Advisory Committee Notes.  "Such testimony is unhelpful when it . . . deals with a proposition that is not beyond the ken of common knowledge."  Zuzula v. ABB Power T & D Co., Inc., 267 F.Supp.2d 703, 711 (E.D. Mich. 2003); see also U.S. v. Lester, 254 F.Supp.2d 602, 607 (E.D. Va. 2003) ("[I]n determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission . . . the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors") (citation omitted); WBC v. Cosell, 715 F.Supp. 1259, 1264 (S.D.N.Y. 1989) (excluding expert testimony where it would "discourage the fact finder from using his own judgment on an issue for which the fact finder is amply suited to make his own judgment").  As the Advisory Committee Notes describe it, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702, Advisory Committee Notes (citing Ladd, Expert Testimony, 5 Vand. L.Rev. 414, 418 (1952)).

**B.**    <u>**Reliability**</u>

The reliability requirement asks the court to decide "whether a reliable methodology was used by the expert witness in reaching his conclusion."  <u>Royal Ins. Co. v. Joseph Daniel Construction, Inc.</u>, 208 F. Supp. 2d 423, 425 (S.D.N.Y. 2002) (citation omitted).  In <u>Daubert</u>, the Supreme Court created a non-exclusive list of factors that a district court may consider in addressing this issue.  The factors are:

> *(1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.*

509 U.S. at 592-593; Fed. R. Evid. 702 Advisory Committee Notes (2000 Amendments).  "Other factors found to be relevant include: (1) whether the expert proposes to testify about matters derived from research independent of the litigation; (2) whether the expert has adequately accounted for obvious alternative explanations; (3) whether the expert has employed the same level of intellectual rigor in the courtroom as in the relevant field of expertise; (4) the non-judicial uses to which the method has been put; and (5) whether the expert's discipline itself lacks reliability."

Blanchard v. Eli Lilly & Co., 207 F. Supp.2d 308, 316 (D. Vt. 2002) (internal citations omitted).

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." Pugliano v. U.S., No. 3:95cv1171(AHN), 3:95cv1330(AHN), 3:95cv1145(AHN), CR. H90-18 (AHN), 2004 WL 213028, at *1 (D. Conn. Jan. 30, 2004) (citation omitted). "In deciding whether a step in an expert's analysis is reliable, the court must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand." Id.

## II.    DISCUSSION

### A.    Dr. Gonzalez's Opinion That The English-Only Rule Is Not Necessary To Job Performance Is Not Helpful to the Jury And, Hence, Is Not Relevant

According to Dr. Gonzalez, the first thing the EEOC asked her to do was to "[e]valuate the necessity of the English-only rule at [BEI] by assessing the nature of the language used on the job by BEI warehouse employees, and to specifically: (a) describe the English used/required for carrying out warehouse job duties in the BEI workplace; . . .[and] . . . (c) form an opinion as to the necessity of an English-only

policy at BEI, given the nature of the work performed by charging parties."[6]    (See Exhibit A, Dr. Gonzalez' report ["Report"], p. 2.).  Asked at her deposition whether this could be more simply described as investigating whether the observance of an English-only rule is necessary for a picker to do the job of a picker, for a packer to do the job of a packer, etc, she first responded that she could not answer the question "as posed" because it was "simplifying."    (Exhibit B, Gonzalez Depo., pp. 91-92.) Ultimately, she conceded that it was "part" of what she did.

Moreover, while she strained to make her fact-gathering and analytical processes more complex than they really were, dressing them up with such pseudo-scientific terms as "standard sociolinguistic background questionnaire" (Exhibit B, Gonzalez Depo., p. 77), "language sample" (Id., p. 78), "qualitative, in-depth interview," (Id., p. 93) and "linguistic analysis of job descriptions" (Id., p. 96), what she actually did was to ask the charging parties whether they had to talk very much to do their jobs. (Id., pp. 98, 111).  Then she checked to see whether their answers were consistent

---

[6] "Charging parties" refers to the Hispanic employees who filed the administrative charges with the EEOC that led to this lawsuit.  On another point, the missing subparagraph 1.(b) reads, "examine BEI's workplace forms and documents and determine the kind of reading and writing skills required for employees to work with these documents."  BEI omitted this subparagraph from the body because it maintains that this task is not relevant, legally or logically, to the English-only rule, which concerns speech, and speech alone.  The EEOC addressed the subject in discovery because BEI has an English language hiring requirement that predates its English-only rule.  The requirement is that individuals must be able to read and write English, as well as to speak and understand it, to become employed at BEI. The EEOC believes that this hiring requirement, like the English only workplace rule, is not necessary

with their deposition testimony (Id., pp. 98, 100, 101, 118) and with the observations she made during her one-day, three hour visit to the site. (Id.)  What she learned was that employees do not have to talk very much to do their jobs.  (Id., pp. 109, 111.)  As she describes it, this made the jobs, and hence, the workplace, not "language dependent."[7] (Id., p. 109.)  This, in turn, caused her to conclude that there is no "linguistic evidence to support the implementation of an English-only rule at BEI."  (Id., p. 117.)  And what she meant by this was simply that language is not necessary to perform the warehouse jobs.  (Id., p. 118.)  Therefore, she reasoned, there is no need for an English-only rule.  (Id., p. 118.)

Without question an untrained layperson presented with this issue could, and probably would, do what Dr. Gonzalez did to structure the inquiry, gather the facts and draw a conclusion.  In terms of structuring the inquiry, it does not take a linguist to figure out that one first must determine whether language is needed on the job before deciding whether a particular language is needed.  In terms of fact gathering, the relevant facts are not just easy to identify, they are also easy to develop and understand.  The layperson would naturally go to the employees and ask them

for most of the jobs in the warehouse.  However, the EEOC is not challenging the workplace rule in this lawsuit.

[7] Asked whether "language dependent" was a recognized linguistic term, she responded, "It's my linguistic term and I don't know if other people use that actual term."  (Exhibit B, Gonzalez Depo., p.

directly, when do they have to talk, or be talked to, to do their jobs?  Why is that the case?  To whom, or with whom, do they have to talk and with what frequency?  What percentage of their day is spent talking, or being talked to?  The layperson would also want to visit the site, if possible, and observe, as best he or she could, the extent of the talking taking place.  And if they knew that employees were deposed on the subject, they would undoubtedly want to read or hear what they had to say.  Armed with this "data," the layperson would be perfectly capable of drawing a conclusion. The conclusion is comfortably within his or her "ken."  All that is required is the application of general intelligence, ordinary experience and common sense.  See, WBC v. Cosell, 715 F.Supp. 1259, 1264 (S.D.N.Y. 1989) (excluding linguistics expert testimony in libel action where a layman was "perfectly capable" of performing the same analysis as the expert.)

Not only is an untrained layperson capable of doing these things, the jury in this case will most assuredly have the opportunity – indeed, the obligation -  to do these things when the case is tried.  The reason is plain.  Both sides recognize that the need for talking on the job is relevant here.  That is why their lawyers fully explored the subject in the depositions they took, a point Dr. Gonzalez readily admits.  (Exhibit B, Gonzalez Depo., p. 113.)  That is why their lawyers will address the issue in examining

110.)  Asked whether there was any source other than her for the term "language dependent," she said,

10

witnesses at trial.[8]  Thus, the jury will have all the "data" Dr. Gonzalez had to reach a conclusion.  And it will have, via argument from the lawyers, each side's view of the conclusion it should draw from this "data."  At that point, it will have everything it needs "to determine intelligently and to the best degree possible the particular issue."  "Enlightenment" from an expert is clearly unnecessary under these circumstances.  See Andrews v. Metro North Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989) (recognizing that expert testimony was improper where it "invaded an area in which the jury was not in need of expert assistance.")

Were there any lingering doubt concerning this, it is quickly dispelled by Dr. Gonzalez' defensiveness and the changing testimony she gave when confronted with this conclusion at her deposition.

> Q:    *Couldn't some reasonably intelligent lay person reading those deposition transcripts or listening to the deposition testimony make a sound judgment about whether these employees needed to do much talking to do their jobs?*
>
> A:    *I really can't answer that.*

---

"I couldn't tell you right now if other people use it."  (Id.)

[8] Actually, the parties agree that employees do not have to talk very much to do their jobs.  Their dispute concerns what follows from this.  According to the EEOC, what follows is that the English-only rule is not justified by business necessity.  BEI, on the other hand, maintains that even if the rule is not necessary for a picker to do the job of a picker, for a packer to do the job of a packer, etc., a point BEI does not concede, it is necessary, nevertheless, – justified by business necessity – to avoid ethnic tension and promote harmony within a diverse warehouse workforce.  According to BEI, the significance of the fact that employees do not have to talk very much to do their jobs is that it proves that the rule cannot, and does not, have a substantial and adverse impact on the terms, conditions or privileges of employment of the Hispanic workers complaining in this case.

Q:    *Wouldn't you say, ma'am, that the deposition testimony would, in and of itself, compel a reasonably intelligent lay person to conclude that the Beauty Enterprise's" warehouse is not, as you say, a language dependent workplace?*

        *Ms. Palacios:        Objection.*

Q:    *Well, I don't know of these lay persons you're talking about because what I did was I looked at my own data in my interview, which came much before any depositions.*

Q:    *So you can't answer the question?*

A:    *No.  I'm answering the question.  And I'm looking at it from a linguistic standpoint.  I'm looking at a theory in second language acquisition and trying to understand what the communicative tasks are in the workplace. And one of the questions is always a standard question.  What are the communicative tasks?  Who are you talking to in order to do your job? How may times do you talk to that person to be able to do your job, or those people?  And you know, please describe to me the times when you've used language – when you have to use language in order to carry out your job. . . .*

Q:    *All right.  Have I asked those questions at the deposition?*

A:    *I believe you asked some of them?*

Q:    *Can you remember any I didn't ask?*

A:    *I really would have to go back to the depositions and look to see what you asked because I relied on my interviews and the depositions and the data from the job descriptions in order to come to my conclusions.*

Q:    *How would testimony from you assist someone, a reasonably intelligent layperson who's read these deposition transcripts, in deciding whether the employees at Beauty Enterprises have to do much talking to do their jobs? . . .*

12

A:    *Well, because of the training that I've had in sociolinguistics and examining language policy and examining language in a workplace in several settings in the United States: in businesses, in courts, in agencies, in schools, in classrooms. I would think that they would want to know what an informed opinion would be on the kind of communicative tasks, the frequency with which language is required, what other cognitive skills are involved so that they would have a truly accurate and empirically sound picture of what the communicative tasks are in that setting.*

Q:    *All right. And yet a lot of what you relied on are answers to questions like, What do you have to say to do your job? How often do you have to talk to do your job? And things of that ilk; is that right?*

A:    *The major qualitative data in this report is from self-report of the plaintiffs, which is the standard way of gathering that report, and observations and understanding what the job descriptions are and all of my knowledge in various areas doing the same kind of analysis.*

Q:    *If someone charged with the task of determining whether or not – whether these employees have to do much talking to do their jobs didn't have the benefit of your work, but instead had only the deposition transcripts, could they come to the same conclusion you've come to?*

*Ms. Palacios:        Objection.*

A:    *Well, I don't think so.*

(Exhibit B, Gonzalez Depo., pp. 113-116.)

Dr. Gonzalez had no choice but to answer this way no matter how unreasonable it made her sound. More revealing is that she testified at first that she "couldn't answer" the question. But, in the final analysis, the call is not Dr. Gonzalez' to make. The question of whether Dr. Gonzalez' opinion is relevant in the <u>Daubert</u> sense is for the Court to answer in discharging its gatekeeping function. And because

the answer is so clearly, "no," the Court must keep the gate closed to this opinion.  The call is not close.

**B.    Dr. Gonzalez's Opinions Concerning the Effect of BEI's English-Only Policy in the Workplace Must be Excluded**

The EEOC also asked Dr. Gonzalez to "[e]valuate whether or not BEI's policy and practice achieved its purported goals [of reducing ethnic tension and creating workplace harmony, as well as promoting safety and productivity] . . ."  (Exhibit A, Report, p. 2.)  Not only does she conclude that the "policy and practice" failed to do so, but in her view, it had just the opposite effect.  (Id., Section 3.0, pp. 31, 42.)  She devotes a full twelve pages of her report to explaining these conclusions, dividing the discussion into subtopics – "BEI's English-Only Requirement is Arbitrary, Subjective and Undefined" (Id., Section 3.2, p. 31); "English-Only Policy Undermines Workplace Harmony and Causes Ethnic Tensions (Id. Section 3.3, p. 34); "BEI's English-Only Rule Creates an Unsafe Workplace" (Id., Section 3.4, p. 37); and "Use of English Only Is Not Necessary for Business Efficiency" (Id., Section 3.5, p. 38).[9]

---

[9] Section 3 has three additional and truly remarkable subsections, subsection 3.6 entitled "English Acquisition Strategies are Prohibited by BEI's English-Only Rule," subsection 3.6.1, entitled "Charging Parties are Trainable in English," and subsection 3.7, entitled "BEI's Language Policy Classifies Applicants Using Personal Characteristics."  These topics are not in the slightest bit related to the question of whether the English-only rule achieved its purposes.  They simply reflect Dr. Gonzalez' documented (but necessarily denied) aversion since childhood to compelled English.  (See Exhibit B, Gonzalez Depo., pp. 8-11.)

Remarkably, there are but two citations to a linguistic textbook or article in these subsections.  All the other citations – and there are many – are to interrogatory responses, produced documents and deposition transcripts - the discovery record in this case.  If the inference is emerging that this is lawyer's argument masquerading as expert testimony, reading this portion of the Report quickly brings the inference to full bloom.  And therein lies the root of the admissibility defects.  Since all Dr. Gonzalez did was to read the record and draw conclusions that an untrained layperson could just as easily have reached, these opinions of hers are irrelevant in the <u>Daubert</u> sense, and should be excluded on that basis alone.[10]

Yet, the opinions are also unreliable in <u>Daubert</u> terms and can be excluded on that basis as well.  The unreliability of the opinion is a function of Dr. Gonzlaez' "methodology."  Since her "methodology" was simply to draw conclusions from the discovery record, that approach can only be reliable if it is based on the record as a whole.  This is what the Court meant in <u>Pugliano v. U.S.,</u> supra, when it wrote that the reliability analysis applies to all aspects of an expert's testimony, including "the facts underlying the expert's opinion."  Here, however, Dr. Gonzalez failed to consider the

---

[10] Dr. Gonzalez maintains that she also relied on the information she gathered during her interviews. Nevertheless, she does not cite to these interviews in Section 3.  She only interviewed the charging parties.  And the depositions covered the topics she covered in her interviews.  <u>See</u> Exhibit C, Dr. Gonzalez' list of interview questions.  The point is that even if she did rely on her interviews for the conclusions she expressed in Section 3, this does not undermine BEI's assertion that she did no more than an untrained layperson would have done – or could do – to answer the question she was asked.

record as a whole. Her opinions are based on selected portions of the record – those that happen to support her views (and, not surprisingly, her client's position). In the process, she either ignored the portions that were inconsistent or, worse yet, chose to disbelieve them.

Moreover, even if Dr. Gonzalez had based her work on the record as a whole, this is a manifestly unreliable method for opining on certain of the points here. For example, if the task is to decide whether the English-only rule had a positive or a negative effect on ethnic tension at BEI, logic dictates that at the very least some sort of quantitative study is necessary – a study that incorporates a device for reliably assessing and measuring the extent of ethnic tension at BEI and the application of that device to periods before and after the rule, or to a period when the rule was lifted for purposes of the study and a period when it was in effect, or to some other scenario that would permit a "with and without" evaluation. Logic further suggests that the person conducting the study must do something that will reliably account for other possible causes or explanations for the presence or absence of ethnic tension. Dr. Gonzalez did none of these things here. She never even sought to try.

Finally, for certain of the opinions she rendered here, she simply lacks the necessary expertise.

The ensuing paragraphs specifically discuss Dr. Gonzalez' Section 3 subsections and demonstrate that some or all of these admissibility defects, and perhaps some others, are present in the opinions expressed there.

      1.    *Subsection 3.2, The Opinion That The Rule Is Arbitrary, Subjective and Undefined*

The irrelevance of this opinion, firmly established by reading this subsection, is more than confirmed by reviewing Dr. Gonzalez' deposition testimony on the point, particularly the portions where she attempts to attach pseudo-scientific labels to her approach and resists the notion that the trier can do what she did.   (Exhibit B, Gonzalez Depo., pp. 188-193.)

> Q:   *Now, does the word "arbitrary" have a special or technical meaning in the field of linguistics or are you using the word in its ordinary, nontechnical sense?*
>
> A:   *I'm using it in a specialist sense.*
>
> Q:   *What is the special or technical meaning of the word arbitrary as you are using it here?*
>
> A:   *Just talking about if the policy is well-defined, formulated and consistently applied and defined.  So - -*
>
> Q:   *Doctor, aren't we really using the word arbitrary in its normal, nontechnical sense here?*
>
>     *Ms. Palacios:    Objection.*
>
> A:   *Well, yes.  But the analysis is a technical analysis.  So - -*

Q:     *Is the same true for the word "subjective"? Are you using it in its ordinary, nontechnical sense?*

A:     *No, I wouldn't agree with that.*

Q:     *Okay.  What's the special technical meaning of subjective in this context?*

A:     *Meaning that it's not objectively defined as in a rule or a set of criteria that were absolutely formulated, written down and followed and people were trained on it and everyone understood the same thing.*

Q:     *How does that differ from the ordinary, nontechnical definition of subjective in this context?*

A:     *My analysis.*

Q:     *Okay.  And would you give the same testimony with respect to the word "undefined"?*

A:     *Definitely.  . . . . .*

Q:     *Did you use some special or technical methodology in determining that the requirement was arbitrary?  Yes or no.*

A:     *Yes.*

Q:     *Okay.  What special or technical methodology did you use in this process?*

A:     *Qualitative research.*

Q:     *Is that the name of the method?*

A:     *Qualitative research.  And it's in-depth interviewing, ethnographic interviewing, observation, and the depositions and everything.  . . .*

Q:     *Who created this method?*

A:     *What method?*

> *Q:    Qualitative research method that you've just described that includes everything.*
>
> *A:    Everything in this case is what I'm talking about.  All of the materials that I was given and the study that I did on the interviewing.*
>
> *Q:    Why is there no allusion to this method or to any linguistic reference or source in this particular section?*
>
> *A:    Probably because I rely on the qualitative research method so heavily, it's, again, a kind of given in sociolinguistics that that's what you're using. . . .*
>
> *Q:    . . . Aren't you just drawing a conclusion from the record and then identifying what's in the record that leads you to this conclusion?*
>
> *A:    That's an oversimplification.*

(Id.)

As to the unreliability of this opinion, it is established by Dr. Gonzalez' admissions at her deposition that she relied solely on the deposition testimony that supported her (her client's) position and failed to cite, or account for, contrary testimony.  For example, after establishing that she wrote in her Report that there came a time when BEI began to discipline employees for Spanish language use during personal time [which would be an expansion of the English-only rule's application], she acknowledged that some of the charging parties testified to this effect at their depositions, but some had no knowledge in this regard and that the supervisors from BEI who were deposed all denied that they applied the rule to "time off the clock."

She then was asked, "Doctor, you don't note any of that in Section 3.2 or anywhere else in your report, do you?"  Her response was:

> A:    I report on what I see **in the majority** and look at all of the data and have reported that this has happened to people.  Now, I'm not saying that all of them have been, but this has happened to people, that in their perception and their belief, that this is what happened to them, that their personal time has been limited.   And I heard it over and again. (Emphasis added.)

(Exhibit B, Gonzalez Depo., pp. 198-199.)

In addition, after confirming that she wrote in her Report that "[t]he rule is also arbitrary because the policy was inconsistently applied across different linguistic groups at BEI," and acknowledging that she cited only BEI Warehouse Manager Fabian Pineros's deposition testimony for this proposition (Exhibit B, Gonzalez Depo., p. 202), she was asked the following questions and gave the following answers:

> Q:    If Mr. Pineros was asked a question in his deposition, "Do you apply the English-only rule to everybody in the same way in the warehouse?"  And he answered, Yes," do you think you would have put that down . . . in this part of the Report?

> A:    Well, he might have said that.  And a lot of the supervisors might have said that.  But the charging parties gave very, very clear examples in their interview with me, and actually the supervisors also testified that they did all kinds of things in languages and joked with people in Italian and taught people Italian words and spoke with other people at times, and some supervisors even said they had complete conversations in Spanish and nobody got cited or reprimanded for anything.

> Q:    Finished?

A:    *So things were inconsistent.*

Q:    *Are you finished?*

A:    *Yes.*

Q:    *You know that Mr. Pineros did make the – there was testimony, that testimony that I just described.  It's at page 431 of his deposition.*

A:    *I'm sure that must be correct.*

Q:    *And you didn't cite it here, did you?*

A:    *No.  . . .*

Q:    *Isn't it true, ma'am, that you cite Mr. Pineros' testimony when it supports your proposition and you ignore it when it doesn't"*

A:    *No.  . . .*

Q:    *Isn't it true that throughout this report you cite deposition testimony that supports your position and reject or ignore deposition testimony that is inconsistent with your position?*

        *Ms. Palacios:        Objection.*

A:    *No, that's not true at all.*

Q:    *You're sure of that?  Not in the least bit?  Not even a tiny little bit?*

        *Ms. Palacios:        Objection.*

A:    *I support assertions with data all from my interviews.  And sometimes I will single out a deposition, okay?*

(Exhibit B, Gonzalez Depo., pp. 206-210.)

Not only did she ignore Mr. Pineros' testimony when it conflicted with her

position, she made a personal judgment that his conflicting testimony was not credible.

21

> *Q:    Isn't it a fact, ma'am, that you rejected Pineros' deposition testimony at page 431 because you didn't believe it; it was against what you considered to be the weight of the evidence, yes?*
>
> *A:    Synthesis and judgment.*
>
> *Q:    Judgment.  What do you mean judgment?  What kind of judgment?  Judgment about what?*
>
> *A:    I have to be able to look at all the data. . . .*
>
> *Q:    Do you – is another word for judgment, a judgment that you're describing, a credibility determination on your part?*
>
> *A:    No.*
>
> *Q:    But you didn't believe Mr. Pineros, when he testified at his deposition, that he applies the English-only rule to everybody in the same way?*
>
> > *Ms. Palacios:        Objection.*
>
> *Q:    Is that right?*
>
> *A:    He contradicted himself in his own testimony and said that sometimes he was lenient, if he had a problem he – sometimes people he didn't do this, he didn't do that.  A lot of the supervisors did that.*

(Exhibit B, Gonzalez Depo. pp. 207-209.)

A reliable expert opinion cannot be based on personal beliefs concerning the credibility of various witnesses.  See Rowe Entertainment, Inc. v. The William Morris Agency, Inc., No. 98 Civ. 8272 (RPP), 2003 WL 2227257, at 7 (S.D.N.Y. Oct. 2, 2003) (expressing concern that expert relied on limited deposition testimony, among other materials).

There is another reason this opinion of Dr. Gonzalez' is unreliable.  It is riddled with what one might charitably describe as citation errors.  For example, Dr. Gonzalez cites pages 354 and 567 of Mr. Pineros' deposition for the proposition that the English-only rule was applied inconsistently across different linguistic groups at BEI.  (Exhibit B, Gonzalez Depo., p. 202.)  Yet, when shown page 354, she admitted that it did not say "that he applies the rule one way for Puerto Ricans and another way for Russians, or words to that effect?"  (Id., p. 204.)[11]  Similarly, when she was shown page 567 and acknowledged that it reflected Mr. Pineros' testimony that sometimes he would warn employee/charging party, Miguel Alvarez, and other times he would not, she was asked, "How then can you cite that for the proposition that BEI applies the rule inconsistently across different linguistic groups?"  (Id., p. 206.)  Her answer was, "As I said before, Mr. Robinson, it supports part of the proposition."  (Id.)

---

[11] Actually, the Q and A was as follows:  Q: . . . Where does it say there in words or substance that Beauty Enterprises applies the rule inconsistently across different linguistic groups?  A:  It talks about inconsistent application.  That sometimes he let's people off the hook, sometimes he doesn't.  That's inconsistent.  Q:  Is it inconsistent [across] linguistic groups?  Does it say that he applies the rule one way for Puerto Ricans and another way for Russians, or words to that effect?  A:  No.  But when I took that and I looked at other data, for example where he said that he let the Jamaican woman sing, you know, instead of telling her English only, and where he let's other people like that go ahead and talk in their language because he likes it, that is across linguistic groups.  And it's also inconsistent because sometimes he decides to be lenient and sometimes he decides to be strict, all subjective and depending on however I guess he feels or if Mr. Cohen [the owner] is in the plant."

Finally, having mentioned Mr. Alvarez, it is worth noting that Dr. Gonzalez referred to him in her report as a supervisor. She confirmed this in her deposition, and then gave the following testimony:

Q:    *He testified that he was a supervisor, didn't he?*

A:    *I honestly can't remember that?*

Q:    *Other people testified – Beauty Enterprises' people testified he wasn't a supervisor, isn't that right?*

A:    *I believe there was some controversy.*

Q:    *And you put down what Mr. Alvarez testified and ignored what the others testified, isn't that true, or rejected it?*

A:    *No. I think what I was thinking of was his function. And I think he was an assistant supervisor and I should have said that.*

(Exhibit B, Gonzalez Depo., p. 201-202.)

Dr. Gonzalez' opinion that the rule is arbitrary, subjective and undefined cannot possibly assist the trier and is totally unreliable in any number of ways. It must be excluded.

2.    *Subsection 3.3, The Opinions Concerning Workplace Harmony and Ethnic Tension*

This opinion is beset with all the admissibility defects previously discussed.  Her answer to one deposition question is enough to establish two of them – irrelevance in the <u>Daubert</u> sense and unreliability per <u>Daubert</u>'s standards.

Q:    *Did you conduct any scientific survey to assess the presence or absence of harmony or ethnic tension in the warehouse at Beauty Enterprises at any particular point in time?*

A:    *In my interview I asked questions about, you know, how people – what happened after the imposition of the rule? What happened?  You know, could they describe things in the warehouse?  And so the descriptions I got, plus the other things, like the interrogatories and the – whatever I could find things in the deposition to analyze, I put that all together and came up with the conclusion that it really did cause ethnic tension in and of itself.*

(Exhibit B, Gonzalez Depo. p. 231.)[12]

The trier will certainly have this same information at trial and is just as capable as Dr. Gonzalez of "putting it all together" and "coming up" with a conclusion.  Further, logic suggests, as previously noted, that some type of quantitative study is necessary to opine reliably on the rule's effect on ethnic tension and workplace harmony, a study that also accounts for potential alternative explanations; that it is not enough simply to

---

[12] See also, Exhibit B, Gonzalez Depo., p. 32, where the following appears:  "Q: Okay.  So what particular points in time did you assess for the presence or absence of harmony and/or ethnic tension in the warehouses at Beauty Enterprises?  A:  I came on the scene and asked people to talk about what they felt about the rule.  And they described a lot of ethnic tension.  What I was able to glean from that was ethnic tension, meaning that it caused problems between groups in the plant."

do what Dr. Gonzalez did.[13]    That Dr. Gonzalez was evasive and ultimately unresponsive to the question indicates that even she recognized just how insufficient and unreliable her work was.

The unreliability of her opinion is also a function of her relying on those parts of the record that support her client's position and ignoring or disbelieving those that do not.    At her deposition she was confronted with the deposition testimony of five charging parties, two Russian employees (disclosed potential BEI witnesses) and a BEI supervisor to the effect that there was never any ethnic tension at BEI, that everyone gets along.  (Exhibit B, Gonzalez Depo., pp. 244-252.)  Asked to concede what was already evident from her Report; namely that she failed to note this testimony there, she conceded this for the first two deponents, but then began vainly to resist.  (Id.)  One excerpt from this portion of her transcript best illustrates her selective approach to the record (as well as her consistently defensive and argumentative approach to answering questions).    It concerned the Russian employee, Jakob Khutorsky.

Q:    You read Jakob Khutorsky's deposition?

A:    Yes.

---

[13] In the final analysis, Dr. Gonzalez' methodology consisted largely of asking the charging parties – the persons with an interest in showing that the rule did not reduce, but increased, ethnic tension  - whether the rule reduced or increased ethnic tension.  There was no consideration of alternative explanations. (Exhibit B, Gonzalez Depo., pp. 237-238.)

> Q:    You noted – specifically you cited the reference he made to the interpreter he had in his [employment] interview, yes? [This is helpful fact for Dr. Gonzalez and the EEOC.]
>
> A:    Yes.
>
> Q:    But you didn't cite his deposition when he said there is no ethnic tension at the company, everybody gets along – at page 61 [of his transcript], did you?
>
> A:    No, but I did – I do think I cited him for saying that it was – that he thought it was unfair the way the rule had been applied to Spanish speakers . . .

(Exhibit B, Gonzalez Depo., p. 252.)

Perhaps the most glaring of all the reliability flaws here is that Dr. Gonzalez lacks the expertise – the qualifications - to opine on the presence or absence of ethnic tension, or the presence or absence of workplace harmony, and the causes of these phenomena.  Her CV, which is part of her Report, makes this perfectly plain.  Her deposition testimony spotlights it.

> Q:    Have you published any studies that you've made of the presence or absence of harmony and/or ethnic tension in the workplace?
>
> A:    No.  That's in the works.
>
> Q:    Have you even studied the presence or absence of harmony and/or ethnic tension in workplaces before your engagement on this Beauty Enterprises case?
>
> A:    Yes, as one of –
>
> Q:    How about have you –

27

A:     *As one of the contexts that you look at in any workplace.*

Q:     *Have you studied the presence or absence of harmony and/or ethnic tension in workplaces before you started working for the EEOC?*

A:     *Yes.  In a case called - - well, no, not before the A and B Nursery Case, I believe.[14]  But I'd have to check.*

Q:     *Have you had any courses in any of your studies where you've studied the factors that impact upon harmony in an industrial workplace?*

A:     *Mr. Robinson, when you go in and do a language policy analysis, you look at the language policy.  The language of the policy tells you what areas you need to make sure that you look at.*

       *One of the objectives of the policy was harmony.  One of the objectives in the language policy in Alabama was something else, integration into society.  So you always look at the purposes and goals of a policy as stated, and then you do your analysis to make sure that you're looking at that in particular to see if there are other ways you know a policy could be written or there are other accommodations that could be made so that people aren't hurt and that objectives are better met.*

Q:     *Doctor, I don't mean to be rude, but my question was: Have you had any courses in your graduate studies where you've studied the factors that impact upon harmony in an industrial workplace?*

A:     *In a language policy course you would talk about all kinds of situational factors that go – that would tell you what the sociolinguistic environment in terms of the - - you know, the hostility or the encouraging nature of the environment is.  And it's a major theory in second language acquisition that you always have to look at the effective issues.  How are people feeling about the policy?  What is it producing in the classroom or in the workplace?  And this goes across workplace, classrooms, agencies,*

---

[14] A and B Nursery was her first English-only rule case for the EEOC.  According to her CV, it dates back to 1992.  This Beauty Enterprises case is her second English-only rule case.  (Exhibit B, Gonzalez Depo., pp. 57-64.)

*anywhere there is a language policy.  You always have to look at that. That's part of the - - you know, the basic methodology in policy analysis.*

Q:    *Have you ever even worked in a warehouse or a factory?*

A:    *No.*

Q:    *Do you consider yourself an expert in what creates harmony or disharmony in a workplace?*

A:    *As it pertains to language, yes.*

Q:    *Well, isn't the presence or absence of harmony or disharmony in a workplace a function of potentially many factors?*

A:    *Yes.  Language could be one of them. . .*

Q.    *But you're not a general expert in workforce harmony, are you?*

A:    *No.  I'm a language policy expert.*

(Exhibit B, Gonzalez Depo., pp. 235-237.)

There is no way this Court should permit this opinion even to approach the proverbial gate.[15]  It too must be excluded.

---

[15]  It should also be noted that in the social science context, some courts have developed more refined qualifications and reliability standards.  They include consideration of whether the purported expert has published and/or relied on scholarly articles subject to peer review, the longevity of the particular field, the amount of literature and peer review on the topic, the presence or absence of general consensus as to the meaning of data and the purported expert's contribution to the field about which he or she is testifying.  Pease v. Production Workers of Chicago & Vicinity Local 707, No. 02 C 6756, 2003 WL 22012678 at *4 n. 1 (N.D. Ill. Aug. 25, 2003) (citation omitted).  Sociolinguistics is a relatively new field, named sometimes in the 1960's.  (Exhibit B, Gonzalez Depo., p. 41.)  While superbly educated, Dr. Gonzalez has little formal education in the field.  (Id., pp. 33-34.)  Indeed, Dr. Gonzalez appears to have dedicated the vast majority of her professional time to the field of courtroom interpretation, rather than sociolinguistics.  (Id., pp. 46-49, 220-226).  Her contributions to the field (other than as a compiler of others work) is minimal.  (Id.)  It would not be unreasonable to conclude either that sociolinguistics is too

3.    Subsection 3.4, Dr. Gonzalez' Safety Opinion

All the admissibility defects – lack of relevance, the many reliability flaws, particularly the lack of anything remotely resembling a study -- are present with Dr. Gonzalez' safety opinion and, with one possible exception, they become patent upon reading Dr. Gonzalez' Report.  The possible exception concerns Dr. Gonzalez' lack of expertise.  The Report (her CV) merely suggests that she lacks the requisite expertise. Fortunately, her deposition establishes this point beyond a shadow of a doubt and in the best possible way.

> Q:    *Let's talk very briefly about Section 3.4 of your report entitled BEI's English-only rule creates an unsafe workplace."  You're not a safety expert, are you, Dr. Gonzalez?*
>
> A:    *No.*
>
> Q:    *In fact, you know the EEOC has a safety expert in this case?*
>
> A:    *Yes.*
>
> Q: . . . . . *You even know the guy, don't you, Mr. Harper?*
>
> A:    *Yes.  I met him twice.*

(Exhibit B, Gonzalez Depo., p. 262.)

Further discussion of Dr. Gonzalez' safety opinion is unnecessary.  Cleary, it must be excluded.

---

young a social science to be the basis for expert testimony, and/or that Dr. Gonzalez' qualifications as a

*4.  Subsection 3.5, Dr. Gonzalez' Business Efficiency Opinion*

Although the title of this subsection is, "Use of English Only Is Not Necessary for Business Efficiency," Dr. Gonzalez' opinion, as she expresses it in the body of the subsection, is that:

> *BEI's efficiency reason for its English-only workplace rule is misleading because the rule, which requires the exclusive use of English in the workplace, actually works against the purported goal of business efficacy.*

(Ex. A, Report at 38.)  Unwilling to leave it at that, she further opines:

> *Moreover, BEI's English-only rule had many unintended negative effects, that tended to reduce efficiency in the workplace.  Two important effects include (1) low employee morale, and (2) high attrition of competent workers.*

(Id.)

It is sufficient to note that Dr. Gonzalez did the very same thing to reach these opinions that she did to reach her others – review the discovery record and the results of her "qualitative, in-depth" interviews (of only the charging parties, of course), and then draw common sense conclusions therefrom, a task that an untrained layperson is perfectly capable of performing. (Exhibit B, Harper Depo., pp. 264-267.)  Thus, these opinions are excludable on relevancy grounds alone.  Nonetheless, the reliability flaws

---

sociolinguist are not sufficient to produce reliable opinions in this case.

are so plentiful and pronounced – and so characteristic of Dr. Gonzalez' work in this case – that a brief discussion of at least some of them is warranted.

First, Dr. Gonzalez is incapable of providing a reliable efficiency opinion because she is not an efficiency expert. Her CV strongly suggests this. Yet, when asked at her deposition, whether she regarded herself as a business efficiencies expert, she answered, "When it comes to language, yes." (Exhibit B, Gonzalez Depo., pp. 262-263.) However, when asked what special training she had that gave her this expertise, she replied with another of her customary evasive and unresponsive answers.

> A:    When it involves language, English is – English as a second language, English for specific purposes, in business, all of these things. I've worked with corporations, schools, businesses to try help them create . . . English policies that will help their workers be more efficient and effective in their work.

(Id., p. 263) Obviously, she had no special training in business efficiencies. Moreover, when asked for an example of her work with corporations, etc to help them create English policies that will help their workers be more efficient, she described an assignment for the Saudi Arabian government where her job was to create a program to teach English to oil rig workers. (Id.) Clearly, this is not a study of efficiency by her; it was the implementation by her of another's idea of something needed for the

efficiency of a particular operation.  Suffice it to say, this deposition testimony is the functional equivalent of an admission of no expertise.

Second, even if what Dr. Gonzalez did here qualifies as a methodology, it is clearly not a reliable one for the task at hand.  As with her "ethnic tension/workplace harmony" opinion, logic dictates that a quantitative study is necessary here, one that measures workplace efficiency in some meaningful and reliable way and then assesses the level of efficiency with and without the rule in an environment with all other possible efficiency factors being equal.  Dr. Gonzalez did not even attempt to do this.  (Exhibit B, Gonzalez Depo., pp. 266-277.)

Third, methodology, or, more accurately, the absence of any methodology, is an even more pronounced flaw with her conclusions concerning the rule, employee morale and attrition.  The following testimony speaks for itself in this regard.

> Q:    *Did you actually study the morale of warehouse workers at Beauty Enterprises?*
>
> A:    *I looked at what they – all of their interviews.*
>
> Q:    *Did you study – yes or no, did you actually study the morale of warehouse workers at Beauty Enterprises?*
>
> A:    *Of the charging parties, yes.  And through the depositions of other employees also.*  [Morale was not covered in the other depositions.]  . . .
>
> Q:    *. . . [D]id you use any quantitative tools to measure employee morale?*
>
> A:    *No.  . . .*

> Q:    *Did you explore any other potential causes of low morale?*
>
> A:    *I was looking at the low morale of these charging parties and some of the other people that I read in the depositions.  Basically it was a byproduct. It was something that I discovered.  These people were unhappy about going to work because they were fearsome and they were - - they were afraid and they were tired of, you know, constantly not - - having to be mute and not be able to really socially engage with people because they were afraid that they would slip into Spanish. . . .*

(Exhibit B, Gonzalez Depo., pp. 265-267.)

In addition, when asked what evidence she had that the English-only rule caused a high attrition rate of competent workers, she responded, "Well, so many of these workers disappeared.  And Supervisor Pineros, you know, mourns this.  He just said some of his best workers disappeared from his plant.  He said that on page 521 of his deposition. . ."  (Exhibit B, Gonzalez Depo., p. 270.)  However, when shown that Pineros said something entirely different on page 521, she testified:

> A:    *I think there were other places in his deposition where he talked about disappearing workers.*
>
> Q:    *You only cited page 521 of the deposition.*
>
> A:    *Sorry.*

(Id., pp. 272-273.)

It does not take an expert to figure out that at least some of BEI's Hispanic workers were unhappy with the English-only rule.  But it is patently unreasonable to

make judgments from this about employee morale generally at BEI.  Yet, that is precisely what Dr. Gonzalez has done here.  At the same time, it may take an expert – or at least someone willing to do something quantitative – to identify an attrition rate and characterize it as high.  Dr. Gonzalez' lack of expertise in this regard perhaps explains why she failed even to try to do these things.  And where, as here, there are disputes about why certain charging parties left, it takes a trier of fact to determine whether the party's assertion is credible.  (See, Exhibit B, Gonzalez Depo., pp. 270-271.)  It is not for linguistic experts to decide whether witnesses are credible.  Yet, this too is what Dr. Gonzalez has done here.

In fairness, Dr. Gonzalez, using intelligence and common sense, thought about the English-only rule and productivity and conceived of situations in which the rule could possibly impact productivity in a negative way.  But at her deposition, she conceded that there were situations in which the rule could positively impact productivity.  (Exhibit B, Gonzalez Depo., pp. 273-275.)  Her argument was that the negative impacts outweigh the positive impacts.  That may or may not be the case, but expert witnesses are not supposed to make arguments.  They are supposed to use appropriate and reliable methodologies and render defendable conclusions based on the data thus produced.  In the final analysis, what Dr. Gonzalez is presenting as an expert opinion here is really just an argument – and a baseless one at that.

The Court must exclude this "business efficiency testimony."

C.    **Dr. Gonzalez's Testimony Concerning Language, Ethnicity, Identity, Stigmatization and Harmful Effects Is Irrelevant and Unreliable**

The last thing the EEOC asked Dr. Gonzalez to do was to "[r]eport on the effect of BEI's English-only policy on the workplace by: (a) elucidating the correlation between language and ethnicity/national origins (i.e., linguistic minorities); and (b) reporting on the stigmatization and other harmful effects of language-based discrimination on individuals." (Exhibit A, Report, p. 2.) Section 4 of her Report addresses this subject. (Id., pp. 42-55.) In the portion that elucidates the correlation, her principal point is that the Spanish language is fundamental to a Hispanic person's self esteem as an Hispanic. In the portion that discusses stigmatization, she asserts that this correlation between language and esteem comes alive for Hispanics when they immigrate to a country, like the United States, where a language other than theirs is dominant, and that the lack of accommodation and acceptance of their language in this country can hold them down economically and socially and make them feel badly about themselves. And in the portion that discusses harmful effects she describes how the charging parties felt when they were reminded to follow the rule or disciplined for violating it and then characterizes their psychological states (according to her, they

experienced disempowerment, humiliation. loss of dignity, isolation and stress).  The Court should exclude all this testimony.[16]

The "correlation and stigmatization" testimony should be excluded because it would not be helpful to the trier and thus, is irrelevant under Daubert.  First, while Dr. Gonzalez' discussion of this subject seems to be scholarly, the scholarship she cites merely confirms a matter of common sense.  The trier does not need an expert to tell it that the Spanish language is important to, say, a Puerto Rican immigrant's sense of himself in America, and that being a linguistic minority, as well as an ethnic minority, is not a boon to self-esteem.  They know that this is generally the case.  Second, Dr. Gonzalez' discussion here only describes what is generally the case.  It does not purport to describe the cases of the individual charging parties here.  Thus, the testimony is not merely unhelpful under Daubert.  It is also unhelpful because it is irrelevant under Rule 401.  Fed. R. Evid. 401.

The "harmful effects" testimony should be excluded because it is both irrelevant under Daubert and unreliable in Daubert terms.  It is irrelevant because the trier can hear directly from the charging parties about their feelings (and with the benefit of

---

[16] In this section of her Report, Dr. Gonzalez talks about language "discrimination," she cites EEOC Guidelines as support for propositions, when the EEOC is a party and its Guidelines are being challenged, and she essentially opines that the use of an English-only is discrimination against the Hispanic workers.  Obviously, this testimony would be confusing and intrude upon the province of both the jury and the Court.  On those grounds alone, at least these aspects of the proposed testimony must be excluded.

cross-examination, whether to believe their testimony on this point or not). It does not need an expert to relay this information to it. And the testimony is unreliable because the method used to develop it – or at least to develop the "feelings" piece - has none of the characteristics <u>Daubert</u> cites. Dr. Gonzalez simply asked the people how they felt when they were reminded of the rule or disciplined for violating it. (<u>See</u>, Exhibit B, Gonzalez Depo., p. 284.) This is not a technique that can be challenged in some objective sense. Neither her technique, nor her work have been subject to peer review and publication. And the concepts of error rate, standards and controls simply cannot be applied to this kind of activity. Moreover, as far as the "divining of the psychological state" piece is concerned, there is an additional reason for its unreliability. Dr. Gonzalez is not a psychologist. (<u>Id.</u>, p. 285.)[17] She has no business opining on one's psychological state and its causes.

As with the other challenged testimony, the testimony based on Section 4 must be excluded.

---

[17] Dr. Gonzalez refuses to concede that she is divining and describing psychological states. She insists that when she says the charging parties experienced feelings of alienation, stigmatization and the like,

**CONCLUSION**

For all of those reasons set forth above, BEI respectfully requests that its Motion to Exclude be granted.

                                        **THE DEFENDANT**
                                        **BEAUTY ENTERPRISES, INC.**


                                        By: _____
                                            Richard C. Robinson (ct04321)
                                            Brian C. Roche (ct17975)
                                            Pullman & Comley, LLC
                                            90 State House Square
                                            Hartford, CT 06103
                                            Telephone: (860) 541-3333
                                            Facsimile: (860) 424-4370

---

she is describing "sociological effects."  Yet, when asked if she had a degree in sociology, she was forced to admit that she did not.  (Exhibit B, Gonzalez Depo., p. 285.)

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record.

**Plaintiff Equal Employment Opportunity Commission:**

Katherine Bissell, Esq.
EEOC - New York District Office
7 World Trade Center, 18th Floor
New York, NY 10048-1102

Rosa Lilliana Palacios, Esq.
525 FDR Avenue
Plaza Las Americas, Suite 1202
San Juan, Puerto Rico 00918-8001

Markus L. Penzel, Esq.
EEOC - Boston Area Office
J.F.K. Federal Building, Room 475
Boston, MA 02203-0506

**Intervenors:**

Barbara E. Gardner
843 Main Street, Suite I-4
Manchester, CT  06040

Julia Morris Paul
Marte, Plepler, Falkenstein, Keith, Meggers & Paul, P.C.
113 East Center Street
Manchester, CT  06040

_____
Richard C. Robinson
Brian C. Roche

HTFD/65094.1/RCR/138244v1