Supervisor F. Pineros (Depo., p. 445), BEI employees violate the rule *"Frequently...a hundred times a day."* He further commented that, *"To be honest, we're always going to have a problem [with the rule]"* (F. Pineros Depo., p. 534). This observation was echoed by non-Hispanic BEI employees as well (See Depositions of L. Mahabeer, p. 32; R. McCormick, p. 41; B. Bratslavsky, p. 46). BEI owner, Mr. Cohen (Depo., p. 131) remarked, "I've been told that still people are using other languages when they're not supposed to." Understanding that language formation is an unconscious process provides a context for understanding why, when faced with many forms of punishment including termination of employment, the imminent threat could not deter charging parties from codeswitching.

### 2.6 The Pragmatic, Unconscious Sociolinguistic Rules of Codeswitching

BEI's supervisors, like most laypersons, have little to no understanding of the way language operates, or of simple linguistic precepts such as the fact that: (1) highly-bilingual individuals will revert to their native language in a stressful situation (Journal of Social Issues, 1957); (2) codeswitching is not necessarily an indication of incompetency in the non-dominant language (Valdes, 1982); (3) a bilingual must possess the topic or domain in their repertoire before it can be actively used (Zentella, 1997); and, (4) in communication between bilinguals, it is automatic (that is, unconscious and therefore unintentional) to speak the native language of the person who initiates the conversation in order to establish rapport (Riegelhaupt, 1999).

#### 2.6.1 Codeswitching into Spanish is Triggered by the English Limitations of Individuals Who Are Not Native Speakers of English

Individuals who are limited and non-English speakers/incipient bilinguals use Spanish because of their lack of English proficiency and experience in that language. They often do not have sufficient grammatical and lexical control of the second language, English, to comply with an English-only workplace rule. An incipient bilingual is an individual who has 50+ words and an extremely limited grammar. It is consistent with generally accepted linguistic theory that incipient bilinguals may possess enough limited vocabulary and grammatical knowledge to engage in codeswitching. They struggle to speak some English, but eventually must use Spanish to convey their question or other meaning.

To accommodate these struggling non-English speakers, more proficient bilinguals will codeswitch to Spanish so that the non-English speaking individual's needs are met. Many of the charging parties would tell the new hires, *"Okay, I'm going to train you in English, but if you have a problem then ask me in Spanish and I will tell you in Spanish."* Codeswitching in this training interaction actually serves to encourage the listener, through the switch into their native language, to participate in the conversation. In this situation, many different variables apply. The setting is work, which is a formal setting; the speaker clearly is not capable in English; the charging party is obliged to train the new person to a level of competency demanded by the employer, there are time constraints; and, the charging parties are attempting to accomplish their own work load while imparting information. Of particular immediacy for charging parties, was to answer the questions of limited and non-English speaking, Spanish dominant co-workers to

21

aid them in the completion of their jobs (e.g., G. Ramos, Depo., p. 53): *"My workmates spoke to me in Spanish. How was I supposed to speak English to them if they don't know English and I had to explain the work to them?"*

The above factors taken together would make it almost impossible for charging parties to comply with the speak-English-only rule due to the phenomena of attentional dissipation and the subconsciously ingrained sociolinguistic rules of codeswitching. Requiring them to comply with the English-only rule is almost impossible to achieve consistently without full devotion of the naturally limited conscious attention span, which takes away from their ability to do job tasks quickly and accurately. Mr. Miguel Alvarez (Depo., p. 120; see also J. Linares Depo., p. 75), who does not consider himself a high functioning bilingual, when asked if it was difficult to choose to speak English to his English speaking supervisors at BEI, answered *"Yes and no."* All of the charging parties I interviewed said that they all violated the rule to *"get the job done."* Mr. Julio Benabe in interview said, *"I felt bad, because if anyone needs help, you want to help them do their job [so I break the rule]."*

Codeswitching on the job is the most efficient way to conduct training or to impart important work-related information to limited and non-English speakers. What is clear is that charging parties are bilinguals who use both English and Spanish with a wide range of variability. The charging parties' switch into Spanish in many situations reflects the sociolinguistic rules that pertain in bilingual linguistic situations — it is not a matter of conscious choice, but dictated by complex, unconscious sociolinguistic patterns of expected sociolinguistic behavior and an underlying Spanish grammar system that controls language formation in both languages. Take, for example, the fact that if two moderate to highly proficient bilinguals (they have moderate Spanish/English proficiency) are conversing they will switch to English when a non-bilingual English speaker joins the conversation (e.g., A. L. Oliveras, Depo., p. 24). Charging parties naturally would have elected Spanish when acquiring knowledge of the job or in communicating with bilingual supervisors or Spanish-speaking co-employees because it is more comfortable and automatic in a learning situation to rely on one's native language.

Finally, other factors such as communicative problems posed by a stressful situation such as the continuous monitoring of language use by supervisors and co-workers, may cause bilinguals to revert to their comfort language — their native language — because expression is most complete in that language. The monitoring of charging parties' language use is stressful and causes tension in an already tense workplace for these Spanish-speaking employees. Moreover, the increased pressure most likely also caused charging parties to revert to Spanish more often than if their native language had not been prohibited.

### 2.6.2 Alternating Between Languages Depends on Such Factors as Who Initiates the Conversation, the Topic, and the Perceived Ethnicity of the Interlocuter

Use of both Spanish and English, in informal and formal situations, dictates the pattern that codeswitching takes. For example, if a Spanish-speaker initiates a question in English, linguistic rules pertain, and the interlocutor's apparent language dominance will take precedence: the reply will be in Spanish because of the interlocutor's perception of the speaker's ethnicity. It would be unnatural to do otherwise (Zentella, 1988; Valdes, 1988, 1982; Grosjean, 1982).

Furthermore, codeswitching is not necessarily an indication of incompetency in the non-dominant language. For example, Ms. Cecelia Ortiz (Depo., p. 8) reported to BEI attorney that she spoke English, *"[w]hen I have to speak to doctor or when I'm obligated because the other person doesn't understand Spanish."* In another example, Ms. Gloribel Ramos (Depo., p. 38) reported speaking in Spanish to Ms. Nancy Maldonado at the temporary agency, *"because she was speaking to me in Spanish."* Mr. Julio Benabe (Depo., p. 64) reported that he would converse with Mr. Nelson Marquez, a supervisor, *"because he is Spanish"* and *"[s]ometimes he would talk to me in Spanish...."*

An interesting example of the rules of codeswitching was revealed by Supervisor F. Pineros (Depo., p. 158) who complained that upon meeting him most Hispanics spoke Spanish to him because he appears Hispanic. This universal reaction is reflective of the strength of the sociolinguistic rules of communication. The perceived national origins of a person dictates the language used upon first greeting another individual who appears to speak a particular language (e.g., J. Linares, Depo., p. 85). In fact, Supervisor F. Pineros (Depo., pp. 125-126) rated his fluency in Spanish at 80% and as equal to his fluency in English.

### 2.6.3  Topics Learned in Spanish Will Trigger Codeswitching into Spanish

In Ms. Luz Andujar's deposition, it is clear that one of the most common situations that dictates a language switch from English to Spanish or vice versa is whether or not the topic was learned in the native language. For example, Ms. Andujar (Depo., pp. 40-44) reports that if the topic is about home, Puerto Rico, or family, she and her daughter converse in Spanish whereas if the topic is about school, then the language switches to English. The switch is not only dependent on the topic, but on whether or not the speaker has the domain or topic in his or her linguistic repertoire. Supervisor F. Pineros (Depo., p. 374) testified that:

> *...[P]ut yourself in a situation where you're not bilingual. We are fortunate that we are and it's a plus for us.... I'm in here with a group of people ...we can talk fluent in English, but yet we choose to speak other [sic] language. Why? Because other nationalities don't mean to do it, it just become [sic] natural.*

### 2.6.4  Non-Compliance with English-Only Rules by Codeswitchers is a World-Wide Phenomena Because It is an Unconscious Process

There is a large body of literature in sociolinguistics that describes the unconscious implicit, pragmatic rules that govern interactions among bilinguals which follows a specific grammar. In one study, Valdes (1988) noted that codeswitching occurred between two bilinguals 25 times in a one-hour period. Zentella (1981) reported 127 switches in eight hours by a bilingual instructor teaching Puerto Rican children.

Codeswitching occurs for a number of reasons, including lack of language proficiency, speaker comfort, situation, language dominance, interlocutor language, solidarity with the audience, and often for stylistic purposes as well. That is to say, bilinguals will use whatever

language is most appropriate for the perceived social context and will do so without active conscious choice — it becomes automatic with a lifetime of linguistic interactions within a bilingual community.

There is also evidence that under certain circumstances of native language prohibition, there is an increase in non-compliance. This phenomenon has been observed worldwide within codeswitching communities and throughout a variety of settings. MacGregor-Mendoza (1999) found that Hispanics reported that even after enduring punishment in the schools of the southwestern United States, that use of Spanish/English codeswitching was an enduring cognitive skill that continued well into adulthood for these speakers. Non-compliance related to prohibition of native language use has been documented among the codeswitchers of the Guaraní of Paraguay; the French Canadians of Canada; the Chicanos of the Southwestern United States; Puerto Ricans in New York (Poplack cited in Myers-Scotton, 1988); and at BEI in Hartford, Connecticut. Because codeswitching is a cognitive process under the control of automatic processes, these individuals in these diverse, worldwide settings could not conform to the language prohibition rules.

Williamson (1991) offers an explanation that may help to partially account for noncompliance as well. He noted that when group members feel their group loyalty is threatened (as symbolized through language), they feel defensive and continue to speak the language labeled as "inferior." Because language is intimately tied to self-identity (See Section 4.0 below), an English-only rule like BEI's demarcates as inferior speakers of those languages, which causes them to suffer from humiliation and a sense that their dignity has been assaulted.

A Spanish dominant bilingual, who is limited or non-English speaking, will tend to rely on his or her dominant or native language for comprehension, especially in emotionally charged or emergency situations, or for learning new tasks. The language environment that BEI has created, where charging parties and claimants are reprimanded for speaking Spanish, can be characterized as emotionally charged because for many of the charging parties the inability to express themselves caused great anxiety (See Sections 4.4.7 and 4.4.8 below).

### 2.7 Charging Parties are Limited and Non-English Speakers and Incipient Bilinguals or Spanish Dominant Bilinguals Who Rely on Spanish or a Codeswitching Repertoire

After a careful review of materials related to this case, in particular, the Plaintiff's Complaint and Jury Trial Demand and Plaintiff, EEOC's Response to Defendant Beauty Enterprises, Inc.'s First Set of Interrogatories (pp. 3-9), charging parties' depositions, and data collected through interviews I conducted with the majority of charging parties from December 6 through 11, 2001, I can conclude with a high degree of certainty that charging parties can be classified into two groups: **(1)** monolingual Spanish speakers with limited or no functional English; or, **(2)** Spanish/English bilinguals who are Spanish dominant (Zentella, 1988). Because of their birth place, age of immigration, socialization, place of education, and age, Puerto Ricans, and thus the charging parties (Appendix F), fit the empirically-derived, typical, linguistic profile of the Puerto Rican community. Furthermore, historical, political, racial and economic forces retard English acquisition and use among Puerto Ricans. For example, a young United States

24

born Puerto Rican is sometimes English dominant; however, for most Puerto Ricans codeswitching is the "unmarked" or most common form of communication (Myers-Scotton, 1995).

For the older generation, many Puerto Ricans who do acquire English proficiency may remain Spanish dominant their entire lives. Both groups rely on codeswitching (the alternate use of Spanish and English within and between sentences). Codeswitching becomes the linguistic repertoire — that is the mix of the two languages becomes the code or language.

Unskilled labor, employment that requires little to no language to accomplish job tasks, socioeconomic isolation, and socialization also impedes English acquisition. However, because comprehension precedes use, Puerto Rican limited-English speakers usually understand more than they can speak.[4] Individuals can work for decades in the United States and not gain any more proficiency than what is required to survive on the job (typically non-language dependent such as BEI) and in their neighborhoods (Hart-González & Feingold, 1990).

Limited and non-English speakers possess familiarity only with those words and phrases that are critical to their employment, which is called memorized proficiency (Omaggio, 2001). For instance, the language required to do a job or a set of related jobs can be memorized — and through use of that language in context — its meaning is comprehended. However, memorized proficiency is not equal to general language proficiency.[5] That is, in other linguistic settings such as educational, medical, or legal there is no "carryover" of the memorized proficiency from the job setting. Comprehension in the new setting would entail having to learn or memorize the language associated with the new setting.

### 2.7.1 Limited and Non-English Speakers Do Not Have Sufficient Control of English to Fully Respond in English

Many of the charging parties are incipient bilinguals and possess limited skills in English; therefore, they cannot "control" their language use to the extent that BEI supervisors expect. Charging parties, Mr. Miguel Alvarez and Ms. Maria de Jesus told Plaintiff EEOC that the reason they used Spanish in a particular situation was that they <u>did not know</u> the words in English. Mr. Alvarez (Depo., p. 97) was suspended without pay for two and one-half days for this type of incident. When asked if he had any difficulty <u>choosing</u> [emphasis added] to speak English, Mr. Alvarez (Depo., pp. 128-129) responded: *"Well, the words I wouldn't know I'd say in Spanish...I try to speak to them in English as much as possible. Sometimes Spanish will come out."* Clearly, one cannot choose Spanish over English when there is no knowledge in English to choose.

---

[4] In interviews, most charging parties claimed to not have done well in their English classes in Puerto Rico, nor in the schools they attended once they immigrated to the United States.

[5] BEI owner R. Cohen stated in his deposition (p. 38-40) that he did not understand the difference between someone being able to read and speak English: "If they can't read English, they've got to be able to speak English. To me [sic] would be the same thing. See, I don't see the difference....I mean, if — if you can't speak it, you can't read it and understand it. So to me, it's all one." See also Footnote 7 below.

25

Despite imposition of the English-only rule, the charging parties were able to speak enough English and Spanish to perform their jobs at BEI (e.g., R. Lugo, Depo., p. 83). Many worked successfully for long periods of time ranging from less than six months to twenty-three (23) years of service. Indeed, the years of service alone are proof positive that their limited and non-English proficiency and Spanish dominant bilingualism did not hinder job performance. Their very limited English proficiency allows them to be called incipient bilinguals, though the range of proficiency is higher for some BEI charging parties than for others. Some charging parties were so Spanish dominant that they reported having problems accomplishing their work because of the English-only rule (e.g., M. Perez Depo., p. 51). Ms. Madelyn Perez said that she had relied on speaking Spanish with her bilingual Supervisor to accomplish the job.[6]

There are other incidences and situations that also point to the charging parties' limited English proficiency. For example, Supervisor F. Pineros (Depo., p. 254) testified that he wrote charging party, Ms. Eva Diaz, a letter to exempt her from jury duty because her English was not strong enough. And, charging party Ms. Marie Garcia recited an incident of counting aloud in Spanish while working, for which she was disciplined. Sociolinguistically, we know from research that counting is, like praying, learned in the native language and does not carry over to the second language very well. In fact, asking an individual in which language they count, pray, do arithmetic, and speak "baby talk" has been used by linguists as indicators of language dominance. Counting in a second language is one of the hardest tasks for individuals to acquire, and, when performed in the second language, it is often processed in the first language learned in childhood and then translated into English (this discussion relates to the verbal representation and not to the mere visualization or matching of numbers).

### 2.7.2 Charging Parties Have Limited Opportunities to Develop English Skills

In this case, many of the charging parties had limited opportunities to develop their English expressive language skills or vocabulary, either on-the-job or at home. Many of these individuals have limited educational experiences in their primary language, Spanish, and most have little to no direct education in English (Appendix F). Only a few have had formal training in English as a second language and a few received their General Education Diplomas in the United States using a Spanish study program (Depositions of L. Andujar, p. 53; R. Lugo, p. 57). The primary problem with these basic ESL courses is that they focus on conversational English or filling out application forms or other basic skills, but do not cover subjects that assist individuals in developing communication skills applicable to the workplace (e.g., J. Linares, Depo., p. 38). For instance, it takes over 2,000 hours of English instruction for an individual to move from one level of proficiency to the next on the Oral Proficiency Interview (Omaggio, 2001).

Mr. Angel Luis Oliveras (Depo., p. 58) recounted that though he did not have trouble communicating in English, some of his Hispanic co-workers lacked the English ability to converse with him in English. The charging parties also had limited opportunities to develop

---

[6] Mr. N. Marquez (Depo., p. 20 & 45), a BEI warehouse supervisor, confirmed that his Spanish spoken skills are superior to his English spoken skills and that sometimes when he is working Spanish just "comes out," especially when he is speaking with other Spanish speakers. He also reported that both he and other supervisors speak slowly to limited English speaking BEI employees, so that they could understand better (N. Marquez, Depo., pp. 43–44).

their English writing skills. Mr. Harold Acosta (Depo., p. 206) reported that his English writing skills are so limited that his son writes his letters for him. But the lack of this particular language skill did not present a problem for most limited and non-English speakers and Spanish dominant bilinguals in the BEI workplace.

### 2.7.2.1 Codeswitching is a Strategy Used in the Acquisition of English

One common and unfounded assumption about ethnic/linguistic minorities is that they can learn English quickly and that failure to do so is equated with resistance, defiance, uncooperativeness, or lack of motivation. However, as the research in the above subsections of this report have established, codeswitching is used by incipient bilinguals when there is a dearth of vocabulary in the second language, when the grammar of the second language has not been acquired, and as a set of expected sociolinguistic interactions among bilingual speakers. In this way, codeswitching is a strategy that uses both languages simultaneously during the phase in which English proficiency is acquired. What is particularly important to understand is that for Puerto Ricans, the use of two languages is not only a strategy, but it is the primary mode of communicating.

Laypersons also tend to estimate incorrectly the time needed to acquire a second language. There is indisputable evidence in the second language acquisition literature that adult learners can take years to develop English proficiency. In fact, among immigrants, the shift to English from a native language generally takes two to three generations (Veltman, 1983). This concept is illustrated by BEI Attorney, Mr. Robinson, who was learning Spanish in the depositions, through exposure to bilingual communications. He observed this about himself attempting to learn a second language: "I'm learning more Spanish. Language is not my thing" (E. Diaz Depo., p. 112). Likewise for charging parties, learning a language as adult learners is an arduous task. As Ms. Margarita Aponte (Depo., pp. 22-23) testified in her deposition about learning English: *"no me entra"* *["it just doesn't sink in"]*.

Many researchers have attempted to address why it is that some English learners never reach fluency in English, while others become functionally bilingual or experience a full language shift. Variables such as age of arrival in the United States, nativity, occupation (non-language dependent labor vs. language-dependent), gender, educational attainment, demographic concentration, characteristics of a speech community (in terms of maintenance patterns and segregation from society), and negative experiences with learning a language all affect the length of time required to learn English. Meisenheimer (1992) found that Hispanic immigrants, unlike other types of immigrants, largely come from non-English speaking countries, live in the United States for a shorter time period than other immigrants, tend to reside in largely Spanish-speaking enclaves (which are the largest and most numerous in the United States), and interact with native United States born Hispanics, who also speak Spanish. Residential segregation among Hispanics had increased since 1980, and Meisenheimer (1992) notes:

27

> The fact that there are so many Spanish speakers in the United States may enable Hispanic immigrants to create labor markets that are somewhat independent of the larger, English-speaking labor market. Thus, for Hispanic immigrants in enclaves, English fluency may be less vital for labor market success than it is for Asian and Black immigrants. (1992, p. 10)

Moreover, in his labor study, Meisenheimer reports many of these individuals working as migrant farm workers in rural areas and in service and construction (manual labor) in metropolitan areas, where bilingual intermediaries allow for communication with English-speaking employers.

One of the best predictors of second language maintenance is the interaction between the number of years of residence in the U.S. and age (Hart-González & Feingold, 1990; Sole, 1990). In a study of Spanish monolinguals, Veltman (1983) found that approximately 20% of each immigrant group will remain essentially monolingual in Spanish, even after a prolonged period of residence in the U.S. However, little Spanish monolingualism was observed for those who arrived as young children.[7]

Several theories have attempted to explain why the acquisition of a second language becomes more difficult with age. In addition to a critical learning period, second language acquisition difficulties in adults may be attributed to the social and psychological distance between the learner and the group speaking the second language. Native language prohibitions encourage this "distance." The result of this dissonance is a poor language-learning situation. In order for successful language learning to occur, the psychological distance between the learner and the group speaking the second language must be decreased (Gardner & Lambert, 1972; Krashen, 1981).

Most importantly, language demands in employment represent the greatest factor in language shift — that is moving from native language dominance into English dominance (Fishman, 1971). Because a second language is acquired through frequency of use in the majority of linguistic domains, workers like those at BEI who have low-status, non-language dependent jobs in manual labor settings will naturally have delayed English acquisition. Prior to their employment at BEI, charging parties as a group almost universally held non-language dependent jobs such as janitorial or cleaning (W. Miranda, p. 25); cooking (W. Miranda, p. 26); and sewing (E. Diaz). Therefore, they did not have a chance, even with extended time in the United States prior to their BEI employment, to develop passive (aural) or production (oral/writing) skills in English. Ms. Madelyn Perez (Depo., p. 81), for example, is Spanish dominant, can understand some English, but not if it is spoken too rapidly. In their depositions, many of the charging parties mentioned that they used a co-worker as an interpreter at prior jobs such as at Idaho Potato Company (H. Acosta, Depo., p. 18); McDonald's (Depositions of B. Berrios, p. 21; M. Aponte, p. 20); a New York party favor sewing company (E. Diaz Depo., pp.

---

[7] However, not all individuals who immigrate at a young age will learn to speak English with facility. See, for example, the deposition of Ms. Mariana Rivera, who immigrated from Puerto Rico to the U.S. when she was two, but whose English is so limited that much of her testimony is marked by miscommunication and frequently appears that she did not understand the questions posed by legal counsel.

18-21); ADVO Systems (newspaper distribution); Data Mail (mail service); Cap Tech sewing (C. Ortiz Depo., p. 29); painting/piece work (R. Green, p. 32); and at subsequent jobs such as at Walmart (B. Berrios Depo., p. 78).

The charging parties in this case fit the above profile, in that they were all young or older adults when they arrived in Hartford, had little formal education, little to no formal English training (Appendix F), occupied low-status, non-language dependent jobs and lived in virtually segregated language communities. It is a truism that one class in English each year from elementary school through high school in a Spanish-speaking community such as Puerto Rico, will not tend to produce fluent bilinguals. This is because the entire society is geared to and functional in Spanish; therefore, English does not have a chance to develop into true fluency. It is predictable that charging parties' English language proficiency would have been limited and, for most of them, remains limited to this day. It is because they are Spanish dominant that they use their native language. When they use Spanish they are more efficient speakers, have a broader vocabulary, can be more accurate, and can communicate ideas more rapidly and with more assurance than in English.[8]

### 2.7.3 Charging Parties' Passive Television Viewing Does Not Improve Their English Proficiency and They Depend on Spanish Media for Information

When queried about their favorite English language television shows, many of the female charging parties with children responded that cartoons such as *Popeye* and *The Flintstones* and shows like *I Love Lucy* and *ALF* were their favorites (Depositions of E. Diaz, p. 25; C. Ortiz, p. 9; G. Ramos, p. 32, M. DeJesus, p. 49; R. Lugo, p. 61). Clearly these shows were used primarily for entertainment and not language learning. They reported that to obtain information they relied on Spanish radio. At best, watching television will only help to improve passive English comprehension or listening skills, but will not improve oral production skills, since it is not an interactive language activity. The English required to be spoken at BEI is so narrow and limited that speaking only English all day long at BEI would not improve a limited or non-English speakers' overall English proficiency. As former Supervisor Assistant Miguel Alvarez (Depo., p. 182) testified, *"The majority of the Hispanics that are there [at BEI] hardly any of them speak English."*

### 2.7.4 Charging Parties are Limited and Non-English Speakers and Dominant Spanish Speakers for Whom English is a Struggle

Charging parties must translate all of the English they hear into Spanish, think of an answer, code it in Spanish, and then translate it back into English. Because of this extensive mental processing, their ability to communicate in English is an extremely difficult task. Their struggle to generate English utterances is analogous to individuals who have a particular disability known as Specific Language Impairment (SLI). Individuals with this disorder are not intellectually impaired, but have the curious inability to form language. As described by Pinker (1995):

---

[8] I believe I gleaned more information, in richer detail, from charging parties in my short interviews than did Mr. Robinson in deposition because they communicated with me primarily in Spanish, and English, as needed to answer my questions.

> *It is their language that is impaired...the impression is more of a tourist struggling in a foreign city. They speak somewhat slowly and deliberately, carefully planning what they will say and encouraging their interlocuters to come to their aid by completing sentences for them. They report that ordinary conversation is strenuous mental work and that when possible they avoid situations in which they must speak. Their speech contains frequent grammatical errors, such as misuse of pronouns and of suffixes like the plural and past tense....* (p. 49)

This description captures the essence of the plight that limited and non-English speaking, Spanish dominant charging parties struggle with under the speak-English-only rule at BEI. It is clear that because they "acquired" English as a second language that, for most individuals they will never be as proficient as in their native language — they have limited opportunities to acquire English and missed the critical age for linguistic grammar acquisition (puberty) that would allow them to acquire a high degree of English proficiency.

For most of the charging parties, acquisition of English began in either early or late adulthood. This makes second language mastery for charging parties a strenuous mental exercise that is exhausting, so much so that many charging parties elected to be mute at work rather than face discipline due to "slipping" into Spanish (J. Linares, Depo., p. 53). This is an avoidance strategy that many second learners engage in when their fluency is insufficient to the assigned task. Charging parties are similar to individuals I have evaluated in the past, who were in my opinion limited and non-English speakers and Spanish dominant bilinguals.

## 2.8 Conclusion

Psycholinguists and scholars of codeswitching agree that "mentalese" or thought formation is independent of any language. Language formation uses only one generative grammar system, which controls both languages of a bilingual. This single, unitary grammar generation system utilizes parallel distributive processing or other brain-wide, unconscious mental mechanisms to form language. Thus, for charging parties, because Spanish is dominant or learned first, it is linked through habitual use to the unitary generative grammar system, which is accessed first when language is formed. Because language formation utilizes these unconscious mental processes, controlling which language is produced by limited and non-English, Spanish dominant speakers is difficult if not impossible to accomplish. Thus, three factors help to explain charging parties' "slips" into Spanish when they violate BEI's English-only rule: (1) a single, unitary grammar generation system controls both Spanish and English language production, in which Spanish is the first language accessed; (2) attentional dissipation when charging parties are asked to monitor their language all day and complete job tasks quickly and accurately; and, (3) fatigue from attempting to accomplish native language suppression and job tasks with only limited conscious awareness.

Moreover, the communication style employed by Puerto Rican, Hispanic Spanish speakers consists of codeswitching at the code (language), sentence, and word levels. This speech style is wholly automatic because it originates at the unconscious level of thought processing. Their unintentional language behavior — speaking Spanish to other Hispanic

Spanish speakers and to some extent to monolingual English speakers — emerges spontaneously without the speaker knowing which language will be produced in the utterance. These unconscious responses occur more often when limited, available conscious attention is used to quickly and accurately accomplish job related tasks. Thus, when Hispanic, Spanish dominant bilinguals are disciplined for speaking Spanish at BEI, that discipline is administered on the basis of a characteristic central to ethnic identity. In conclusion, because language formation and codeswitching phenomenon are under the control of automatic, unconscious mental processes, they cannot be extinguished by an external English-only rule at BEI.

### 3.0 EFFECT OF BEI'S ENGLISH-ONLY POLICY IN THE WORKPLACE

#### 3.1 BEI's Purported Goals for its English-Only Policy Cannot Be Linguistically Supported

The following subsections of 3.0 will examine the reasons and assumptions that form the basis upon which BEI's English-only rule was created. BEI's English-only rule cannot be linguistically supported because it is an arbitrary, undefined, and subjectively enforced rule; furthermore, it creates an unsafe and inefficient workplace, and promotes rather than ameliorates racial tension, and inhibits English language learning.

#### 3.2 BEI's English-Only Requirement is Arbitrary, Subjective and Undefined

BEI's English-only requirement is arbitrary in that it was never defined, nor disclosed to applicants and BEI employees in writing until March 2001 (See *Response to Plaintiff's First Set of Interrogatories*, #2). Even when it was disclosed, how it was to be applied and the consequences for noncompliance were never specified (See *Response to Plaintiff's First Set of Interrogatories*, #11). The rule generally was defined as pertaining to restrictions of language on the job, but after the May 2000 hearing, BEI disciplined employees for Spanish language use during personal time. When presented with its own bilingual supervisor's opinion, charging party Mr. Miguel Alvarez, that BEI's Spanish-speaking employees needed to speak their native tongue to express themselves best in the workplace, BEI arbitrarily rejected that opinion in favor of disciplining its employees who spoke Spanish. It is also arbitrary because the policy was inconsistently applied across different linguistic groups at BEI (e.g., Supervisor F. Pineros Depo., pp. 354 & 567). Sometimes it was enforced only if the owner, Mr. Robert Cohen, or certain supervisors, such as Mr. F. Pineros, were present. Other times, the rule was always applied, but primarily to Hispanic employees.

The rule was *ad hoc* in nature from 1980 until March 2001. It is striking that though BEI argues that this policy was important to the safety and efficiency of its business operations, it was never memorialized (See *Response to Plaintiff's First Set of Interrogatories*, #11; L. Sussman, Depo., pp. 81-82), as was an extensive sexual harassment policy (BEI Employee Policy Manual, pp. 7-9). This lack of acknowledgement in the *Employee Policy Manual* also suggests that the rule was not a fundamental and well-known company policy, since employees had no notice of its existence and its operationalization was left ambiguous. For example,

employees under the "Conduct for the Common Good" are warned while at work not to sleep, smoke, horseplay, and fight with co-workers. The policy was finally promulgated in May 2001, and reads:

### English-only Policy

In order to promote harmony and avoid tensions among the Company's racially and ethnically mixed [sic] workforce, as well as for safety and efficiency, BEI maintains a Speak only English [sic] rule — a rule requiring employees to speak only English while they are working. At lunch or on breaks, employees are free to speak in the language of their choosing. All job applicants must be able to read, write and speak English. The only exception to this rule applies to product cleaners who work in a physically segregated space in an ancillary warehouse and have little to no contact with the rest of the workforce. (p. 6)

However, how the English-only policy was to be applied remained undefined at BEI. For example, Mr. Cohen (Depo., pp. 124-125) testified that use of one non-English word is not a conversation and not a violation, but codeswitching or an inadvertent use of one word within an English conversation is a violation. Later in his testimony Mr. Cohen (Depo., p. 151) reflected, "Slipping into the language in talking is not a flagrant violation. It can happen. I'm not in favor of it, I don't think anybody is in favor of it, but it's not something you would write a warning of every time it happened." Some BEI supervisors noticed, but would ignore employees who "slipped" into Spanish because they thought it was a violation of the rule (P. Lopes, Depo., pp. 89-90), while others chose to not view the use of "one word" as an infraction (T. Buonocore, Depo., pp. 107-109).

After examining the sociolinguistic evidence, I found the rule to be arbitrary, as well as inconsistently applied in practice in the workplace. The arbitrariness of the rule is evidenced by eight linguistic facts:

(1) At least part of the application process was conducted in Spanish by AAA and Essential staff members and some BEI supervisors or managers (See J. Benabe, Depo., p. 29);

(2) The majority of charging parties were never told of the English-only rule prior to beginning employment with BEI (See Depositions of W. Miranda, pp. 42-46; E. Diaz, p. 50-55, did not know of rule for 10 years; M. Alvarez, p. 48, did not know for 14 years);

(3) The rule was applied inconsistently or not at all during different times at BEI, except during the period of intense discipline after the May 2000 hearing (e.g., Depositions of E. Diaz, pp. 126-127; G. Ramos, p. 53);

(4) The bilingual supervisors/manager and assistant supervisors regularly violated the rule when speaking with charging parties and among themselves (See confusion it caused charging parties, Depositions of W. Miranda, p. 99; B. Berrios, pp. 90 & 98-102);

(5) No written policy was ever presented to workers even when requested (Depositions of B.Berrios, pp. 105-106; G. Ramos, p. 56);

(6) When a policy was finally issued, it was vague and ambiguous, and no rules for its implementation or enforcement were ever formulated;

(7) The majority of charging parties either received their training in Spanish or were expected to train others using their Spanish language skills (e.g., Depositions of G. Ramos, p. 49); and,

(8) Temporary and permanent employees are not told of the consequences of speaking Spanish on the job (F. Pineros Depo., pp. 429-430) and, temporary employees are not given the employee handbook (R. A. Piccirillo, Depo., p. 122).

Furthermore, although it appears that a progressive warning system (verbal warning, written warning, suspension, and termination) was in place for English-only rule violations, that system was inconsistently followed (T. Buonocore, Depo., p. 111). Supervisor F. Pineros (Depo., pp. 425 & 501) claims that this warning procedure was never consistently followed at BEI with regards to the English-only rule. The fact that there were no principles of implementation or procedural guidelines for reporting, appeal, and reprimands — along with its inconsistent application — demonstrates its arbitrary nature at BEI.

### 3.2.1 BEI's English-Only Policy and Practice Is Subjective, Inconsistently Applied, and Undefined

The English-only workplace policy and practice is a fatally flawed language policy because it is a wholly subjective, ambiguous, and undefined standard. Because it is not derived from an empirical standard, and because it is inconsistently[9] and subjectively applied, the policy invites discriminatory treatment of individuals who are members of linguistic/ethnic minorities. For example, BEI supervisor, Mr. M. Ambruso (Depo., p. 93), reported that he only applied the rule to pullers, packers, and shippers (most of whom were Hispanic); but not to Bosnians,[10] though they worked in the same physical area.[11] He also stated that he was a little more lax

---

[9] Though he denies applying the English-only rule differently at BEI, Supervisor N. Marquez (Deposition, pp. 119-120) admitted that if he is dating someone or finds them attractive that he speaks privately to them in Spanish at work.

[10] According to Mr. Tom Buonocore, the jobs of Bosnians, which were restricted cleaning, have been expanded to include separating and sorting products, writing them up for credit from the manufacturer, and boxing these products for return. However, the Bosnians are still exempt from the English-only rule though their English has improved and additional language skills are required to perform their job duties. In addition, now that cleaning is done by Black Spanish speakers and a Russian, the speak English-only rule once again applies. Bosnians were exempted from the English-only rule because BEI claimed that cleaning required no English reading, writing, or speaking skills (T. Buonocore, Depo., pp. 24-27). Note that primarily Hispanics are once again the target of the enforcement of the English-only rule, regardless of the business justifications used for Bosnians who performed the exact same job and were not under the onus of this rule.

[11] BEI owner, Mr. Cohen (Deposition, p. 52) stated that having the Bosnians speak their language in a warehouse that had other employees restricted from speaking their native language did not raise harmony issues. However, this was an inconsistency in the rule that many charging parties as well as the supervisor of warehouse #5 questioned. In another part of his deposition, Mr. Cohen stated that he believed that the exemption from the English-only rule applied to all product cleaners, not just Bosnian cleaners (Deposition, p. 69). However, this was not the

33

about enforcing the rule because the two different groups worked so closely together (M. Ambruso Depo., pp. 102-103), and that he had complained to other supervisors about the problems of supervising an area without being able to consistently apply the English-only rule. Furthermore, BEI and its temporary hiring agency partners do not evaluate employees prior to hiring them to make sure that they can speak, read, and write English, though it claims that this is a prerequisite for employment (See *Response to Plaintiff's First Set of Interrogatories*, #20, #22, #23, and #24), which is something that is done in language dependent workplaces.

BEI's failure to define the level of English proficiency employees must possess in order to be an employee allows its language policy to operate like a *de facto* subjective punishment. In fact, BEI admits in its *Response to Plaintiff's First Set of Interrogatories* (#23) that: "BEI does not think in terms of 'degrees' in connection with language abilities and, therefore, has no way of responding to the second part of the interrogatory, other than to say that it does not hire only 'A' English students at the high school level."[12] It is apparent that BEI has no understanding that there should be a reasonable relationship between the actual level of English proficiency required to complete BEI jobs and its enforcement of its English-only policy. That is why this allegedly neutral policy is much like a "test": if BEI employees do not "speak English only" (*even if English proficiency is not required to accomplish the job*), then they "fail" the employer's "test" of competency to perform their routine, non-language-dependent jobs. At BEI, then, the speaking of Spanish is equated to incompetence in English, which is an unsupported assumption.

Employers who need English skills for jobs that can be classified as "language dependent" typically list that requirement in their job descriptions; BEI does not (See *Response to Plaintiff's First Set of Interrogatories*, #24, Job Descriptions). Because these jobs are not language dependent, BEI has never had to contemplate or determine even a vague language proficiency standard or level of proficiency required to complete the job. Because there is no definition, it is uncertain when linguistic/ethnic minorities of varying language ability will ever qualify to be employees of BEI given its inconsistent interpretation of its English-only policy.

### 3.3    English-Only Policy Undermines Workplace Harmony and Causes Ethnic Tensions

In its employee manual, BEI's first listed reason is "to promote harmony and avoid tensions among the Company's racially and ethnically mixed [sic] workforce." In fact, the English-only rule had the opposite effect on workers and the work environment. It is also interesting to note that BEI listed as a "safety" concern, ..."the avoidance of the products of ethnic hostility..." (*Response to First Set of Interrogatories*, #18). In point of fact, there is only one incident that occurred when the company first opened that Mr. Cohen and Supervisor F. Pineros can point to, but which is not documented by BEI — an alleged fight between Blacks and Hispanics at BEI — that neither was there to witness at its inception. Sometime after the alleged fight broke out, Mr. Cohen and Supervisor F. Pineros happened on the scene

---

understanding of the area supervisor (M. Ambruso, p. 93). In addition, Supervisor N. Marquez (Deposition, p. 136) reported he had heard of a Jamaican girl cursing two Bosnian workers because they were speaking their language, but he did not know what the argument was about.

[12] Asst. Warehouse Manager, Mr. Paul Lopes (Depo., p. 33) described how he refuses to hire individuals whose English speaking skills "is not quite good enough....I could not understand them, and I sensed that they cannot understand me."

(Depositions of F. Pineros pp. 358-361; R. Cohen, pp. 54-63). Allegedly, the Hispanics had at this point in the fight reverted to cursing in Spanish. Swearing is culturally bound, and it is a common phenomenon for a person who is angry to revert to his or her native language.

However, there was no investigation about what caused the fight, and no one was suspended for the incident (R. Cohen, Depo., pp. 83-85).[13] Nonetheless, Mr. Cohen concluded that the speaking of a non-English language is what caused the fight.[14] Mr. Cohen's first inclination was to suppress the language from being spoken instead of addressing what should be the actual concern — prohibiting fighting and encouraging intercultural tolerance. His conclusion is logically and linguistically inconsistent. Instead of focusing on punishing the actual violation of fighting, Mr. Cohen seized on the opportunity to infer that the name calling, occurring well after the initiation of the fight, was the cause of the fight.

When Mr. Cohen encouraged his workers to report the speaking of foreign languages to their supervisors, many of the charging parties recounted that the "Jamaicans and Russians" would report them when they spoke Spanish. When charging party Ms. Marie Garcia challenged the disproportionate disciplining of Hispanics and reported Russians speaking Russian, she was ignored (F. Pineros Depo., p. 661). It is clear that the strict enforcement of the "Speak English-only Rule," the only prong that was ever really enforced at BEI,[15] was the actual cause of the rise of ethnic tensions at BEI. It appears from the evidence that no systematic process for addressing reported concerns were in place.

Racial tension also escalated when Mr. Cohen shared his views with the BEI workforce about the pending lawsuit. When Mr. Cohen was a guest on a local talk radio show, he claimed that his company's workers were having interracial problems with Hispanics (See Appendix J, p. 3). Supervisor F. Pineros (Depo., p. 498) testified that there was tension with the people who had been there a while like the African Americans about a month after the "*La Voz*" article appeared in the warehouse. Moreover, the tape of the radio show in which Mr. Cohen denounced the lawsuit brought by charging parties, at his direction, was played at five different times in the warehouse to all of BEI's workforce (e.g., Depositions of R. Cohen, p. 183; F. Pineros, p. 507; A. L. Oliveras, p. 132).

Another example of the negative effects of the English-only rule was that it served as a catalyst for increasing racial tensions rather than diminishing them (See A. L. Oliveras, Depo., p. 128, quoting 9/2001 *The Beauty Times* article by co-worker; and R. Cohen, Depo., pp. 186-187).[16] Illustrative of this fact is the publication of an article in *The Beauty Times* that reported

---

[13] Angel Luis Oliveras (Depo., p. X) relates a story of how fellow employees at BEI in 1976 had a fist fight over whether or not he would come back to work at BEI after leaving for Puerto Rico. It would seem that the prohibition against fighting is not strictly enforced at BEI, which if it were would help to promote racial harmony.

[14] R. Cohen in deposition (p. 86-87) said it was the only fight he could recall with any specificity.

[15] When Mr. Cohen first created the rule, it only dealt with verbal communication; and it was this portion of the policy that was ever really enforced at BEI (See Depositions of F. Pineros, p. 370; R. Cohen, p. 32-33; Section 6.2.1).

[16] *The Beauty Times* article states, in part: "Now a bit of an editorial. I cannot fathom the ignorance of some employees at Beauty Enterprises, Inc. that are so unhappy with the working conditions that are costing themselves and all the other employees profit-sharing money, yet come to work here and face Mr. Cohen and the other

to the BEI workforce that BEI's lawsuit defense was being funded by the employee profit sharing plan, which served to increase racial tension. Additionally, one long-term employee who initially did not want to join the lawsuit out of loyalty to Mr. Cohen later changed his mind because of the discriminatory treatment of Hispanics and after co-employees repeatedly reported that he was speaking Spanish in the warehouse in violation of the rule:

> *When two other times somebody went and told Bob that I was talking Spanish back there with some other people. And then he call me in the office. And then he screamed at me, very hard this time. I thought he was going to get sick or something because he — you know, like he was looking for air, you know what I mean? You know, when he get upset?....Oh, you better not[see it]. So he screamed bad to me in a way that I feel so bad about it. And then I said — I see how people come and go in that company, all kind of different nationality, no Spanish people no more. So I feel bad about it because it's my people and they got equal opportunity to come and work in that company. Don't tell me that they don't apply for that company to work in that company. How come they don't want to hire them anymore?....But I feel bad because this is my language and screaming because of that reason, it wasn't fair the way he talked to me. See, put yourself in my position. It's your language. You born with that language. And somebody tell you they don't have room for you because of a rule. That's why I feel bad about it. [grammatical errors his]* (A. L. Oliveras, Depo., pp. 102 & 108)

According to Supervisor F. Pineros, although BEI has had its speak English-only rule for the past 20 years, he observed:

> *I wish a lot of things would change, but things never change.... For the most part, the people that come in, the fighting, the arguments, the frictions among people. And it will never change, because we have different nationalities and so forth.* (Depo., pp. 616 & 624)

Hence, though BEI has had an English-only rule for over 20 years, it has not eased what is perceived by BEI supervisors as ethnic tensions in the workplace. According to Supervisor M. Ambruso (Depo., p. 69), the fights people have at BEI are not "full-on" fights, but arguments primarily due to personality conflicts. These arguments or dissension are found in most workplaces.

Therefore, contrary to Mr. Cohen's assumptions and "common sense," the English-only rule has never demonstrated the intended effect of improving interracial harmony. In fact, it has the opposite effect. From a language policy point of view, this inter-ethnic tattle-telling and hostility, enforcement of the policy for policy's sake, and the low morale and fear among the BEI

---

employees like nothing is wrong. America is all about freedom and personal freedoms, so why can't Mr. Cohen have the freedom to make the rules in his own company that he created with his vision, hard work, sweat, and help of others. Individuals that do not like these rules have the freedom to find employment where they will be happy, since it's all about freedom in the USA." Mr. Cohen (Deposition, p. 196) stated that he agreed with the contents of the article, that: *"Basically yes. They don't like working here, get another job."*

36

workforce is linguistic evidence of its failure. It is well known that the cure for ethnic tensions is to show respect, acknowledgment, and tolerance of ethnic minorities' languages, traditions, and customs (Lambert, 1991; See also Martinez & Dukes, 1997; J. Linares, Depo., p. 106).

### 3.4   BEI's English-Only Rule Creates an Unsafe Workplace

BEI reported that its safety concerns included: "...injuries from falling boxes, from forklifts colliding with pedestrians, fire and evacuation concerns...concerns relating to injuries resulting from the unsafe use of equipment" (*Response to Plaintiff's First Set of Interrogatories*, #18). Note that none of these safety concerns is directly related to the inability to speak English.

BEI's English-only rule encourages an unsafe work environment by not allowing linguistic minorities to speak in their native language during an emergency. In a state of panic, linguistic minorities will comprehend and revert to use of the native language much more rapidly because it is their dominant language (Scovel, 1978). Forbidding employees to use their natural "emergency" language would create more of a hazard because the rapidity of response would be slowed as the person attempts to retrieve the words in a non-native language or seeks to translate the English that was spoken. (This is not to say that English spoken directions are not comprehensible to limited and non-English speakers and Spanish dominant bilinguals during an emergency.) Additionally, language that is filled with hedges, pauses and hesitations may also create an unsafe workplace. This type of hesitant communication can serve to create an unsafe workplace by not allowing for rapid communication in the event of emergencies such as fire or other natural disasters.

In the instance of falling boxes or fires, reaction times to warnings would come much quicker if uttered in the person's native language because there would be no time lag for translating the English utterance into the native language. For professional interpreters, the lag time is three (3) to seven (7) seconds between hearing and uttering the translation. For non-professional's, the lag time can be much longer since there are 22 or more cognitive processes that must occur for a person to translate an utterance (González, Vásquez, & Mikkelson, 1991).

When queried, charging parties who were interviewed did not know of any safety incidents, injuries or production errors that were caused due to non-comprehension of English instructions. Supervisor F. Pineros (Depo., pp. 326-327; P. Lopes, p. 53) confirmed that since he started working at BEI in 1972, he knew of no safety injuries related to the inability to read or speak English. And in response to interrogatories that asked about documentation supporting the various employee safety issue claims, no documentary evidence of such workplace problems was produced by BEI. In fact, in deposition Mr. Reinaldo Acosta (Depo., p. 44) related an incident where a box was thrown at him and the person yelled *"Watch out"* — but the warning came too late to be of assistance. A limited and non-English speaker and Spanish dominant bilinguals may have a broad enough aural (listening) proficiency to work in an English-speaking setting by memorizing, and thereafter, comprehending needed vocabulary in English. But it is not necessary to speak English when evacuating a burning building.

Furthermore, in interviews, three charging parties (Mr. William Torres, Ms. Margarita Aponte, and Ms. Lisette Santon) reported that they failed to report their injuries to BEI supervisors for fear of being warned or disciplined because they did not know how to speak about their accidents in English, and/or they were afraid because the workplace was so hostile. BEI's application of the English-only policy creates an unsafe work environment for limited and non-English speakers, especially in emergency situations.

### 3.5  Use of English Only Is Not Necessary for Business Efficiency

BEI's efficiency reason for its English-only workplace rule is misleading because the rule, which requires the exclusive use of English in the workplace, actually works against the purported goal of business efficacy. For instance, in response to interrogatories that asked about documentation supporting the various employee inefficiency claims, no documentary evidence of such workplace problems was produced by BEI.

Moreover, BEI's English-only rule had many unintended negative effects, that tended to reduce efficiency in the workplace. Two important negative effects include: (1) low employee morale, and (2) high attrition of competent workers. Given that entry-level workforces in the year 2000 and beyond will be comprised primarily of women and minorities, it behooves employers to utilize factors for employment decisions that are perceived as fair. "[S]cholarly studies...found that employee hiring and promotion selection methods that were perceived as fair to individuals and groups increased worker efforts and minimized the costs associated with employee attrition" (Selmi, 1995). Clearly, at BEI, charging parties did not view the use of an English-only policy as a fair method to determine job competence in a workplace that required primarily manual labor to accomplish job functions.

Illustrative of this negative effect is the deposition testimony of long-term, lead warehouse Supervisor F. Pineros (Depo., p. 521), who commented throughout his deposition that some of his best workers "disappeared" from employment — people he would like to have working again at BEI because of their productivity. BEI was, as a result, a less efficient company because they lost productivity when they terminated some of their most experienced employees or removed them from specific functions, which they were competent to perform. For example, Mr. Harold Acosta's demotion from forklift operator to janitor was inefficient for BEI since on the late shift that he worked, there were relatively few forklift operators (T. Buonocore Deposition, p. 92).

BEI's English-only rule creates barriers to accomplishing job tasks as efficiently and rapidly as possible. Forcing limited and non-English speakers to communicate in their non-dominant language is cognitively stressful. The communication is marked by excessive hedging (um, uh, ah), repeated information, false starts, requests for confirmation by the speaker of the listener, and other linguistic and paralinguistic cues (Mehrabian, 1972; Hall, 1959). Thus, communication is slowed and takes more time than not permitting non-English speakers to speak in their native language to co-workers who would understand them. When Spanish dominant bilinguals and limited and non-English speakers use Spanish, they are more efficient speakers, have a broader vocabulary, can be more accurate, and can communicate ideas more rapidly and with more assurance than in English. Mr. Julio Benabe in interview said, *"If they let them speak*

38

*Spanish, they could do their job faster, more eficiente [efficient]."* Requiring the use of English at BEI guaranteed that there would be delays because the non-dominant English speaker had to find the correct word, think about how to translate it, and then attempt to produce a message, which often has to be self-corrected.

Furthermore, BEI has relied on its long-term employees to train new hires. When they are prohibited from speaking in the native language to those who are in need of linguistic accommodation, then the communication must rely to a great extent on non-verbal teaching modes such as demonstration and gestures. In addition, because learning vocabulary for the second language learner is more efficient when the concept is first learned in the native language, acquisition of job-related terminology will also be slowed or impeded (See Section 3.6 below). And, whereas some supervisors report having to speak more slowly to limited and non-English speakers in order to accommodate them (See Footnote 6), this phase would last only as long as it takes these limited English speakers the time it takes to acquire the workplace language in English. However, when BEI uses only a punitive approach to English learning in the workplace (See Section 3.6 below), then this slowed communication between supervisors and novice workers may likely become routine in BEI's workplace, rather than the exception that lasts only a short time while English is being learned.

BEI's business efficiency is based on how rapidly and accurately employees complete job tasks. The more time is taken to communicate, the more time it will take to accomplish job tasks. Under the English-only rule, if the time taken to communicate is increased because of the requirement to speak English-only it is required to be only in English, these small increments of time used to relay information in the non-native language mount over time and may significantly impact the completion of job tasks. Also, because BEI is requiring its limited and non-English speakers and bilinguals to self-monitor their language use during working hours, they must use their limited attention span for this task instead of dedicating it to completing job tasks quickly and rapidly.

Furthermore, if English is the only language for communication of job-related information, then the English-only rule also contributes to job inefficiency because limited or non-English speakers are denied information vital to the completion of their or their co-worker's jobs, since comprehension in English is predictably weaker. For experienced, long-term employees, which many of the charging parties are, these burdens would be subtle and possibly undetectable to monolingual employers, but they are a source of great stress and cognitive overload to the worker themselves. For inexperienced workers, the task might be even more burdensome because they become linguistically isolated from those workers who could have otherwise assisted them by communicating with them in their native language.

Finally, because English acquisition is delayed or impeded in an environment in which native language is prohibited, no amount of monitoring by BEI supervisors will aid in their learning the workplace English required by Mr. Cohen. Thus, the time supervisors spend "requesting" charging parties not to speak Spanish, or to speak English only, is wasted. Taking supervisors away from other required tasks and burdening them with this monitoring requirement creates inefficiency in the workplace.

### 3.6 English Acquisition Strategies are Prohibited by BEI's English-Only Rule

Many laypersons who create restrictive language policies such as BEI's English-only rule also assume that if only English is used in the workplace, then English can be acquired more rapidly. BEI's policy actually creates the opposite effect: instead of promoting, it impedes English acquisition by limited and non-English speaking employees who can competently do the job. Second language learners typically can acquire vocabulary in the second language more rapidly if they understand the meaning or the "deep structure" of the word or concept first. Use of the native language is a strategy for discovering the deep structure of a work-related word or concept. The novice will ask experienced workers in their native language questions such as, "What does "palletize" mean? What do they mean when they say "on the clock" to me? What does this red dot here mean?" The experienced worker, in the native language will answer. Thereafter, repeated exposure to the word or concept in English will evolve into comprehension in the second language without the need for further Spanish language use (Ovando, Collier & Combs, 2003).

BEI's requiring its employees to speak only English on its premises turns the workplace into an immersion classroom by forcing employees to fall behind in acquiring English because they do not have the background schema to understand the second language. The fastest way to encourage language shift is to allow the new hire to learn the job in Spanish or other non-English language and then over time encourage English to be acquired on-the-job. Understanding the concept and the terms in the native language is fundamental to learning the English label (word/concept or "surface structure", i.e., "pallet" is the surface structure that means the wooden thing we put boxed orders on and wrap in plastic so the forklift can take them).

Charging parties are limited and non-English speakers, and bilinguals who are Spanish dominant. Both groups have varying degrees of proficiency in English, but Spanish is their stronger or <u>dominant</u> language. Many limited and non-English speakers naturally rely on their native language to complete job tasks, but this reliance is also a strategy that aides English acquisition. Take for example a strategy employed by Ms. Garcia, to say aloud in Spanish the names of products she was learning from an English written list (for which she was disciplined).[17] Repeating words in the native language is a strategy that assists language learning by allowing the learner to associate the English vocabulary item with the semantic domain that exists in Spanish. This is an essential step towards acquiring an English lexicon. These incidents indicate how BEI supervisors do not understand that prohibiting the use of Spanish actually impedes the eventual learning of English (Auerbach, 2000; Krashen, 1982, 1981). This repetition in the native language is a counter-intuitive language learning process, which is not readily understood by laypersons.

---

[17] Supervisor F. Pineros (Depo., p. 504) testified that BEI employees talk to themselves, *only in English*, repeating things on a list. This statement by Mr. Pineros is not linguistically credible. We know linguistically that individuals will talk to themselves in their native language before their second language as charging parties reported. Talking to oneself is verbalizing thought. For charging parties, who are limited and non-English speakers, thought is an unconscious process linked through heaviest use to the native or dominant language.