### 3.6.1 Charging Parties are Trainable in English

It was clear from my interviews with charging parties that many of them, who had worked at BEI long enough, had acquired enough memorized English proficiency to do the job. Thus, it is not that charging parties are not trainable in English or unwilling to comply with an English-only rule, but what is being asked of them is almost impossible to modify without extensive time and instruction. For example, Ms. Waleska Miranda (Depo., p. 64) reported that after the May 2000 hearing she was violating the rule everyday because she was *"tempted to speak Spanish...[because] there were more employees, more Hispanic employees, than the others."* The "temptation" in this example is a clear case of psycholinguistic inability to throw off a life-long, ingrained language-use behavior because of an external rule to speak English only. When BEI Attorney, Mr. Robinson, suggested that Ms. Miranda (Depo., p. 76) would have tried harder to follow the English-only rule if the discipline had been more serious, she answered that her responses would have been the same — she could not ignore the linguistic necessity of speaking her native language over the less dominant second language. Because most charging parties are adult learners of English, it is harder for most of them to try to learn new linguistic responses, even with the threat of being fired. Ms. Waleska Miranda (Depo., p. 117) reports about the eventuality of being fired: *"Because of the way they were acting, and I knew at the end, they were going to fire me anyway. They were making my life miserable there."*

### 3.7 BEI's Language Policy Classifies Applicants Using Personal Characteristics

Another negative effect of BEI's language policy is that it works as an identification mechanism that utilizes an employee's language use to classify them and then to treat them differently in the workplace. BEI's declaration that English is needed exclusively in the warehouse is a company practice that tends to exclude members of Hispanic, Spanish-speaking linguistic/ethnic minorities on the basis of their native language use and/or their alleged lack of English proficiency.

As my investigation of the language required for performing job duties reveals, the actual information to be read and processed by employees is minimal and consists of numbers, codes, names, and words that can be easily memorized as a strategy to enable comprehension. If BEI were not using its language policy for singling out Hispanic, Spanish-speaking linguistic/ethnic minorities, it would offer Spanish linguistic/ethnic minorities similar accommodations as those afforded to its Jamaican, Guyanese, Vietnamese, Italian, Polish, Bosnian, Bangladeshi, and East Indian employees. For example, one of the Caribbean employees was singing in Jamaican *patois* and Supervisor F. Pineros walked by and asked her to sing louder, which sends a demeaning and humiliating message to all Spanish speakers who are not allowed to speak their language during breaks, lunch hour, or outside the warehouse on BEI premises. Supervisor F. Pineros (Depo., p. 503) insisted that Jamaican *patois* was English and, therefore, allowable under the English-only policy.[18] He reported that when she sings too loudly and it is distracting, he opens his arms and

---

[18] Jamaican *patois* is a separate and distinct language; it is a Creole derived from multilingual sources including French, English, and several African languages.

asks her to *"help us out"* (F. Pineros Depo., pp. 503-504). However, singing in Spanish by Ms. Marie Garcia was considered an infraction of the English-only rule and Ms. Waleska Miranda (Depo., p. 138) believes she was fired for speaking and singing in Spanish.

### 3.8   Conclusions

BEI's English-only rule did not achieve its stated goal of promoting racial harmony, business efficiency, and safety in the workplace. BEI's rule is a wholly subjective and arbitrary policy that is neither valid nor fair in its application. Further, it serves no linguistic purpose and is counterproductive because it produces harmful effects by: **(a)** widening the cultural divide between employees and employer; **(b)** creating an embattled workplace, in which racial/ethnic tension is escalated rather than diminished; **(c)** creating barriers to getting work done efficiently and safely; and, **(d)** serving to impede English acquisition by limited and non-English speaking employees.

Additionally, the ability to speak English is not a remedy for the types of safety (injury) concerns that BEI alleges. Moreover, BEI creates an unsafe workplace by not allowing safety communications in languages other than English among speakers of non-English languages in cases of emergency; use of the native language allows for rapid and efficient communication in this type of situation.

### 4.0   RELATIONSHIP OF ETHNIC IDENTITY AND UNEQUAL TREATMENT

This section of the analysis will concentrate on explicating the relationship between ethnic identity and unequal treatment. Pertinent social science research will be reported that indicates there is an inextricable link between language use and ethnic identity. I will also highlight the detrimental effects on the individual when language use is assailed.

### 4.1   The Definition of Language Discrimination

Sociolinguistically, language discrimination is defined as treating someone differently solely because of his or her native language or other characteristics of speech. A substantial body of scholarly research suggests that ethnicity and native language are inextricably linked. For all practical purposes, identity as expressed by language use is more often than not inseparable from identity as defined by ethnicity or national origins.

The United States Equal Employment Opportunity Commission, which is responsible for interpreting and enforcing Title VII of the Civil Rights Act, has long held that national origin discrimination includes "the denial of equal employment opportunity...because an individual has the physical, cultural, or *linguistic* [emphasis added] characteristics of a national origin group" (EEOC, 2003). The EEOC also recognizes that primary language is often an essential national origins characteristic. Section 4.0 discusses the sociolinguistic evidence of the intimate tie between the language an individual uses and its relationship to ethnic identity — in the linguistic literature it is a precept that there is an extremely high correlation between which language one uses and how one self-identifies in terms of national origin.

### 4.1.1   Language Restrictions Are a Hidden Dimension of Discrimination

Language is a powerful instrument of control, which can and has been used to maintain power relationships (Roberts *et al.*, 1992). Phillipson (1992) coined the term "linguicism" to stress the link between restrictions of language use and other forms of exclusion. He contends that, "linguicism" is a form of racism where "language is the means for effecting or maintaining unequal allocation of power and resources" (Phillipson, 1992; p. 55). Racist and oppressive societies have historically been known to impose external languages on indigenous populations, and to eradicate, humiliate, and ostracize unpopular language varieties and accents. One form of such oppression involves "representation of the dominant language, to which desirable characteristics are attributed, for purposes of inclusion, and the opposite for dominated languages, for purposes of exclusion" (Phillipson, 1992, p. 55).

Yet, language *"continues to be one of the least visible, least measurable and least understood aspects of discrimination [emphasis added]"* (Roberts *et al.*, 1992, p. 366). According to Perea (2001), Valdes (2001), Woolard (1998), Piatt (1995), and Lippi-Green (1994), the idea that discrimination on linguistic grounds is acceptable, but on ethnic or racial grounds is not, can lead to inconsistent jurisprudence. These scholars argue that language discrimination must be recognized as a hidden form of discrimination by race, national origins, or ethnicity in order to bring coherence to civil rights policies. To wit, if Hispanic children fail in school for not speaking English and if they are not allowed to speak Spanish in a bar or on the phone on their lunch break, they are restricted in their access to services and employment opportunities which — were they not related to language use — would be regarded as discriminatory and unfair.

### 4.2   Correlation Between Language and Ethnicity/National Origins

According to current knowledge in sociolinguistics, ethnolinguistics, and linguistic anthropology, language and ethnic identity/national origins are related and bound together reciprocally — language use influences the formation of ethnic identity, and ethnic identity influences language attitudes and use. These disciplines accept that a person's language is inextricably linked with his or her national origins, and self-identify is defined in terms of ethnicity. As Roberts *et al.* (1992, p. 366) argue, "culture, language, and social identity are constantly recreating and reconfirming each other." In the case of second or third generation immigrants, linguistic difference, even if in the form of a special dialect or accent, often serves as the sole indicator of ethnic origins. According to Roberts *et al.* (1992):

> The importance of Gumperz' work is to show how these [linguistic] cues both trigger and feed into the attitudes of speakers and listeners so that power differences and negative ethnic stereotyping are perpetuated and reinforced. And these cues are not specific features of speakers' linguistic codes which they can learn to change but are part of their ethnically specific style of communicating — a style which may not be consciously controlled by speakers and which is a part of their ethnic identity. (p. 95)

The term "ethnic group" refers to a population whose ethnic identity is defined by unique social characteristics, such as genetic inheritance, culture, *language* [emphasis added], religion, and tribal, regional, or national origins. From a sociolinguistic perspective, Fishman, Gertner, Lowy, and Milan (1985, p. 70) define ethnicity as "both the sense and the expression of the collective, intergenerational cultural continuity (i.e., the sensing and expression of links to one's own kind, one's own people) with whom one shares ancestral origins."

### 4.2.1 Language: An Expression of Ethnicity/National Origins

In most industrialized parts of the world, the major urban areas have become multiracial, multiethnic, and multilingual due to a series of similar economic and social factors including "the need to fill unpopular jobs, historical 'chains of migration' from less developed countries and areas, obligations towards refugees, and the right of family members to be united" (Roberts *et al.*, 1992, p.10). These chains of migration have resulted in a number of language minority groups that live in United States communities and share a distinctive identity, with their own particular history, characteristics, needs, and system of customs, values, beliefs and most notably language. For example, Spanish has always been treated as an identifying characteristic of Hispanics. In everyday life, this is also true. Ms. Brenda Berrios (Depo., p. 196) was asked if she knew whether Supervisor Jimmy Adorno was Hispanic and she said: *"I think so. I'm not sure. He never speak* [sic] *Spanish, so I don't know."*[19]

The use of the Spanish language represents the essence of the Hispanic experience and identity and is a source of pride among many Hispanic Americans. Spanish has also been the source of considerable pain, as individuals and the community as a whole have often been singled out for adverse treatment due to their Spanish language use. The identity of an ethnic group also embraces categories that range from material culture such as food, music, and dress to the inner recesses of human experience such as values, interpersonal relationships, and the manner in which reality is perceived and experienced.

From a sociolinguistic point of view, language is the most vital characteristic of ethnicity/national origins identity. As such, it is more than a neutral tool for the communication of ideas; language is the essence of ethnicity. According to Fishman *et al.* (1985, p. 71), the relationship between language and ethnicity is such that "language and ethnic authenticity may come to be viewed as highly interdependent." One's ethnicity is embedded in verbal culture: one's primary language is the supreme symbol system of its users. An individual's activities, behaviors, sentiments, and perceptions are deeply rooted in the matrix of his/her particular language. Language is the vehicle through which occurs the "reflection, clarification, consolidation and alteration of interpersonal relationships and sociocultural values" (Fishman *et al.*, 1985, p. 70).

It is through language that human beings organize and relate to their environment, express their feelings, and reveal their way of thinking. For example, among the Lakota people, language is considered a method of total perception and comprehension. It validates and affirms an individual's

---

[19] However, Mr. Jose Linares (Depo., p. 46) testified that Mr. Adorno spoke in Spanish to him during his interview when he saw that he was struggling to understand English.

"Indianness" or identity. McDougal, Lasswell, and Chen (1976, p. 51) contend that there is another deeper dimension to language — *language is the rudiment of consciousness and close to the core of personality; deprivations in relation to language deeply affect identity* [emphasis added].

### 4.2.2 Language as an Important Group and Self-Identifying Characteristic

Language is one of the key factors all individuals use to organize their world and categorize others; thus, language contributes significantly to the development of social and ethnic identity. Social or ethnic group identity is an inherent part of an individual's self-concept because self-concept is derived from an individual's knowledge and membership in a social or ethnic group (Martinez & Dukes, 1997). One's self identity also embraces the values and emotional significance attached to that group. Domengeaux (1986) contends that language is the lifeblood of every ethnic group:

> To economically and psychologically penalize a person for practicing his native tongue is to strike at the very core of ethnicity. *(p. 1167)*

Empirical studies have shown that Hispanics see Spanish as an essential part of their identity that cannot be separated from their ethnicity/national origins. Spanish is related not only to the self, but to other Hispanic institutions such as the religion practices. Many Puerto Ricans are practitioners of Catholicism, for example, which is intimately connected to the Spanish language and is the language of prayer for many Hispanics. Sociolinguistic investigations reveal a high correlation between Spanish language use and ethnic identity. Comments offered by respondents participating in a major cross-sectional study underscore the importance of Spanish to Hispanic American identity: *"It is the expression of the soul"; "[o]ur culture without it would be like a body without a heart"; "[y]ou cannot express your really intimate feelings in any other language"* (Fishman *et al.*, 1985, p. 296). Positive attitudes and beliefs about one's own mother tongue and other manifestations of ethnicity have been cited as key elements in language loyalty or pride and language retention. If one's language is attacked, so too are the individual and any related social self identifiers such as the religion one practices.

### 4.2.3 Spanish is the Predominant Ethnic Characteristic of Hispanics

In terms of the sheer number of speakers, the United States is the fifth largest Spanish-speaking country in the world (University of Alcalá, 2001; Central Intelligence Agency, 2001). Spanish language maintenance and immigration, along with population growth, have led Spanish to become the most widely claimed non-English language in the United States, and the only major non-English language which over the last two decades has not lost but retained and gained claimants (Veltman, 1983). Hispanics comprise 11.9 percent of the United States population and total more than 32,000,000 (U.S. Census Bureau, 2000). Spanish is not only a widely-used language in the United States, but it is also a major factor in the identification of the Hispanic American ethnic group: 97 percent of the individuals who usually speak Spanish are Hispanic; 72 percent of all Hispanics claim some knowledge of Spanish; and 64 percent of all Hispanics report being bilingual. Hispanics also comprise 76 percent of those individuals who report Spanish as a second language (U.S. Bureau of Census, 1990). Most astonishing, Hispanics who have lost their Spanish language abilities report that being Hispanic is to be a Spanish speaker.

### 4.2.4 Maintenance of Spanish Reinforces Ethnic Identity

Spanish language use, maintenance, and intergenerational transmission, along with constant immigration, have institutionalized Spanish as a constant element of Hispanic identity and linguistic repertoire in the United States. Contrary to the myth that Anglification has shifted or will shift Hispanics towards English monolingualism, English-Spanish bilingualism remains by far the predominant feature of Hispanics. It is important to note, however, that there are many first-generation Hispanic immigrants who acquire English very rapidly, but there are also many who do not. Consequently, just because individuals may identify themselves as "bilingual," does not necessarily mean they have full command of both languages (Valdes, 1988; Moore & Pachon, 1985). On the other hand, speaking Spanish is not evidence of lack of English proficiency. Many Hispanic group members, such as charging parties, report that they maintain their Spanish because of frequent visits to Puerto Rico, visits from relatives who only speak Spanish, and from the newcomers from Puerto Rico who arrive regularly. In addition, many charging parties watch or listen to only Spanish television and radio broadcasts to gain information. They also reported frequenting Spanish-speaking merchants including banks, stores, and services with bilingual representatives, and living in Spanish-speaking enclaves.

### 4.3    Stigmatization of Linguistic/Ethnic Minorities as a Result of Unequal Treatment

Because language is critical to the cognitive and personality development processes, the restriction of language has a significant impact on both the individual's group identification and self-identification or self-concept. According to Karst (1986):

> The individual's identification with ethnic, racial, religious, or language groups
> plays a major part in the process of self-definition. In defining ourselves, we
> rely heavily on others' views of us, real or imagined, and on our connections with others.
> (p. 307)

Empirical evidence shows that a lack of accommodation and acceptance of an ethnic group's language during their assimilation into the mainstream culture can lead to alienation from family, community, and ultimately segregation from United States society (Sanmaniego & González, 1999). Specifically, the lack of accommodation of linguistic/ethnic minorities into the larger culture can result in acculturative stress — stress associated with cultural disparity or perceived discrimination. Sanchez (1993) documented the presence of stress related to acculturation among Hispanic college students as a reaction to perceived negative policies, practices, and attitudes toward Hispanics on campus. Specifically with regard to Hispanic youth, research indicates that young people "can learn English better and adjust more comfortably to America if their linguistic and cultural ties with the Spanish-speaking world are kept alive and active from infancy on" (Lambert, 1991, p. 226; also see Martinez & Dukes, 1997).

It is a well accepted precept within the linguistic community that stigmatized features of language are associated with low-status groups; that is, the lack of English proficiency "marks" the ethnic and linguistic minority as surely as does skin color among African Americans (Williams, 1992; Fishman, 1989; Edwards, 1985; Peñalosa, 1981). Just as skin color has been

46

used as a tool of prejudice and oppression, so too has language been used to achieve the same ends (Phillipson, 1992; Tollefson, 1991). Haugen (1956) observes that "[m]ere communication may be satisfied by a relatively modest mastery of the second language; social identification with a dominant group may require something approaching native command" (pp. 96-97). As a result, language restrictions have historically been a socially acceptable way of expressing intolerance towards ethnic/national origins groups (González & Melis, 2001 & 2000).

Research reveals that most limited and non-English proficient and immigrant populations are politically disenfranchised, members of the lowest socioeconomic group, and among the poorest people in our country. Generally these individuals hold the lowest-status occupations, are generally perceived to be to be inherently inferior to English speakers, and they are typically members of racial and ethnic minorities who have faced historical discrimination in the United States (Espenshade & Fu, 1997; Schneider, 1996; Borjas, 1994; McManus, Gould & Welch, 1983; Bourdieu, 1977; Quesada, 1976).

Interaction between members of different ethnic and linguistic groups often confirms unarticulated prejudices, which are frequently predicated on subconscious negative judgments about language use and communication styles. For example, accented speech is often perceived by an English language speaker as an indication of illiteracy and lack of oral proficiency in English (Lippi-Green, 1994). Neither assumption is necessarily true.

Variation in language use including accent, dialect, or any other "substandard" language use is often used to express and reinforce social differences related to gender, race, ethnicity, and class. Therefore, language use reflects — and often becomes a means of reproducing — unequal or unfair social relations. Requiring English proficiency from employees sends a message that those who do not communicate effectively in English are not welcome to participate in the larger society. Speakers of mainstream or majority language are typically unable to make sound judgments about language minority group members' competence in English, and they often draw incorrect conclusions from their use of memorized or conversational level English. These conclusions often serve as the basis of expecting linguistic/ethnic minorities to conform to English only workplace rules when they in fact cannot. Therefore, exclusive use of English language communication may be used to exclude employees whose English is limited. According to Roberts, Davies and Jupp (1992):

> The greatest hurdle for ethnic minorities with regard to language is the failure of white-Anglo gatekeepers to make sound judgments about ethnic minority groups' knowledge of English and the tendency of such gatekeepers to draw incorrect conclusions from the way non-Anglos use English. (p. 368)

BEI's language policy and practice also places symbolic barriers before any linguistic/ethnic minority group member. BEI's failure to allow Spanish-speaking employees to speak their dominant language or to permit other bilingual employees to accommodate the most limited-English speakers — causes the unaided employees to feel alienated and stigmatized. Only English speakers are not stigmatized by the implementation of restrictive communication policies (i.e., English only or undefined English language standards). This serves to signal

linguistically-diverse populations that they are second-class citizens by ensuring that they will be disciplined, lose pay, or be fired because of noncompliance with the English-only rule (e.g., G. Ramos, Depo., p. 42).

### 4.4 Harmful Effects of BEI's Disciplining of Charging Parties

As a result of BEI's constant disciplining of charging parties — from verbal warnings to firings (See Appendix I) — charging parties suffered a variety of sociolinguistically-related problems, some of which are described below.

#### 4.4.1 Disempowerment

Because BEI did not make its English-only workplace policy and practice known to all employees prior to hire, charging parties once hired had an expectation that they would be able to retain their jobs, if performed competently. Upon learning of the rule when beginning their jobs, most charging parties were shocked (e.g., Depositions of B. Berrios, p. 56; G. Ramos, p. 46) as was Ms. Waleska Miranda during her first day on the job:

> *And we were pretty excited because most of the people who was there was Hispanic. He [the supervisor] was Hispanic, but he was all the time in English. His language was in English. When we went out to the warehouse, there was more Hispanic in front, and I was really excited because I say, 'Oh a lot of Hispanic here,' but I say that in Spanish. And he was like, 'Oh, my God. Shoo. Don't say that in Spanish.' And I said, 'What's wrong?' He went — he looked in the right side and the left side...'Because you can't speak Spanish here.'.... We were like — I was pretty in shock why you can't speak Spanish.* [grammatical errors hers] (Depo., pp. 48-49)

When charging parties were, for some after many years of service (See Appendices B & I), disciplined for something that they had long engaged in — that is speaking Spanish with each other at the BEI workplace — it caused charging parties to feel disempowered. Charging parties felt disrespected and dishonored as human beings because they perceive that BEI understands that they can do the job, but is disciplining them because of their ethnic language — a feature inextricably linked to their ethnic identity.[20] After many years of law-abiding citizenship and employment, charging parties found themselves in a crisis that made them question their status as Americans. They feel like second-class citizens — not as good as everyone else.

---

[20]Representative of the attitude of BEI supervisors in general, Mr. Tom Buonocore (Deposition, pp. 110-111) believes that the English-only rule affects both English speakers and limited and non-English speakers the same way and that it does not have an adverse affect on anybody.

48

### 4.4.2 Humiliation

Many of these Hispanic, Spanish-speaking employees had long worked for BEI. When their supervisors started to warn them, sometimes yelling and screaming[21] at them in front of co-workers who would laugh at them (e.g., Depositions of B. Berrios, p. 143; M. Alvarez, p. 140), it made them feel embarrassed and humiliated. Some charging parties also felt humiliated for being fired from a job that they could perform for a factor that was unrelated to the performance of that job. The way some charging parties were fired was also a humiliating experience. Ms. Waleska Miranda (Depo., pp. 135-140) reports that she was fired in front of many BEI employees and was sent to her temporary agency for a report that was never faxed to them by her supervisor.

The fact that they were being monitored (e.g., Depositions of C. Ortiz, pp. 82-83; B. Berrios, pp. 70-71 & 118-119; G. Ramos, pp. 92-93) also humiliated them since they do not think of speaking in their first language as something that should be done surreptitiously at the workplace, especially since case materials reveal that BEI had allowed such practice. It was also humiliating for the charging parties to be treated like second-class citizens at BEI and yet the company profited from selling products that Hispanics (and African Americans) used. According to Mr. Julio Benabe, it was like living through black/white discrimination because at BEI, *"speaking Spanish is like having black skin color."*

Representative of many of the charging parties, Ms. Cecelia Ortiz reported that when disciplined for speaking Spanish, the Supervisors "came at me with an attitude." For some charging parties, their reaction was to give "attitude" back as a self-defense measure. Charging party, Ms. Rosa Rojas, reported that she did not complain about the English-only rule because when she spoke English her co-workers would make fun of her. This second-class treatment struck at the core of their self-identity and led them to believe that co-workers and supervisors saw them as inferior. Like anyone else in this situation would be, they were humiliated and filled with doubt about their self worth (Allport, 1954). BEI also intentionally constructed social barriers, that encouraged the humiliation of Spanish-speaking BEI employees in the workplace, when they instructed their co-workers to report them to management when they spoke Spanish in violation of the rule.

BEI's language policy also restricted Hispanics' non-job related speech during working hours which was also a source of humiliation for them. According to Supervisor F. Pineros (Depo., pp. 115-117), only 15 to 30 percent of the time on the job is spent speaking by various BEI warehouse workers. Although this estimate seems high, for argument's sake only, I will assume that figure. That estimate leaves 85 to 70 percent of the speaking that occurs at BEI as non-work related speech. As a class, many charging parties had the ability to speak, though

---

[21]Many times the yelling and screaming was accompanied by paralinguistic behaviors that were threatening, aggressive, and hostile (Mehrabian, 2000, in press; Hall, 1959). Some of these behaviors included invading the personal space of charging parties, pointing of fingers, disgusted or aggressive facial features, hostile or aggressive tone of voice, use of foul language, clapping of hands and using elevated voice levels (See Depositions of Supervisor F. Pineros Deposition, pp. 426-429 & 445-447; J. Linares, p. 81). One supervisor does admit, however, to getting a little louder and more stern when an employee repeatedly violates the rule (See Depositions of T. Buonocore Depo., p. 114; P. Lopes, pp. 89-90); and that other supervisors might get a little louder too.

some with much difficulty, the few English words required to get the job done. However, because of the speak English-only rule, many of the interviewed charging parties said that they felt humiliated, that they were in prison, or that they were afraid of slipping into Spanish because they didn't know the words in English; consequently, they choose to be silent or mute at work (See Depositions of Manager R. Acosta, p. 108; J. Benabe, p. 95; M. DeJesus, p. 89; M. Aponte, Volume 2, p. 33).

### 4.4.3 Loss of Dignity

Charging parties, like anyone in these circumstances, would plainly feel a tremendous loss of dignity after an experience such as this one. To be monitored or to be yelled at in a rude and loud manner, to be fired for non-work related reasons caused them feel a loss of self dignity. Because they were limited English speakers, they felt isolated in the workplace and often could not speak to anyone since they could not communicate in English for fear of the loss of their jobs if they reverted to Spanish. Moreover, they were expected to wait until their lunch or breaks to socially communicate with their Spanish-speaking peers, unlike the other ethnic minorities or English speakers in the workplace who were not actively monitored and were, therefore, allowed to engage in social communication while doing their jobs. To reject charging parties on the basis of their language dominance is to reject them as individuals because they have no control over their national origins. This includes the fact that the majority of charging parties learned Spanish as their first language and were born into Spanish-speaking communities such as Puerto Rico, a United States Commonwealth. As Ms. Luz Andujar (Depo., p. 21) clearly testified: *"...Then I made them understand that I knew I had to speak English to the supervisors and the people that had some importance in the company. But I didn't understand why I couldn't speak Spanish when I wasn't talking to them."*

BEI's practice of exclusion by native or ethnic language sends an unequivocal message to Spanish-speaking, limited and non-English speakers that they are unwanted, not like us, not really American. The excluded person receives the distinct message that they are less than they think they are, that they are branded and that perhaps they are exceeding their place in society. By disciplining charging parties, BEI sends a message to all other Hispanics that they are not as privileged as other non-English speakers or English speakers — no matter how hard they work.

The use of Spanish signals membership in a particular linguistic/ethnic group. To be told that you cannot speak your native language when other minorities can is as damaging and stigmatizing as the classic denial of entrance to a country club. Although you have met all objective requirements for entrance, you are rejected based on an aspect of self that, just like dark skin color, you cannot change or could take a lifetime to change. Furthermore, for the rest of some charging parties' lives, they will be forced to admit to other companies that he or she was disciplined or fired by BEI because he or she spoke Spanish. This stigma would most likely follow them for the rest of their lives, and predictably they might then be further stigmatized as "uncooperative."

BEI's English-only policy created an intimidating work environment for limited and non-English speakers, many who chose silence over the threat of losing their jobs. Ms. Rosa Green (Depo., p. 94) reported that after the hearing, the enforcement of the English-only rule not only

escalated, but was also done more rudely. Compare, for instance, the treatment of Russian BEI employee, Mr. Jakob Khutorosky (Depo., pp. 44-45). He claimed that he was never reprimanded in front of others when told to "speak English," that it was always done in private and *"it's not in any rude way. It's more like a friendly conversation."* Ms. Waleska Miranda reported that after the May 2000 hearing, she was miserable at work because she was:

> *Depressing and really quiet. Trying not to be tempted to speak Spanish at work...you have to work with a lot of stress and a lot of pressure, and just doing your work, and without nothing, knowing everybody's yelling at you because you just, whoops, speak Spanish.* (Depo., p. 132)

Many charging parties reported that when they used Spanish, they hid or spoke it quietly, switched to English if supervisors approached, then switched back to Spanish (both before and after the May 2000 hearing). Supervisor Teofilo Baez (Depo., p. 28), who in general denied that anything was wrong at BEI, reported that when he spoke Spanish in the back with a couple of guys, *"we keep it quiet, too."* When asked why he was willing to sign the petition to request to speak Spanish, he said:

> *Like I say, not that we're going to speak Spanish all the time, but just in case — because the Spanish people we speak English, you know. Once in a while we speak Spanish, you know. And just warning us and stuff like that, I guess that's why we signed the letter.... What I see is no matter what language you are, they always slip into your language, you know.* (See Depositions of T. Baez, pp. 50 & 55; F. Pineros, p. 443)

Expressive language is the cognitive faculty which sets humans apart from other mammals in the animal kingdom, it is the unique human attribute (Aitchison, 1993). To demand that employees act as if they are mute while at work is an intolerable working condition that most humans could not willingly endure for very long without serious repercussions. According to Mr. Harold Acosta (Depo., pp. 97 & 100), it didn't matter how often Hispanics were reprimanded or warned about not speaking Spanish: *"We had to speak. We weren't dumb. We had to speak* [while working]*"* (Also see Depositions of M. Perez, p. 56; J. Linares, pp. 59 & 99). Ms. Maria DeJesus (Depo., p. 95) remarked that after being mute at work when she took her breaks, *"it was a relief."* Ms. DeJesus (Depo., 97) during her testimony refused to agree with the BEI attorney that she had any English skills: *"We spoke, because we didn't know any other language. It's the only one I know."*

BEI's English-only rule impacted primarily Hispanic limited and non-English speakers who were not permitted to enjoy the same privileges that other similarly linguistically-limited employees enjoyed. The fact that they could not use their native language without fear of reprimand, and others could, was a great source of their feeling a loss of dignity. It is ironic that charging parties' social conversations were actively monitored and suppressed, not only by supervisors but also by their co-workers, because Mr. Cohen (Depo., p. 140) expressly stated in his deposition that there is no rule against talking on the job. This means that limited and non-English speaking workers (primarily Hispanics) at BEI did not enjoy the same privilege as other limited and non-English speakers and English speakers enjoyed while working, to chat about

51

friends, family, children, and their daily woes to co-workers. Although it is clear that BEI's supervisors and managers wished the employees would not talk at all (See F. Pineros Depo., pp. 375-376), this is an unrealistic expectation, because human beings are pre-wired to speak. According to Supervisor F. Pineros (Depo., pp. 375-376), BEI employees talk about *"Everything....What they did last night. What they are going to do tonight. Who they going with. Who is cheating with somebody. A million things."* To prohibit primarily Hispanics from doing so, and not other linguistic minorities in the same workplace, causes them to feel a loss of dignity.

### 4.4.4 Social Segregation/Isolation

In the face of disparate treatment such as this, it is not uncommon for workers to experience dissonance to account for being terminated. Some workers questioned their worth, or accepted blame for termination for something not related to their job performance. Charging parties also felt isolated in the workplace when they were monitored by supervisors and were not asked to do things they normally were asked to do (e.g., E. Diaz Depo., pp. 166-170), and were overtly monitored and reported for any violation of the English-only rule by co-workers (Depositions of L. Andujar, p. 42; H. Acosta, p. 178; M. DeJesus, Vol. II, p. 26) and Supervisors. See also Supervisor F. Pineros' (Depo., pp. 388-389) confirmation that he asked employees to report on their co-workers in order to "break up talking" on the job. They began to be treated as the "out" group by their fellow employees, for example, by being yelled at by their English-speaking co-workers to not speak Spanish (e.g., L. Andujar Depo., p. 63). Supervisors, including Mr. F. Pineros and Mr. R. Smith, made them the subject of jokes. In other words, when BEI singled out this group, other workers perpetuated the stigmatization and isolated these workers too (Hakuta, 1986; Ball *et al.*, 1984; Giles *et al.*, 1977).

Most isolating of all for the heretofore valued, limited and non-English-speaking employees (who had earned merit increases and promotions prior to the institution of BEI's English-only policy) was that they were the subject of gossip by supervisors and co-workers. The excluded persons receive the distinct message that they are not welcome, which undermines their self-worth. Their self esteem, their expectations for their children, their ultimate assimilation into mainstream society, and their acquisition of English will all be affected, with socioeconomic and personal negative ramifications for their generation and those to follow (Roberts, *et al.*, 1992; Domengeaux, 1986).

The physical segregation and isolation was also immediate in the BEI workplace. Many individual charging parties complained about the loss of the privilege to speak about non-job related matters in their own native language as was the right of the other limited and non-English speaking Italians, East Indians, Jamaicans, Guyanese, Vietnamese, Russians, Bosnian, Bangledeshi, Polish and English speaking American workers. As Ms. Cecelia Ortiz (Depo., pp. 78 & 52) noted through the interpreter in her deposition,[22] communicating in English for social discourse was limited because: *"For me, it's — it's easier for me to speak in my language. I don't know enough English to be able to communicate as I do in my own language."* Ms. Ortiz

---

[22] Two Russian BEI employees and defense witnesses also requested an interpreter for their depositions (Depositions of Boris Bratslavsky, pp. 6-; Jakob Khutorosky, p. 6). Both individuals had been in the United States for over 13 years.

(Depo., p. 82) felt she was not free to *"speak my language without persecution"* [at BEI]. The fear of being disciplined, with the eventual threat of termination from jobs they sorely needed to survive economically, forced many of the charging parties to choose to be mute at work.

Some saw the rule as harassing, while others perceived it as discriminatory and challenged the rule, but no relief was offered to them. Eventually they became the targets of ridicule for speaking their limited English and for violating the rule and speaking Spanish, and the object of BEI's company-wide English-only enforcement efforts. Mr. Jose Linares (Depo., p. 65) cited to an incident in which a supervisor verbally warned him for an English-only violation when he was speaking English with an Hispanic-looking Guyanese co-worker. The effect of the English-only rule was to further socially isolate these employees at BEI. They had to be silent or be forced to communicate about job related matters in an unnatural language, which supervisors ridiculed. Sociolinguistically speaking, social isolation leads to alienation from the larger society and retards integration into the workplace and the larger community.

### 4.4.5  Exclusion from Future Employment

Charging parties, like other limited-English proficient and non-English proficient individuals, do not have the option of choosing into which community they are born. If these individuals are born in a minority enclave or immigrate to the United States from another country, it will literally be generations before they, as a group, fully linguistically assimilate into mainstream culture (Veltman, 1983). Given that charging parties are adults and in the working world with little time to actually study English, I can safely predict that it may take many years for them to become proficient enough to speak English with moderate proficiency and comprehension, if ever.

Empirical evidence shows that a lack of accommodation and acceptance of an ethnic group's language during their assimilation into the mainstream culture can lead to alienation from family, community, and ultimately segregation from United States society (Sanmaniego & González, 1999). One foreseeable consequence is that charging parties and their families risk being unable to advance because of poverty due to job loss. Not only did the socioeconomic status of some of the charging parties' families change markedly, but also it is highly predictable that their children would not pursue higher education because of the necessity to work. Thus, the cycle of non-English proficiency would be further perpetuated in charging parties' and their children's generations.

The most important factors for linguistic assimilation are employment in a setting where English is used (language-dependent occupations unlike at BEI) and the educational and financial attainment of parents (Fishman, 1989; Fishman *et al.*, 1966). Not having the financial security employment provides, places charging parties and their children at higher risk for a life of poverty and second-class citizenship because their assimilation is delayed and they fail to become English proficient as rapidly as they might with job security.

### 4.4.6  Higher Levels of Workplace and Other Forms of Stress

If a native speaker of English is told only to speak Spanish, inevitably he or she will revert to English out of sheer necessity. If an incipient bilingual attempts to go through the entire day only being allowed to speak a foreign language, the natural tendency is to revert to the native language when gaps in knowledge appear or when fatigued. It is the experience of many monolingual English speakers when on vacation in a foreign country that one of the things they are most thankful for upon returning to the United States is that they are able to once again communicate in English, their native language. It is not uncommon for the reaction to be so powerful that they are reduced to tears from the relief of the burden of straining to understand and communicate in another language — and this experience is only a short-term, temporary, voluntary vacation. For instance, it is difficult for students learning a foreign language to speak that language even for an hour. Limited and non-English speakers and Spanish dominant bilinguals at BEI face this stress daily, without any relief in sight.

According to the sociolinguistic literature, even individuals who appear to possess a high degree of English proficiency, in a situation that causes anxiety or fear — such as job loss, speaking about a highly emotionally charged issue, or finding themselves in a strange or new setting — will revert to their native language. Reversion to the native language is a well-documented sociolinguistic phenomenon (Journal of Social Issues, 1957). Individuals comprehend and can express themselves best in their native tongue, especially in a stressful situation.

In addition, charging parties were cursed at, yelled and screamed at to not speak Spanish or to only speak English by co-workers (See M. DeJesus, Depo., Volume II, p. 10). Russian BEI employee, Mr. Boris Bratslavsky (Depo., p. 44), admitted that co-employees would "jokingly" tell other co-employees "English only" both on and off the clock and during the lunch break. Some charging parties were called disparaging names in Spanish and English (e.g., M. Aponte, Depo., Volume 3, pp. 51-53), whereas others were warned that they would be terminated for speaking their native language. Export Manager, Mr. R. McCormick (Depo., pp. 76-77) confirmed that supervisors were familiar with and used Spanish curse words and joked in Spanish (e.g., R. A. Piccirillo, Depo., p. 48). Supervisor T. Buonocore told charging party, Ms. W. Miranda (Depo., pp. 95-96), that Puerto Ricans were hard-headed and stubborn. Supervisor R. McCormick (R. Cohen, Depo., p. 164) yelled in the warehouse where many employees heard him, that he was not going to lose his job over these *"fucking Puerto Ricans."* Mr. Larry Sussman, BEI Vice President, (Depo., pp. 80-81) not only considered the comments discriminatory, but counseled the supervisor that his behavior was inappropriate.

This harassing verbal behavior has all of the linguistic earmarks of stereotyping Puerto Ricans as a group, rather than viewing them as individuals. See, for example, Supervisor F. Pineros (Depo., p. 364) comments in his testimony that Puerto Ricans are, *"naturally loud."* As the policy enforcement escalated, the few settings in which the charging parties could speak their language without threat — lunch hour, in the bathroom, and outside the warehouse — were soon eliminated, making the entire BEI premises a threatening setting (Appendix I; M. Garcia, Depo., p. 71).

Charging party Ms. Cecilia Ortiz told AAA employee Ms. Nancy Maldonado that she did not like the job at BEI because she felt like a prisoner. She was not able to speak to anyone while she was at work because her English was not good enough so she had to work in silence or be humiliated and screamed at if she spoke Spanish. Charging party, Ms. Madelyn Perez, said she never complained about the policy because one supervisor understood about her daughters' frequent asthma attacks. As a result, she felt as if her daughter and family came first; therefore, she consciously chose to suffer the humiliation and discrimination so that her family could get by.

Moreover, after testifying at May 2000 hearings on workplace discrimination, the monitoring and surveillance of Spanish speakers became harassing (Depositions of H. Acosta, pp. 86-89; M. Aponte, Vol. III, p. 36; M. Alvarez, p. 214). These employees could not thereafter count on sympathetic supervisors and managers to protect them from an unfair workplace rule. Because co-workers were actively monitoring them, any linguistic behavior charging parties could not control became a potential threat to their job security. The charging parties also felt that complaining was tantamount to losing their jobs.

### 4.4.7 Unusual Stress Levels Cause Charging Parties Physical and Emotional Changes

Constant self-monitoring and suppression of the native language is a significant burden placed on Hispanic employees because the human brain is pre-wired for language, just as the human body is pre-wired for breathing. The following list captures what charging parties suffered or felt when they were forced to follow the English-only rule every day:

- sad, bad, unhappy or depressed; some were so depressed that they had to take medication
- sleeplessness or insomnia, nightmares
- irritability and/or unusual stress in familial relationships, stressed out, frustrated
- nervousness, anxiety or anxiety attacks
- headaches, muscle spasms, weight gain, high blood pressure, heart-related problems such as palpitations and erratic heartbeats, and pre-heart attack symptoms requiring medication
- fear of being yelled at[23] for speaking Spanish, of others speaking Spanish at work; or that future employers would discriminate against them due to their Spanish dominance
- conflicted (over trying to decide whether to leave BEI)
- mad and/or out of control
- discriminated against
- traumatized watching Hispanics being fired or discriminated against because they were speaking Spanish

---

[23] One charging party, R. Lugo (Deposition, p. 46) was already traumatized before being fired from BEI because of a dispute with a high school substitute teacher who had a speak-English-only rule in Boston. Ms. Lugo opposed the rule, had an altercation with the teacher, and was ultimately expelled from school.

The preceding list documents the far reaching effects of BEI's English-only policies on the health and well-being of its limited and non-English speaking and Spanish dominant bilingual, Hispanic employees.

### 4.5 Conclusions

Research and theory in sociolinguistics, sociology, and cultural anthropology has established that ethnicity and language are inextricably tied. To exclude workers based on their linguistic characteristics, without evidence of a legitimate job-related purpose is, as a practical matter, to exclude them on the basis of their national origins.

BEI's English-only language policy harmed its limited English-speaking employees by creating in them a reasonable understanding that they were being disciplined, demoted, and fired due to linguistic traits they possessed as a result of being members of a particular national origin or ethnic group, rather than because of their job skills.

## IV. METHODS USED TO PREPARE MY REPORT WERE THOSE COMMONLY AND WIDELY USED BY LINGUISTS IN THE PRODUCTION OF SCIENTIFIC EVIDENCE

The methods I used to generate my report included an extensive review of relevant articles, citations, and books related to the topics at issue. The sociolinguistic and linguistic theories I relied upon are widely accepted and have appeared in peer reviewed journals, chapters, and books. I examined the job tasks for their linguistic/communicative properties, and I also relied upon a personal interview technique using a standardized sociolinguistic language use questionnaire to conduct my interviews of charging parties. In addition, I used the Chall Qualitative Assessment of text difficulty for readability to generate complexity estimates of various BEI documents pertinent to this case. Finally, I used sociolinguistically accepted role-play techniques in order to elicit language samples in English and the native language from charging parties in their interviews. I checked the validity of the generated language samples through observing the workplace, by reading and analyzing BEI job-related documents, examining the depositions of BEI managers and supervisors, and by examining the frequency of occurrence across the charging parties' interviews and depositions.

All of the aforementioned methods and techniques are generally and widely accepted practices by linguists in my field as is exemplified by the various citations throughout my report. These methods have been in use for decades and are widely published in peer reviewed linguistic journals. Their collective use is considered highly reliable for generating scientific evidence in the linguistic community. Therefore, the opinions — stated in this report — are based on my specialized linguistic knowledge and the reliable technical and scientific methods and theories used to generate data by linguists.

## V. MAJOR REFERENCES RELIED UPON

Aitchison, J. (1993). Teach yourself linguistics. Chicago: NTC Publishing Group.

Allport, G. (1954). The nature of prejudice. Cambridge, MA: Addison-Wesley Publishers.

Amato (Richard-Amato), P. A. (1996). Making it happen: Interaction in the second language, from theory to practice (2d ed.). White Plains, NY: Longman.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). Standards for educational and psychological testing. Washington, DC: American Psychological Association.

Anastasi, A. (1988). Psychological testing. New York: Macmillan Publishing Co.

ANSI (American National Standards Institute). (1987). Criteria for Safety Symbols. ANSI Z535.3, draft. And, Safety Color code, ANSI Z535.1, draft. New York: National Electrical Manufacturers Association.

Appel, R., & Muysken, P. (1987). Language contact and bilingualism.

Auerbach, A. P. (May, 1994). Note: Language classifications and the equal protection clause: When is language a pretext for race or ethnicity? Boston University Law Review, at 481.

Bachman, L. F. (1990). Fundamental considerations in language testing. Oxford: Oxford University Press.

———, & Palmer, A. S. (1996). Language testing in practice. Oxford: Oxford University Press.

Bandura, A. (1977). Social learning. Englewood Cliffs, NJ: Prentice Hall.

Barrett, R. S. (1996). Fair employment strategies in human resource management. Westport, CT: Quorum Books.

Bloom, B., Krathwohl, D., & Anderson, L. W. (2001). A taxonomy for learning, teaching, and assessing: A revision of Bloom's taxonomy of educational objectives. New York, NY: Longman.

Borjas, G. J. (1994). The economics of immigration. Journal of Economic Literature, 32, 1667-1717.

Bourdieu, P. (1977). The economics of linguistic exchanges. Social Science Information, 16, 645-88.

Brown, H. D. (1987). Principles of language learning and teaching, 2nd edition. Englewood Cliffs, NJ: Prentice-Hall, Inc.

Brundage, D. H., & MacKeracher, D. (1980). Adult learning principles and their application in program planning. Toronto: Ontario Institute for Studies in Education. Central Intelligence Agency. (2001). November 23, 2003, www.cia.gov/cia/publications/factbook..

Chall, J. S., Bissex, G. L., Conrad, S. S., & Harris-Sharples, S. (1996). Qualitative assessment of text difficulty. Cambridge, MA: Brookline Books.

Chang, W. B., & Araujo, M. U. (1975). Interpreters for the defense: Due process for the non-English-speaking defendant. California Law Review, 63(3), 801-23.

Chen, E. (1999, May). Speech. Asian Law Journal Symposium on Labor and Law, at 223.

Chomsky, N. (1988). Language and problems of knowledge: The Managua lectures. Cambridge, MA: MIT Press.

———. (1985). Knowledge of language: Its nature, origin and use. New York: Praeger.

Collier, V. (1992). A synthesis of studies examining long-term language minority data on academic achievement. Bilingual Research Journal, 16(1-2), 187-212.

Connecticut. (2002, December 18). Latinos in a suburban frame of mind. December 18, 2002, http://www.ctnow.com/news/localal/hc-hispmain1218.artdec18.story.

Connecticut General Assembly. (2003). Proposed House Joint Resolution No. 16, LCO No. 482, October 9, 2003, http://www.cga.state.ct.us/2003/tob/h/2003HJ-00016-R00-HB.htm.

Court Interpreters Act of 1978, Pub. L. 95-539, 92 Stat. 2040 (codified at 28 U.S.C. § 1827 (1978)).

Crawford, J. W. (2003). Website devoted to English-only topics and legislation. arc.html. October 10, 2003, http://ourworld.compuserve.com/homepages/jwcrawford/home.htm; and, http://www.humnet/linguistics/people/grads/macswan/legislation.

———. (2000). Proposition 222: A new phase of the English-only movement. In R. D. González & I. Melis, Language ideologies, Volume 1, 28-61. Urbana, IL: NCTE & Lawrence Erlbaum Associates, Inc.

Cronbach, L. J. (1970). Essentials of psychological testing, 3rd ed. New York: Harper & Row.

Cummins, J. (1989). Language and literacy acquisition in bilingual contexts. Journal of Multilingual and Multicultural Development, 10(1), 17-31.

———. (1986). Empowering minority students: A framework for intervention. Harvard Educational Review, 56, 18-36.

Curtain, H., & Pelosa, C. A. (1994). Language and children: Making the match (2d. ed.). White Plains, NY: Longman, (ERIC Document Reproduction Service No. ED 376 717).

Darwin, C. R. (1874). The descent of man and selection in relation to sex (2nd ed.). New York: Hurst & Co.

De Bot, K., & Schreoder, R. (1993). Word production and the bilingual lexicon. In R. Schreoder & B. Weltens (Eds.). The bilingual lexicon. Philadelphia: John Benjamins Publishing Co., pp. 215-248.

Domengeaux, J. H. (1986). Comment: Native-born Acadians and the equality ideal. Louisiana Law Review, 46, 1151.

Eagleton, T. (1991). Ideology: An introduction. New York: Verso.

Edwards, J. (1985). Language, society, and identity. New York: Basil Blackwell.

Equal Employment Opportunity Commission. (2003). November 23, 2003 http://www.eeoc.gov/.

Espenshade, T. J., & Fu, H. (1997). An analysis of English-language proficiency among U.S. immigrants. American Sociological Review, 62, 288-303.

Fishman, J. A. (1989). Language and ethnicity in minority sociolinguistic perspective. Clevedon, UK: Multilingual Matters, Ltd.

———, Gertner, M. H., Lowy, E. G. & Milan, W. G. (1985). The rise and fall of the ethnic revival: Perspectives on language and ethnicity. New York: Mouton.

———. (1971). Bilingualism in the barrio. The Hague: Mouton.

———, Nahirny, V. C., Hofman, J. E. & Hayden, R. G. (1966). Language loyalty in the United States: The maintenance of non-English mother tongues by American ethnic and religious groups. The Hague: Mouton.

Fodor, J. A. (1983). The modularity of mind. Cambridge, MA: MIT/Bradford.

Gardner, R. C., & Lambert, W. E. (1972). Attitudes and motivation in second language learning. Rowley, MA: Newbury House.

Ghiselli, E. (1973). The validity of aptitude tests in personnel selection. Personnel Psychology, 25, 461.

González, R. D. (1991). Bilingual interactions in a formal setting: A pilot study of Hispanic employees of the city of Tucson. Renato Rosaldo Lecture Series Monograph. Tucson: Mexican American Studies Center, University of Arizona.

———., Vásquez, V. F., & Mikkelson, H. (1991). Fundamentals of Court Interpretation: Theory, Policy and Practice. Durham, NC: Carolina Academic Press.

———., Vásquez, V. F., & Schott, A. (1988). The English language amendment: Examining myths. English Journal, 77(3), 24-30.

Gumperz, J. J. (1989). Deposition of John J. Gumperz in the matter of El Rescate, et al. vs. Executive Office for Immigration Review, et al., No. CV 88-01201 WPG, United States District Court for the Northern District of California.

Green, D. W. (1993). Towards a model of L2 comprehension and production. In R. Schreoder & B. Weltens (Eds.). The bilingual lexicon. Philadelphia: John Benjamins Publishing Company, pp. 249-277.

Griliches, Z., & Mason, W. M. (1972). Income and ability. Journal of Political Economy, 80 (3), 574.

Grosjean, F. (1997). Processing mixed languages: Issues, findings and models. In A. M. B. de Groot & J. F. Kroll (Eds.). Tutorials in bilingualism: Psycholinguistic perspectives. Mahwah, NJ: Lawrence Erlbaum Associates, pp. 225-254.

Grosjean, F. (1982). Life with two languages: An introduction to bilingualism. Cambridge, MA: Harvard University Press.

Hakuta, K. (1986). Mirror of language: The debate on bilingualism. New York: Basic Books.

Hall, E. T. (1959). The silent language. New York: Doubleday.

Hart-González, L. & Feingold, M. (1990). Retention of Spanish in the home. International Journal of the Sociology of Language, 84, 5-34.

Haugen, E. (1956). Bilingualism in the Americas: A bibliography and research guide. Alabama: University of Alabama Press.

Heckman, J., & Sedlacek, G. (1985). Heterogeneity, aggregation, and market wage functions: An empirical model of self-selection in the labor market. Journal of Political Economy, 93 (6), 1077.

Higgs, T. V., & Clifford, R. (1982). The push toward communication. In T. V. Higgs (Ed.). Curriculum, competence, and the foreign language teacher (pp. 57-79). ACTFL Foreign Language Education Series, Vol. 13. Lincolnwood, IL: National Textbook.

Hill, J. (2001). The racializing function of language panics. In. R. D. González & I. Melis, Language ideologies, Volume 1, 28-61. Urbana, IL: NCTE & Lawrence Erlbaum Associates, Inc.