**APPENDIX F:**                **Educational Attainment of Charging Parties**

|  |  | English Education | Spanish Education |
|---|---|---|---|
| 1. | H. Acosta* | | 2nd Year of High School, P.R. |
| 2. | M. Alvarez* | | 4th Year of High School, P.R. |
| 3. | L. Andujar* | G.E.D., CT | |
| 4. | M. Aponte* | | 9th Grade, Middle School, P.R. |
| 5. | J. Benabe* | | 8th Grade, Middle School, P.R. |
| 6. | B. Berrios* | G.E.D., CT | 11th Grade, High School, P.R. |
| 7. | M. de Jesus* | | 9th Grade, Middle School, P.R.<br>G.E.D., Public Library, P.R.<br>Cosmetology Degree, P.R. |
| 8. | E. Diaz* | ESL, 1 year, CT | 6th Grade, P.R. |
| 9. | M. Garcia* | Training, Avoiding Contagious<br>Diseases, Philadelphia, PA<br>Courses, Science & Business<br>Institute, PA<br>Training, Headstart Substitute<br>Teacher, PA<br>2 Years Community College, NY | High School Graduate, P.R. |
| 10. | R. Green | | 3rd Grade, Elementary School, P.R |
| 11. | R. Lugo* | G.E.D. & Computer Course, CT | |
| 12. | C. Ortiz* | ESL, Level 4 and<br>Computer Courses, CT | 9th Grade, High School, P.R.<br>Coursework, Cosmetology, P.R.<br>G.E.D., P.R. & |
| 13. | M. Perez* | 9th Grade, High School, CT | |
| 14. | R. Rojas* | | 11th Grade, High School, P.R. |

* Indicates Charging Party was born in Puerto Rico. The native language of residents and language of the public schools in Puerto Rico is Spanish. The federal court in Puerto Rico must use federally certified interpreters for almost all of its witnesses in order to meet the legal requirement of maintaining the record of legal proceedings in English.

**APPENDIX F CON'T.:**        **Educational Attainment of Charging Parties**

|     |              | English Education | Spanish Education |
|-----|--------------|-------------------|-------------------|
| 15. | W. Torres*   | 10th Grade, High School, CT | 9th Grade, High School, P.R. |
| 16. | W. Miranda*  | 6-8 months, ESL, CT | 12th Grade, High School, P.R. and Computer Course in P.R. |

* Indicates Charging Party was born in Puerto Rico. The native language of residents and language of the public schools in Puerto Rico is Spanish. The federal court in Puerto Rico must use federally certified interpreters for almost all of its witnesses in order to meet the legal requirement of maintaining the record of legal proceedings in English.

**APPENDIX G:**       **Jobs Charging Parties Held with Defendant BEI**

| | Name | Job | #Years Working |
|---|---|---|---|
| 1. | H. Acosta | Forklift operator and driver. | 16 |
| 2. | M. Alvarez | Driver's helper, Driver, Warehouse Supervisor's Assistant, and Shipping and Receiving. | 18 |
| 3. | L. Andujar | Stocking, pulling, packing, damaged products cleaning, and cosmetics. | 4 |
| 4. | M. Aponte | Puller and cleaner. | 2 |
| 5. | J. Benabe | Stocking. | 2 |
| 6. | B. Berrios | Large order puller. | 1 |
| 7. | M. de Jesus | Puller. | 1 |
| 8. | E. Diaz | Warehouse clerk. | 23 |
| 9. | M. Garcia | Packing and picking. | 2 |
| 10. | R. Green | Packing. | 2 |
| 11. | R. Lugo | Pulling, packing, repacking, and training. | 2 |
| 12. | C. Ortiz | Puller and packer. | 2 |
| 13. | M. Perez | Puller and packer. | 2 |
| 14. | R. Rojas | Puller and packer. | 1 |
| 15. | W. Torres | Driver's helper and Driver. | 18 |
| 16. | W. Miranda | Puller and packer. | 2 ½ |

APPENDIX  H

No. 99-1908

IN THE
## Supreme Court of the United States

JAMES ALEXANDER, in his official capacity as the Director
of the Alabama Department of Public Safety, and the
ALABAMA DEPARTMENT OF PUBLIC SAFETY,

*Petitioners,*

v.

MARTHA SANDOVAL, individually and on behalf of all
others similarly situated,

*Respondents.*

*On Writ of Certiorari to the
United States Court of Appeals
for the Eleventh Circuit*

## BRIEF FOR BEAUTY ENTERPRISES, INC., AS
## AMICUS CURIAE IN SUPPORT OF PETITIONERS

*OF COUNSEL*
Richard C. Robinson
SOROKIN, GROSS
& HYDE, P.C.
One Corporate Center
Hartford, CT 06103

Joseph E. Schmitz*
Gregory S. Walden
Matthew F. Stowe
PATTON BOGGS LLP
2550 M Street, NW
Washington, D.C. 20037
(202) 457-6086
*Counsel of Record*

November 13, 2000

2

cosmetics, etc.) designed primarily for African-Americans and other people of color. Today, it has customers in almost every region of the country, and in addition to its warehouse in Hartford, it has warehouses in: Birmingham, Alabama; Romulus, Michigan; Brooklyn, New York; Baltimore, Maryland; and Capital Heights, Maryland. It employs approximately 325 people. One third of its work-force is African-American. Twenty-two percent are Hispanic. Eleven percent are recent immigrants from countries such as Russia, Poland and Bosnia.

The question presented to this Court may well entail consideration of English-only workplace practices and policies such as the one that has been adopted by BEI. Specifically, this Court may decide in this case whether language can be equated with a person's national origin, such that the adoption and maintenance of an English-only practice or rule can be considered national origin discrimination in violation of a Title VI disparate impact regulation, at least under certain circumstances. BEI is vitally interested in this issue because it long ago adopted and has continuously maintained a Speak Only English rule for its workforce. A decision in this case may well have implications for BEI under Title VII. It is important, therefore, that this Court understand the very practical business interests that led BEI to adopt its English-only workplace rule. Reported cases confirm that these interests are not unique to BEI, but are present in most businesses with a similarly diverse workforce.

## SUMMARY OF ARGUMENT

The Court should reverse the holding below in *Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999), which otherwise could be construed to prevent English language workplace policies that are no more discriminatory than the English-language texts of the Declaration of Independence and Constitution of

3

the United States of America. The 11th Circuit's holding that
"Title VI flatly prohibits . . . English language policies that
cause disparate impact on the basis of national origin" (citing
*Lau v. Nichols*, 414 U.S. 563 (1974)) contorts this Court's
ruling in *Lau*, the underlying premise of which was that
ethnically Chinese American citizens who do not understand
English need to be taught English first in order to participate
fully in public schools. Finally, amicus respectfully urges the
Court to clarify that nothing in *Lau* or in any law of the United
States should be construed to prohibit workplace policies that
require utilization of our common American English language
for sound business reasons, including workplace safety,
harmony, and efficiency. American workers deserve no less.


## ARGUMENT

I. *LAU V. NICHOLS* NEITHER SUPPORTS THE 11TH
CIRCUIT HOLDING THAT "TITLE VI FLATLY
PROHIBITS . . . ENGLISH LANGUAGE
POLICIES THAT CAUSE DISPARATE IMPACT
ON THE BASIS OF NATIONAL ORIGIN" NOR
PROVIDES ANY NOTICE THAT "ENGLISH
LANGUAGE POLICIES, WHICH CAUSE A
DISPARATE IMPACT," MAY BE ILLEGAL.

The 11th Circuit held that "Title VI flatly prohibits . . .
English language policies that cause disparate impact on the
basis of national origin," *Sandoval v. Hagan*, 197 F.3d at 495,
and that "*Lau* and it subsequent legislative history . . .
unambiguously notify state recipients of federal funds that
English language policies, which cause a disparate impact on
the ability of non-English speakers to enjoy federal benefits,
may violate Title VI." 197 F.3d at 497. *Amicus* respectfully
suggests that *Lau*, if it remains good law, does not support the
Court of Appeals' holding that Alabama's English-language
requirements for drivers constitutes national origin

8

conclusion." 894 F. Supp. at 940 (quoting *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 94-95 (1973)).

Were this Court to affirm the 11th Circuit, employers in BEI's position – *i.e.*, employers with no intention of doing anything discriminatory and who simply wish to create a workplace that is safe and free of ethnic tension for its diverse workforce – would no longer be able to use a Speak English Only rule to accomplish these objectives, absent business *necessity*, as determined by some outside agency, either the EEOC and/or a federal district court.

BEI's English language workplace rule was the result of a sound and reasoned business decision. More than twenty years ago, as the then fledgling BEI was starting to grow, its founder and President, Robert Cohen, personally observed that there was tension and low morale within certain segments of his warehouse workforce and that this was adversely affecting the efficiency of the operation. He was determined to discover the reasons, and, to this end, embarked upon an investigation that consisted of discussions with employees and extensive observations of employee behavior in BEI's warehouse. Cohen discovered that the principal cause of the tension and low morale was that there were English-only speaking employees, including many African-Americans, who thought that they were being ridiculed by Spanish-speaking employees in a language they did not understand – Spanish. On several occasions, this perception actually led to fights in the warehouse.

This discovery led Cohen to consider a Speak Only English rule. He concluded that such a rule would not only eliminate these distressing encounters between his Spanish-speaking and non-Spanish-speaking workers, but it would eliminate, or at least reduce, other problems as well, one of which was safety-related.

11

decreased and efficiency improved. And for more than twenty years, there were few, if any, complaints from employees. The vast majority of the workforce, regardless of their native language, has always endorsed the rule and enthusiastically embraced it.

Recently, however, a local Hispanic politician (a state legislator from Hartford) colluded with a disgruntled former employee, another Hispanic, and enlisted a small group of BEI Hispanic employees (fifteen to be exact[3]), to file disparate impact national origin discrimination charges with the EEOC based on BEI's workplace Speak Only English rule. The motivation for this action remains unclear. Nonetheless, despite the fact that the EEOC's guideline on the subject, deeming such rules presumptively illegal,[4] has been rejected by at least two Courts of Appeals, the EEOC invoked its "Speak-English-only rules" guideline to find reasonable cause and threaten suit based on an alleged disparate impact upon BEI's Spanish-speaking employees.

A Supreme Court decision in the instant case squarely holding that language cannot be presumptively equated with national origin will end this threat to BEI's long standing rule and preserve the workplace benefits this rule has produced – benefits not only to BEI's business, but also to its employees whatever their national origin. In contrast, a contrary decision may well require BEI again to experience the very real and very serious problems that its Speak Only English rule has largely eliminated.

---

[3] Of these fifteen, only five are full-time BEI employees. The remaining ten are placed individuals from temporary staffing organizations.

[4] The EEOC guideline ("Speak-English-only rules") provides that the EEOC "will presume that a rule [requiring employees to speak only English at all times in the workplace] violates Title VII and will closely scrutinize it." 29 C.F.R. 1606.7(a). "An employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity." 29 C.F.R. 1606.7(b).

**APPENDIX I:**    **Forms of Discipline Administered by Defendant**

1.    Cursed at by supervisor/owner.

2.    Threatened/warned could be fired.[**]

3.    Warned not to speak Spanish.[**]

4.    Warned to speak only English.[**]

5.    Suspension from work without pay.

6.    Threatened with or received
      (written) warning.[**]

7.    Monitored, followed, harassed.

8.    Told to go outside to speak Spanish.

9.    Told not to speak Spanish outside.

10.   Told to leave premises to speak
      Spanish.

11.   Observed others threatened, warned,
      not hired or being fired for speaking
      Spanish.

12.   Terminated for speaking Spanish
      or other specious reason.

13.   Demoted, loss of pay/overtime.

14.   Socially isolated.

15.   Quit due to harassment/stress.

[*]Indicates that individual participated in May 2000 public protest on Latinos and Workplace
Discrimination.

[**]Often the warning or threat was yelled or screamed at Charging Parties in plain view of co-workers,
sometimes in loud aggressive tones at other times soft and intimidating or threatening, causing the
Charging Party humiliation and feelings of isolation. In some instances, the screaming was so abusive that
the person being screamed at was reduced to tears. In one instance the Charging Party, Margarita Aponte
became ill and was rushed to an emergency room.

# APPENDIX J

Transcription of Bob Cohen on Brad Davis Radio Show
- Approximately March/April, 2001

BD: Beauty Enterprises, Incorporated, Cohen who runs the Company; a policy that he started twenty years ago, "English only" and, ah, Minnie Gonzalez, the Representative from the South end of Hartford from the Puerto Rican community got some members of that community to protest, carry signs, "racist" everything else, you know what protests are like, demonstrations. I told you I received a call from Mr. Cohen after that broadcast and I invited him on my program this morning, and I have him on the line, Robert, good morning!

BC: Good morning, Brad.

BD: and* I thank you very, very much Sir for being with me, now, first, your Company, the majority of employees are from the minority community, is that correct?

BC: Over 63% are minorities, approximately 25% are Spanish.

BD: Now, 20 years ago, you instituted an English only policy. Why?

BC: Well, it was done for a number of reasons but basically to avoid a lot of confrontation. Also when they were picking orders, it made it a lot easier if everybody spoke the same language; a lot of times people'd be talkin' different languages, there'd be items out of stock that were not out of stock, so we made it a rule that everybody has to speak English. The rule has been in effect over 20 years, everybody who works for us has to be able to speak English as well as write English. 'Cus we employ, oh, ah, immigrants from Poland, Russia, the Ukraine, Bosnia, Vietnam, as well as Spanish. And of course we have a large Black employee base as well.

BD: you know, and, and, and, Robert, I just couldn't figure this out, when I saw this picture, in the paper, ah, what they are trying to do; I mean, its wrong, you have a right, as a business man to establish, you know, what you want; the regulations in your, in your Company*did you have anybody else complain that's worked for you over the years?

BC: Well the funny part about it, the five employees that originally are the full time employees of Beauty Enterprises, and there are ten others that are working for an employment based operation, they're not employees of ours, the five employees have been with us for a total of 98 years. It is unbelievable, we knew nothing about this, until one morning we got a phone call from one of our other Spanish employees that here's been a problem and its in the Spanish newspaper regarding the five employees. They have never once, ever came in to see me or any one of our other empl*our other managers, 'cus we have an open door policy in our company. Not once were we ever advised that there was a problem, now these 5 employees again, that have been with us, again, a total of 98 collective years.

BD: And speak English.

BC: Of course, they have to speak English in order to work for us.

BD: Boy this is, uh, when you see a story like this in the Hartford Courant, it just smacks of a set up Robert. What are you going to do? Are they continuing to attack you?

BC:  Well, here's what happened just this past weekend, Mrs. Gonzalez was going around to all the stores in the North end of Hartford, as well as the Park Street area advising all the stores not to buy from us.  Now, what that does is create that they're just trying to put us out of business.  It doesn't make sense.  We are going to fight this, we will go up to the Supreme Court, we are already going to have a docket; I think we're going to be in the Superior Court in the state of Connecticut, because what we are doing is totally illegal.  The state of Connecticut has a ruling that in other words English only is legal and that is what we enforce.

BD:  You know, but to get back to Minnie Gonzalez, here she is going around to stores in the Black community, this is not going to work, by the way, Robert.

BC:  Not at all, we're getting more business right now than ever.

BD:  Of course, but she's going around to these stores; does she realize that the people she is hurting are the ones that you are employing from her community?

BC:  Ah, I guess she doesn't realize that, and I want to say also that the five employees that we are talking about, all of our employees, we have, they have in their retirement fund, that is totally funded by Beauty Enterprises, they have over $100, 000, to talk about some of these 5 employees, so it doesn't even make sense.  We are a fabulous employer.  40% of our employees have been with us for over 5 years.  Now that is a record because you are talking about a lot of minorities working in a warehouse, we have excellent benefits, what she is trying to do, I don't know, I can't understand it.

BD:  Well, I think it is obvious, I think its obvious and again, Robert, this is the reason I spoke out the other morning and I am so glad that you called me and I'm so glad that you are going to go all the way, if you have to go to the Supreme Court, you're going to do there because this is absolutely outrageous what Gonzalez is doing and some members of the Puerto Rican community, when they are hurting their own community.

BC:  Absolutely.  Absolutely.  I agree with you 100%.

BD:  How many employees do you have at Beauty Enterprises?

BC:  We have approximately, presently our Company has 340 employees; we are the largest minority employer in the redevelopment land in the city of Hartford, in Hartford we employ approximately 200 people.

BD:  And you're, I mean, this is a national Company?

BC:  Yes we're the largest distributor of Black products in the United States, I guess in the world really, 25% of our business is done in export into Europe and Africa.

BD: And Robert, wouldn't you think this is what we need in the Capital city?  This is what we need to build the economic base.

BC:  Absolutely and all she is doing is causing dissention with our workers against the Spanish workers. It really, really doesn't make sense.  It is a political issue that Minnie Gonzalez is getting involved with and also the John Figueroa he made a statement that we had fired people, we have never - to my knowledge, and I will say that - ever, ever fired anybody for speaking Spanish on the job.  They are allowed to speak Spanish or any language they want on their break or on their lunch hour, but no one has ever, ever been

BD: And, of course, you want orders taken and everything else in English.

BC: Of course, it makes for a much easier, uh, way to*.(muffled)

BD: Well, some of the other employees, some of the other employees, Robert, must be really upset.

BC: Well, uh, its only five that are causing the problem*.(muffled)

BD: Yeah, but I know, they must be upset about this being said about your Company.

BC: *problems in the Company. Absolutely. But we are going to stand by our guns out here and we are going to stand and we will go to Court against the EEOC because they are wrong. We have been proven right and uh, we are doing what is right legally.

BD: Let me say this publicly, if there's anything that we can do to help you, if you, you know, need a forum, if you call me up, we'll go right on the air and we'll follow this right through. I want you to know that.

BC: Thank you very much Brad. I want to say also, that, we have a lot of support we have received letters from individuals, I don't even know who they are, supporting our stand, so we really feel good about it. We really thank you, Brad, for allowing us to be on the radio.

BD: Robert Cohen. Beauty Enterprises, Inc. and we'll be following the story. Robert, good luck to you.

BC: Thank you Brad.

BD: We'll be right back after the 7:30 news*(fade out).