EEOC vs Beauty Enterprises
3/12/2004                                                                              Roseann Duenas Gonzalez

Page 78

1   Q   Okay. Did you use any models for the
2   questionnaire?
3   A   A model --
4   Q   Other than the standard format that -- for
5   some of the introductory questions, is that what you're
6   telling me?
7   A   Yes. Yes.
8   Q   Did you use any models?
9   A   Models in terms of the actual questionnaire?
10  Q   Yes.
11  A   No. But I used standard, widely accepted
12  methods of data collection in order to write the
13  questions that I was asking. And I used standard,
14  accepted-in-the-field ways of getting at that
15  sociolinguistic information about the job, about the
16  communicative tasks on the job, how to best elicit
17  questions about the kind of language that they were
18  using on the job. And I used standard accepted, widely
19  accepted ways in the literature of eliciting language
20  samples from the people, because I was really
21  interested in understanding how much they could
22  actually speak English to do the kinds of things on
23  their job.
24  Q   Okay. Did you use any questionnaires that --
25  for this case that you've used in other cases?

Page 79

1   A   No.
2   Q   Did you prepare -- did you have any
3   sociolinguistic articles, materials, pieces of
4   literature in front of you that you were consulting as
5   you were writing these questions?
6   A   Yes.
7   Q   As opposed to the materials from the case?
8   A   Yes.
9   Q   What did you have in front of you?
10  A   I had Gumperz -- several pieces of Gumperz
11  works, Hymes, Fishman, Rossman. All kinds of
12  qualitative data collection guides. And I consulted
13  with an expert in the -- in my field.
14  Q   Who?
15  A   Roger Shuy.
16  Q   Who's he?
17  A   He's emeritus of Georgetown University. He's
18  one of the most renowned sociolinguists in the United
19  States.
20  Q   You didn't mention he was one of the top
21  three.
22  A   No.
23  Q   He's not in the top three?
24  A   He's -- there is many, many good
25  sociolinguistics.

Page 80

1   Q   He lost in the semifinals of the tournament,
2   so he's not going to be -- you know.
3       All right. Now, how do I know -- can you
4   give me -- if I asked you to prepare a list for me of
5   the sociolinguistic materials that you had in front of
6   you when you were preparing this questionnaire, could
7   you do it?
8   A   Yes.
9   Q   Could you do it now?
10  A   I can go to my bibliography and tell you a
11  few. I don't know if all of them are there.
12  Q   Well, your bibliography has 400-some-odd
13  items on it.
14  A   Uh-huh. Yes.
15  Q   It's going to help you looking through those
16  400 items to know what you had in front of you? Let me
17  do it this way. You don't say you had all those 400
18  items in front of you?
19  A   No.
20  Q   And you don't say that you actually read all
21  of those pieces of literature or books or monographs
22  that you've listed as major references relied upon
23  within the time period that you worked on this case for
24  the purpose of working on this case, are you?
25  A   All of them?

Page 81

1   Q   Yes.
2   A   No. But I consulted the majority of them.
3   Q   And consulting can mean, you know, you looked
4   for -- you look at a page in the book, right?
5   A   It could be that, or it could be reading a
6   whole section or a whole article.
7   Q   Right. So go ahead. Try to tell me what you
8   had in front of you when you did the questionnaire.
9   A   I don't know that if I listed the kinds of
10  things I looked at except perhaps --
11  Q   I'm not looking for the kinds of things, I'm
12  looking for the exact things.
13  A   Okay. Fishman, "Bilingualism in the Barrio,"
14  1971. Hart-Gonzalez & Feingold --
15  Q   What's that? That is the authors. What's
16  the --
17  A   It's an article.
18  Q   What's the title of the article?
19  A   "Retention of Spanish in the Home."
20  MacGregor-Mendoza.
21  Q   Let me stop you there for -- recognizing that
22  there may be more, I'm not suggesting that those are
23  the only ones, but let's just take these three.
24      If I went to Fishman, would I find sample
25  questionnaires that you relied upon?

EEOC vs Beauty Enterprises
3/12/2004                                                                   Roseann Duenas Gonzalez

Page 82

1  A  Partial ones, yes.
2  Q  And if I went to Hart -- the Hart-Gonzalez &
3  Feingold --
4  A  Feingold.
5  Q  -- Feingold article, would I find
6  questionnaires that you relied upon or descriptions of
7  questionnaires that were -- that you relied upon?
8  A  No. You would find characteristics of
9  factors that empirically have shown to impinge upon
10 language acquisition among adults.
11 Q  Give me the name again of the guy at
12 Georgetown.
13 A  Roger Shuy, S-H-U-Y. And there are many
14 other sources that are not listed on here that I relied
15 upon in terms of qualitative research in my field.
16 Q  When you say you consulted with this fellow
17 on this questionnaire, how did you do that as a
18 physical matter?
19 A  Talked to him on the phone.
20 Q  Anything else?
21 A  No.
22 Q  Do you have any notes of your discussions
23 with him?
24 A  No.
25 Q  Do you have any first drafts of this

Page 83

1  questionnaire?
2  A  No. I always overwrite what I am working
3  on.
4  Q  Were you paid by the hour for your work in
5  this case?
6  A  Yes.
7  Q  Have you kept time records for billing
8  purposes?
9  A  Yes.
10 Q  What do the records reflect? By that I mean
11 do they reflect time spent on a case on a particular
12 date?
13 A  Yes.
14 Q  Okay. Like today, your deposition?
15 A  Yes.
16 Q  3/12/04 deposition. Okay. And would it
17 indicate how much time you spent on that day performing
18 activities for that case -- for this case?
19 A  I think for the most part. Sometimes things
20 were lumped, like one activity would take up so many
21 days, I believe. I can't quite remember. But I think
22 it's both.
23 Q  So if -- but we should be able to get a fair
24 idea of what you did and when by looking at your -- at
25 your time records for this case, yes?

Page 84

1  A  I can't say that that would be absolutely
2  true because I might not have, you know, talked about
3  things in specificity. I might have just said,
4  "Prepare for" --
5  Q  You mean time records?
6  A  Yes. I might have said, "Prepare for
7  interviews" or prepare for this or that. And it
8  wouldn't have shown all of the various pieces that went
9  into that.
10 Q  Okay. But can you make your time records
11 available to me unless it -- well, can you make your
12 time records available to me?
13      MS. BISSELL: We'll look at them and
14 make them available.
15 BY MR. ROBINSON:
16 Q  Return to pages 1 and 2 of your report.
17 Always a good place to start.
18      You say you were asked by the -- you say
19 there that you were asked by the EEOC to investigate
20 and opine on four issues; is that right?
21 A  Yes.
22 Q  Is there a writing from the EEOC that asks
23 you to do these things?
24 A  I believe it's in the contract.
25 Q  So the answer is yes?

Page 85

1  A  Yes.
2  Q  Do you have the contract with you today?
3  A  No, I don't.
4  Q  Is there any reason you didn't bring -- I
5  mean, I know I didn't ask for them. Is there any
6  reason you didn't bring these things with you today?
7  A  I have three boxes of things that go with
8  this case. I'm sorry.
9  Q  Okay. But you'll be able to produce that for
10 me?
11 A  Yes.
12 Q  Now, when did the EEOC first contact you
13 about this case?
14 A  I believe sometime in -- this is just a
15 guess -- in 2001, I believe.
16 Q  I don't want you to guess. When you say
17 guess, you mean that it is my best recollection, but
18 it's pretty vague?
19 A  Yes. I hate to ask this, but could we take a
20 bathroom break?
21 Q  Go ahead. Just go.
22
23      (Recess: 12:07 pm to 12:12 pm.)
24
25 BY MR. ROBINSON:

Page 86

1  Q  I think I was asking you when the EEOC first
2  contacted you. And you said that to the best of your
3  memory, you could be right, you could be wrong, it was
4  sometime in 2001?
5  A  Yes. I believe so.
6  Q  Who first contacted you?
7  A  Ms. Palacios.
8  Q  And did you make notes of that
9  conversation?
10  A  I don't believe so.
11  Q  And you worked -- had you met Ms. Palacios
12  before?
13  A  No. Never.
14  Q  Okay. Did she tell you in -- then or ever
15  how she found you, how she came to call you?
16  A  I don't remember. I think it's through -- I
17  don't remember.
18  Q  You think through one of her colleagues from
19  some other case where you worked for the EEOC?
20  A  No. It wasn't that. It was some lawyer
21  somewhere, but I don't know who it was.
22  Q  Okay.
23  A  And that may not be correct. I just --
24  that's what I'm remembering.
25  Q  Did she talk to you about the case in that

Page 87

1  first phone call?
2  A  Yes.
3  Q  What did she tell you?
4  A  She basically just told me some of the facts,
5  that it was --
6  Q  What facts did she tell you?
7  A  That it was a company where -- a distribution
8  company and that there was a restrictive English-only
9  policy and that people were suing the company. And she
10  didn't say much more than that.
11  Q  Did she talk about the subject of your
12  involvement in that first conversation in this case?
13  A  Not directly. She said that would it be
14  something that would -- that I believed that I had time
15  to do, would it be something that I felt like I had the
16  appropriate expertise to do, would it be -- I think
17  questions like that. It was really quite
18  exploratory.
19  Q  Okay. Do you remember anything else about
20  that first conversation?
21  A  No.
22  Q  Okay. What was the next contact you had with
23  the EEOC or with Ms. Palacios regarding this case?
24  A  I think I received a bid solicitation from
25  the --

Page 88

1  Q  They put you out to competitive bidding?
2  A  Bid solicitation.
3  Q  Were you the lowest responsible bidder? Go
4  ahead.
5  A  I forget what -- who I got that from, but it
6  was some agency, government agency.
7  Q  Okay. Let me focus what -- let me try to
8  focus on what I'm really interested in. I'm really
9  interested in your -- how your assignment was either
10  communicated to you and/or developed with your input.
11  A  Okay. When I got the --
12  Q  So anything you have to say in that regard
13  can helpful to me.
14  A  When I got the bid solicitation, it was the
15  first time I actually saw the questions that the EEOC
16  was interested in me investigating. And it asked me
17  to -- and then it laid out a number of issues like
18  parts of the process of the case that -- where I would
19  have to help with things or write a report or do my
20  investigation or any way it laid all of these things
21  out. And then it was my job to write back a proposal
22  that would show how I would go about answering the
23  questions and actually proposing a study that would
24  help me form an opinion in the case.
25  Q  Okay. And what happened between the

Page 89

1  submission of your proposal to the contract stage as
2  far as the description of your assignment was
3  concerned?
4  A  When I turned in the solicitation -- the bid
5  and my proposal of how I would investigate these
6  questions, I never heard from anybody again until I
7  actually got a contract back in the mail. And then --
8  Q  It's the way the government works.
9  A  So that's the way it was.
10  Q  Was any negotiation over the contract
11  presented to you or was it signed as presented?
12  A  No, it was signed as presented.
13  Q  Okay. So there is a -- what you describe as
14  a request for proposal sent to you by the government?
15  A  Yes.
16  Q  And a proposal responding to the request from
17  you?
18  A  Yes.
19  Q  And a contract?
20  A  Yes.
21  Q  And do you have all those documents?
22  A  I believe so.
23  Q  And you can make them -- you can send them to
24  me?
25  A  Yes, if I can find them.

23 (Pages 86 to 89)

Page 90

1  Q  Well, the government has them, so they can
2  send them to me, too. Okay.
3       Now, according to page 2, the first issue you
4  addressed was -- withdrawn. Let me ask you some other
5  things first.
6       Did you help the EEOC with interrogatory
7  questions in this case?
8  A  No.
9  Q  Did you help them with requests for
10 production in this case?
11 A  I believe I was asked, "What would be
12 helpful?" And I think I wrote down a few things that
13 would be helpful to me to see.
14 Q  Okay. I'm going to ask you, if you can, to
15 answer these questions yes or no.
16 A  Okay.
17 Q  Did you help the EEOC in any way with
18 preparing for or conducting the depositions that it
19 took in this case?
20 A  I believe I asked --
21 Q  Just yes or no.
22 A  Okay. Yes. Yes.
23 Q  Okay. Good. It's easy. All right. Let's
24 talk about the first issue you have here on page 2.
25 Your evaluation of the necessity of the English-only

Page 91

1  rule at Beauty Enterprises by assessing the nature of
2  the language used on the job by Beauty's warehouse
3  employees. Or if I can put it slightly differently, to
4  evaluate the necessity of the English-only rule given
5  the nature of the work performed by the warehouse
6  employees. Is that a fair description of the first
7  issue?
8  A  I believe you read it straight out, yes.
9  Q  So it's very fair?
10 A  Yes.
11 Q  It's the fairest of descriptions, right?
12 A  Yes.
13 Q  But let me see if I can describe it even more
14 simply. Isn't the issue you're investigating whether
15 the observance of an English-only rule is necessary for
16 a picker to do the job of being a picker, and for a
17 packer to do the job of being a packer, and for a
18 checker to do the job of being a checker?
19 A  You mean for a --
20     MS. PALACIOS: I'm sorry, can you read
21 back that question?
22
23     (The testimony was read.)
24
25     MS. PALACIOS: Objection.

Page 92

1  BY MR. ROBINSON:
2  Q  And your question was do I mean 1-A?
3  Actually, I mean 1 to -- before the articulation of the
4  two specificallys.
5  A  I think I can't answer the question as you
6  posed it.
7  Q  Why not?
8  A  But I could tell you what I did.
9  Q  Why can't you answer the question as I posed
10 it?
11 A  Because it's simplifying.
12 Q  Okay. So it's an oversimplification of what
13 you did?
14 A  Yes.
15 Q  But it's part of what you did?
16 A  Yes. Now --
17 Q  Now, let's turn to the method that you used
18 to evaluate this issue. You say that you created the
19 language use questionnaire that we previously talked
20 about, right?
21 A  Yes.
22 Q  And you used the responses as data; is that
23 right?
24 A  Yes.
25 Q  And that's one aspect of the method that you

Page 93

1  used?
2  A  Yes. That's a qualitative, in-depth
3  interview.
4  Q  That's one aspect of the method that you
5  used, yes?
6  A  Yes.
7  Q  And another aspect is that you -- and I'm
8  reading -- that you elicited authentic language samples
9  to provide a linguistic description of the use and
10 functions of language in the workplace. Is that what
11 you -- is that what you wrote?
12 A  Yeah. Where are you reading from?
13     MS. PALACIOS: What page?
14     MR. ROBINSON: Okay. I figured that
15 out. I've got to figure out what page I've marked on
16 my notes.
17 BY MR. ROBINSON:
18 Q  Well, whether I can find it or not, is one
19 aspect of your approach that you elicited authentic
20 language samples to provide a linguistic description of
21 the use and functions of language in the workplace?
22 A  The language samples were to determine the
23 kind of communicative tasks -- one way of looking at
24 what the communicative tasks were on the job from the
25 interviewee's point of view and to actually look at the

Page 94

1  language that they spoke to see if they were able to
2  carry out the tasks in a functional way in English.
3  Q    Well, what do you mean by "authentic language
4  samples"?
5  A    In other words, I would say, Tell me exactly,
6  you know, how you ask a question about X. And then
7  they will give me the question in English and I will
8  write down that sample.
9  Q    Okay. So some of these authentic language
10 samples are obtained in discussions -- are words that
11 you obtained in discussions with the charging
12 parties?
13 A    Yes. Simulations.
14 Q    Right. What's Appendix D to your report?
15 Are those authentic language samples?
16 A    No. Appendix B is --
17 Q    D. D.
18 A    Oh, D. Appendix D are all the forms that I
19 looked at, the documents.
20 Q    But are they what you refer to as authentic
21 language samples?
22 A    No.
23 Q    No. Okay. Are there any authentic language
24 samples that you used, other than words spoken to you
25 in response to questions you asked of charging

Page 95

1  parties?
2  A    I used --
3  Q    Yes or no.
4  A    Yes.
5  Q    What are they?
6  A    The language in the depositions themselves
7  that you took of the plaintiffs and --
8  Q    Did a wonderful job, didn't I? Obviously
9  made your work just a pleasure, right?
10 A    And I also looked at the forms and documents
11 used on the job. And I didn't --
12 Q    Isn't that what Appendix D is?
13 A    Appendix D, they're really the forms. And I
14 kind of specify that I'm looking at these as reading
15 tasks. So that's a little bit different.
16 Q    Okay. So some of the things you're looking
17 at by way of authentic language samples are pieces of
18 paper you got from Beauty?
19     MS. PALACIOS: Objection.
20 A    No. I'm looking at that as forms for reading
21 purposes.
22 BY MR. ROBINSON:
23 Q    What do you mean a form for reading
24 purposes?
25 A    Okay. I asked the plaintiffs, and I did

Page 96

1  simulations with them, to get their authentic language.
2  I looked at the language that they spoke in in the
3  deposition to look at their language for other
4  purposes.
5  Q    What do you mean by forms for --
6  A    I'm talking about Appendix D as being samples
7  of the kinds of texts and forms that they have to
8  interact with in order to do their job.
9  Q    Right.
10 A    For reading.
11 Q    Right.
12 A    Yes.
13 Q    And so that's -- and is that included in what
14 you describe as authentic language samples to provide a
15 linguistic description of the use and function of
16 language in the workplace?
17 A    Yes.
18 Q    Okay. That's what I thought. Now, you also
19 say in terms of methodology that you conducted a
20 linguistic analysis of the Beauty Enterprises' job
21 descriptions. Now I'm on page 7 of your report. And
22 you created a chart of job tasks from a representative
23 sample of the positions.
24 A    Yes.
25 Q    Okay. Let me ask you some questions about

Page 97

1  this aspect of what you did.
2      First, is this what the pages in Appendix B
3  are all about?
4  A    Yes. Yes.
5  Q    So let's look at Appendix B, page 2. Now,
6  there, for example, you list the position of order
7  puller, correct?
8  A    Yes.
9  Q    You identify the job tasks of order puller
10 performance, correct?
11 A    Yes.
12 Q    And was the job description the sole source
13 of the job tasks -- that the job tasks that you listed
14 for this job?
15 A    Yes, as verified by depositions and by
16 interviewees. In other words, I used all the data
17 to -- but this particular analysis is on --
18 Q    But everything was consistent with the job
19 description?
20 A    Yes. Right.
21 Q    And then for each task that the puller
22 performs, you've got a column for linguistic skill, a
23 column for matching, and a column for other?
24 A    Yes.
25 Q    What do you mean by "linguistic skill"?

EEOC vs Beauty Enterprises

3/12/2004                                                               Roseann Duenas Gonzalez

Page 98

1   MS. PALACIOS: Well, it says language
2   skill.
3   MR. ROBINSON: No, it says linguistic
4   skill.
5   MS. PALACIOS: I have language.
6   MR. ROBINSON: You're not on page 2.
7   MS. PALACIOS: I'm sorry.
8   A   I'm sorry. I have language skill on the
9   first page.
10  BY MR. ROBINSON:
11  Q   Look at page 2.
12  A   Yes, on the second page I have linguistic
13  skill and it should be language skill, but it's the
14  same thing. It means can this only be done by through
15  the use of verbal language.
16  Q   Okay. Is it fair to say then that what
17  you're measuring here is whether or not an order puller
18  has to talk or otherwise communicate with others to
19  pick an order?
20  A   That's true.
21  Q   And so when you say, "No" under linguistic
22  skill, you're saying they don't have to do any talking
23  to pick with others to pick an order?
24  A   They can depend on other kinds of skills and
25  strategies, that they don't necessarily have to speak,

Page 99

1   right.
2   Q   And how did you determine whether they had to
3   speak or didn't have to speak to pull an order --
4   A   From --
5   Q   -- or pick an order? You use those terms
6   interchangeably.
7   A   Right. From my own personal observation when
8   I was there, from all of the data from the depositions,
9   from the plaintiffs, from the supervisors and from
10  all -- from my interviews when I asked about, When is
11  it that you really have to speak on this job?
12  Q   Okay. So what you saw with your eyes and
13  what others told you?
14  A   Yes.
15  Q   Now, the next column --
16  A   I'm sorry, what I saw with my eyes, what
17  others told me, and what I gleaned from my own
18  interviews of the plaintiffs.
19  Q   Well, I mean, you asked them, Do you have to
20  do much talking to pick an order? And they say, No?
21  A   That's right.
22  Q   And you accepted that answer?
23  A   And this was verified in the depositions and
24  by the supervisors, too.
25  Q   But I asked them in the deposition, Do you

Page 100

1   have to talk to pick the order? And they said, No. So
2   you were lying -- it's not a high level of analysis
3   that's going on. You ask them, Do you have to talk?
4   They say, No. You accept that, right?
5   A   Yes.
6   Q   And you see that that's verified by your own
7   observations of what they do?
8   A   Yes.
9   Q   Okay. What do you mean by "matching"?
10  A   That the cognitive skill that's required,
11  which really don't have to -- it's not a language
12  skill, it's matching. In other words, they have to be
13  able to match the order number of the -- or the product
14  number on the pick list with the product number on the
15  shelf.
16  Q   Okay. So you -- when you say that under the
17  matching column for order puller, for the job task pick
18  order, yes?
19  A   Yes.
20  Q   You mean that they have to be able to match
21  in order to be able to pick the orders?
22  A   Yes.
23  Q   Now, what's other?
24  A   Other could be any physical kind of skill.
25  The ability to lift or pull or stamina or concentration

Page 101

1   or focus.
2   Q   Your method included interviewing some 20 of
3   the charging parties?
4   A   Twenty, yes.
5   Q   What language did you use to conduct the
6   interviews?
7   A   Spanish and English.
8   Q   Did they complete your questionnaire in front
9   of you, in your presence?
10  A   No. This --
11  MS. PALACIOS: Objection.
12  A   This was not a questionnaire. It was a
13  questionnaire guide. So when you do an in-depth
14  interview --
15  BY MR. ROBINSON:
16  Q   Okay. You're saying this was a questionnaire
17  you used to ask questions of others, it's not a form
18  that others filled out?
19  A   Exactly. Yes.
20  Q   Okay. And you say you visited the site for
21  three hours and reviewed depositions taken in this case
22  as part of your methodology on this first issue, yes?
23  A   I'm not sure I understand what you mean.
24  Q   We're going over the method that you say you
25  used to conduct the evaluation that's called for by the

26 (Pages 98 to 101)

Page 102

1    first issue that you were asked to address and did
2    address. Are you with me?
3        A    Yes. I did several things and used several
4    techniques to gather the data.
5        Q    Well, wait. We've gone over that. And the
6    only one that -- the only aspect of your methodology
7    that -- at least according to your document, you can
8    tell me differently -- that we have yet to articulate
9    in this deposition today is your three-hour site visit
10   and your review of the depositions in this case?
11           MS. PALACIOS: Objection. I'm lost.
12   BY MR. ROBINSON:
13       Q    Let's go back. Do you describe in your
14   report the methodology you used to evaluate issue
15   Number 1?
16       A    Yes. I discuss it briefly, yes. I don't
17   really flesh it out.
18       Q    But one of the things you did is to create
19   this language use questionnaire, yes?
20       A    Yes.
21       Q    Another thing you did is to elicit these
22   authentic language samples, yes?
23       A    Yes.
24       Q    Another thing you did is to conduct a
25   linguistic analysis of the job descriptions and create

Page 103

1    a chart of tasks from a representative sample of the
2    positions, yes?
3        A    Yes.
4        Q    Another thing you did is to conduct
5    interviews with 20 of the charging parties using your
6    questionnaire, among other things?
7        A    Yes.
8        Q    And another thing you did was to visit the
9    site for three hours, review some of the depositions
10   taken in this case as part of your -- and use some of
11   the depositions taken in this case; is that right?
12       A    Why. And I also --
13       Q    Did you --
14           MS. PALACIOS: Hang on. You're cutting
15   her off.
16           MR. ROBINSON: No. She said yes. And I
17   -- she answered the question yes.
18           MS. PALACIOS: She can answer the
19   question how she wants to. She's giving you a
20   responsive answer.
21   BY MR. ROBINSON:
22       Q    You answered the question yes.
23           MS. PALACIOS: Objection.
24   BY MR. ROBINSON:
25       Q    What else did you do, if anything, as part of

Page 104

1    the methodology that you employed to respond to this
2    first issue that you were asked to respond to?
3        A    Okay. I followed a standard sociolinguistic,
4    widely accepted, documented in referee journals and
5    several publications, a set of steps that you go
6    through in order to assess what the communicative tasks
7    are in a job, what the purposes and needs of the
8    communication should be -- might be, how -- what kind
9    of proficiency people have who are trying to do those
10   jobs, and looking at the policy in place to see if the
11   policy encourages or discourages the language use on
12   the job. So I did several things that informed the
13   whole study.
14       Q    Okay. But remember what Issue 1 is? Do you
15   remember what Issue 1 is?
16       A    Yes. It's to describe the language on the
17   job.
18       Q    Okay.
19       A    And that -- I know. There is an analysis, a
20   qualitative analysis of the forms that you didn't
21   mention in your long list. So I wanted to make sure
22   that you understood that that was part of it.
23       Q    Okay. What else?
24       A    An analysis of the actual language sample.
25       Q    Okay.

Page 105

1        A    To understand what the communicative tasks
2    are on the job. In addition to looking at the job
3    description.
4        Q    Are you using different words to describe
5    something that we already covered?
6        A    Well, I -- it just seemed like you were
7    simplifying it. And I'm sorry if I just didn't hear it
8    properly.
9        Q    Okay. This methodology that we've just
10   discussed, did it come from a textbook?
11       A    Several textbooks.
12       Q    What textbooks did it come from?
13       A    Sociolinguistic qualitative research, several
14   of them.
15       Q    Give me the names and the authors of the
16   textbooks that this methodology came from.
17       A    Okay. English For Specific Purposes by
18   Strevens is one.
19       Q    English For Specific Purposes?
20       A    And I don't think it's on my --
21       Q    You say it came from English For Specific
22   Purposes by Strevens?
23       A    Strevens and Mackey. Here it is. I'm sorry,
24   Mackey and Palmer, 1981, Language For Specific
25   Purposes; Program Design and Evaluation.

Page 106

1  Q  So it's not Strevens?
2  A  No. Strevens is --
3  Q  It's Mackey and Palmer?
4  A  Yeah. Strevens is New Orientations in the
5  Teaching of English.
6  Q  Hold on a second. Wait. So one of the
7  textbooks that you looked at to obtain your methodology
8  is Mackey and Palmer, 1991, Language For Specific
9  Purposes; Program Design and Evaluation, Newbury House
10 Publishers?
11 A  Right.
12 Q  Are there any other textbooks that you used
13 to develop the methodology for this particular study of
14 this particular issue?
15 A  Language policy books, which the titles of
16 them I can't remember. One of them is by Mackey and I
17 don't have it listed.
18 Q  When you say don't have it listed, you don't
19 have it listed on the major references relied upon
20 section of your report, which is really pages 57
21 through 65 of your -- 66 of your report, yes?
22 A  Right. And part of the reason is that --
23 Q  No, I didn't ask you about the reason.
24    Any other textbooks that you -- that your
25 methodology comes from?

Page 107

1  A  Methodology in sociolinguistics is a kind of
2  a compilation of all of the research that's done in
3  sociolinguistics, so I would have had to list all of
4  the works of Labov, all of the works of Gumperz, all of
5  the works of Hymes in order to really give you an
6  exhaustive list of everything that I've relied on.
7     So basically I'm relying on my knowledge of
8  the qualitative research in sociolinguistics, plus a
9  number of books that -- and articles that I would refer
10 to in this setting out the methodology for this case.
11 And it's a widely accepted --
12 Q  You said that a number of times. I
13 understand that that's your position. But I want to
14 know if I want to check that out, okay, can I go to a
15 book that you can identify that will say that to me?
16 A  There are Sage Publications, S-A-G-E, that
17 talk about --
18 Q  Is that an adjective or a noun?
19 A  No, it's the name of a publishing company. I
20 can't remember the names of them, but they're all about
21 qualitative research. I believe one of them is
22 Rossman. Another one is Patton, P-A-T-T-O-N. These
23 are sociolinguistic or qualitative research
24 methodological --
25 Q  Are any listed here in the major references

Page 108

1  relied upon?
2  A  Well, as I told you, the Mackey and Palmer
3  one --
4  Q  No. The Sage Publications.
5  A  I don't remember if I listed them because --
6  Q  Do you cite --
7     MS. PALACIOS: I'm sorry. Hang on.
8  BY MR. ROBINSON:
9  Q  I'm sorry, I thought you were finished.
10 A  Those are such basic, fundamental research
11 guidances in our field that ordinarily I don't list
12 them.
13 Q  Did you cite any of these Sage Publications
14 in your report, in the body of your report?
15 A  No, I didn't.
16    MR. ROBINSON: By the way, I guess we
17 should just make this part of our record. Mark this.
18
19    (Defendant's Exhibit 5: Marked for
20    identification.)
21
22 BY MR. ROBINSON:
23 Q  Showing you what's been marked as Exhibit 5
24 to your deposition. This is a true and accurate copy
25 of the pages 57 through 66 of your report, not included

Page 109

1  in Exhibit 3, and it's a list of what you describe as
2  the major references relied upon, is that true?
3  A  Yes. As I said before, not all references
4  are here.
5  Q  Only the major ones?
6  A  The major ones that don't include such
7  standard, basic research guides.
8  Q  Okay. In any event, the method that you --
9  the method that you used furnished you with information
10 and/or data from which you drew certain conclusions;
11 isn't that right?
12 A  Yes.
13 Q  And one of the conclusions you reached is
14 that the warehouse at Beauty Enterprises is not, in
15 using your words, language dependent; isn't that
16 true?
17 A  Yes.
18 Q  Is language dependent a recognized linguistic
19 term?
20 A  It's a term that's used in policy.
21 Q  Is it a recognized linguistic term?
22    MS. PALACIOS: Objection. She can
23 answer that question as she likes.
24    MR. ROBINSON: No, it can only be
25 answered yes or no. I'm entitled to a responsive

Page 110

1  answers.
2      MS. PALACIOS: Objection. Her answer
3  may be responsive in other than a yes or no.
4      MR. ROBINSON: It can't be responsive
5  other than a yes or no. It only calls for a yes or no
6  answer.
7      MS. PALACIOS: Objection. My objection
8  is on the record. She'll answer it how she wishes.
9      MR. ROBINSON: Don't coach the witness.
10     A  I'm sorry, could you ask your question again,
11 please?
12 BY MR. ROBINSON:
13     Q  Is the term "language dependent" a recognized
14 linguistic term?
15     A  It's my linguistic term and I don't know if
16 other people use that actual term. They might use
17 other ways of specifying how much language is actually
18 required on a job.
19     Q  Is there a glossary of linguistic terms that
20 I could go to to find language dependent and learn what
21 it means?
22     A  I don't think so, but that's because
23 workplace English is a very, very -- just incipient
24 field.
25     Q  Are there any other linguistic -- is there

Page 111

1  any other linguistic source for the term language
2  dependent other than you?
3      A  I couldn't tell you right now if other people
4  use it.
5      Q  When you say, Dr. Gonzalez, that the
6  warehouse at Beauty Enterprises isn't language
7  dependent, aren't you simply saying -- and I know I'm
8  guilty of oversimplifying, and I apologize in advance
9  for doing so -- but aren't you simply saying that the
10 warehouse workers at Beauty Enterprises don't have to
11 use much language to do their jobs?
12     MS. PALACIOS: Objection.
13     A  That the people that I looked at who have the
14 positions that I looked at don't have to use very much
15 actual verbal speech to be able to do their jobs
16 because they have found other strategies.
17 BY MR. ROBINSON:
18     Q  That's fine. Okay. And wasn't this question
19 of whether and to what extent these folks need to talk
20 to do their jobs something that the lawyers in this
21 case fully explored in the depositions that they took
22 and you reviewed?
23     A  I'm sorry, I didn't understand your
24 question.
25     Q  Wasn't the matter of whether, and if so, to

Page 112

1  what extent these charging parties needed to talk to do
2  their jobs something that the lawyers in this case
3  fully explored in the depositions that they took?
4      A  Yes. After I had already created my
5  questionnaire and asked those questions.
6      Q  The answer to the question is yes, is it?
7      A  Yes.
8      Q  Okay. And couldn't some reasonably
9  intelligent -- and you'd agree with me that the lawyers
10 in this case are at least reasonably intelligent,
11 perhaps the EEOC's lawyers more reasonably intelligent
12 than the company's lawyer, but they're both reasonably
13 intelligent people, yes?
14     MS. PALACIOS: Objection.
15 BY MR. ROBINSON:
16     Q  Yes?
17     A  I don't know what your question is. I'm
18 sorry.
19     Q  You'd -- you think Ms. Palacios is a
20 reasonably intelligent person?
21     MS. PALACIOS: Objection.
22     A  Oh, absolutely.
23 BY MR. ROBINSON:
24     Q  Do you think I'm a reasonably intelligent
25 person?

Page 113

1      A  Yes. Reasonably.
2      Q  Do you know if Ms. Palacios has linguistic
3  training?
4      A  No.
5      Q  I don't have any linguistic training. That
6  wouldn't surprise you, would it?
7      A  No.
8      Q  Couldn't some reasonably intelligent lay
9  person reading those deposition transcripts or
10 listening to the deposition testimony make a sound
11 judgment about whether these employees needed to do
12 much talking to do their jobs?
13     A  I really can't answer that.
14     Q  Wouldn't you say, ma'am, that the deposition
15 testimony would, in and of itself, compel a reasonably
16 intelligent lay person to conclude that the Beauty
17 Enterprises' warehouse is not, as you say, a language
18 dependent workplace?
19     MS. PALACIOS: Objection.
20     A  Well, I don't know of these lay persons
21 you're talking about because what I did was I looked at
22 my own data in my interview, which came much before any
23 depositions.
24 BY MR. ROBINSON:
25     Q  So you can't answer the question?

Page 114

1 A No. I'm answering the question. And I'm
2 looking at it from a linguistic standpoint. I'm
3 looking at a theory in second language acquisition and
4 trying to understand what the communicative tasks are
5 in the workplace. And one of those questions is always
6 a standard question, What are the communicative tasks?
7 Who are you talking to in order to do your job? How
8 many times do you talk to that person to be able to do
9 your job, or those people? And, you know, please
10 describe to me the times when you've used language --
11 when you have to have language in order to carry out
12 your job.
13    And so you ask them in terms of frequency,
14 you ask them in terms of descriptions. And so these
15 are all part of the standard way of looking at
16 communicative tasks.
17 Q All right. Have I asked those questions at
18 the depositions?
19 A I believe you asked some of them.
20 Q Can you remember any I didn't ask?
21 A I really would have to go back to the
22 depositions and look to see what you asked because I
23 relied on my interviews and the depositions and the
24 data from the job descriptions in order to come to my
25 conclusions.

Page 115

1 Q How would testimony from you assist someone,
2 a reasonably intelligent lay person who's read these
3 deposition transcripts, in deciding whether the
4 employees at Beauty Enterprises have to do much talking
5 to do their jobs?
6 A How would testimony from me add to their
7 knowledge, is that what you're asking?
8 Q How would it assist someone who's read the
9 deposition transcripts in deciding whether the
10 employees at Beauty Enterprises have to do much talking
11 to do these jobs?
12 A Well, because of the training that I've had
13 in sociolinguistics and examining language policy and
14 examining language in a workplace in several settings
15 in the United States: in businesses, in courts, in
16 agencies, in schools, in classrooms. I would think
17 that they would want to know what an informed opinion
18 would be on the kind of communicative tasks, the
19 frequency with which language is required, what other
20 cognitive kind of skills are involved so that they
21 would have a truly accurate and empirically sound
22 picture of what the communicative tasks are in that
23 setting.
24 Q All right. And yet a lot of what you relied
25 on are answers to questions like, What do you have to

Page 116

1 say to do your job? How often do you have to talk to
2 do your job? And things of that ilk; is that right?
3    MS. PALACIOS: Objection.
4 A The major qualitative data in this report is
5 from self-report of the plaintiffs, which is the
6 standard way of gathering that report, and observation
7 and understanding what the job descriptions are and all
8 of my knowledge in various areas doing the same kind of
9 analyses.
10 BY MR. ROBINSON:
11 Q If someone charged with the task of
12 determining whether or not -- whether these employees
13 have to do much talking to do their jobs didn't have
14 the benefit of your work, but instead had only the
15 deposition transcripts, could they come to the same
16 conclusion that you've come to?
17    MS. PALACIOS: Objection.
18 A Well, I don't think so.
19 BY MR. ROBINSON:
20 Q Okay. That's fine. Take a look at page 6 of
21 your report, the first paragraph of Section 1.1.
22 That's where you report your conclusion that the
23 workplace isn't language dependent; isn't that right?
24 A Yes.
25 Q And then you say, "Therefore, there is no

Page 117

1 linguistic evidence to support the implementation of an
2 English-only rule at Beauty Enterprises." Did I read
3 that correctly?
4 A Yes.
5 Q What do you mean by "linguistic evidence" in
6 this context?
7 A Meaning that when I did my linguistic
8 analysis of the jobs, which is basically part of a job
9 analysis, I did the linguistic analysis of the kinds of
10 communicative tasks that are required in the jobs, I
11 found that they're very minimal.
12 Q Can I stop you?
13 A Yes.
14 Q I'm not asking for your findings. I'm asking
15 what you mean by linguistic evidence.
16 A Linguistic evidence is --
17 Q Items of linguistic evidence. The following
18 are items of linguistic evidence.
19 A Okay. Linguistic evidence is what I found in
20 my analysis about the -- what kind of language skills
21 and what frequency of language is used on the job and
22 what kinds of jobs they were that required many other
23 things besides language in order to carry them out.
24 That's linguistic evidence.
25 Q Are you -- are one of the things you're

Page 118

1  saying here, when you say that there is no linguistic
2  evidence to support the implementation of an
3  English-only rule, that these folks really -- that
4  language isn't really needed to do the jobs; therefore,
5  there is no need for an English-only rule?
6     A   That's right. That's part of what I'm
7  saying, yes.
8     Q   Now, in your mind, then, is need simply a
9  function of the specific requirements to perform a
10 particular job?
11        MS. PALACIOS: Objection.
12    A   Need for what? Could you be more specific?
13 BY MR. ROBINSON:
14    Q   Well, what one needs to do the job. You're
15 saying you don't need language to do the job of a
16 picker because pickers, you know, don't have to talk
17 very much to do their jobs; they can do what they have
18 to do using other skills?
19        MS. PALACIOS: Objection.
20 BY MR. ROBINSON:
21    Q   Yes?
22    A   I still don't understand your question.
23    Q   I'll withdraw it.
24    A   I'm sorry to ask again, but could we take
25 another break?

Page 119

1     Q   Yes. We can take -- it's about lunchtime.
2
3         (Recess: 12:57 pm to 1:49 pm.)
4
5  BY MR. ROBINSON:
6     Q   Do I read your report correctly that the
7  warehouse workers, the charging parties, need at least
8  some English language skills to do their jobs?
9     A   They need very minimal skills.
10    Q   Well, okay. But they need at least some?
11    A   Yes.
12    Q   Do they have to be able to speak and ask and
13 understand simple questions about things such as what
14 they're going to be doing that day?
15        MS. PALACIOS: Objection.
16    A   What I found out is that they very often
17 don't need to check in or speak to anybody about the
18 work of the day.
19 BY MR. ROBINSON:
20    Q   Well, I'm really at page 9, Section 1.3 of
21 your report. Do you say there that minimal English
22 skills are needed to perform the jobs?
23    A   Very limited English language skills can be
24 accomplished. But then they can also be accomplished
25 through demonstration and other strategies and

Page 120

1  sometimes with no language at all.
2     Q   Okay. But -- well, is this statement I'm
3  about to read from your report inaccurate then, quote,
4  Once on the job -- and I'm reading the first sentence
5  in 1.3 -- Once on the job, charging parties needed only
6  very limited English language skills to accomplish
7  their various job duties?
8     A   Yes.
9     Q   So they needed these things?
10    A   Very minimal, yes.
11    Q   And what they needed was the skill -- English
12 to ask and understand answers to simple questions about
13 things such as what they're going to be doing that day,
14 yes?
15        MS. PALACIOS: Objection.
16    A   This was an example of someone who could ask
17 a question. But if you look at 1.4.1, I talk about
18 minimal to no language used for job assignment
19 enclosure. So basically a lot of charging parties
20 really didn't need to talk to anybody to go pick up
21 their list at the basket and go on and do their regular
22 job from day-to-day.
23        So sometimes they needed to have the
24 language, but a lot of the times they don't at all.
25 And that's what I found in my interviewing.

Page 121

1  BY MR. ROBINSON:
2     Q   You mean some of them did and some of them
3  didn't, or for one person sometimes they did and
4  sometimes they didn't? What do you mean?
5     A   Most of the time they reported that they --
6  that if they were pickers, for example, pullers, that
7  they would just go to the basket and get their next
8  order and start working. And as soon as they finished
9  their picking order, they would go line it up at the
10 cart -- line up their cart so that the checker could
11 check it, and then they would go on to get another
12 basket.
13    Q   Are you retracting anything that you said in
14 Section 1.3?
15    A   No.
16    Q   You stand by what you've said in 1.3?
17    A   Yes. And 1.4. You have to read --
18    Q   With the entire report?
19    A   Yes. You have to read it as a whole.
20    Q   Am I correct that the conclusions that you
21 report -- well, withdrawn.
22        Take a look at page 9. You see where you
23 refer in Section 1.3 under the subtopic A, Simple
24 questions, an example given by Gloribel Ramos?
25    A   Yes.

Page 122

1  Q  Where did that come from?
2  A  My interviews.
3  Q  Not the deposition?
4  A  No.
5  Q  How do you know that?
6  A  Basically most of the language that I put in
7  is from my interviews because that's where I got the
8  language simulations.
9  Q  So this is your memory of -- this is your
10 best memory of where this came from? You remember
11 this?
12 A  Well, yes, because it was a part of my method
13 in writing the report.
14 Q  Do you know if similar testimony was sought
15 and elicited in Gloribel Ramos' deposition?
16 A  I don't remember that. But whenever I gave
17 an example from the deposition, I gave the page number
18 in the deposition. And I stated in here from my
19 interviews I didn't.
20 Q  Okay. But do you remember whether Gloribel
21 Ramos was asked the kind of question that you asked her
22 whether she gave the kind of answer that you report
23 here --
24         MS. PALACIOS: Objection.
25 BY MR. ROBINSON:

Page 123

1  Q  -- in her deposition?
2  A  I really can't remember that.
3  Q  Do you acknowledge that employees at Beauty
4  Enterprises need to communicate with supervisors about
5  order errors?
6  A  Yes. And sometimes they're able to do the
7  communication through verbal and sometimes they're able
8  to write it down. Sometimes they're able to point at
9  something on the list. So that communication can be
10 done in a number of ways, not just through verbal
11 language.
12 Q  Well, that's true with any type of
13 communication, isn't it?
14 A  No. Not particularly.
15 Q  But this need to communicate with supervisors
16 about order errors is in addition to the subjects that
17 you list in the letter -- the four lettered paragraphs
18 of Section 1.3; isn't that right?
19 A  I'm not sure what you're saying. In 1.4.3 I
20 talk about order errors were the most typical situation
21 that required verbal communication.
22 Q  Right. And you don't mention order errors --
23 you mention order errors in 1.4.3, but not in section
24 1.3?
25 A  Because Section 1. --

Page 124

1  Q  Is that right?
2  A  No. Because 1.3 talks about functions.
3  Functions of language. So an order error could be in
4  the function of a simple question.
5  Q  Okay. That's fair. Now, on page 8 you also
6  talk about the extent of English language reading
7  ability that one needs to do warehouse jobs at Beauty
8  Enterprises; isn't that right?
9  A  Yes.
10 Q  Can you tell me what the ability to read
11 English has to do with the necessity of a speak
12 English-only rule?
13         MS. PALACIOS: Objection.
14 A  I'm not sure what you're -- thrust of your
15 question is.
16 BY MR. ROBINSON:
17 Q  Do you want to hear my question again?
18 A  Or maybe you could rephrase it so I can
19 understand it better.
20 Q  Well, why don't you listen to it again and
21 tell me what it is that you don't understand about my
22 question, if there is something that you don't
23 understand about it.
24
25         (The testimony was read.)

Page 125

1
2         MS. PALACIOS: Reinterpose my
3  objection.
4  BY MR. ROBINSON:
5  Q  Maybe I can ask it better.
6  A  Okay.
7  Q  What you're dealing with in this section 1 is
8  the necessity of BEI's English-only policy, right?
9  A  And the nature of the work performed.
10 Q  Right. Because that is -- you're making a
11 comparison between -- you're analyzing the necessity of
12 the English-only rule, at least in this section, on the
13 basis of language requirements that the work would
14 generate or not generate as the case may be?
15 A  Exactly. You got it.
16 Q  So my question for you then is: What does
17 the ability to read English have to do with this issue
18 that you're addressing in Section 1.0?
19 A  Okay. 1.0 is describing the kind of language
20 needed at BEI. In other words, what are the
21 communicative tasks that are required at BEI to do the
22 jobs?
23 Q  No. That's 1.1.
24 A  Well, 1.0 is the whole thing.
25 Q  Right.

Page 126

1  A  Yeah.
2  Q  Right. And that's my question. If 1.0 is
3  the whole thing, and 1.0 deals with an English-only
4  policy that deals with speaking, why are you talking
5  about reading?
6  A  Because I had to look at all the
7  communicative tasks at BEI.
8  Q  Why?
9  A  Because according to a language policy
10 analysis, I have to look at any part of their work that
11 includes language. And documents and forms that
12 employees have to work with are considered part of that
13 data.
14 Q  Did the EEOC ask you to opine on whether or
15 not one needs the ability to read English to perform
16 the work at Beauty Enterprises?
17 A  EEOC asked a general question. No, they
18 asked a general question of what was the nature of the
19 language used on the job. And A was the English
20 required for carrying out warehouse job duties, and B
21 was examining BEI's workplace forms and documents and
22 determining the kind of reading and writing skills are
23 required for employees to work with these documents.
24 In other words, no linguistic policy analysis is
25 correct unless you look at all the communicative tasks.

Page 127

1  And those are speaking, listening, reading and
2  writing.
3  Q  But you'd agree with me that the speak
4  English-only rule deals only with speaking, true?
5      MS. PALACIOS:  Objection.
6  A  Well, no, not in the way it's written,
7  actually. The way it's written it talks about people
8  have to have proficiency in speaking, reading,
9  listening and writing.
10 BY MR. ROBINSON:
11 Q  Are you sure?
12 A  I'll go to it right now. "All job applicants
13 must be able to read, write and speak English." So
14 part of the rule is -- and it's part of the rule that
15 doesn't seem like it's ever really been enforced --
16 Q  You don't need to tell me that. Do you draw
17 a distinction between a restriction on one's ability to
18 speak a particular language once their employed and on
19 the job, and B, a criteria for hiring?
20     MS. PALACIOS:  Objection.
21 A  Can you restate that just basically because
22 it was really long.
23 BY MR. ROBINSON:
24 Q  Okay. Do you see a difference between a
25 hiring requirement and a rule that governs conduct in

Page 128

1  the workplace?
2     MS. PALACIOS:  Objection.
3  A  I think they're part and parcel of the same
4  thing. And in terms of your earlier question, no
5  matter what, I had to, by my methodology, had to look
6  at every communicative issue in the workplace because
7  that's language. Whether it's reading, speaking,
8  listening or understanding, I had to look at it. And
9  if I didn't, it would be a bad study.
10 BY MR. ROBINSON:
11 Q  Okay. Now, I haven't looked at the errata.
12 Do you say that the employees have to read and
13 understand English at least at a third grade level to
14 do their jobs, unless they want to simply rely on the
15 matching of names and products or use code numbers for
16 products instead of product names?
17 A  Yes.
18 Q  And I have a note that Appendix E, pages 1
19 and 5 in the original says, "Fourth grade on average
20 and some fifth." Does the errata -- that's
21 inconsistent with this?
22 A  That's right.
23 Q  Does the errata correct that?
24 A  Yes. Yes. And it was my error.
25 Q  How did you make the error?

Page 129

1  A  It was actually a typist error.
2  Q  So it wasn't your error?
3  A  Well --
4  Q  It was a proofreading error?
5  A  Well, I take the responsibility.
6  Q  The buck stops with you?
7  A  Yeah.
8  Q  Now, turn to page 8, Section 1.2 of your
9  report. The section is entitled, "Hiring procedure did
10 not require English proficiency."
11 A  Yes.
12 Q  Why do you include this in your report?
13 A  Because as part of the analysis of the
14 workplace language, it's important to know if they were
15 actually tested for English when they were hired, if
16 they were told to expect nothing but English only on
17 the job, if someone actually warned them that if they
18 couldn't do their job solely in English, that this job
19 was not for them.
20 Q  Why is that important to know in assessing
21 whether the English-only policy is necessary for people
22 to do their jobs there?
23 A  Because implicit in -- if the hiring
24 procedure did not contain a test or really focus on the
25 issue that English is required on the job, it's

Page 130

1  probably because English isn't that required on the
2  job. And, in fact, they could -- they sent people in
3  who obviously didn't know English and who had their
4  orientation -- their application process done by
5  someone else and interpreted and done in Spanish.
6  Jakob brought an English-speaking son to act as
7  interpreter. Maldanado would fill out the paperwork.
8  So this would mean that it's a kind of a general
9  perception that you really didn't need to have English
10 to do that job.
11     Now, in a job where English --
12  Q  So you are looking -- let me ask you this:
13 Would your ultimate conclusion be any different if they
14 had a hiring procedure that required and indeed
15 established English proficiency?
16     MS. PALACIOS: Objection.
17 BY MR. ROBINSON:
18  Q  Your conclusion about the necessity of the
19 English-only rule to do the English language to do the
20 job?
21  A  If the test and the assessment actually met
22 actual skills needed on the job and it wasn't the
23 English -- I mean the BEI workplace, then that might
24 make some sense. But if they had an English
25 proficiency test for the BEI jobs, there would be

Page 131

1  something wrong with that test unless it really
2  absolutely was at the level required for BEI.
3   Q  Okay. My question, madam, was whether or not
4  the -- if they had a test that required English
5  proficiency and the employees were given the test and
6  they passed it with flying colors, would that affect
7  your conclusion about the need for English only to
8  perform the functions of the job of picker or puller or
9  checker, et cetera?
10     MS. PALACIOS: Objection.
11  A  Not in this workplace, because it was --
12 because it was minimal.
13     MS. PALACIOS: Hang on. Don't cut her
14 off.
15 BY MR. ROBINSON:
16  Q  Not in this workplace is fine. Let's see if
17 I can guess the reason.
18     MS. PALACIOS: I object to you cutting
19 off the witness before she's completed her answer.
20     MR. ROBINSON: Okay.
21     MS. PALACIOS: It's your record,
22 though.
23 BY MR. ROBINSON:
24  Q  It's because the nature of the jobs
25 themselves, in your view, don't require communication

Page 132

1  at all via language, let alone the English language,
2  true?
3   A  No. I wouldn't characterize it that way.
4   Q  Is there some methodology reported in a
5  sociolinguistic textbook or a sociolinguistic article
6  that would cause you to examine in a situation like
7  this whether or not the employer had a hiring procedure
8  that required English proficiency?
9   A  It would be one of the things that I would
10 have to look at in order to look at the whole process
11 of the language situation on the job. What were the
12 expectation of your workers? What were the
13 expectations of the employers given at the very
14 beginning? What did that do to the workers, you know,
15 if they're using the English-only policy for the
16 purpose of saying that you need to have English on the
17 job, then a better way to do that would have been
18 through a test that would be objective, would be valid
19 and reliable, instead of this policy which doesn't seem
20 to be -- you know, doesn't seem to do that job.
21  Q  Okay. Did you understand my question?
22  A  I thought I did.
23     MR. ROBINSON: Could you read my
24 question back?
25

Page 133

1         (The testimony was read.)
2
3   A  In sociolinguistic --
4  BY MR. ROBINSON:
5   Q  Can you say yes or no first and then go on
6  and explain?
7   A  Yes.
8   Q  Yes, you can say yes or no, or yes is the
9  answer?
10  A  Yes, it's part of a methodology where you
11 have to look at all aspects on the job, the
12 communicative tasks. And the hiring procedure is part
13 of the communicative tasks of the job.
14  Q  Dr. Gonzalez, aren't you -- don't you include
15 this section in here because you're making the argument
16 that the employer doesn't really care about language
17 skills?
18  A  I think that's what I said about ten minutes
19 ago, that a test might be able to tell you more
20 information.
21  Q  Now, the first sentence of Section 1.2 you
22 write, "For existing long-term employees, the
23 English-only requirement was imposed after they had
24 been hired and already demonstrated competence on the
25 job." Did I read that right?

Page 134

1   A   Yes.
2   Q   Would you agree with me that you state this
3   as if it's an undisputed fact?
4   A   This is what I found from my interview
5   process, from the data that I gathered there, and in
6   my -- and in reading the depositions.
7   Q   And of course the long-term employees you
8   refer to, each have testified to this effect at their
9   depositions then I take it; isn't that right?
10  A   I'm not sure if they testified to this at the
11  depositions, but I know that they talked about it in
12  their interview. And most everything I got in
13  interview I checked with depositions to make sure that
14  they were consistent.
15  Q   So at least in part the depositions, the
16  transcripts are the basis for your making the statement
17  that we're now discussing; is that right, at least to
18  confirm what you found in your interviews, yes?
19  A   To confirm, but basically I got this
20  information from interviews.
21  Q   Did you read the depositions that Lili took
22  of -- or Mark Penzel took of Beauty Enterprises'
23  management and supervisory personnel?
24  A   Yes.
25  Q   And you know that there was testimony that

Page 135

1   they elicited from those folks on this very point;
2   isn't that right?
3   A   On the very point that the English-only
4   requirement was imposed after these people had been
5   hired?
6   Q   Right.
7   A   I don't remember that testimony
8   specifically.
9   Q   Do you remember the testimony of Fabian
10  Pineros on page 268 of his deposition?
11  A   No. There were three volumes, so --
12  Q   Right. Would you concede with me -- there
13  are three volumes?
14  A   Yes.
15  Q   Of Fabian Pineros?
16  A   That's what I remember.
17  Q   But you read those three volumes?
18  A   Yes.
19  Q   And I can assume, if you wanted to be fair in
20  this report, you would have noted testimony that was
21  perhaps different than testimony that you're citing,
22  right?
23      MS. PALACIOS:  Objection.
24  BY MR. ROBINSON:
25  Q   Right?

Page 136

1   A   No.
2   Q   That's fine. Let me take a minute. Let me
3   get Fabian Pineros' deposition.
4
5       (Off-the-record discussion.)
6
7   BY MR. ROBINSON:
8   Q   Do you think, Dr. Gonzalez, that you have an
9   obligation to be fair in doing your work in this
10  case?
11  A   Oh, absolutely.
12  Q   And if there is a dispute in the testimony on
13  a point that you cite, do you think that fairness
14  requires that you at least note the dispute?
15  A   If it's something that the charging parties,
16  you know, basically agree on and some supervisors agree
17  to, I basically take that as a kind of, you know,
18  overall conclusion.
19      However, I did, if you look on page 9, talk
20  about what Cohen says and what Pineros said about how
21  they began their work at BEI. So, you know, I
22  understand that there were some disagreements in all of
23  this. But when there was an overwhelming amount of
24  data that supported something, I took that into
25  account.

Page 137

1   Q   I will represent to you that at page 268 of
2   Fabian Pineros's deposition, he was asked, "But
3   anything else that you tell people when they start?
4       "Answer -- that's Lili speaking.
5       "Answer" -- she's asking questions and he's
6   doing the answering -- "if the person is foreign, we
7   tell them that Beauty Enterprises is an
8   English-speaking environment. You can speak English on
9   break -- I'm sorry. I'll start again.
10      "Answer: If the person is foreign, we tell
11  them that Beauty Enterprises is an English-speaking
12  environment. You can speak English on break -- I mean,
13  you can speak other than English on break, lunch,
14  before work and after work. If you on the clock, you
15  must speak English."
16      Okay. Did you read that testimony before you
17  wrote this report?
18  A   What page is that?
19  Q   268.
20  A   Yes.
21  Q   Is it -- did you make a conscious decision
22  not to note that in your report?
23  A   I know that there were some disagreement --
24  Q   Yes or no, ma'am. Did you make a conscious
25  decision not to put that in your report?

Page 138

1  A  I looked at a preponderance of the evidence
2  of the data and decided that most of the people, their
3  perception was that they were really not always
4  instructed. And this was very inconsistent also.
5  Q  What do you mean it was inconsistent also?
6  What was inconsistent?
7  A  The fact that maybe somebody said something,
8  but usually they found out about a rule from the
9  coworker.
10 Q  Who are the theys that you're talking
11 about?
12 A  Some charging parties.
13 Q  So the charging parties were inconsistent on
14 this issue about when they were told about the
15 English-only rule?
16    MS. PALACIOS: Objection.
17 A  Well, it was also very inconsistent about --
18 BY MR. ROBINSON:
19 Q  IS that right?
20 A  No.
21 Q  Well, I'm just trying to figure out what you
22 mean.
23 A  The supervisors and Mr. Cohen were very
24 inconsistent about when people were told things, when
25 this thing was actually memorialized, when -- it just

Page 139

1  seemed like this was not a formal process that was
2  written and handed to people when they were hired
3  during the interview procedure. Sometimes people said
4  that they had no orientations at all, sometimes they
5  were just put to work with a trainer. So it was
6  very -- it was not solid information that they had been
7  given this information ahead of time.
8  Q  Was there any conflict among the charging
9  parties about when they were told about the
10 English-only rule for the first time?
11 A  It was inconsistent there in terms of when
12 they really became aware of it, but -- because it
13 didn't seem to be a formal part of anything that the
14 company did.
15 Q  Let me ask the question again. Did some
16 people say -- I'll ask it even more specifically. Did
17 some people say they learned about it before they
18 started? Did some people say they learned about it on
19 the first day? And did some people say they didn't
20 learn about it until after they were on the job for
21 days, weeks or months or years?
22    MS. PALACIOS: Objection.
23 A  It seems --
24 BY MR. ROBINSON:
25 Q  Is that a fair description of the testimony

Page 140

1  of the charging parties?
2     MS. PALACIOS: Objection.
3  A  No.
4  BY MR. ROBINSON:
5  Q  What's unfair about it?
6  A  That most of the people talked about not
7  knowing, not knowing about the rule until a coworker
8  told them, until someone whispered it to them, until
9  someone who was walking them back from actually
10 starting at BEI said, Don't talk Spanish. We don't
11 talk Spanish here.
12 Q  Well, did you reject any testimony that was
13 inconsistent with that?
14 A  I talk about it on page 9.
15 Q  Yes or no. I'll get there. Did you reject
16 any testimony that was inconsistent with that?
17 A  No, I took it into consideration.
18 Q  Okay. Took it into consideration?
19 A  Yes.
20 Q  And how did you take it into consideration?
21 A  When you do qualitative research, you look at
22 everything that you -- all of the data from interviews,
23 from depositions, and you have to make some expert
24 subjective assessments to say that it seems as if the
25 people really were -- really believed that they were

Page 141

1  not given this information at the beginning.
2  Q  Are you making -- are you saying that you
3  don't believe Fabian Pineros?
4  A  No. I'm just saying that, you know, the
5  supervisors and Mr. Cohen are very hazy on when the
6  rule was actually established. I could never find a
7  date that they really believed that something happened.
8  Some people say -- some of the supervisors say there
9  was a meeting. Other people say that they don't
10 remember a meeting.
11 Q  Can we focus on this specific issue for --
12 we're talking about your statement on Section 1.2 that
13 for existing long-term employees, the English-only
14 requirement was imposed after they had been hired and
15 had already demonstrated competence on the job. Okay.
16 That's what we're talking about.
17 A  Uh-huh.
18 Q  I'm not talking about when the rule was
19 established. We're not talking about the testimony
20 about that. We're talking about one thing and one
21 thing only. Understand that?
22 A  Uh-huh.
23 Q  Okay. So my question to you is: Aren't you
24 really saying here that either one of two things
25 happened, either you made a conscious decision to

36 (Pages 138 to 141)

Page 142

1  ignore the testimony that was inconsistent with this
2  position or you didn't believe it?
3       MS. PALACIOS: Objection.
4   A   The long-term employees, we're talking about
5  the plaintiffs --
6  BY MR. ROBINSON:
7   Q   Did I ask a question? Can you read the
8  question back, please. This is not an option to make a
9  speech. I want you to answer my question. I pose
10 these questions very carefully, not always very
11 artfully, but always very carefully.
12
13      (The testimony was read.)
14
15      MS. PALACIOS: Objection.
16  A   No.
17 BY MR. ROBINSON:
18  Q   That answers the question. That's fine.
19 Now, you go on in this Section 1 to note that,
20 "Language was used only infrequently in the warehouse
21 at Beauty Enterprises, not only because there was
22 really very little need for communication, but because
23 the employees generally performed their work alone and
24 with minimal interaction with coworkers." Do I have
25 that right?

Page 143

1   A   Yes.
2   Q   And this is based on the interviews?
3   A   And my observation.
4   Q   And the deposition testimony?
5   A   And the deposition testimony.
6   Q   Okay. And is this the case for what
7  appears --
8   A   I'm sorry, where are you in my report?
9   Q   I'm going to a new section. Is this the case
10 for what appears in Section 1.5 the basis of the facts
11 recited here, Section 1.5, including 1.5.1, point 2,
12 point 3 and point 4?
13  A   I don't understand your question.
14  Q   The basis for the facts that you recite in
15 these sections, they're your interviews, what you
16 observed when you were at the place, and deposition
17 testimony?
18  A   You want to know if that's the basis for all
19 of 1.5?
20  Q   Basis for the factual -- that's where you got
21 the facts that you referred to in section 1.5 and its
22 various subsections?
23  A   Yes.
24  Q   Now, before we leave the analysis of whether
25 the English-only rule is necessary to perform the jobs

Page 144

1  at Beauty Enterprises, I know this is tedious, I had to
2  read your report. You think it took me two weeks to
3  read your report. And I was trying to avoid it as best
4  I could.
5       Let me ask you a few more questions on the
6  topic. Would you agree with me that the English-only
7  rule is a restriction on speech?
8   A   Yes.
9   Q   Would you also agree in light of what you
10 told me about the frequency and amount of language
11 needed to do the job, that the rule restricts a minor
12 and infrequently performed work-related activity at
13 Beauty Enterprises?
14      MS. PALACIOS: Objection.
15 BY MR. ROBINSON:
16  Q   Speak.
17  A   It restricts not only the language used for
18 working, but it also restricts the personal language
19 and the language used for learning on the job and just
20 being free on the job.
21  Q   Would you agree, though, with the statement,
22 given what you've told me about the frequency and
23 amount of language needed to do the jobs, that the rule
24 restricts a particularly minor, infrequently performed
25 work-related activity at Beauty Enterprises?

Page 145

1       MS. PALACIOS: Objection.
2   A   I wouldn't characterize it that way.
3  BY MR. ROBINSON:
4   Q   No, I didn't think you would. Okay. Next
5  question.
6       Now, are you aware that the EEOC has conceded
7  in this case that all the charging parties have
8  sufficient English language skills to do their jobs?
9       MS. PALACIOS: Objection. I don't
10 think we've conceded that.
11      MR. ROBINSON: You admitted it in your
12 interrogatory responses.
13      MS. PALACIOS: No, that's not -- and in
14 fact this was an issue that came up in our discussion
15 of the interpreters motion where you had -- I took the
16 position in our brief at least that you had misquoted
17 what our interrogatories said, as far as --
18      MR. ROBINSON: Do I have to get them?
19      MS. PALACIOS: I have them. I mean,
20 basically what we did say -- I don't know if you want
21 this on the record or not -- but what we did say is
22 they had sufficient English and Spanish in order to do
23 their job to the extent they needed language.
24      I mean, you can ask your question, but
25 I disagree with your characterization of it being a

Page 146

1  conceded point.
2       MR. ROBINSON: Okay. Well, subject to
3  the interpretation of that mealymouthed concession.
4  BY MR. ROBINSON:
5     Q  Are you aware of the concession that Lili
6  just described?
7     A  No.
8     Q  Okay.
9       MS. PALACIOS: Yes, that's what we have
10 here Rick, by the way. They have varied abilities and
11 skills in the English language, but each of them is
12 able to speak, read and write enough English and
13 Spanish to perform their jobs at Beauty. Very
14 different from what you said.
15      MR. ROBINSON: I don't know if it's so
16 different.
17      MS. PALACIOS: It is.
18      MR. ROBINSON: It may be. I don't
19 know.
20      MS. PALACIOS: So ostensibly they could
21 have done their job in Spanish.
22      MR. ROBINSON: Well, they could have
23 done the job all in Spanish or all in English. They
24 had enough skills in each language to do the entire
25 job in each language.

Page 147

1       MS. PALACIOS: That's why I get paid
2  the big bucks. Okay.
3  BY MR. ROBINSON:
4     Q  Issue Number 2. You were asked by the EEOC
5  to discuss code switching and the nature of language
6  use in English and Spanish by bilingual employees with
7  other employees and to explicate the effect of the
8  English-only rule on monolingual non-English speakers,
9  bilinguals, and monolingual English speaking workers;
10 is that right?
11    A  Yes.
12    Q  Now, would you look at page 15, Section 2.2
13 of your report. You say there that you were asked to
14 render an opinion about the relative ability of the
15 charging parties, parentheses Spanish dominant
16 bilinguals and limited and non-English speakers, end
17 parentheses, to continuously abide by BEI's language
18 rule to prohibit their native language use in the
19 workplace. Did I read that right?
20    A  Yes.
21    Q  Here's my question: Do you consider this
22 statement that we just read together to be different
23 from the statement you made on page 2 concerning Issue
24 2?
25    A  No.

Page 148

1     Q  Okay. I don't think you actually defined
2  code switching in your report. Would you do it for me
3  now? I mean, I don't care, just do it for me now.
4     A  I just want to check something. I did define
5  it in 2.5.1.
6     Q  Okay. Just define it for me now.
7     A  Okay. It's the alternation of English and
8  Spanish in one language episode. It's the use of two
9  codes alternately at the phrase level, at the code
10 level, at the sentence level in order to communicate
11 about one linguistic episode.
12    Q  Linguistic episode?
13    A  Uh-huh.
14    Q  That's a very fancy term for what?
15    A  For --
16    Q  Two people talking together?
17    A  One utterance, right.
18    Q  Now, you say this phenomenon of code
19 switching is unconscious, correct?
20    A  Yes.
21    Q  Can it also be conscious or deliberate?
22    A  Not really in the way that most people would
23 think of conscious. It's very rule governed by social
24 rules.
25    Q  I've done -- you know, I'm not a linguist,

Page 149

1  okay. I went to a library for a few hours and looked
2  at some books after I finished your report, got
3  headaches and stuff, and I came across something, some
4  article, maybe an older one, that talked about code
5  switching as intentional conduct, that people
6  intentionally went into another language to express
7  something because for a whole variety of reasons, not
8  the least of which is the word might -- that the word
9  in the native language might be better suited than any
10 English word to describe what they wanted to describe.
11      I mean, when I in yiddish say, you know, that
12 guy is a gonniff, do you know what that means?
13    A  No.
14    Q  Gonniff is a thief. But if I say gonniff,
15 that's not just a thief, that's a major league thief.
16 That's a real bad guy. And people understand that. So
17 when I say, "He's a real gonniff," I'm code switching,
18 right?
19    A  Yes.
20    Q  And I'm doing it deliberately to convey
21 something that I don't think the English language
22 conveys as well, right? That would be an example of
23 code switching, wouldn't it?
24      MS. PALACIOS: Objection. Okay. You
25 got my objection.

38 (Pages 146 to 149)

Page 150

1    A   That's an example of stylistic code
2  switching.
3  BY MR. ROBINSON:
4    Q   But it's intentional?
5    A   I can't say that, no. I would not agree with
6  that.
7    Q   That what I did -- when I use the word
8  gonniff it's unintentional?
9    A   Maybe when you used it because you're
10 proficient in both English and maybe you have these
11 vestigial yiddish proficiency. Maybe you know 50 words
12 or 100 words. I don't know.
13   Q   That's a good guess.
14   A   Okay.
15   Q   We've got a dictionary, yiddish for lawyers.
16 It's so terrific.
17   A   So yes, at the word level you can make that
18 stylistic choice. But for certain populations like
19 Puerto Ricans, in fact, code switching is actually
20 their code. So code switching is their language. And
21 they don't really have a fully -- a fully developed
22 Spanish apart from a fully developed English. And some
23 of them have very little English and a lot of Spanish,
24 but still the code is code switching, which means that
25 these people I would have to predict would do very

Page 151

1  little stylistic code switching and most of it would be
2  absolutely automatic because that's their language.
3  It's their -- let's call it their unmarked code.
4    Q   So unmarked code in what context? It's not
5  their unmarked code in Puerto Rico, is it?
6    A   It's what happens when they come to the
7  United States.
8    Q   Now, it's fair to say, isn't it, that code
9  switching can't occur unless two or more people are
10 communicating through the spoken word?
11   A   Code switching can occur individually. In
12 other words, I can sit and be doing my work and I can
13 be --
14   Q   Talking to yourself?
15   A   -- talking and saying this one in English and
16 that one in Spanish and counting in Spanish and then --
17   Q   But you're talking to yourself?
18   A   Yeah.
19   Q   But at least someone has got to be talking
20 for code switching to occur?
21   A   Yes. That's right.
22   Q   And does it continue to be your position that
23 employees at Beauty Enterprises don't have to do much
24 talking, don't have to do much communicating through
25 the spoken word in order to do their jobs?

Page 152

1    A   That's true. In order to do their jobs.
2    Q   So wouldn't it follow then that there
3  shouldn't be many occasions for code switching to occur
4  at Beauty, at least as far as business-related
5  conversations are concerned?
6        MS. PALACIOS: Objection.
7    A   No, that wouldn't follow at all.
8  BY MR. ROBINSON:
9    Q   Okay. Now, in Section 2.2 of your report,
10 you described the charging parties as Spanish dominant
11 bilinguals and limited non-English speakers; is that
12 right?
13   A   Spanish dominant bilinguals and limited and
14 non-English speakers, right.
15   Q   Is there some special linguistic definition
16 of non-English speaker or is the term self-explanatory
17 to a lay person?
18   A   Well, it means that they don't have --
19   Q   Hello.
20   A   I'm sorry.
21   Q   Is there some special linguistic definition
22 of non-English speaker or is the term self-explanatory
23 to a lay person?
24   A   There is a definition.
25   Q   It's a special linguistic definition?

Page 153

1    A   Non-English speaker, yes.
2    Q   And it's different than what a lay person
3  would understand the term to mean?
4    A   Probably.
5        MS. PALACIOS: Objection.
6  BY MR. ROBINSON:
7    Q   Okay. What's the special linguistic
8  definition?
9    A   It means that you have no functional ability
10 in the language. And it means that you could have up
11 to 200 words of vocabulary, but you can't really make
12 yourself understood in English, except for maybe
13 memorized proficiency at work.
14   Q   And that person would be a non-English
15 speaker in your field?
16   A   Yes.
17   Q   What do you mean by a limited English
18 speaker?
19   A   A person that has a little bit more
20 functional ability and, you know, if you're talking
21 about a scale, you could -- that person might fit under
22 a Number 1 in an OPI scale, which is a generally widely
23 accepted scale used by the Foreign Service Institute.
24   Q   What does OPI stand for?
25   A   OPI is Oral Proficiency Instrument scale.

Page 154

1   Q   Is limited English speaker a recognized term
2   in the field of linguistics with its own special
3   definition?
4   A   Yes.
5   Q   What source could I turn to to confirm
6   this?
7   A   Just about any source in the sociolinguistics
8   or second language acquisition.
9   Q   What do you mean by bilingual?
10  A   Persons who have some amount of English but
11  are dominant in Spanish.
12  Q   Or German or whatever other language?
13  A   Right.
14  Q   And is this definition that you've just given
15  me a recognized definition in the field of
16  linguistics?
17  A   Yes.
18  Q   And I could turn to any source to confirm
19  this?
20  A   Yes.
21  Q   What's your basis for saying that the
22  charging parties, as you say, include non-English
23  speakers?
24  A   I did not formally test them, but I did use
25  the interviews that I did as a language sample. And so

Page 155

1   I was -- you know, in my questioning of them I made the
2   assessment that they had very, very limited English
3   ability to the point where I would call them a
4   non-English speaker. They were not functional.
5   Q   So this is --
6   A   Except in the case of work proficiency, which
7   all of them had memorized proficiency.
8   Q   So it would be fair to say you made this --
9   this statement is based on interviews, at least in
10  part?
11  A   Yes.
12  Q   On deposition testimony?
13  A   Yes.
14  Q   On anything else?
15  A   No.
16  Q   So it's based on what the charging parties
17  told you; is that right?
18  A   It was the -- based on the language sample
19  that I gathered at the interview.
20  Q   Language -- you know, a urine sample comes
21  from a person, too. The language sample -- I don't
22  want to be more graphic, but a language sample is
23  something somebody told you, right?
24  A   A language sample is what somebody says.
25  Q   Right.

Page 156

1   A   So if I was asking them a question in English
2   and I realized I had to switch to Spanish because they
3   just didn't understand, then I would -- I was able to
4   assess their language in that way.
5   Q   Could they have fooled you?
6   A   Could they fool me?
7   Q   Yes.
8   A   Well, they wanted to --
9   Q   Could they fool you? Yes or no.
10  A   No.
11  Q   Not possible? Impossible?
12  A   They wanted to communicate with me. They
13  wanted to tell me their story and they were unable to
14  do it in English so I had to switch to Spanish.
15       So in that setting, I would say that I really
16  was able to see their English ability. I was also able
17  to see it in your depositions where there was a lot of
18  problems.
19  Q   With me?
20  A   No.
21  Q   I'm very sensitive. You didn't give any
22  English proficiency tests, right?
23  A   No.
24  Q   You didn't ask any others about the English
25  proficiency of the charging parties, did you?

Page 157

1   A   No, but methodologically --
2   Q   Okay. That's fine. That's fine.
3   A   I used the sample.
4   Q   That's fine. "No" is fine.
5   A   All right.
6   Q   And is your basis for saying that there are
7   limited English speakers the same?
8   A   Yes.
9   Q   And is your basis for saying there are
10  bilinguals are the same?
11  A   Yes.
12  Q   Now, you also say that bilinguals aren't all
13  equally bilingual; is that right?
14  A   That's right.
15  Q   So all things considered, one couldn't fairly
16  say, could one, that the English-only rule effects all
17  the charging parties' ability to communicate the same
18  way or to the same degree, isn't that fair?
19       MS. PALACIOS: I'm sorry, I didn't --
20  can you repeat the question? I apologize, Rick.
21
22       (The testimony was read.)
23
24       MS. PALACIOS: Mark my objection.
25  A   No, I wouldn't agree with that.

40 (Pages 154 to 157)