Page 158

1  BY MR. ROBINSON:
2     Q   So the English-only rule affects a
3  non-English speaker exactly the same way and to the
4  same degree that it affects a highly capable
5  bilingual?
6     A   None of these people are highly capable
7  bilinguals.
8     Q   Okay. That it affects a bilingual?
9     A   None of these people are bilinguals in that
10 sense. They are all code switchers and that's the
11 problem.
12    Q   You describe in Section 2.2, do you describe
13 at least some of the charging parties in Section 2.2 of
14 your report as Spanish dominant bilinguals?
15    A   Yes, but that doesn't say what they speak.
16    Q   Yes. Yes answers the question. Yes is fine.
17       Now, are you telling me something different
18 now?
19    A   No. I told you from the beginning.
20    Q   So the answer -- let me pose my question to
21 you again. Is it your testimony that the English-only
22 rule at Beauty Enterprises affects a Spanish dominant
23 bilingual precisely the same way and to the same degree
24 it affects a non-English speaker?
25       MS. PALACIOS: Objection.

Page 159

1  BY MR. ROBINSON:
2     Q   You can give me at least this one, can't
3  you?
4        MS. PALACIOS: Objection.
5     A   I wouldn't agree with that.
6  BY MR. ROBINSON:
7     Q   You won't give it to me?
8     A   Because this is --
9     Q   Okay. That's it.
10    A   Because they're code switchers as a group.
11    Q   The answer is no.
12    A   Okay.
13    Q   Are you familiar with the charging party
14 Harold Acosta?
15    A   Yes.
16    Q   How would you characterize him, non-English,
17 limited English or bilingual?
18    A   What were your categories again?
19    Q   Non-English, limited English or bilingual,
20 including within bilingual Spanish dominant bilinguals.
21 Do you remember Harold Acosta?
22    A   Yes. Vaguely.
23    Q   Well, you talk about him in your report.
24 He's the guy, among other times you cite his deposition
25 transcript, he's the fellow -- this is to refresh your

Page 160

1  recollection -- who flunked the forklift drivers test.
2     A   Uh-huh.
3     Q   Do you have enough recollection of him to
4  characterize him as non-English, limited English or
5  bilingual?
6     A   I think his, as I remember, his -- he was a
7  dominant Spanish speaker, which means that he had very
8  little English proficiency.
9     Q   Can you use these categories, non-English,
10 limited English or bilingual? I'm including Spanish
11 dominant in bilingual.
12    A   A Spanish dominant bilingual is still by
13 definition a limited English speaker, so --
14    Q   Are you aware that Mr. Acosta testified in
15 his deposition that he was able to speak and understand
16 English?
17    A   Pardon me?
18    Q   Are you aware that Mr. Acosta testified at
19 page 12 of his deposition that he was able to speak and
20 understand English?
21    A   I don't remember that.
22    Q   Do you make a note of that in your report?
23    A   Did I make a note of that in my report?
24    Q   Is there an echo in here? Yes. That's what
25 I asked you. Did you make a note of this in your

Page 161

1  report?
2     A   I don't remember if I did or not.
3     Q   If I tell you you didn't, would that surprise
4  you? Because I don't want you to read 62 pages again.
5  It took me two weeks to do it.
6     A   I did not make a note of it in my report. I
7  will have to take your word for it because I don't
8  remember.
9     Q   And are you aware that Mr. Acosta testified
10 at his deposition that he had the ability to obey the
11 English-only rule?
12    A   I remember -- I think I remember reading
13 that.
14    Q   And you didn't put that down in your report
15 either, did you?
16    A   I didn't, because there is a reason.
17    Q   Okay. That's fine. If I want to know the
18 reason, I'll ask for it.
19       Are you familiar with Miguel Alvarez?
20    A   Let's see. Yes.
21    Q   How would you characterize him, non-English,
22 limited English or bilingual?
23    A   I don't have all of my, you know, notes here
24 on what I categorized each person. But I would have to
25 say that he probably is a Spanish dominant bilingual

Page 162

1  speaker.
2  Q  Were you aware that Mr. Alvarez testified at
3  his deposition that he studied English in the first
4  grade through the third year of high school in Puerto
5  Rico?
6  A  That's a typical English education in Puerto
7  Rico.
8  Q  I didn't ask you whether it was typical. I
9  asked you if you were aware he testified to that in his
10 deposition?
11 A  I can't specifically remember, but I wouldn't
12 be surprised.
13 Q  Were you aware that Mr. Alvarez testified at
14 his deposition that he's been in the States for over 30
15 years?
16 A  I don't remember the exact number of years,
17 but that sounds like it could be plausible.
18 Q  Were you aware that he testified at his
19 deposition that he attended a six-month program of
20 English study in 1970 a year before he arrived here?
21 A  I don't have that noted and I can't check it,
22 but I would not be surprised.
23 Q  Are you aware that he's been at Beauty
24 Enterprises since 1983?
25 A  That sounds plausible.

Page 163

1  Q  And are you aware that at his deposition he
2  rated his English as better than fair?
3  A  I think I remember that, yes.
4  Q  What effect, if any, did this testimony have
5  on your characterization of his -- or your
6  categorization of his English proficiency?
7  A  I didn't depend on their self-report of how
8  their language was.
9  Q  So the answer is none?
10 A  I looked at the sample. I looked at how they
11 actually spoke in the deposition and in my interview.
12 Q  So is the answer to my question then none?
13    MS. PALACIOS: Objection.
14 A  I don't remember what your question is.
15 BY MR. ROBINSON:
16 Q  I know because you're not listening to it.
17 You're telling me whatever you want to tell me. What
18 effect, if any, did his testimony have on your
19 characterization?
20 A  All of those seven pieces of data that you
21 gave me, a lot of -- they contributed a lot.
22 Q  Immensely?
23 A  Well, there are a lot of factors that tell
24 you why a person who's been here for 30 years still has
25 limited English.

Page 164

1  Q  Are you familiar with Luz Andujar?
2  A  Yes.
3  Q  How did you characterize her, non-English,
4  limited or bilingual?
5  A  I really don't have -- I honestly cannot
6  remember and I didn't bring my notes that would tell me
7  the categories.
8  Q  Were you aware that she testified at her
9  deposition that she rates her English as 9 out of a
10 scale of 10?
11 A  I believe I remember that, yes.
12 Q  Would that affect your characterization of
13 her as non-English, limited English or bilingual in any
14 way?
15 A  No. But let me explain why.
16 Q  You don't have to. No answers the question.
17    Marguerita Aponte, did you characterize
18 her?
19 A  I don't remember what -- I would have to look
20 at my notes.
21 Q  Julio Benabe, did you characterize him?
22 A  For all of these people that I interviewed, I
23 have an assessment. I didn't bring it today so I can't
24 tell you exactly what it is. But all of the charging
25 parties I found were either dominant Spanish speakers

Page 165

1  or limited or non-English speakers with code switching
2  as their major code of communication.
3  Q  When you say you have an assessment, is that
4  something physical?
5  A  I made notes on who -- you know, what kind of
6  language each one of these people --
7  Q  Ma'am, is it something physical?
8  A  Physical?
9  Q  Yes.
10 A  Like written down?
11 Q  Is it a piece of -- is it a piece of paper?
12 A  Yes.
13 Q  Okay. Is it like the same kind of piece of
14 paper for each person? Is it on a form, for example?
15 A  It's at the bottom of the interview notes.
16 Q  So it's notes you made on your interviews?
17 A  Yes.
18 Q  And you have those interview notes?
19 A  Not the notes. I have the interview forms.
20 Q  So you don't have the --
21 A  But I have the final -- my analysis on each
22 interview.
23 Q  What do you mean you have your analysis on
24 each interview?
25 A  I have a note to what kind of language these

Page 166

1  people demonstrated after looking at the interviews,
2  assessing that sample and then assessing the
3  depositions. I have a note on each person on what I
4  think of their language.
5      Q   That's what I asked you. You say that's a
6  physical thing, a note?
7      A   Yes. I have a --
8      Q   Is that a separate piece of paper?
9      A   Yes, a separate piece of paper.
10     Q   So it's a separate piece of paper for each
11 charging party?
12     A   No. I have one list with my final assessment
13 of each one.
14     Q   On their language?
15     A   Yes.
16     Q   And that's available to me? I mean, you have
17 it?
18     A   Yes.
19     Q   Okay.
20         MS. PALACIOS: What is it, though, the
21 notes on the assessment of language?
22         THE WITNESS: Yes.
23         MS. PALACIOS: Language assessment
24 notes.
25 BY MR. ROBINSON:

Page 167

1      Q   Now, are these -- you didn't give any
2  standardized English proficiency test to these folks?
3  We established that, yes?
4      A   No. But I used a standard method for
5  assessing the language sample.
6      Q   What method did you use?
7      A   Looking at their discourse abilities.
8  Looking at their grammatical ability. Looking at their
9  ability to function in the language. Ability to ask
10 questions when I -- you know, I used the same kind of
11 methods that the OPI recommends.
12     Q   Does the method have a name?
13     A   It's like the oral proficiency instrument. I
14 just assess the things on the scale when I have a
15 language sample.
16     Q   Was there a numerical assessment?
17     A   Yes.
18     Q   So if I see your notes next to Eva Diaz, for
19 example, I mean what could I see? Don't tell me
20 exactly what's there, you don't remember that, but
21 theoretically what could be there?
22     A   I didn't really use a scale score but I used
23 the scale name. So in other words, it would be
24 functional, you know, at the lowest level,
25 nonfunctional.

Page 168

1      Q   Are those judgments on your part?
2      A   They're judgments based on my knowledge of
3  language proficiency and training and proficiency and
4  testing, yes.
5      Q   At least as to some of the folks, could
6  people equally -- who have the same experience and
7  talents and skills that you have reasonably come to
8  different judgments about characterizations?
9          MS. PALACIOS: Objection.
10     A   For the same population?
11 BY MR. ROBINSON:
12     Q   No. At least to some of these people.
13     A   No, I wouldn't think so. Because the
14 language situation of Puerto Ricans is very well
15 studied and understood. In other words, they would
16 look at these people and understand that, yes, they
17 might have some Spanish proficiency and they might have
18 a little bit of English proficiency, some might have a
19 little bit more English proficiency than others, but
20 together they are code switchers. They use the
21 language interchangeably.
22         And I think that this was really important in
23 your deposition of Marianna Rivera where you were not
24 able to communicate and she refused to use the
25 interpreter. She didn't understand most of your

Page 169

1  questions.
2      Q   I didn't depose Marianna Rivera.
3          MS. PALACIOS: Yes, you did.
4      A   And you didn't understand her answers. And
5  she -- you asked her, What's your best language? Is it
6  English or Spanish? And she actually said English,
7  because for a Puerto Rican, code switcher, they -- the
8  code that they use is code switching. It's English and
9  Spanish at the same time and mixed.
10         So her understanding of her ability in
11 English is really -- she has no ability to understand
12 that her English proficiency is very low because that's
13 just one of the parts of her code, which is code
14 switching.
15 BY MR. ROBINSON:
16     Q   Could there have been any other explanation
17 for Marianna Rivera's performance at the deposition?
18     A   She --
19     Q   Yes or no. Could there have been? I'll ask
20 you what it could be, but yes or no?
21     A   In addition to the language proficiency,
22 perhaps.
23     Q   No. I said could there have been any other
24 explanation, in addition, in place of, whatever?
25     A   Along with the language proficiency problems,

Page 170

1  sure, there can always be other explanations. But the
2  sample was very clear.
3     Q  Oh, yeah, I did take that deposition.
4     A  She had a lot of grammatical problems. She
5  didn't know words. You even tested her and said, Do
6  you know what it means for a police officer to enforce
7  the law? And she said, I don't know enforce. And yet
8  she thought her English was better than her Spanish.
9  So --
10    Q  I have no idea what the question I asked was.
11 We went off on a tangent, which is what I'm trying
12 desperately not to do.
13       I guess what I'm asking you is: If you rated
14 a person as functional, barely functional, could
15 another person equally skilled and experienced as you
16 have rated that person somewhat higher or somewhat
17 lower?
18    A  No, I don't believe so, because the scale is
19 very well defined.
20    Q  Okay. Okay. That's fine. That's fine.
21       The scale is -- you can make the scale
22 available to me?
23    A  Sure.
24    Q  Okay. That's another thing.
25       Okay. Now, take a look at page 25, Section

Page 171

1  2.7.1 of your report. Among the things you say here is
2  that Miguel Alvarez told the EEOC that the reason the
3  charging parties used Spanish in a particular situation
4  was that they didn't know the words in English; is that
5  right?
6     A  Yes.
7     Q  And you cite page 97 of the transcript for
8  that assertion?
9     A  No. This comes from my interviews. And I
10 don't know why I have, "Told plaintiff EEOC," unless it
11 also was consistent with the EEOC findings. But Mr.
12 Alvarez told me that, that he didn't know the words in
13 English.
14    Q  Okay. But then you say that Mr. Alvarez was
15 suspended without pay for two and a half days for this
16 type of incident, right? And that's when you cite page
17 97.
18    A  Yes.
19    Q  So we should -- if we go to page 97 of the
20 transcript, we should expect to see Mr. Alvarez stating
21 in substance there that he actually was suspended for
22 two and a half days for saying words in Spanish that he
23 didn't know in English, right?
24    A  I hope so. Unless it was a typo.
25       MR. ROBINSON: I'll be right back.

Page 172

1
2       (Off-the-record discussion.)
3
4  BY MR. ROBINSON:
5     Q  Let me show you page 97 of his deposition and
6  read it to yourself, if you would.
7     A  Okay. That's definitely an error.
8     Q  So would you concede that page 97 doesn't
9  talk about any actual suspension?
10    A  Yes.
11    Q  Would you agree that there isn't any
12 reference there to his using Spanish because he doesn't
13 know the words in English?
14    A  That's on page 128 to 129.
15    Q  Well, what's on page -- ma'am, wait a second.
16 Hold on.
17       MR. ROBINSON: You're coaching her. You
18 can't do that.
19       MS. PALACIOS: No. She said, Where is
20 page 97? I said, It's right here.
21       MR. ROBINSON: She read page 97.
22    A  Yes. I mean, page 97 he's talking about what
23 could happen if he --
24 BY MR. ROBINSON:
25    Q  There is no question pending. Would you

Page 173

1  agree that there is no reference on page 97 to his
2  using Spanish because he doesn't know the words in
3  English?
4     A  That's not what's cited here.
5     Q  I don't care. Would you just agree with
6  that?
7        MS. PALACIOS: Objection.
8     A  The citation is page 128 to 129. And you're
9  right on those pages.
10 BY MR. ROBINSON:
11    Q  Let's go back, okay? I don't want to make a
12 meal of this. Let's go back to page -- I'm starting
13 with the second sentence of 2.7.1. Says, "Charging
14 parties, Mr. Miguel Alvarez and Ms. Maria Dejesus told
15 plaintiff EEOC that the reason they use Spanish in a
16 particular situation was that they did not know the
17 words in English," period. Did I read that sentence
18 correctly?
19    A  Yes. The next from the interviews and
20 possibly the EEOC.
21    Q  My question is: Did I read it correctly?
22 Did I read it correctly?
23    A  Yes.
24    Q  The next sentence is Mr. -- it states, quote,
25 Mr. Alvarez, parentheses, depo page 97, was suspended

Page 174

1  without pay for two and a half days for this type of
2  incident, period. Did I read that right?
3      A   Yes.
4      Q   Okay. On page 97 in his deposition, which I
5  showed you, is there anything -- is there any reference
6  there to his using Spanish because he doesn't know the
7  words in English?
8      A   That citation does not go to that sentence
9  about Spanish. That's not the way it works.
10     Q   So the answer to my question then is no; is
11 that right?
12     A   Well, no, because there is no relationship.
13     Q   Fine. On page 97 the testimony is to the
14 effect, this is a fair characterization, I hope it's a
15 fair characterization, that's what's my question is
16 going to be, the testimony is to the effect that he
17 understood if he was caught violating the rule more
18 than once he could be suspended for two and a half
19 days. Isn't that what it says there on page 97?
20     A   Yes.
21     Q   So you would agree with me that you miscited
22 page 97 in your report, didn't you?
23     A   Yes, I did.
24     Q   Now, you also say, "At pages 128 and 129 of
25 his transcript, Miguel Alvarez was asked if he had any

Page 175

1  difficulty choosing to speak English to which he
2  responded, 'Well, the words I wouldn't know I would say
3  in Spanish. I try to speak them in English as much as
4  possible. Sometimes Spanish will come out.'" Did I
5  read that right?
6      A   Yes.
7      Q   Take a look at pages 128 and 129 of the
8  transcript and read it to yourself, if you would, and
9  tell me when you're through.
10     A   Uh-huh.
11     Q   Are you through?
12     A   Yes.
13     Q   Now, Mr. Alvarez did, in fact, make the
14 statement that you report him as saying in this Section
15 2.7.1 that we've just read, right?
16     A   Yes.
17     Q   But the question to which this statement was
18 an answer was not what you state in your report; is
19 that correct?
20     A   The question is: "You told us it wasn't hard
21 for you to choose to speak English to the supervisors
22 and managers who don't speak Spanish."
23     Q   I'm sorry, what? You're thinking out loud.
24     A   No. The -- it correlates. This is a
25 summary. When asked if he had any difficulty

Page 176

1  choosing --
2      Q   -- to speak English?
3      A   To speak English.
4      Q   Mr. Alvarez responded, "Well, the words I
5  wouldn't know, I'd say in Spanish. I try to speak them
6  in English as much as possible. Sometimes Spanish will
7  come out."
8      A   Yes.
9      Q   Now, read the actual question -- read into
10 the record the actual question I asked him that
11 elicited that answer.
12     A   Well, there is two questions.
13     Q   Is there a question that begins with, "Is it
14 fair to say"?
15     A   "Is it fair to say that you also have no
16 difficulty choosing to speak English to your other
17 coworkers who don't speak Spanish?"
18     Q   Right.
19     A   And so I summarized that, "When asked if he
20 had any difficulty choosing to speak English." That's
21 a summary and a paraphrase.
22     Q   Okay. That's what it is. That's what you
23 say it is.
24         And just before that question in the
25 transcript, didn't I ask Mr. Alvarez this question, and

Page 177

1  didn't he give this answer. "Question: You told us it
2  wasn't hard for you to choose to speak English to the
3  supervisors and managers who don't speak Spanish.
4         And Mr. Alvarez's response was, "Yes." Is
5  that right?
6      A   Yes.
7      Q   Why didn't you include this testimony in your
8  report, Dr. Gonzalez?
9      A   Well, I think I did somewhere. Not
10 particularly here, but I did report that charging
11 parties said that they could talk to supervisors most
12 of the time. They tried a lot, but they had
13 difficulties, so they switched to Spanish and that was
14 a problem.
15     Q   Do you think you were fair in characterizing
16 the testimony of Miguel Alvarez that appears at pages
17 128 and 129, in characterizing in your report the
18 testimony of Miguel Alvarez that appears on pages 128
19 and 129 of his transcript?
20     A   Yes, I do.
21     Q   Dr. Gonzalez, isn't it true that a number of
22 the charging parties testified at their depositions
23 that it wasn't hard for them to choose to speak English
24 when they were speaking with supervisors, managers and
25 coworkers who didn't speak Spanish?

EEOC vs Beauty Enterprises

3/12/2004                                                                                    Roseann Duenas Gonzalez

Page 178

1       MS. PALACIOS: Objection.
2   A   I do believe that they testified that,
3   but --
4   BY MR. ROBINSON:
5   Q   Is there any reason --
6   A   The problem is that they also, in an
7   interview, told me that.
8   Q   I don't want to know the problem. You
9   answered my question.
10      Is there any reason you failed to note this
11  in your report?
12  A   I don't think I failed to note it.
13  Q   Did you interview Julio Benabe?
14  A   Yes.
15  Q   Did you read his deposition?
16  A   Yes.
17  Q   Did you interview Jose Linares?
18  A   Yes.
19  Q   Did you read his deposition?
20  A   Yes.
21  Q   Is it fair to say that Mr. Benabe's ability
22  to speak and understand English is substantially better
23  than Mr. Linares'?
24  A   I don't remember. And I would have to look
25  at my -- I would have to consult my notes.

Page 179

1   Q   Okay. Let's assume for the sake of the
2   argument that it does. I want you to make that
3   assumption.
4       MS. PALACIOS: Objection to this line
5   of questioning.
6   BY MR. ROBINSON:
7   Q   Now, Mr. Linares has a college degree in
8   civil engineering from the University of Peru. He
9   apparently comes from a well-to-do and well-educated
10  family in Peru. He studied English in school each year
11  from third grade on. He came here as a 35-year-old and
12  took two semesters of ESL education at Trinity College.
13  Do you remember all that from his deposition?
14  A   Yes.
15  Q   Benabe on the other hand went to school in
16  Puerto Rico through the 8th grade and then quit
17  because, in his words, he wasn't any good in school.
18  He came here when he was 21, didn't take any English
19  courses or programs. Do you remember this from his
20  deposition?
21  A   I can't really say that I remember that.
22  Q   If indeed -- well, assume that it's true. If
23  indeed Mr. Benabe's English is better than Mr.
24  Linares', is that at all inconsistent with statements
25  you've made in your report?

Page 180

1   A   Could you restate your question, please?
2   Q   Gee, that's a long one. Is this strategic on
3   your part?
4   A   No.
5   Q   The Reader's Digest version is Jose Linares
6   is a very bright, well-educated guy from a family in --
7   from a well-to-do family in Peru. He came here as a
8   35-year-old, took two semesters of English as a second
9   language education at a relatively renowned educational
10  institution in this town. And on the other hand, Julio
11  Benabe is a guy who went to school in Puerto Rico
12  through the 8th grade, never went to school after that,
13  wasn't any good in school when he was in Puerto Rico,
14  came here when he was 21, didn't take any English
15  courses, and speaks English pretty well.
16      MS. PALACIOS: Objection.
17  BY MR. ROBINSON:
18  Q   And Linares doesn't speak English pretty well
19  or so he said. And I want to know if all that is
20  inconsistent with statements you've made in your
21  report?
22  A   I don't believe so. And it's not
23  inconsistent with second language acquisition.
24  Q   How do you account -- if those facts are
25  true, and I want you to assume they are, how do you

Page 181

1   account for the differences in English proficiency?
2   A   Okay. First of all --
3   Q   In 25 words or less, if possible.
4   A   This is really just speculative because I
5   don't have their -- you know, the notes about these two
6   charging parties in front of me, so I'm totally going
7   by memory. But let's just say I assume what you say is
8   true.
9   Q   This is what I've asked you to do. This is
10  what experts do from time to time in cases. But that's
11  okay.
12  A   That Jose Linares, is, as I remember, is
13  quite a limited English speaker and he came here at 35.
14  And in the sociolinguistic literature we know that when
15  a person comes later in life, it's more difficult to
16  acquire language.
17      On the other hand, when people are very
18  highly educated it becomes a little easier for them to
19  acquire language. So I don't honestly remember exactly
20  where Linares was in this whole make up. But I believe
21  he was a developing English speaker. And I know he was
22  quite dominant Spanish. So he would have to rely on
23  Spanish a lot in order to be able to be completely
24  understood and express himself.
25      As far as Benabe, it all depends -- I

46 (Pages 178 to 181)

Page 182

1  remember --
2  Q  You'd never forget him if you met him.
3  A  I remember that he was basically a code
4  switcher and would talk in English and Spanish mixed.
5  And would -- you know, that was his code. That was the
6  language --
7  Q  You're giving me recollections of these
8  people. I asked you to assume things. What I want you
9  to do is explain to me why, in the most simplistic
10 terms, Linares' English ain't so good and Benabe's
11 English is a lot better.
12 A  I would really have to wait and look at my
13 notes.
14 Q  Okay. Turn to page 29 in your report.
15 A  29?
16 Q  Yes. Look at the first full paragraph that
17 begins on this page. It begins with the sentence, "The
18 charging parties in this case fit the above profile in
19 that they were all young or older adults when they
20 arrived in Hartford, had little formal education,
21 little to no formal English training."
22 A  Where are we exactly?
23 Q  Page 29.
24    MS. PALACIOS: Right here. First full
25 paragraph.

Page 183

1  A  I'm sorry.
2  BY MR. ROBINSON:
3  Q  "Little to no formal English training,
4  occupied low-status, nonlanguage dependent jobs, and
5  lived in virtually segregated language communities."
6  Did I read that right?
7  A  Yes.
8  Q  Now, go back to the part where you say all
9  young or older adults. Does "young" modify adults?
10 A  Yes.
11 Q  Do you stand by this statement that all the
12 charging parties have these characteristics?
13 A  I would say the majority of them did. And I
14 should have not have used "all."
15 Q  Is an 18-year-old a young adult?
16 A  Yes.
17 Q  Is a 17-year-old a young adult?
18 A  Yes.
19 Q  How about a 16-year-old?
20 A  Yes.
21 Q  How about a 14-year-old?
22 A  Yes.
23 Q  How about an 8-year-old?
24 A  That gets into --
25 Q  14-year-old is a young adult?

Page 184

1  A  Yes. High school age. The problem is that
2  language basically has been already formulated and
3  conditioned and it's kind of difficult to learn a
4  second language when you come as an adult, depending
5  also on the socialization and the isolation and the
6  alienation in the communities where they live.
7  Q  And if you were Jewish you would have
8  barmitzvah for over a year, so that's a young adult.
9  8-years-old?
10 A  Eight, that's more getting into a child
11 status. But socialization in the community, in the
12 Puerto Rican community, depending on where people live,
13 have a lot to do with if they're socialized in English
14 or socialized in Spanish.
15 Q  How about a 5-year-old?
16 A  That's also a child, but has to do with
17 socialization. So --
18 Q  Then you say in here, "It is a truism" -- see
19 that sentence? "It is truism," do you see it?
20 A  Yes.
21 Q  "That one class in English each year from
22 elementary through high school in a Spanish-speaking
23 community such as Puerto Rico will not tend to produce
24 fluent bilinguals." Did I read that right?
25 A  Yes.

Page 185

1  Q  What do you mean by a truism?
2  A  That it's been a fact that has been reported
3  for 50 years and it hasn't changed.
4  Q  Do you cite any studies, textbooks or
5  articles for that proposition here in this paragraph?
6  A  Anna Zentella talks about it and she's one of
7  my references in the back. You can go to the census
8  and get the same information.
9  Q  Is there a citation here?
10 A  No. A lot of things I did not cite if they
11 were really general information.
12 Q  What do you mean by "fluent bilinguals"?
13 A  That they were balanced bilinguals in English
14 and Spanish.
15 Q  So one can be bilingual without being
16 necessarily fluent in the second language?
17 A  Right.
18 Q  The bottom of page 2.7.4, at the bottom of
19 the page in section 2.7.4 you say, "The charging
20 parties must translate all of the English they hear
21 into Spanish, think of an answer, code it in Spanish,
22 and then translate it back into English." Did I read
23 that right?
24 A  Yes.
25 Q  Now, you don't say that some of the charging

EEOC vs Beauty Enterprises
3/12/2004 Roseann Duenas Gonzalez

Page 186

1 parties have to do this, do you? So can I assume that
2 you mean here that is all the charging parties have to
3 do this?
4 A Yes, because again their code switches and
5 their matrix is in Spanish.
6      MS. PALACIOS: Can I put in a request
7 for a break?
8      MR. ROBINSON: Let me ask a couple more
9 questions.
10 BY MR. ROBINSON:
11 Q And then in the same paragraph on page 29 you
12 analogize the condition of the charging parties to
13 individuals who suffer from what you call a disability
14 identified as specific language impairment. Do you see
15 that?
16 A Yes.
17 Q Has any scholar or linguist made this analogy
18 or anything close to it or is this simple an analogy
19 that you have made on your own?
20 A It's an analogy that I hoped would make it
21 understandable to lay persons reading this report.
22 Q I didn't ask you --
23 A I made the analogy.
24 Q You're the --
25 A Yes.

Page 187

1 Q This analogy hasn't been made by any other
2 scholar or linguist?
3 A No. Or not that I know of.
4      MR. ROBINSON: Okay. Take a break now.
5
6      (Recess: 3:27 pm to 3:38 pm.)
7
8      (Ms. Bissell left the deposition.)
9
10 BY MR. ROBINSON:
11 Q Turn back to page 2 of your report. Issue 3.
12 Now, you say the third thing you were asked to do here
13 is evaluate whether or not Beauty Enterprises' policy
14 and practice concerning the English-only rule achieved
15 its purported goals for having such a linguistic
16 requirement. Did I read that right?
17 A Yes.
18 Q And is it your evaluation of this that's
19 contained and discussed in Section 3.0 of your
20 report?
21 A Yes.
22 Q One of the subparts of Section 3.0,
23 specifically Section 3.2, is entitled, "BEI's
24 English-only requirement is arbitrary, subjective and
25 undefined." Is that correct?

Page 188

1 A Yes.
2 Q And it's fair to say, isn't it, the
3 discussion in this particular section is designed to
4 make and support the points that the rule is arbitrary,
5 subjective and undefined, correct?
6 A Yes.
7 Q Now, does the word "arbitrary" have a special
8 or technical meaning in the field of linguistics or are
9 you using the word in its ordinary, nontechnical
10 sense?
11 A I'm using it in a specialist sense.
12 Q What is the special or technical meaning of
13 the word arbitrary as you are using it here?
14 A Just talking about if the policy is
15 well-defined, formulated and consistently applied and
16 defined. So --
17 Q Doctor, are we really using the word
18 arbitrary in it's normal, nontechnical sense here?
19      MS. PALACIOS: Objection.
20 A Well, yes. But the analysis is a technical
21 analysis. So --
22 BY MR. ROBINSON:
23 Q Is the same true for the word "subjective"?
24 Are you using it in its ordinary, nontechnical sense?
25 A No, I wouldn't agree with that.

Page 189

1 Q Okay. What's the special technical meaning
2 of subjective in this context?
3 A Meaning that it's not objectively defined as
4 in a rule or a set of criteria that were absolutely
5 formulated, written down and followed and people were
6 trained on it and everyone understood the same thing.
7 Q How does that differ from the ordinary,
8 nontechnical definition of subjective in this
9 context?
10 A My analysis.
11 Q Okay. And would you give the same testimony
12 with respect to the word "undefined"?
13 A Definitely. The common meaning of defined
14 has given me a synonym from the dictionary or a
15 paraphrase of what something means.
16 Q And what you mean here is that there is no
17 definition of the English-only rule, right?
18 A There is no definition. There is no
19 criterion. There is no standard. Nobody knows really
20 what they're talking about.
21 Q In other words, there is no definition of
22 it?
23 A Right.
24 Q And that's special and technical?
25 A The analysis is.

48 (Pages 186 to 189)

Page 190

1  Q  By the way, where could I go in the
2  linguistic literature to find these special technical
3  meanings of the words arbitrary, subjective and
4  undefined?
5  A  Probably to the testing literature.
6  Q  Could you give me one piece that I could
7  get -- a name of one piece that I could go to, put my
8  hands on without having to call you up and do five
9  hours of research? Just give me the name of one place
10 where I could go and confirm that there are special and
11 technical definitions in linguistics for the terms
12 arbitrary, subjective and undefined.
13 A  You could find some of it in Bachman.
14 Q  Bachman. What's Bachman? What's the name --
15 is that the name of a book or an author?
16 A  He's a testing expert.
17 Q  Is he listed in your major references?
18 A  I think so.
19 Q  There it is. Fundamental Considerations in
20 Language Testing. That's where I could go?
21 A  You could, yes. I don't know whether they'd
22 all be there, but that would give you some idea.
23 Q  What should I find there, some special -- and
24 how would I look through Bachman to find a special
25 technical definition in linguistics for the terms

Page 191

1  subjective and/or arbitrary and/or undefined?
2  A  You know, I'm going to take that back. You
3  could look in Bachman, but I would have to look at
4  least 40 other books to try to understand --
5  Q  -- what subjective means?
6  A  What arbitrary, subjective and undefined mean
7  as the way that I'm using them here and in terms of my
8  analysis.
9  Q  That's fine. Okay. Did you use some special
10 or technical methodology in determining that the
11 requirement was arbitrary?
12 A  I used my --
13 Q  Did you use some special or technical
14 methodology in determining that the requirement was
15 arbitrary? Yes or no.
16 A  Yes.
17 Q  Okay. What special or technical methodology
18 did you use in this process?
19 A  Qualitative research.
20 Q  Is that the name of the method?
21 A  Qualitative research. And it's in-depth
22 interviewing, ethnographic interviewing, observation,
23 and the depositions and everything.
24 Q  Everything?
25 A  Yes.

Page 192

1  Q  Who created this method?
2  A  What method?
3  Q  Qualitative research method that you've just
4  described that includes everything.
5  A  Everything in this case is what I'm talking
6  about. All of the materials that I was given and the
7  study that I did on the interviewing.
8  Q  Where in the literature is there anything
9  regarding this method that you used here in Section
10 3.0?
11 A  Qualitative research. Qualitative research
12 is the basic method of finding evidence and data that
13 through usually interview and observation and reading
14 documents that will help you understand how something
15 is being implemented, how it's been developed, and how
16 it's been implemented and the problems or issues
17 involved with that implementation.
18 Q  Why is there no allusion to this method or to
19 any linguistic reference or source in this particular
20 section?
21 A  Probably because I rely on the qualitative
22 research method so heavily, it's, again, a kind of a
23 given in sociolinguistics that that's what you're
24 using.
25 Q  And if I ask you the same series of questions

Page 193

1  about subjective -- the method you use to determine
2  whether the requirement was subjective and undefined,
3  would you give the same answers?
4  A  Why didn't I include my -- --
5  Q  The same series of questions.
6  A  -- citations you mean?
7  Q  What method did you use? Does it have a
8  name?
9  A  Yes. It's all qualitative research. It's
10 gathering data.
11 Q  Why didn't you cite it? Same answers?
12 A  Yes.
13 Q  What part of your specialized linguistic
14 knowledge did you draw on in writing this Section
15 3.2?
16 A  Policy analysis, sociolinguistics, the
17 educational literature on restrictive language
18 policies. All the literature on -- that I am familiar
19 with in -- I already talked about educational settings,
20 workplace settings.
21 Q  Are you finished?
22 A  I think so. There are other things that I
23 can't remember right now.
24 Q  Things you may remember later, you'll give me
25 a telephone call, let me know, okay? Right?

Page 194

1   MS. PALACIOS: That's not usually how
2   it works, but --
3   BY MR. ROBINSON:
4   Q   I'm just being a jerk. Couldn't a reasonably
5   intelligent lay person presented with this issue that
6   you were dealing with and given the record, the
7   discovery record in this case --
8       MS. PALACIOS: Objection.
9   BY MR. ROBINSON:
10  Q   -- have done the very same thing you did?
11      MS. PALACIOS: Objection.
12  A   No. I wouldn't agree with that at all.
13  BY MR. ROBINSON:
14  Q   Aren't you just drawing a conclusion from the
15  record and then identifying what's in the record that
16  leads you to this conclusion?
17      MS. PALACIOS: Objection.
18  A   I'm subjecting the data to analysis.
19  BY MR. ROBINSON:
20  Q   Just answer my question. Aren't you just
21  drawing a conclusion from the record and then
22  identifying what's in the record that leads you to this
23  conclusion?
24  A   That's an oversimplification.
25  Q   Okay. Aren't you really just making an

Page 195

1   argument here, ma'am?
2       MS. PALACIOS: Objection.
3   A   I'm trying to bring out the issues that I
4   found that have a linguistic bearing on the
5   English-only policy at BEI. And I looked at all of the
6   data that we've already talked about and I have
7   analyzed it and come to some conclusions. And I try to
8   give support.
9   BY MR. ROBINSON:
10  Q   What data do you cite in 3.2?
11  A   If you read the beginning of my paper, you'd
12  see that I didn't cite to my interview because
13  everything -- much of my whole paper is based on my
14  interview and observation. I had 60 hours of
15  interviewing with these plaintiffs.
16  Q   What are you getting paid an hour, by the
17  way?
18  A   I don't really remember what my contract
19  states.
20      MS. PALACIOS: That's in the pleading
21  that the company drew up.
22      MR. ROBINSON: I don't remember either.
23      MS. PALACIOS: I don't have it right
24  now.
25  BY MR. ROBINSON:

Page 196

1   Q   Well, you do cite sources here in 3.2, don't
2   you?
3   A   Yes.
4   Q   The first two are responses to the
5   plaintiff's first set of interrogatories?
6   A   Uh-huh.
7   Q   Yes? And you refer -- the next one is a
8   reference to --
9   A   -- depositions.
10  Q   Yes. Deposition of Fabian Pineros, right?
11  A   Uh-huh.
12  Q   And another reference to the
13  interrogatories?
14  A   Uh-huh.
15  Q   And a reference to the employee policy
16  manual, which is one of the documents produced in
17  discovery, right?
18  A   Yes.
19  Q   You cite from Mr. Cohen's deposition, yes?
20  A   Yes.
21  Q   You cite from Mr. Lopes' deposition?
22  A   Uh-huh.
23  Q   Mr. Buonocore's deposition?
24  A   Yes.
25  Q   You go on to cite from various other

Page 197

1   depositions?
2   A   Yes.
3   Q   Is there any other source cited in Section
4   3.2?
5   A   Besides my interview data that --
6   Q   That's not cited?
7   A   No, it's not cited because at the beginning
8   of the paper I said that I wasn't going to cite from it
9   because the --
10  Q   Is there any other source cited in 3.2?
11  A   No.
12  Q   Now, you write in the first section of 3.2
13  that, "BEI's English-only requirement is arbitrary in
14  that it was never defined." I mean, then you go on,
15  but you wrote that, right?
16  A   Yes.
17  Q   Now, take a look at the third sentence.
18  Would you read the third sentence to me out loud?
19  A   "The rule generally was defined as pertaining
20  to restrictions of language on the job."
21  Q   Okay. Stop there. Can you reconcile for me
22  the statement in the first sentence that it was never
23  defined with the statement in the third sentence that
24  it was defined?
25  A   This was one way that it was defined, but it

50 (Pages 194 to 197)

Page 198

1  was not completely defined. In other words --
2  Q  So it was defined, but not well?
3  A  It was minimally defined.
4  Q  Minimally defined?
5  A  And it was never defined on paper.
6  Q  Okay. Do you regard these two statements as
7  consistent?
8  A  Yes.
9  Q  Then you say, "But after the May 2000
10 hearing, BEI disciplined employees for Spanish language
11 use during personal time." Did I read this
12 correctly?
13 A  Yes.
14 Q  Now, Doctor, there are certainly some
15 charging parties who testified to this effect at their
16 depositions; isn't that right?
17 A  Yes.
18 Q  But there are also plenty of other charging
19 parties who had no knowledge of any enforcement of the
20 rule during personal time; isn't that right?
21 A  I believe so.
22 Q  And Doctor, you read the depositions of the
23 Beauty Enterprises' supervisors, didn't you?
24 A  Yes.
25 Q  You're aware that they deny applying the rule

Page 199

1  to time off the clock; isn't that right?
2  A  Yes. Some of them did, and I don't know, I
3  really can't tell you right now.
4  Q  Doctor, you don't note any of that in Section
5  3.2 or anywhere else in your report, do you?
6  A  What?
7  Q  Any of these other pieces of the record from
8  charging parties and supervisors that contradict the
9  assertion you make here that after the May 2000
10 hearing, BEI disciplined employees for Spanish language
11 use during personal time.
12 A  I report on what I see in the majority and
13 look at all of the data and have reported that this has
14 happened to people. Now, I'm not saying that all of
15 them have been, but this has happened to people, that
16 in their perception and their belief, that this is what
17 happened to them, that their personal time has been
18 limited. And I heard it over and over and over again
19 during interview.
20 Q  So it's your position if we went into the
21 record and went through all the depositions and
22 identified those people who say that Beauty Enterprises
23 applied the rule when employees were off the clock and
24 all the employees who said either they don't know
25 anything about it or that didn't happen, the majority

Page 200

1  would be on they applied the rule off the clock side,
2  yes?
3  A  From my interview notes, that would be -- you
4  know, I would have to say that.
5  Q  Well, what about the depositions, too? You
6  want to be careful. You want to corroborate what you
7  found in your interview notes to what was testified to
8  in the depositions, don't you? And read all the
9  depositions, so it shouldn't have been such a difficult
10 task, should it? Answer either one of those questions.
11         MS. PALACIOS: Objection.
12 A  What question do you want me to answer?
13 BY MR. ROBINSON:
14 Q  Whichever one you feel like answering. Limit
15 it to those that I've asked, however. Never mind.
16 I'll withdraw that.
17     You also say in Section 3.2 that Miguel
18 Alvarez was a supervisor; isn't that right?
19 A  Let's see. Yes. And I should have said he
20 was an assistant to a supervisor.
21 Q  Well, there was some issue of whether or not
22 that he was a supervisor in the discovery; isn't that
23 right?
24 A  I thought it was pretty much determined that
25 he was an assistant to a supervisor and he had like

Page 201

1  really supervisory duties, but he didn't have the
2  title.
3  Q  Well, are you saying that Beauty Enterprises'
4  management and supervisors testified that Miguel
5  Alvarez had supervisory duties?
6  A  I can't remember, you know, what they
7  testified, but I do remember that a lot of the charging
8  parties' interaction with Mr. Alvarez was like with the
9  supervisor. He was the one that was there that gave
10 them their orders in the morning, that they could ask
11 questions to, and I understood that he was an assistant
12 to a supervisor with supervisory duties.
13 Q  You wrote he was a supervisor?
14 A  Yes.
15 Q  He testified that he was a supervisor, didn't
16 he?
17 A  I honestly can't remember that.
18 Q  Other people testified -- Beauty Enterprises'
19 people testified he wasn't a supervisor; isn't that
20 right?
21 A  I believe that there was some controversy.
22 Q  And you put down what Mr. Alvarez testified
23 and ignored what the others testified, or isn't that
24 true, or rejected it?
25 A  No. I think what I was thinking of was his

Page 202

1  function. And I think he was an assistant supervisor
2  and I should have said that.
3      Q   Okay. Then in the same paragraph you say,
4  "The rule is also arbitrary because the policy was
5  inconsistently applied across different linguistic
6  groups at BEI." Right?
7      A   Yes.
8      Q   And you cite the testimony of Fabian Pineros
9  at pages 354 and 567 of his deposition, did I read that
10 right?
11     A   I think so.
12     Q   Is the cite to these pages of the deposition
13 intended to suggest that the referenced testimony
14 supports the assertion of inconsistent application
15 across different linguistic groups?
16     A   I would hope so, but this isn't the only
17 thing that attests to that. It's all my interview
18 notes. And again, my interview data is not cited in
19 here. It's just part of the -- you know, it's always
20 supportive of what my assertions are.
21     Q   So if we see a citation here to a
22 deposition --
23     A   That's one place.
24     Q   Yes. But it's got to be special because
25 you've specially gone beyond your interview notes to

Page 203

1  identify a deposition page that you want to put -- you
2  deliberately chosen to put here; is that right?
3          MS. PALACIOS: Objection.
4      A   Well, I'm not going to say that because after
5  writing 60 pages and, you know --
6  BY MR. ROBINSON:
7      Q   Hey, I've got to read this.
8      A   -- 30,000 words and looking at every one of
9  the witnesses, there could be some mistakes. So --
10     Q   Do you have anybody to do cite checking for
11 you?
12     A   Yes.
13     Q   Take a look at page 354 of Fabian Pineros'
14 deposition. Where does it -- and I want you to do that
15 for the purpose of telling me where does it say there
16 in words or substance that Beauty Enterprises applies
17 the rule inconsistently across different linguistic
18 groups.
19     A   Okay. 354 talks about just --
20     Q   Are you going to answer my question or tell
21 me what page 354 talks about? My question is: Where
22 does it say there in words or substance that Beauty
23 Enterprises applies the rule inconsistently across
24 different linguistic groups?
25     A   It talks about inconsistent application.

Page 204

1  That sometimes he let's people off the hook, sometimes
2  he doesn't. That's inconsistent.
3      Q   Is it inconsistently linguistic groups? Does
4  it say that he applies the rule one way for Puerto
5  Ricans and another way for Russians, or words to that
6  effect?
7      A   No. But when I took that and I looked at
8  other data, for example where he said that he let the
9  Jamaican woman sing, you know, instead of telling her
10 English only, and where he let's other people like that
11 go ahead and talk in their language because he likes
12 it, that is across linguistic groups. And it's also
13 inconsistent because sometimes he decides to be lenient
14 and sometimes he decides to be strict, all subjective
15 and depending on however I guess he feels or if Mr.
16 Cohen is in the plant.
17     Q   Okay. So this citation at page 354 isn't a
18 mistake then, right?
19     A   No, that's not a mistake.
20     Q   You're comfortable with that as a citation
21 for the proposition?
22     A   It's part of --
23     Q   Are you comfortable with it as a citation for
24 the proposition?
25     A   As one of the pieces it supports it.

Page 205

1      Q   Now, turn to page 567.
2      A   Oh, dear, there isn't any 567.
3      Q   Watch. Magically it will appear.
4          MS. PALACIOS: Day 3. Day 2, rather.
5          MR. ROBINSON: And this wasn't me, this
6  was her.
7          MS. PALACIOS: So I took a one-time
8  three-day depo.
9          MR. ROBINSON: It was a good one.
10 Really was. Certainly covered the waterfront. Very
11 thorough.
12         MS. PALACIOS: Did a lot of work for
13 both of us in those depositions.
14         MR. ROBINSON: Yes, you did.
15 BY MR. ROBINSON:
16     Q   Does it say there in words or substance that
17 Beauty Enterprises applies the rule inconsistently
18 across different linguistic groups?
19     A   He talks -- here it talks about
20 inconsistently, period. That sometimes he would warn
21 Mr. Alvarez and other times he wouldn't. And --
22     Q   Mr. Alvarez is one person and one linguistic
23 group, right?
24     A   Yes.
25     Q   He might have been inconsistent to the same

Page 206

1 person in the linguistic group that claims to be
2 disadvantaged here. How then could you cite that for
3 the proposition that BEI applies the rule
4 inconsistently across different linguistic groups?
5     A    As I said before, Mr. Robinson, it supports
6 part of the proposition.
7     Q    A big part or a little part?
8     A    Half of it.
9     Q    So now you wanted to be fair here, right, and
10 objective because you're a social scientist, true?
11    A    Yes.
12    Q    And fairness is part of your duty as an
13 expert and part of your obligation as a linguist,
14 right?
15        MS. PALACIOS: Objection.
16    A    It's objectivity with judgment, yes.
17 BY MR. ROBINSON:
18    Q    So if --
19    A    Because one of the things I have to do is
20 synthesize all of the data.
21    Q    If Mr. Pineros was asked a question in his
22 deposition, "Do you apply the English-only rule to
23 everybody in the same way in the warehouse?" And he
24 answered, "Yes," do you think you would have put that
25 down in this deposition -- in this part of the

Page 207

1 report?
2     A    Well, he might have said that. And a lot of
3 the supervisors might have said that. But the charging
4 parties gave very, very clear examples in their
5 interviews with me, and actually the supervisors also
6 testified that they did all kinds of things in
7 languages and joked with people in Italian and taught
8 people Italian words and spoke with other people at
9 times, and some supervisors even said they had complete
10 conversations in Spanish and nobody got cited or
11 reprimanded for anything.
12    Q    Finished?
13    A    So things were inconsistent.
14    Q    Are you finished?
15    A    Yes.
16    Q    You know that Mr. Pineros did make the --
17 there was that testimony that I just described. It's
18 at page 431 of his deposition.
19    A    I'm sure that must be correct.
20    Q    And you didn't cite it here, did you?
21    A    No.
22    Q    And you still think you're fair; isn't that
23 right?
24    A    Absolutely.
25    Q    Isn't it a fact, ma'am, that you rejected

Page 208

1 Pineros' deposition testimony at page 431 because you
2 didn't believe it; it was against what you considered
3 to be the weight of the evidence, yes?
4     A    Synthesis and judgment.
5     Q    Judgment. What do you mean judgment? What
6 kind of judgment? Judgment about what?
7     A    I have to be able to look at all the data.
8 For example, there was a place where Mr. McCormick was
9 asked if he actually said some offensive thing.
10    Q    "Fuck you" or "You fucking Puerto Ricans"?
11    A    He said he didn't, but another supervisor
12 said did he and many charging parties said they heard
13 something. So I have to look at that and say, Well,
14 Mr. McCormick may not have wanted to admit that, but
15 all of these people say this and this person says that
16 and so probably it was said.
17        And so this is just judgment looking at all
18 the data and looking at, you know, what kinds of things
19 charging parties are saying in terms of their specific
20 remembrances of things and looking at all of that and
21 deciding that probably certain things were said. But
22 in the whole of it, all of it is very, very
23 inconsistent, you know, the way the policy was
24 applied.
25    Q    Do you -- is another word for judgment, a

Page 209

1 judgment that you're describing, the credibility
2 determination on your part?
3     A    No.
4     Q    But you didn't believe Mr. Pineros, when he
5 testified at his deposition, that he applies the
6 English-only rule to everybody in the same way?
7        MS. PALACIOS: Objection.
8 BY MR. ROBINSON:
9     Q    Is that right?
10    A    He contradicted himself in his own testimony
11 and said that sometimes he was lenient, if he had a
12 problem he -- sometimes people he didn't do this, he
13 didn't do that. A lot of the supervisors did that.
14    Q    Isn't it true, ma'am, that you cite Mr.
15 Pineros' testimony when it supports your position and
16 you ignore it when it doesn't?
17    A    No.
18        MS. PALACIOS: Objection.
19 BY MR. ROBINSON:
20    Q    Isn't it true that throughout this report you
21 cite deposition testimony that supports your position
22 and reject or ignore deposition testimony that is
23 inconsistent with your position?
24        MS. PALACIOS: Objection.
25    A    No, that's not true at all.

Page 210

1  BY MR. ROBINSON:
2  Q  You're sure of that? Not in the least bit?
3  Not even a tiny little bit?
4      MS. PALACIOS: Objection.
5  A  I support assertions with data all from my
6  interviews. And sometimes I will single out a
7  deposition, okay?
8  BY MR. ROBINSON:
9  Q  You say in Paragraph 3.2 -- I'm reading from
10 part of the sentence -- that, "The rule was not
11 fundamental at Beauty Enterprises." Is that right?
12 A  It was not a fundamental and well-known
13 company policy.
14 Q  What special knowledge do you have as a
15 linguist that enables you to opine as an expert as
16 whether an employer considers a workplace rule
17 important or fundamental?
18 A  The fact that it isn't published. The fact
19 that it isn't well-known. The fact that it is not
20 published or posted in the entryway of the company like
21 all, you know, antidiscrimination kinds of things are
22 put so that people have notice. Looking at all of the
23 situational issues around it, you know, how important
24 is it? Have supervisors had training on it? Have
25 employees been trained on it? Has anybody defined

Page 211

1  what's a flagrant problem or just a little bit of
2  problem?
3  Q  Anything else?
4  A  Well, there is probably a lot more that I
5  can't remember right now.
6  Q  And that's your answer to this question?
7  A  Yes.
8  Q  Now, let's turn to page 32 -- page 32 of your
9  report. We're still on Section 3.2, aren't we?
10 A  Uh-huh.
11 Q  Look at the paragraph at the bottom that
12 begins, "After examining sociolinguistic evidence."
13 Are you with me?
14 A  Yes.
15 Q  "I found the rule to be arbitrary, as well as
16 inconsistently applied in practice in the workplace.
17 The arbitrariness of the rule is evidenced by eight
18 linguistic facts." Did I read that right?
19 A  Yes.
20 Q  Now, the linguistic facts that you're relying
21 on, except in one instance, are excerpts that you cite
22 from depositions I took of certain charging parties;
23 isn't that right?
24 A  Let me review this so that I can agree or
25 disagree with you. Again, any assertion that I make is

Page 212

1  based on all of the 60 hours of interviewing that I did
2  and observation and deposition data, as well as
3  interrogatories.
4  Q  And your experience and your training and
5  everything that's happened to you in your life, true?
6  A  No. I didn't say that.
7  Q  Okay.
8      MS. PALACIOS: What's the question
9  pending?
10
11     (The testimony was read.)
12
13     MS. PALACIOS: There is no answer
14 yet.
15     MR. ROBINSON: No, she's just checking
16 on it.
17 A  Didn't I just give an answer?
18
19     (The testimony was read.)
20
21 BY MR. ROBINSON:
22 Q  I thought that was a preface to what you were
23 about to review.
24 A  No. That's what your question was, Are all
25 of these things taken from the depositions that you

Page 213

1  took? Isn't that what you asked?
2  Q  Are these eight linguistic facts that you
3  cite all based on evidence that constitute excerpts
4  from the depositions I took of certain of the charging
5  parties?
6  A  And I answered no, that's not the only thing
7  I depended on for those assertions, that I took them
8  from my interview notes, from --
9  Q  Okay. We got that.
10 A  Everything.
11 Q  It's the only actual citations you make here
12 next to these list of eight linguistic facts are
13 deposition references, except in this one instance,
14 right?
15 A  Yes, because as I said before --
16 Q  Yes answers the question.
17 A  The interviews I did not cite to.
18 Q  Okay.
19 A  They were part of my data.
20 Q  Okay. Would you agree that some lawyer or
21 lay person can conclude or at least make an argument
22 based on the discovery record in the case that the rule
23 is arbitrary?
24 A  No.
25 Q  Got to be a linguist to do this, right?

Page 214

1  A  You have to understand the -- what a policy
2  should look like, you know, have the understanding of
3  what a language policy can be and how it can be fully
4  explicated, standardized in terms of what it really
5  means, and then have people trained on it so that the
6  implementation is absolutely standardized and not
7  unfair to any group or any person.
8  Q  What is it that makes depositions
9  sociolinguistic evidence in your view?
10  A  It's what people say.
11  Q  Okay. And what is it that makes eight facts
12  you cite linguistic facts, the eight facts that you
13  cite here, linguistic facts?
14  A  Because they are linguistic -- they are
15  pertinent to my linguistic analysis of the policy.
16  Q  So we're clear, you say that it's a
17  linguistic fact that a majority of charging parties
18  were never told of the English-only rule before they
19  started working, yes?
20  A  Yes.
21  Q  And you say that it's a linguistic fact that
22  at least part of the application process was conducted
23  in Spanish by AAA and Essential staff members and some
24  BEI supervisors or managers, right?
25  A  Yes, that this took place.

Page 215

1  Q  By the way, are you claiming that these eight
2  so-called linguistic facts that you list here, that
3  you've taken largely -- or at least cited the
4  depositions that I took, are you claiming that they're
5  undisputed facts in this case?
6  A  I'm just claiming that --
7  Q  Are you claiming that they're undisputed
8  facts?
9      MS. PALACIOS: Objection.
10  BY MR. ROBINSON:
11  Q  Yes, no, or I'm not making any such claim?
12  A  No, I'm just talking about these are the
13  linguistic issues that I found that support my
14  assertion that this policy is arbitrary, as well as
15  everything else that I've said on page 31 and 32.
16  Q  So when you say at least part of the
17  application process which was conducted in Spanish by
18  AAA and Essential staff members and some BEI
19  supervisors or managers, you say that that fact applies
20  to everybody and it's uncontested; is that right?
21  A  No. No. The fact is that it happened and
22  that's part of the arbitrariness of the rule.
23  Q  Okay. That's fine. So it happened to
24  somebody?
25  A  Yes.

Page 216

1  Q  If it happened to two people, you put it down
2  here?
3  A  Well, if it did, yes. But, in fact, it
4  didn't. It happened to more than that.
5  Q  In fact it didn't? In fact it didn't?
6  A  Well, charging parties were -- said that they
7  didn't find out about it from the company or from the
8  employment agency, they didn't really understand it,
9  even if they were told what it meant from the -- when
10  they went to their job, and that it was never fully
11  explicated or that they found out from a coworker.
12  Q  Okay.
13  A  I think that that's very arbitrary.
14  Q  In a scientific and technical sense of that
15  word?
16  A  Yes. A test would not be arbitrary.
17  Q  Are you an expert in sexual harassment?
18  A  No.
19  Q  If an employer had a policy intended to
20  prevent sexual harassment and the policy was
21  subjective, ambiguous and undefined, would you have any
22  difficulty concluding the policy wouldn't do what the
23  employer wanted it to do?
24  A  I --
25      MS. PALACIOS: Objection.

Page 217

1  A  I really am not an expert in sexual
2  harassment so I wouldn't be able to do anything in that
3  regard. As an administrator at my university, all
4  that's turned over to the legal office.
5  BY MR. ROBINSON:
6  Q  Now, do you see in here where you say that,
7  "Because the rule isn't derived from an empirical
8  standard"?
9  A  Where is that, please?
10      MS. PALACIOS: Do you know what section
11  it's in?
12  A  Is it in the first section?
13  BY MR. ROBINSON:
14  Q  Here it is, next sentence, 3.2.1, "Because it
15  is not derived from an empirical standard," and you go
16  on. Do you see that second sentence, 3.2.1?
17  A  Okay.
18  Q  Do you see the reference to empirical
19  standard?
20  A  Yes.
21  Q  Essentially you're saying because the rule
22  isn't derived from an empirical standard, something bad
23  can happen, right? What's the matter?
24  A  What's your question? Something bad can
25  happen?

Page 218

1  Q  No. I mean -- okay. You're saying that
2  because the rule isn't derived from an empirical
3  standard?
4  A  Meaning that no one has --
5  Q  I'll get there. But something bad can
6  happen, as you describe later that we'll get to. I
7  just want to get beyond this.
8      MS. PALACIOS: Objection.
9  BY MR. ROBINSON:
10 Q  To ask you what do you mean by empirical
11 standard?
12     MS. PALACIOS: So is that the question?
13     MR. ROBINSON: Yes.
14 A  Okay. An empirical standard is -- what I
15 mean is no one investigated to find out what the
16 communicative tasks were on the job, and if it was
17 really necessary to have a particular level of English
18 on the job to be able to do the job. And so that's a
19 lack of empirical standard.
20 BY MR. ROBINSON:
21 Q  That's a standard?
22 A  Yes. If you were going to test on that, that
23 would be a standard.
24 Q  Test on what?
25 A  On the kind of English that's required on the

Page 219

1  job. So in other words, the policy is basically acting
2  like a test. If you don't have enough English to speak
3  English all the time on this job, then you're going to
4  be terminated, suspended, and maybe fired.
5  Q  Well, if you're terminated, you're certainly
6  going to be fired probably both at the same time?
7  A  Yes. And if there was an empirically defined
8  standard, if Mr. Cohen had done as he said that he did
9  in his amicus brief where he said that he
10 investigated --
11 Q  It's amazing how conversant you are with all
12 the evidence that supports the government's position.
13 You are very conversant with that evidence, aren't
14 you?
15     MS. PALACIOS: Objection. The brief
16 was written by you.
17     MR. ROBINSON: Okay. But she's trying
18 to use it against us.
19     MS. PALACIOS: Objection.
20 A  I'm just saying that he talked about
21 investigating, you know, what was needed on the job and
22 things like that. If he had done that, and there had
23 been a test that was devised and you actually found
24 that English was needed on the job, then that would be
25 an empirically derived standard. Then you could say,

Page 220

1  Oh, this is what we're going to ask people to do and
2  this is why.
3  BY MR. ROBINSON:
4  Q  So by empirical -- well, what would be an
5  empirical standard for an English-only rule that would
6  be legitimate or that would legitimize or warrant an
7  English-only rule?
8      MS. PALACIOS: Objection.
9  BY MR. ROBINSON:
10 Q  A language-dependent job?
11 A  A language-dependent job where you really had
12 to have certain levels of language. Like the
13 Administrative Office of the United States Courts has
14 its very high linguistic standard. You know, there has
15 been 18,000 interpreters who have taken this test that
16 I devised that I was primary consultant for and
17 everyone has failed except for about 1,200 people
18 across the country.
19     And that standard is there because we did a
20 very large empirical study of the language of the court
21 and we determined that this is the level of language
22 required. We can test on it and it's a real business
23 necessity.
24 Q  By the way, in the last five years how much
25 of your professional time has been spent with matters

Page 221

1  relating somehow, some way to your court reporting
2  subspecialty -- court interpreting subspecialty? She's
3  the expert on court reporting.
4  A  Well, let's see. As director of the National
5  Center for Interpretation at the university, half my
6  time is there and part of that time has to do with
7  testing and interpreting, training and interpreting,
8  and a large part of it has to do with language policy.
9  Actually helping agencies, businesses, governments,
10 work with -- develop language policies that work.
11 Q  That's court interpreting?
12 A  No. My center is policy research and
13 teaching.
14 Q  What's the name of the center?
15 A  National Center for Interpretation.
16 Q  And what do you mean by interpretation?
17 A  Interpretation, like language services. Like
18 interpreting and translating.
19 Q  In court?
20 A  Everywhere.
21 Q  But everywhere?
22 A  Yes.
23 Q  And having the English -- the language
24 proficiency skills someone needs to be an effective
25 interpreter?

Page 222

1    A  Yes. But we deal with policy testing.
2    Q  Policy about what?
3    A  Language policy.
4    Q  What kinds of language policy?
5    A  Language policy for courts. Language policy
6 for agencies.
7    Q  Give me an example of a language policy for a
8 court that you've dealt with.
9    A  Okay. The Executive Office of Immigration
10 Review. I was the expert for the Executive Office of
11 Immigration Review when they were sued by 500
12 immigrants who felt that their civil rights were being
13 violated by the fact that when they went into the
14 Executive Office of Immigration Review courts, that
15 simultaneous interpretation was not offered to them.
16 They sat there like mutes and, you know, in a
17 sound-proof box not understanding anything that was
18 going on. The only time they received interpretation
19 was at the stand.
20   Q  You're describing to me a bunch of facts?
21   A  No, this is what I'm telling you. This was
22 the language policy problem.
23   Q  But what was the policy that -- I mean,
24 describe the policy, like there is an English-only
25 policy, like there is a this policy.

Page 223

1    A  Okay. The Executive Office of Immigration
2 Review had a policy, no interpretation for immigrants
3 when they -- their cases were being heard except at the
4 witness stand.
5    Q  And you determined that that was a bad
6 policy?
7    A  I determined that that was a problematic
8 policy. But I was working for the Executive Office of
9 the Immigration Review. Susan Berk-Seligson was the
10 opposing witness and she was working for the
11 plaintiffs.
12   Q  Who?
13   A  Susan Berk-Seligson, sociolinguist. And
14 basically what I was doing was -- I told the Executive
15 Office of Immigration Review, Let me look at your
16 policy. I went and observed --
17   Q  Okay. I don't need to know all that. I'm
18 trying to get some sense of what you do.
19   A  Here is another one. San Francisco fireman.
20 They had a policy that they didn't have people who
21 could give interpretation or translation to Chinese and
22 Spanish people who needed help with 911 emergencies,
23 fires, everything else. So I went in and looked at
24 their whole system and I devised a certification test
25 for them so that they can now have a policy where they

Page 224

1 would have quality interpreting services for Spanish
2 and Chinese, mandarin and Cantonese speakers in the
3 communities so that they could do their work.
4    Q  Is that a policy or were you just figuring
5 out how to implement some previously set objective?
6    A  No. That was a policy.
7    Q  What was the policy?
8    A  The policy was that they would have -- it was
9 policy and planning. How do you get from point X to
10 point Y.?
11   Q  How is that different from implementation,
12 which is what I used in my question?
13   A  Okay. Because I developed what the policy
14 should be. I told them what the language services
15 should be. I did a complete investigation.
16   Q  You told them they should have interpretation
17 skills, right? Is this facility available, yes?
18   A  I told them that they should have certain
19 kinds of interpreting available, other kinds not, and
20 not translation skills available. So I made a whole
21 language services plan for them out of their, you know,
22 initial need. And I had to investigate all of these
23 same kind of things that I'm investigating now.
24   Q  Was your task to determine what, if any,
25 interpretation or translation skills this 911 system

Page 225

1 should have?
2    A  Their whole system, including the 911, yes.
3    Q  All right. And so you -- the policy was that
4 they were going to have something, yes, and that was
5 already set?
6    A  Yes. And I defined the policy.
7    Q  And you came in and refined it and defined it
8 in words and developed action plans and implementation,
9 yes?
10   A  And did all the research, yes.
11   Q  And how much time do you spend teaching?
12   A  I teach one course a semester, but only since
13 about the last two years because before then I was a
14 full-time administrator for the National Center for
15 Interpretation.
16   Q  How much time do you spend doing -- where
17 does this expert witness stuff fall in your
18 categorization of your activities?
19   A  It's independent consulting work, but at the
20 same time it's -- these are counted for service and
21 publications in my annual review.
22   Q  In other words, it's part of the Center for
23 Interpretation and --
24   A  Yes.
25   Q  It is?

Page 226

1   A   Yes.
2   Q   Okay. So how much of your time do you spend
3   doing expert witness stuff in discrimination cases?
4   A   Well, you mean just discrimination -- civil
5   cases that have to do with discrimination?
6   Q   Yes.
7   A   It's probably about -- well, right now I'm
8   working on two cases. And it's usually --
9   Q   This is one of them?
10  A   And it's usually always about one or two
11  cases.
12      MS. PALACIOS: They're all
13  discrimination?
14      THE WITNESS: No. Some of them are
15  criminal cases, death penalty issues with interpreting
16  issues. Language assessment proficiency.
17  BY MR. ROBINSON:
18  Q   Okay. Now, let's go back to the statement
19  about empirical standard. You say, "Because it's not
20  derived from an empirical standard and because it's
21  inconsistently and subjectively applied, the policy
22  invites discriminatory treatment of individuals who are
23  members of a linguistic ethnic minority." Did I read
24  that right?
25  A   Yes.

Page 227

1   Q   Are you saying here that the group subject to
2   discriminatory treatment comprises all of the
3   linguistic or ethnic minorities and not just the
4   Hispanics?
5   A   Well, it invites discriminatory treatment of
6   individuals who are members of linguistic ethnic
7   minorities, but in its application it's mainly the
8   Hispanics who have gotten the brunt of this.
9   Q   So it invites --
10  A   In other words, it's susceptible to
11  discriminatory treatment.
12  Q   Against all linguistic ethnic minorities?
13  A   Right. But as it's been applied, it's been
14  mainly to Hispanics.
15  Q   Based on -- and you base that conclusion on
16  your review of the record?
17  A   And my interviews, yes.
18  Q   Did you interview any of the Russian
19  employees?
20  A   No.
21  Q   Did you interview any of the --
22  A   But I read their depositions.
23  Q   Good. Did you interview any of the Jamaican
24  employees?
25  A   No.

Page 228

1   Q   Did you interview any of the African American
2   employees?
3   A   No.
4   Q   Did you interview Mr. Cohen?
5   A   No.
6   Q   Did you interview any of the Beauty
7   Enterprises' supervisors?
8   A   No.
9   Q   Did you interview any of the Beauty
10  Enterprises' employees who weren't charging parties in
11  this case?
12  A   No. Can we take a quick bathroom break?
13
14      (Recess: 4:32 pm to 4:39 pm.)
15
16  BY MR. ROBINSON:
17  Q   From your report in this -- I'm now in -- I'm
18  still at 3.2.1. You -- are you there citing as
19  evidence of this invitation to discriminatory treatment
20  Mike Ambrusio's testimony that he failed to apply the
21  rule to Bosnians in the Elliott Street warehouse?
22  A   Yes.
23  Q   You know that Mr. Ambrusio is a supervisor in
24  that warehouse, right?
25  A   Yes.

Page 229

1   Q   Did you learn through your review of the
2   materials that you reviewed what Beauty's position was
3   or is concerning the application of the English-only
4   rule to those Bosnian workers?
5   A   Yes. In the -- it's stated in the policy.
6   Q   So you then understand that Beauty
7   Enterprises made a deliberate decision to exclude this
8   small group of employees from the application of the
9   rule, right?
10  A   Yes.
11  Q   So doesn't it follow that Ambrusio was simply
12  following orders, so to speak, in failing to apply the
13  rule to Bosnians and that he wasn't acting on his own
14  in dealing with a rule that failed to provide him with
15  enough guidance?
16      MS. PALACIOS: Objection.
17  A   I believe that Mr. Ambrusio was saying that
18  he was having a little bit of trouble with that because
19  people were -- you know, when Warehouse 5 expanded to
20  do all other kinds of things and the Bosnians also
21  expanded their duties, that it just did not -- it was
22  inconsistent in the same warehouse for this little
23  group to be able to speak their own language. What
24  about all the other people that were in that warehouse
25  doing other things? It caused ethnic strife.

58 (Pages 226 to 229)

Page 230

1  BY MR. ROBINSON:
2   Q  Well, he might not have -- he might have felt
3  uncomfortable applying the rule to excluding one group
4  of people from the rule, but the point I'm making is
5  that he was following orders. It wasn't that he was
6  doing this because the rule didn't provide him with
7  enough guidance. He was following the rule and
8  following the exception to the rule, right?
9         MS. PALACIOS: Objection.
10 BY MR. ROBINSON:
11  Q  Do you see what I mean?
12  A  I'm not going to agree with you. The
13 problem --
14  Q  Why start now?
15  A  The problem is that the English-only policy
16 itself is inconsistent in that if its objective is to
17 promote harmony and avoid tensions, you're already
18 setting up a tension by allowing some people to be
19 exempt, and that inconsistently applying the rule to
20 other cleaners that were Spanish speaking who were
21 subject to the rule.
22  Q  All right. Let's turn to Section 3.3. You
23 entitle that "English-only policy undermines workplace
24 harmony and causes ethnic tension." Okay?
25  A  Yes.

Page 231

1   Q  Did you conduct any scientific survey to
2  assess the presence or absence of harmony or ethnic
3  tension in the warehouse at Beauty Enterprises at any
4  particular point in time?
5   A  In my interview I asked questions about, you
6  know, how people -- what happened after the imposition
7  of the rule? What happened? You know, could they
8  describe things in the warehouse? And so the
9  descriptions that I got, plus other things, like the
10 interrogatories and the -- wherever I could find things
11 in the deposition to analyze, I put that all together
12 and came up with the conclusion that it really did
13 cause ethnic tension in and of itself.
14  Q  Would you like to hear the question again or
15 are you satisfied with that answer?
16  A  I'll hear it again.
17  Q  The question is: Did you conduct any
18 scientific survey -- and just tell me that "I'm
19 satisfied with my answer" or "I'm not satisfied with my
20 answer," okay -- did you conduct any scientific survey
21 to assess the presence or absence of harmony and/or
22 ethnic tension in the warehouse at Beauty Enterprises
23 at any particular point in time?
24  A  Yes. Survey and analysis.
25  Q  Are you satisfied with your answer?

Page 232

1   A  I'm saying yes, survey and analysis.
2   Q  Yes, you are satisfied with your answer?
3   A  And I'm adding.
4   Q  You're adding something?
5   A  My interview set of questions and my analysis
6  of all of the data that I read.
7   Q  Okay. So what particular points in time did
8  you assess for the presence or absence of harmony
9  and/or ethnic tension in the warehouses at Beauty
10 Enterprises?
11  A  I came on the scene and asked people to talk
12 about what they felt about the rule. And they
13 described a lot of ethnic tension. What I was able to
14 glean from that was ethnic tension, meaning that it
15 caused problems between the groups in the plant.
16  Q  Are you satisfied with the answer? Are you
17 satisfied with that answer to my question?
18  A  That I used my training and methodology to do
19 my analysis, yes.
20  Q  My question was: What points in time or
21 single point in time, if that's the case, did you test
22 or use to determine whether there was ethnic tension
23 and/or harmony present or absent in the workplace; in
24 other words, did you make a determination as to whether
25 there was ethnic harmony or tension present in the

Page 233

1  workplace in 1985 or in 1990 or in 2000 or in June of
2  2002? Something like that.
3   A  I asked questions and, you know, studied all
4  of the data to understand when this ethnic tension was
5  present and if it escalated at a certain point after
6  the rule was imposed.
7   Q  After the rule was imposed? When was the
8  rule imposed?
9   A  Well, that's really difficult to say.
10  Q  Well, but you just referred to a point in
11 time that after the rule was imposed as if there was a
12 time when the rule was imposed and --
13  A  Okay. People say that the rule became more
14 known in the early '90s, and then there seemed to be
15 some meetings, at least in the hallway or somewhere,
16 actually talking about the rule. And so I looked at
17 what ethnic tension there was that people could talk
18 about.
19  Q  When?
20  A  After they became aware of the rule and when
21 it began to be implemented more strongly.
22  Q  But people became -- you know, we have people
23 who in this charging party population who joined Beauty
24 Enterprises at a variety of different times.
25  A  And so I was able to look at what people said

Page 234

1  who had been there for a long time, people that had
2  just gotten there, and what happened. I looked at the
3  depositions. For example, Pineros, who says that
4  nothing changes, that there will always be these
5  problems in the workplace.
6      Q  He's credible?
7      A  No, I'm not saying that. I never said that.
8  So I took all of the data and said that, you know, this
9  policy did not lessen ethnic tension, but it
10 exacerbated it.
11     Q  You didn't talk to anyone other than certain
12 of the charging parties for this, did you?
13     A  I looked at all the depositions, so I read
14 all of the statements of the supervisors and Mr. Cohen
15 and everyone, and my observation and my interviews.
16     Q  In this discussion here, do you cite to any
17 linguistic or sociolinguistic textbook as the
18 methodology used to test for the presence or absence of
19 harmony and/or ethnic tension in the workplace at
20 Beauty Enterprises?
21     A  Sociolinguistically, you can get this --
22     Q  Do you cite to any?
23     A  No. I'm not citing to any. I'm not citing
24 to any.
25     Q  Do you cite to any articles as a source of

Page 235

1  your methodology?
2      A  No.
3      Q  Have you published any studies you've made of
4  the presence or absence of harmony and/or ethnic
5  tension in workplaces?
6      A  I've discussed them in some publications.
7      Q  Have you published any studies that you've
8  made of the presence or absence of harmony and/or
9  ethnic tension in the workplaces?
10     A  No. That's in the works.
11     Q  Have you even studied the presence or absence
12 of harmony and/or ethnic tension in workplaces before
13 your engagement on this Beauty Enterprises case?
14     A  Yes, as one of --
15     Q  How about have you --
16     A  As one of the contexts that you look at in
17 any workplace.
18     Q  Have you studied the presence or absence of
19 harmony and/or ethnic tension in workplaces before you
20 started working for the EEOC?
21     A  Yes. In a case called -- well, no, not
22 before the A and B Nursery case, I believe. But I'd
23 have to check.
24     Q  Have you had any courses in any of your
25 studies where you've studied the factors that impact

Page 236

1  upon harmony in an industrial workplace?
2      A  Mr. Robinson, when you go in and do a
3  language policy analysis, you look at the language
4  policy. The language of the policy tells you what
5  areas you need to make sure that you look at.
6         One of the objectives of the policy was
7  harmony. One of the objectives in the language policy
8  in Alabama was something else, integration into the
9  society. So you always look at the purposes and goals
10 of a policy as stated, and then you do your analysis to
11 make sure that you're looking at that in particular to
12 see if there are other ways you know a policy could be
13 written or there are other accommodations that could be
14 made so that people aren't hurt and that objectives are
15 better met.
16     Q  Doctor, I don't mean to be rude, but my
17 question was: Have you had any courses in your
18 graduate studies where you've studied the factors that
19 impact upon harmony in an industrial workplace?
20     A  In a language policy course you would talk
21 about all kinds of situational factors that would go --
22 that would tell you what the sociolinguistic
23 environment in terms of the -- you know, the hostility
24 or the encouraging nature of the environment is. And
25 it's a major theory in second language acquisition that

Page 237

1  you always have to look at the effective issues. How
2  are people feeling about the policy? What is it
3  producing in the classroom or in the workplace? And
4  this goes across workplace, classrooms, agencies,
5  anywhere there is a language policy. You always have
6  to look at that. That's part of the -- you know, the
7  basic methodology in a policy analysis.
8      Q  Have you ever even worked in a warehouse or a
9  factory?
10     A  No.
11     Q  Do you consider yourself an expert in what
12 creates harmony or disharmony in a workplace?
13     A  As it pertains to language, yes.
14     Q  Well, isn't the presence or absence of
15 harmony or disharmony in a workplace a function of
16 potentially many factors?
17     A  Yes. Language would be one of them.
18     Q  Language could be one of them?
19     A  Yes. And that's what I consider myself an
20 expert in.
21     Q  But you're not a general expert in workforce
22 harmony, are you? Workplace morale?
23     A  No. I'm a language policy expert.
24     Q  Isn't it fair to say that the method you used
25 to conclude that the English-only rule undermines