UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY ) COMMISSION, ) Plaintiff, ) -against- ) BEAUTY ENTERPRISES, INC., ) and ESSENTIAL TEMPORARIES, INC. ) Defendants ) ) | |
| MIGUEL ANGEL ALVAREZ, ) WILLIAM TORRES, LUZ ANDUJAR, ) EVA DIAZ, WALESKA MIRANDA, ) JOSE LINARES and HAROLD ACOSTA ) Plaintiff-Intervenors, ) -against- ) BEAUTY ENTERPRISES, INC., ) Defendant ) ) | Civil Action No. 301CV378AHN  May 28, 2004 |
| LUZ ANDUJAR and ) WALESKA MIRANDA ) Plaintiff-Intervenors, ) -against- ) ESSENTIAL PERSONNEL, INC., ) Defendant ) ) | |

**PLAINTIFF, EEOC'S MEMORANDUM IN OPPOSITION TO
BEI'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
EARNEST F. HARPER**

Plaintiff, Equal Employment Opportunity Commission ("EEOC") files this Memorandum

in Opposition to Defendant, Beauty Enterprises, Inc.'s ("BEI") Motion and Memorandum in

Support of its Motion to Exclude the Testimony of Ernest [sic] F. Harper ("Mr. Harper").  The

EEOC respectfully requests that this Court deny BEI's Motion and allow Mr. Harper to provide

the proposed expert testimony in this case which is admissible under applicable law.

1

## I.    PROCEDURAL BACKGROUND

On or about March 12, 2001, the EEOC filed this action pursuant to Section 706(f)(1) and (3) of Title VII, 42 U.S.C. §2000e (5)(f)(1) and (3), ("Title VII"), alleging that BEI, AAA Industrial Temporaries, Inc. ("AAA"), and Essential Personnel Inc. ("Essential"), violated Title VII.[1]  EEOC seeks class-wide relief in this case on behalf of 15 Hispanic Charging Parties and other similarly situated individuals who suffered from unlawful national origin discrimination - under a disparate impact, disparate treatment and hostile work environment theory - retaliation, constructive discharge and discriminatory discharge while employed at BEI.  *See generally* (EEOC Compl.).  At the heart of this case is BEI's English only policy, which EEOC alleges is unlawful.

Discovery in this case is complete.  BEI has not designated any experts of its own in this case.  Instead, it has sought to exclude EEOC's experts.  In this Motion, BEI seeks to exclude Mr. Harper's expert testimony despite his overwhelming qualifications as a safety professional and his testimony which is relevant and reliable, consistent with the Federal Rules of Evidence, and allowed by applicable case law.  BEI has requested oral argument in this case.  EEOC does not believe oral argument or a Daubert hearing is necessary to resolve BEI's Motion.  However, should the Court require either, sufficient time is requested to coordinate travel prior to a Daubert hearing for Mr. Harper who resides in Boise, Idaho.

---

[1]Essential and AAA are no longer part of this litigation.  Essential filed for Chapter 7 bankruptcy on July 13, 2001, and EEOC settled its claims against AAA by Consent Decree entered by this Court January 2, 2003.

## II.    INTRODUCTION

As described above, this case involves a number of discrimination claims related in part to BEI's English only policy.  Although there are many disputes between the parties regarding BEI's English only policy,[2] there is no dispute that BEI has such a policy and that it was first put into writing in March 2001 following the filing of the EEOC's lawsuit.  *See* (BEI Am. Resp. to EEOC First Set of Interrogs., at 2), attached at **Tab 1**.  There is also no dispute that this written policy reads as follows:

> In order to promote harmony and avoid tensions among the Company's racially and ethnically mixed workforce, as well as for **safety** and efficiency, Beauty Enterprises, Inc. maintains a Speak only English rule - a rule requiring employees to speak only English while they are working.  At lunch or on breaks, employees are free to speak in the language of their choosing.  All job applicants must be able to read, write and speak English.  The only exception to this rule applies to product cleaners who work in a physically segregated space in an ancillary warehouse and have little or no contact with the rest of the warehouse.

(emphasis added).  (BEI English Only Policy, BEI Employee Policy Manual, at 6), attached at **Tab 2**.  One matter which remains vigorously in dispute, among others, is BEI's alleged business necessity for the policy.  Specifically related to BEI's desire to exclude Mr. Harper's testimony, is a dispute surrounding BEI's allegation that its English only rule is justified by the business necessity of safety.

Under Title VII, an unlawful employment practice based upon disparate impact is established if the plaintiff shows that the employer uses a particular employment practice that causes a disparate impact on a protected group.  *See generally* 42 U.S.C. §2000e-2(k).  The

---

[2]For example, the parties dispute when BEI first implemented the policy, the reasons BEI implemented the policy, and the scope of the policy itself.  In that regard, EEOC specifically disagrees with BEI's assertion that its English only policy applies only "on the premises and on the clock."  (BEI Mem. at 2).

burden then shifts to the employer to demonstrate a legitimate "business necessity"[3] for the

practice.  Id.  If the employer demonstrates a business necessity for the practice, the burden then

shifts back to plaintiff to prove that the employer could have used other non-discriminatory

means to satisfy the same business necessity.  Id.  EEOC regulations state that an English only

policy that applies at all times is a burdensome term and condition of employment that

disadvantages an individual's employment opportunities on the basis of national origin and is

presumptively unlawful.  See 29 CFR §1606.7 (a).[4]  When such a policy applies at certain times

it must be justified by business necessity.  See 29 CFR §1606.7 (b).  Furthermore, where an

employer has an English only policy that applies only at certain times, the employer should

inform its employees of the general circumstances when speaking English is required and of the

---

[3]The EEOC has adopted the test for business necessity set forth in Robinson v.
Lorillard Corporation, 444 F.2d 791 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006 (1971).
Applying the test used in Robinson to BEI's business necessity for its English-only policy, it
must (1) be compelling enough to override discriminatory impact, (2) carry out the purpose that it
is said to serve, and (3) there must be no acceptable alternative policies or practices which would
better accomplish the business purpose advanced or accomplish it equally well with a lesser
differential disparate impact.  Id. at 798.

[4]BEI erroneously relies upon the cases of Garcia v. Gloor, 618 F.2d 264 (5th Cir. 1980),
rehearing denied, 625 F. 2d 1016 (5th Cir. 1980), cert. denied, 449 U.S. 1113 (1981), and Garcia
v. Spun Steak, 998 F.2d 1480 (9th Cir. 1993), rehearing en banc denied, 13 F.3d 296 (9th Cir.
1993, cert. denied, 512 U.S. 1228 (1994), in its Memorandum, at n. 3, for its position that EEOC
Guidelines are not a sound interpretation of Title VII.  The EEOC had not implemented any
guidelines on English only rules when Gloor was decided, see Gloor at n.1.  Also, the Ninth
Circuit's decision not to apply the EEOC Guidelines in Spun Steak was based on the Court's
finding that there was nothing in the Congressional Record regarding English only policies.
Compare EEOC v. Premier Operator Services, Inc., 113 F.Supp.2d 1066, 1074 (N.D.Tex.
2000)(citing to Congressional Record for support of EEOC's English only regulations and
finding the EEOC's regulations applicable).  See also EEOC v. Synchro Start, Inc., 29 F.Supp. 2d
911, 913 (N.D. Ill. 1999)(giving substantial weight to EEOC interpretation of the statute in
English only case given its administrative interpretation of Title VII is entitled to great
deference.)

consequences of non-compliance with the policy; if the employer fails to effectively notify its employees of the policy, the employer's adverse employment action against an individual in violation of the rule will be considered evidence of discrimination on the basis of national origin. *See* 29 CFR §1606.7 (c).

As part of making a determination in this case, the jury will have to evaluate whether BEI's English only policy is justified by business necessity, a task which will require rigorous scrutiny and analysis of BEI's policy - its history, implementation, evolution and enforcement, rationale and goals - and ultimately a determination as to the existence and viability of non-discriminatory alternatives to said policy.  One particular part of this scrutiny will be to examine whether one of BEI's alleged reasons for the policy - safety - is legitimate and supported by business necessity.  Where Mr. Harper's testimony will educate the jury and assist it in making its decision on this crucial matter, his testimony should be permitted.

### III.  SUMMARY OF ARGUMENT

To assist the jury in making its determinations in this case, EEOC seeks to qualify Mr. Harper in the area of workplace safety.  As described more fully below, Mr. Harper is qualified to testify in the area of workplace safety given that his experience satisfies the requirements of Fed. R. Evid. 702.  His testimony should also be permitted as relevant given that it will educate the jury so that it can evaluate the alleged business necessity of safety for BEI's English only policy. As his testimony is based on all the facts in the record and the product of his vast experience in workplace safety applied to the case facts, it should also be admitted as reliable.  Furthermore, given that Mr. Harper is qualified to provide expert testimony, most of BEI's arguments regarding his testimony go to the weight of his testimony and not to its admissibility.  Thus, BEI

will have the opportunity to cross-examine Mr. Harper at trial and present contrary evidence so that the jury can decide what weight it will give to his testimony. BEI's Motion should therefore be denied.

## IV.  ARGUMENT

Pursuant to Fed. R. Evid. 402, all relevant evidence is admissible.[5] As set forth by Fed. R. Evid. 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Based upon and incorporating this fundamental requirement of relevancy is Fed. R. Evid. 702, which governs expert witness testimony. Fed. R. Evid. 702 not only requires that expert testimony be relevant, it provides that where:

> scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, in order to be admissible, expert testimony must not only be relevant and assist the jury with understanding the case, it must be reliable; that is, the testimony must be based upon sufficient facts or data, a sound methodology, fit the facts of the case, and generally exhibit "good grounds." *See generally* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); Khumo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

Experts can be qualified through their experience alone. *See* Dychalo v. Copperloy

---

[5]BEI has not made any arguments that Mr. Harper's testimony should be excluded pursuant to Fed. R. Evid. 403, which can limit Fed. R. Evid. 401.

Corp., et al., 78 F.R.D. 146, 149 (E.D. Pa. 1978)(stating that under Rule 702 any one of the listed areas of qualifications - *e.g.* experience - is sufficient); U.S. v. Paul, 175 F.3d 906, 911 (11th Cir. 1999)(affirming qualification of expert who had thirty years of experience as handwriting analyst, had established government laboratories in the field, was a member of several professional organizations, lectured and taught in the field, and trained examiners in the field for law enforcement); U.S. v. Merritt, No. IP 01-081-CR-01 T/F, 2002 WL 1821821, *3 (S.D. Ind. June 26, 2002)(finding that an expert can be qualified by experience alone) *citing* Advisory Committee Notes to Rule 702;[6] Cohen v. Lockwood, No. 02-2246-JPO, 2004 WL 763961, *1 (D. Kan. April 8, 2004)(same).[7]

Although Daubert provided factors to consider in determining whether an expert's testimony is reliable, the inquiry regarding the expert testimony's reliability should not be rigid. *See* Daubert, at 593-4 (setting forth factors to consider in evaluating validity of expert testimony but noting that there is no definitive checklist or test).  In fact, since Daubert, courts have considered other factors to determine the reliability of expert testimony.  *See* Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 702.  For example, in cases where an expert is to be qualified by experience, the expert must explain how his experience leads to the conclusions he reached, why the experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts.  *See* Merritt at *4; Cohen at *1.

The District Court is the "gate-keeper" that determines the admissibility of the expert witness testimony based on an examination of the testimony's relevance and reliability.  *See*

---

[6]Case attached at **Tab 3.**

[7]Case attached at **Tab 4.**

<u>Khumo Tire</u>, at 147.  Once an expert's testimony is admitted, however, the jury is charged with considering the sufficiency and weight of the testimony after the opponent has had the opportunity to challenge the testimony with vigorous cross-examination and the presentation of contrary evidence.  *See* <u>Daubert</u> at 596; <u>Wechsler v. Hunt Health Systems, Ltd.</u>, No. 94 Civ. 8294(PLK), 2003 WL 22358807, * 2 (S.D.N.Y. Oct. 16, 2003) *and cases cited therein*.  Attached at **Tab 5.**  *See also* <u>Butler v. Home Depot</u>, 984 F.Supp. 1257, 1261 (N.D. CA 1997)(where an expert's testimony was admissible pursuant to Rule 702, arguments opposing her testimony were more appropriately directed at weight of testimony);  <u>Royal Ins. Co. of America v. Joseph Daniel Construction</u>, 208 F.Supp. 2d 423, 426 (S.D.N.Y. 2002)(finding Court not charged with weighing the correctness of an expert's testimony);  <u>Zuzula v. ABB Power T&D Co., Inc.</u>, 267 F.Supp.2d 703, 712 (E.D. Mich. 2003)("In determining validity, the Court's focus is on principles and methodology, not results.").

"The Rules of Evidence provide a liberal standard for the admissibility of expert testimony," <u>U.S. v. Dukagjini</u>, 326 F.3d 45, 52 (2nd Cir. 2003), and "any doubts about whether an expert's testimony will be useful should be resolved in favor of admissibility."  <u>Valentin v. New York City</u>, 94 CV 3911 (CLP), 1997 U.S. Dist. Lexis 24059, *53 (E.D.N.Y.  September 9, 1997), attached at **Tab 6.**  *See also* <u>Valentin</u> at * 48 (noting that liberality and flexibility should be the rule in evaluating expert qualifications);  <u>Daubert</u> at 588 (noting that <u>Frye</u> standard was at odds with the "liberal thrust" of the Federal Rules and their "general approach to relaxing the traditional barriers to opinion evidence.").  Indeed it has been noted that a review of post-<u>Daubert</u> cases demonstrates that it is a rare case where expert testimony is excluded.  *See* <u>Royal Ins. Co. of America</u> at 425, *citing Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 702.*

Where, as described in detail below, Mr. Harper's expert testimony is admissible under the Federal Rules of Evidence and applicable case law, and most if not all of BEI's arguments against his testimony go to its weight and not its admissibility, the Court should deny BEI's Motion and allow the jury the benefit of Mr. Harper's testimony.

## A.  MR. HARPER IS WELL QUALIFIED TO TESTIFY IN THIS CASE

Mr. Harper is well qualified to testify on matters regarding safety in this case.  Mr. Harper began his career as a member of the U.S. Navy and remained on active duty for nine years. (Depo. Harper, at 5:23-8:11).[8]  After completing his active duty, Mr. Harper went to work for Hewlett Packard[9] ("HP") in 1967, (Depo. Harper, at 8:13-18) and while he worked, obtained his Bachelor's Degree from George Fox University, in addition to Associates Degrees in mathematics and physics from West Valley College.  *See Curriculum Vitae* at 1.[10]  Mr. Harper is a Retired Officer of the U.S. Naval Reserve, in which he served for over twenty years, (Depo. Harper, at 6:2-7), and during which he held three safety Naval Officer Billet Classifications

---

[8]EEOC cautions the Court to review Mr. Harper's deposition testimony in its totality and in context, as BEI has - as it did in its memorandum to exclude the testimony of Dr. González - improperly excluded parts of Mr. Harper's testimony without noting proper omission citation. *See e.g.* (BEI Mem. at 8), omits 102:14-16; (BEI Mem. at 14), omits 126:15-17; (BEI Mem., at 22), omits 143:21-147:24, and 148:8-20.

[9]As the Court well knows, HP is a Fortune 500 Company that employs over 80,000 people world-wide and "provides technology solutions to consumers, businesses, and institutions, globally." *See* HP Fast Facts, attached at **Tab 7**.  It is of note that according to Mr. Harper, HP, a large Company with a diverse employee population which has production, manufacturing, warehousing and other industrial facilities much more complex than those at BEI, does not have an English only policy. *See* (Harper Aff., at 1), attached at **Tab 8**.

[10]EEOC has not attached a copy of Mr. Harper's Report nor deposition transcript given that BEI has done so.  However, EEOC attaches a copy of Mr. Harper's *Curriculum Vitae,* at **Tab 9,** which was omitted from BEI's submissions.

(NOBCs) as (1) Safety Engineer; (2) Aviation Safety Officer and (3) Staff Aviation Safety Officer. *Curriculum Vitae,* at 3.

Since 1971, Mr. Harper's responsibilities at HP have been completely related to safety (Depo. Harper, at 13:12-17), and he was a co-founder of HP's first ever corporate-wide safety program in the early 70's. (Harper Aff., at 1). Throughout the course of his career he has held a number of safety related titles including: Occupational Health and Safety Manager, Product Safety Engineering Manager, and Facilities Safety Manager, among others. *See* (Harper Aff., at 1). Mr. Harper currently holds the position of Site Safety Engineer, Laser Safety Officer and Site Safety and Forensic Engineer at HP. (Harper, Aff., at 1). *See Curriculum Vitae*, at 2. In the various safety related positions he has held at HP, his duties have included, but have not been limited to: accident investigation; safety auditing and inspecting; safety compliance; responding to safety complaints; and, fire, chemical and medical emergency response. *See* (Harper Aff., at 2). Through the performance of his duties, Mr. Harper is aware of, conversant in, and able to apply a multitude of state and federal safety regulations, codes and standards, as he has done throughout his thirty-plus years at HP. *See* (Harper Aff. at 2). *See also e.g.* (Depo. Harper at 41:4-17)(discussing his expertise in OSHA regulations, fire and building codes). While at HP he also authored papers used throughout the Company in the area of product safety, video display terminals, material handling, and ergonomics, and co-authored HP's Product Safety Design Manual and its Corporate Health and Safety Manual. *See Curriculum Vitae*, at 3.

In addition to his work experience, Mr. Harper is a Board Certified Safety Professional

(CSP).[11]  He is also a member of various professional organizations related to safety, including the American Society of Safety Engineers (which awarded him the honor of "Fellow" and other awards),[12] the Canadian Society of Safety Engineers, and the Board of Certified Safety Engineers.  *See Curriculum Vitae,* at 2.  *See also* (Harper Aff. 3–4).  He has also lectured and trained on various safety-related topics at universities, before government commissions and agencies, and at conferences.[13]  *See Curriculum Vitae,* at 2.  His experience also includes work he does as part of his consulting business, Industrial Safety Consulting Service (through which he performed the work related to his expert Report in this case), which he has run since 1986.  Id., at 1.  Through this consulting business, he has been qualified to provide testimony in a number of civil cases.  *See* Id., at 3.  *See also* (Harper Aff., at 3).

Given that BEI has asserted a safety reason for its English only policy, testimony from a safety professional with over thirty years of experience in safety will be an asset to the jury.

### B.  SUMMARY OF MR. HARPER'S TESTIMONY

EEOC will offer Mr. Harper to testify about three matters: (1) whether BEI's English only

---

[11]The Board of Certified Safety Professionals is a peer certification board through which safety professionals can become certified if they meet education and experience requirements and pass substantive "safety fundamentals" and "comprehensive practice" examinations.  For more information see www.bcsp.org  Mr. Harper is also a Board Certified Forensics Examiner, and a Diplomate American College of Forensic Engineering & Technology Fellow.  *See Curriculum Vitae,* at 1.

[12]*See* Fellowship materials attached at **Tab 10**; (1) Nomination Letter for Mr. Harper as ASSE Fellow, dated November 28, 2000, (2) letter informing Mr. Harper of his selection as Fellow, dated March 6, 2001, and (3) ASSE press release related thereto.

[13]Mr. Harper has also attended courses and conference on safety for purposes of professional development.  *See Curriculum Vitae,* at 1.  *See also* (Depo. Harper, at 31:17-19)(stating he attends a professional development conference yearly).

policy is necessary for safety in its facility; (2) to provide a description and evaluation of BEI's safety program in general, and (3) to identify less onerous alternatives available to BEI in meeting safety goals.  In his Report, Mr. Harper reaches three main conclusions on the aforementioned matters; (1) that there is no safety, health or operational reason for BEI to implement an English only policy, (Harper Report, at 2); (2) that BEI's safety problems indicate a failure of the management system and lack of a coordinated safety program and not a failure of the employee workforce, id., and, (3) that there are multiple communication strategies available to BEI for safety purposes.  Id.

In support of his conclusion that there is no safety, health or operational reason for BEI to implement an English only policy, Mr. Harper's Report notes that "there is nothing inherently unsafe or unusual about multilingual workforces," noting specifically that U.S. Census information supports that many people "earn a living without ever speaking much English" and that despite an increase in limited-English speakers in the U.S. workforce, U.S. injury rates have decreased over the last decade.  Id.   He also noted that Charging Parties and other similarly situated individuals with limited or no English fluency were performing the essential functions of the job.  Id.  He identified that no BEI injury could be traced to a failure to adhere to its English only policy and that the injury rate at BEI rose dramatically despite the presence of the policy. Id., at 3.  Furthermore, in his deposition, when asked whether he believed that an English only policy which would require employees to shout a warning like "watch out" in  English could support the policy's safety goals by avoiding accidents, Mr. Harper disagreed, noting that such a

warning is insufficiently descriptive.[14]  *See* (Depo. Harper, 81:22-85:13)(stating such a warning doesn't mean anything because it doesn't indicate, for example, which way to jump).  Mr. Harper also notes that most ordinary hazards are open and obvious to employees regardless of language and that employees who view the English only policy as punitive may be less willing to speak up about safety matters.  Id., at 7.[15]

On December 6, 2001, Mr. Harper directly observed the BEI facility,[16] which, in addition to his review of case materials, led to findings supporting his second conclusion.  As a result of this direct observation he noted that BEI's Hartford facility is "typical of warehousing and shipping and receiving environment" with "no 'high hazard' operations or materials requiring extra-ordinary care, training or design."[17]  Id., at 5.  He noted that chemical use was minimal with

---

[14]In the deposition of Shipping and Receiving Supervisor Reinaldo Acosta, Acosta describes a situation where a co-worker is passing him boxes; by the time the co-worker said "watch-out" it was too late, and he was struck by a box in the face.  (Depo. Reinaldo Acosta, at 42:25-44:4), attached at **Tab 11**.  *See also* (González Report, at 37)(stating that the lag time for an individual whose native language is not English to utter a warning in English may make the warning come too late).

[15]N.B. This is a point also made by Dr. González in her Report at 37.

[16]*See* (Harper Report, at 4) finding that "[c]ompliance with most safety requirements and plant safety rules is easily validated by direct observation."  *See also* (Depo. Harper, at 40:3-13)(describing what goes into a safety audit and discussing it as a field of his expertise).

[17]N.B. and *compare* Saucedo v. Brothers Well Service, Inc., 464 F.Supp. 919, 921 (S.D. Tex. 1979)(noting in *dicta* that a duly and officially promulgated, efficiently communicated rule absolutely prohibiting the speaking of a foreign language during the highly skilled, dangerous work of oil well drilling which requires close coordination between members of the crew would be a reasonable rule for which a business necessity could be demonstrated).  *See also* (Depo. Harper, at 80:25-81:21)(noting that an English only policy may help in critical areas of a nuclear power plant).

13

the exception of cleaning[18] and described the work area noting that primary risks involved lifting, pushing and pulling stresses, knife cuts, falling material, ladder falls and forklift traffic, which were supported by BEI's injury data.  Id.  He determined that several safety and protective systems were lacking at the BEI facility, including: the lack of site-wide safety audits; untested fire systems with sprinkler valves not locked "open;" untrained supervisors teaching employees to drive forklifts; and infrequent safety signage, among other things.  See Id., at 6 -7.

One of the most staggering findings Mr. Harper made in his Report was that based on the BEI OSHA logs from January 1990 to June 2001, BEI's injury rate increased 201.3%.  Id.  See also Id., at 7-9.  (itemizing injuries and computing rate of injury per 100 employees for each year).  Of the injuries reported in the OSHA logs, Mr. Harper found that not a single injury could be traced to a failure to adhere to the English only policy and that despite the fact that over 50% of the injuries reported in the period of 1990 to 2001 were sprains, strains or cuts, BEI failed to adequately address the factors which led to these most common and recurring injuries.  Id., at 3. In addition, Mr. Harper found that there was no evidence that BEI put any serious effort into eliminating hazards (one of the first goals, he notes, of an effective safety program) and noted that BEI had no safety manual, safety was mentioned in a few lines covering housekeeping in the BEI policy manual,[19] and long-time warehouse supervisor Fabian Pineros was not aware of either OSHA logs or MSDSs (material safety data sheets).  Id.  He noted BEI employees - including

---

[18]Ironically, this is the one job to which BEI's English only policy does not apply.  BEI alleges it currently uses non-English speaking Bosnian immigrants in this self-proclaimed "least desirable position," and previously used developmentally disabled workers.  See (BEI First Am. Resp. to Ints., No. 5, at 2-3).  See also (BEI English only Policy).

[19]See BEI Employee Policy Manual at 24, attached at **Tab 12**

management - had not been trained in emergency procedures such as responding to fire or earthquake emergencies id., at 5, and he identified the lack of first aid and CPR training.  Id., at 11.  He further noted the poor administration and *ad hoc* nature of the Company's safety committee, and highlighted that the English only policy was never a topic in the safety committee meetings that occurred.  Id.[20]

_____Mr. Harper's Report concludes with citations to federal OSHA General Industry Safety Regulations, which require BEI to provide a workplace reasonably free from hazards.  Id., at 9.  This obligation, he notes, can be broken down by requirements to train, instruct, or advise employees on how to work safely around equipment.  Id   He states that there is no regulation requiring English proficiency under the OSHA General Industry Standards Regulations and suggests that training can be done in foreign languages.  Id., at 9-10.  Indeed, throughout his Report, Mr. Harper provides less onerous alternatives to providing safety information to a multi-lingual workforce including training in multiple languages, id., at 11, MSDS's in multiple languages, use of bilingual supervisors, movement of supervisors throughout the facility to observe conditions threatening to employee safety, signage, id., at 6-7, and general improvement of safety performance in the facility.

### C.  MR. HARPER'S TESTIMONY IS RELIABLE

To reach the conclusions in his Report, Mr. Harper reviewed all of the depositions in this case (over 40 were taken), all of the substantive pleadings, and all of the documentary evidence

---

[20]Note that Mr. Harper's on-site review of BEI's work-site was conducted *after* BEI had been inspected and fined by OSHA for five workplace safety violations on August 3, 2001.  BEI was again inspected and cited by OSHA for additional violations on September, 13, 2002.  *See* www.osha.gov (statistics/inspection data/establishment search: Beauty Enterprises; Connecticut)

submitted by both parties.  (Harper Aff., at 2-3).  He also performed an on-site visit of BEI's

facility on December 6, 2001, as part of his evaluation process, reviewed site photographs,

participated in the interview of several employees and obtained information from Charging

Parties and other similarly situated individuals through a questionnaire.[21] Id.  Mr. Harper is a

safety professional who, because of his experience, can walk through almost any building and

automatically spot safety hazards, violations, and concerns based on his knowledge of and

familiarity with a multitude of state and federal safety codes, regulations, and standards with

which he has worked over his career.  (Harper Aff., at 2).  This is what he did when he reviewed

BEI's facility for safety performance in the winter of 2001.  Id.  *See supra* at n. 14.

Mr. Harper took copious notes of his observations at the BEI site.  *See generally* On-Site

Notes, attached at **Tab 14**.  In these notes, he approximated ceiling and rack heights, he noted the

use of equipment in the facility, and he recognized safety concerns such as: locked exits;

damaged pallets in use; no mirrors at the aisle corners in warehouse 2; no rack sprinklers

throughout; combustibles in front of electrical panels; no air-conditioning in some buildings; the

absence of evacuation maps, among other notations.  Id.  *See also generally* (Harper Report).  He

also interviewed a number of Charging Parties and other similarly situated individuals on safety-

related matters and prepared a questionnaire which was administered to other class members,

which also provided feed back on safety-related information in the workplace from an employee

perspective.  *See generally* Employee Safety Questionnaires.  *See* (Harper Aff., at 2).

With respect to his analysis of the injury data provided by BEI in its OSHA 100 logs, his

experience also led to his conclusion that BEI did not have any safety, health or operational

_____

[21]*See* Employee Safety Questionnaires attached at **Tab 13.**

16

reason for its English only policy.  From a review of Mr. Harper's notes and calculations of

BEI's injury data, and his analysis of the increase in injuries over time, it also becomes clear that

what Mr. Harper did was above that of average intelligence and experience level of a juror.  He

reviewed the OSHA 100 logs with familiarity given his experience as a safety professional,

identified common injuries and the factors related thereto, derived injury rate composites, and

concluded that none of the injuries were related to language or non-compliance with the English

only policy.  *See* (Harper OSHA 100 Notes), attached at **Tab 15.**

As a seasoned safety professional, Mr. Harper conducted his review of BEI's safety

program through a site visit, a review of relevant materials included in the record and through the

interview of Charging Parties and other similarly situated individuals.  In addition, because this is

the kind of information a safety professional would normally review in making opinions on

safety, Mr. Harper's testimony should be admitted as reliable.

### D.  MR. HARPER'S TESTIMONY IS RELEVANT

By setting forth safety as a business necessity for its English only policy, BEI has opened

the door to the examination of the legitimacy of this alleged business necessity.  Because the jury

will have to determine whether safety is a legitimate business necessity justifying BEI's English

only policy, it will likely want to know whether BEI has a safety program such that its English

only policy appears legitimate in that context.  Although BEI argues that Mr. Harper's general

evaluation of BEI's safety program is irrelevant because there is too great an analytical gap

between his opinion on this point and the lack of necessity of the English only policy for safety

purposes, (BEI Mem. at 12), Mr. Harper's opinion on BEI's safety program is absolutely relevant

to the business necessity inquiry.

For example, BEI has alleged that the safety concerns its English only policy was meant to address included: "[c]oncerns from falling boxes, from forklifts colliding with pedestrians, fire and evacuation concerns, concerns for the avoidance of the products of ethnic tensions [and] concerns relating to injuries resulting from the unsafe use of equipment." (BEI Am. Resp. to EEOC' First Set of Ints., No. 18, at 6). However, as mentioned above, Mr. Harper specifically found that BEI lacked specific safety precautions such as; sufficient mirrors in aisles for forklift visibility; fire and evacuation training, and adequate safety training, in addition to the absence of a coordinated safety program. Furthermore, Mr. Harper has stated that his vast experience includes working with a diverse workforce in the absence of an English-only policy, which he will testify, as set forth above, is not necessary for any safety-related purposes. *See* (Harper Aff., at 1). *See also generally* (Harper Report).

Where BEI has little to no regard for safety in its facility, the implementation of an English only policy for alleged safety reasons can appear pretextual and illegitimate to a jury, thereby enhancing the jury's analysis of the legality of the rule and the business necessity defense. Thus, the connection between Mr. Harper's opinion and the data in this case is not only clear but relevant, given that his expert testimony will assist the jury in understanding BEI's safety program. The average juror may be able to identify glaring safety violations - such as the blockage of an exit - but could never identify all of the violations, concerns, and general observations Mr. Harper made through his work in this case, based on generally accepted workplace safety standards with which he has become familiar over his thirty-plus year career as a safety professional.

Mr. Harper's testimony is also relevant given that the jury will also likely want to analyze

whether the policy is actually necessary for safety, looking at its different functions and impact -
if any.  Although it is true that the jury will likely have the benefit of the OSHA 100 records in its
analysis of BEI's English only policy, and will likely be able to read the records, the jury will be
unlikely to perform the analysis and calculations based on vast safety experience as done by Mr.
Harper.  The average person is not familiar with OSHA reporting requirements, the forms, its
descriptions, or how to draw long-term conclusions based on cumulative injury data.  Thus, Mr.
Harper's experienced testimony in this case will assist the jury by supplementing its
understanding of such records and particularly as they relate to BEI's business necessity defense.
*See* Connors v. University Assoc. in Obstetetrics & Gynecology, Inc., 4 F. 3d 123, 128 (2nd Cir.
1993) (discussing use of expert to "bridge the gap" between juror's common knowledge and
uncommon knowledge of experts, and distinguishing between the common knowledge of a juror
and the common knowledge held by an expert); U.S. v. Hall, 93 F.3d 1337, 1344 (7th Cir.
1996)(noting that a Court is not compelled to exclude expert testimony that "may overlap with
matters within the jury's experience."); Tyus v. Urban Search Management, 102 F.3d 256, 263
(7th Cir. 1997)(similarly noting).

Finally, the jury will also likely want to know from a seasoned safety professional
whether based on his review of the appropriate materials, an English only rule is necessary to
BEI's safety, health and operational needs and what other alternative safety strategies are
available to BEI in meeting safety goals.  It is true that an average juror may know generally that
there are alternative means to communicate with individuals.  However, alternative
communication in a safety context are not within an average juror's knowledge.  Mr. Harper will
be able to address the availability of specific safety related signage, specific safety related

training alternatives, and the existence of safety information in multiple languages, not within the knowledge of the average juror, which will also enhance the jury's more general and insufficient common sense as applied to this case. Thus, Mr. Harper's expert testimony should be allowed as relevant.

## V.  CONCLUSION

BEI has failed to show that Mr. Harper's expert testimony should be excluded. His testimony is relevant to the analysis of BEI's business necessity of safety in its English only policy and the legality of the policy. In this regard it will be helpful to the jury in determining facts relevant to the case and generally understanding the evidence as required under Fed. R. Evid. 702. Mr. Harper's expert testimony is also reliable, based on his experience and on all the available facts in the record. Furthermore, Mr. Harper's expert testimony is based on over thirty years of experience as a safety professional that will inform the jury in reaching its conclusions. Where Mr. Harper's testimony is admissible, BEI's arguments go to the weight of his testimony and not to its admissibility, and the weight of his testimony will be for the jury to determine once BEI has had the opportunity to cross-examine Mr. Harper and present contrary evidence.

For all the foregoing reasons, the Commission respectfully requests that the Court deny BEI's Motion to Exclude the Testimony of Earnest Harper and allow the jury the benefit of Mr. Harper's expert testimony which is both relevant and reliable, and consistent with the Federal Rules of Evidence and applicable case law.

Respectfully submitted,

_____
R. Liliana Palacios
Trial Attorney
MA BBO 647078; Ct. Fed. Bar. ct22358
EEOC Boston Area Office
JFK Federal Building, Room 475
Boston, MA 02203-0506
Tel: (617) 565-4805; Fax: (617) 565-3196

## CERTIFICATE OF SERVICE

I, R. Liliana Palacios, hereby certify that on this 28th day of May, 2004, I caused a copy of the above document to be mailed, postage prepaid, to:

Julia Morris Paul
Marte, Plepler, Falkenstein, Keith, Meggers & Paul, P.C.
113 East Center St.
Manchester, CT 06040

Barbara E. Gardner, Esq.
843 Main St., Ste. 1-4
Manchester, CT 06040

Richard Robinson, Esq.
Pullman & Comley, LLC
90 State House Square
Hartford, CT 06103-3702

Evette Soto-Maldonado , Esq.
Puerto Rican Legal Defense and Education Fund
99 Hudson St., 14th Floor
NY, NY 10013-0000

_____
R. Liliana Palacios
Trial Attorney