UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                    )
                 Plaintiff,    )
       -against-            )
BEAUTY ENTERPRISES, INC.,      )
and ESSENTIAL TEMPORARIES, INC. )
          Defendants       )
_____)
MIGUEL ANGEL ALVAREZ,          )       Civil Action No. 301CV378AHN
WILLIAM TORRES, LUZ ANDUJAR,   )
EVA DIAZ, WALESKA MIRANDA,     )
JOSE LINARES and HAROLD ACOSTA )
      Plaintiff-Intervenors, )       May 28, 2004
       -against-            )
BEAUTY ENTERPRISES, INC.,      )
          Defendant        )
_____)
LUZ ANDUJAR and                )
WALESKA MIRANDA                )
      Plaintiff-Intervenors, )
       -against-            )
ESSENTIAL PERSONNEL, INC.,     )
          Defendant        )
_____)

## PLAINTIFF, EEOC'S MEMORANDUM IN OPPOSITION TO BEI'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. ROSEANN DUEÑAS GONZÁLEZ, Ph.D.

Plaintiff, Equal Employment Opportunity Commission ("EEOC") files this Memorandum in Opposition to Defendant, Beauty Enterprises, Inc.'s ("BEI") Motion and Memorandum in Support of its Motion to Exclude the Testimony of Dr. Roseann Dueñas González, Ph.D. ("Dr. González"). The EEOC respectfully requests that this Court deny BEI's Motion and allow Dr. González to provide the proposed expert testimony which is admissible under applicable law.

1

## I.  PROCEDURAL BACKGROUND

On or about March 12, 2001, the EEOC filed this action pursuant to Section 706(f)(1) and (3) of Title VII, as amended, 42 U.S.C. §2000e (5)(f)(1) and (3), ("Title VII"), alleging that BEI, AAA Industrial Temporaries, Inc. ("AAA"), and Essential Personnel Inc. ("Essential"), violated Title VII.[1]  EEOC seeks class-wide relief in this case on behalf of 15 Hispanic Charging Parties and other similarly situated individuals who suffered from unlawful national origin discrimination - under a disparate impact, disparate treatment and hostile work environment theory - retaliation, constructive discharge and discriminatory discharge while employed at BEI. *See generally* (EEOC Compl.).  At the heart of this case is BEI's English only policy, which EEOC alleges is unlawful.

Discovery in this case is complete.  BEI has not designated any experts of its own in this case.  Instead, it has sought to exclude EEOC's experts.  In this Motion, BEI seeks to exclude Dr. González' expert testimony despite her impeccable qualifications[2] and testimony which is relevant and reliable, consistent with the Federal Rules of Evidence, and allowed by applicable case law.  BEI has requested oral argument.  EEOC does not believe oral argument nor a <u>Daubert</u> hearing is necessary to resolve BEI's Motion.  However, should the Court require either, sufficient time is requested to coordinate travel prior to a <u>Daubert</u> hearing for Dr. González who

---

[1]Essential and AAA are no longer part of this litigation.  Essential filed for Chapter 7 bankruptcy on July 13, 2001, and EEOC settled its claims against AAA by Consent Decree entered by this Court January 2, 2003.

[2]EEOC has not attached copies of Dr. González' Report or deposition transcript given that BEI submitted a copy of these documents with its Motion.  However, it does attach a copy of the *errata* to Dr. González' Report provided to BEI March 12, 2004, the *errata* to her deposition provided to BEI on April 30, 2004, and Dr. González' *Curriculum Vitae* which BEI omitted from its submissions.  These documents are attached at **Tabs 1, 2** and **3**, respectively.

resides in Tucson, Arizona.

## II.  INTRODUCTION

As described above, this case involves a number of discrimination claims related in part to BEI's English only policy.  Although there are many disputes between the parties regarding BEI's English only policy,[3] there is no dispute that BEI has such a policy and that it was first put into writing in March 2001 following the filing of the EEOC's lawsuit.  *See* (BEI Am. Resp. to EEOC First Set of Interrogs., at 2), attached at **Tab 4**.  There is also no dispute that this written policy reads as follows:

> In order to promote harmony and avoid tensions among the Company's racially and ethnically mixed workforce, as well as for safety and efficiency, Beauty Enterprises, Inc. maintains a Speak only English rule - a rule requiring employees to speak only English while they are working.  At lunch or on breaks, employees are free to speak in the language of their choosing.  All job applicants must be able to read, write and speak English.  The only exception to this rule applies to product cleaners who work in a physically segregated space in an ancillary warehouse and have little or no contact with the rest of the warehouse.

(BEI English Only Policy, BEI Employee Policy Manual, at 6), relevant page attached at **Tab 5**.  What remains vigorously in dispute, among other things, is the discriminatory effect of BEI's English only policy on Charging Parties and other similarly situated individuals on the basis of their Hispanic national origin, the legality of BEI's English only policy and BEI's alleged business necessity for the policy.

Under Title VII, an unlawful employment practice based upon disparate impact is established if the plaintiff shows that the employer uses a particular employment practice that

---

[3]For example, the parties dispute when BEI first implemented the policy, the reasons BEI implemented the policy, and the scope of the policy itself.  In that regard, EEOC specifically disagrees with BEI's assertion that its English only policy applies only "on the premises and on the clock."  (BEI Mem. at 2).

causes a disparate impact on a protected group.  *See generally* 42 U.S.C. §2000e-2(k).  The

burden then shifts to the employer to demonstrate a legitimate "business necessity"[4] for the

practice.  Id.  If the employer demonstrates a business necessity for the practice, the burden then

shifts back to plaintiff to prove that the employer could have used other non-discriminatory

means to satisfy the same business necessity.  Id.  EEOC regulations state that an English only

policy that applies at all times is a burdensome term and condition of employment that

disadvantages an individual's employment opportunities on the basis of national origin and is

presumptively unlawful.  *See* 29 CFR §1606.7 (a).[5]  When such a policy applies at certain times

it must be justified by business necessity.  *See* 29 CFR §1606.7 (b).  Furthermore, where an

employer has an English only rule that applies only at certain times, the employer should inform

---

[4]The EEOC has adopted the test for business necessity set forth in Robinson v. Lorillard Corporation, 444 F.2d 791 (4th Cir. 1971), *cert. dismissed*, 404 U.S. 1006 (1971). Applying the test used in Robinson flexibly to BEI's business necessity for its English-only policy, it must (1) be compelling enough to override discriminatory impact, (2) carry out the purpose that it is said to serve, and (3) there must be no acceptable alternative policies or practices which would better accomplish the business purpose advanced or accomplish it equally well with a lesser differential disparate impact.  Id. at 798.

[5]BEI erroneously relies upon the cases of Garcia v. Gloor, 618 F.2d 264 (5th Cir. 1980), *rehearing denied,* 625 F. 2d 1016 (5th Cir. 1980), *cert. denied,* 449 U.S. 1113 (1981), and Garcia v. Spun Steak, 998 F.2d 1480 (9th Cir. 1993), *rehearing en banc denied*, 13 F.3d 296 (9th Cir. 1993, *cert. denied,* 512 U.S. 1228 (1994), in its Memorandum, at n. 3, for its position that EEOC Guidelines are not a sound interpretation of Title VII.  The EEOC had not implemented any guidelines on English only rules when Gloor was decided, *see* Gloor at n.1.  Also, the Ninth Circuit's decision not to apply the EEOC Guidelines in Spun Steak was based on the Court's finding that there was nothing in the Congressional Record regarding English only policies. *Compare* EEOC v. Premier Operator Services, Inc., 113 F.Supp.2d 1066, 1074 (N.D.Tex. 2000)(citing to Congressional Record for support of EEOC's English only regulations and finding the EEOC's regulations applicable).  *See also* EEOC v. Synchro Start, Inc., 29 F.Supp. 2d 911, 913 (N.D. Ill. 1999)(giving substantial weight to EEOC interpretation of the statute in English only case given its administrative interpretation of Title VII is entitled to great deference.)

its employees of the general circumstances when speaking English is required and of the consequences of non-compliance with the rule; if the employer fails to effectively notify its employees of the rule, the employer's adverse employment action against an individual in violation of the rule will be considered evidence of discrimination on the basis of national origin. *See* 29 CFR §1606.7 (c).

As part of making a determination in this case, and particularly as to the claim of disparate impact, the jury will have to decide a number of issues which raise the need for expert testimony.  First, and crucial to the claims of national origin discrimination generally, the jury may have to determine whether there is a connection between language and national origin for purposes of invoking the coverage of Title VII in this case.[6]  The jury will also have to determine whether BEI's English only policy has a disparate impact on the terms and conditions of the Charging Parties and other similarly situated individuals' employment on the basis of their Hispanic national origin.  Furthermore, the jury will have to evaluate whether BEI's English only policy is lawful and justified by business necessity, a task which will require rigorous scrutiny and analysis of BEI's policy - its history, implementation, evolution and enforcement, rationale and goals - and ultimately a determination as to the existence and viability of non-discriminatory alternatives to said policy.

## III.  SUMMARY OF ARGUMENT

To assist the jury in making its determinations in this case, EEOC seeks to qualify Dr. González in the social science discipline of Linguistics, including its relevant sub-fields of

---

[6]Whether this is a question for the jury or the Court, Dr. González' expert testimony will be of assistance.

Sociolinguistics, Applied Linguistics, Second Language Acquisition, English for Specific

Purposes, Language Proficiency Assessment, and Language Policy and Planning.[7]  As described

more fully below, Dr. González is qualified to testify in these areas of Linguistics given that her

education, knowledge, and experience satisfy the requirements of Fed. R. Evid. 702.  Her

testimony should also be permitted as relevant given that it will inform the jury as to the effect of

BEI's English only policy on Charging Parties and other similarly situated individuals and will

educate the jury so that it can evaluate the legality and alleged business necessity of BEI's

English only policy.  Where her testimony is based on all the facts in the record and the product

of standard, widely-accepted linguistic methodology and principles applied to the case facts, it

should also be admitted as reliable.  Furthermore, given that Dr. González is qualified to provide

expert testimony most of BEI's arguments regarding her testimony go to the weight of her

testimony and not to its admissibility.  Thus, BEI will have the opportunity to cross-examine Dr.

González at trial and present contrary evidence so that the jury can decide what weight it will

give to her testimony.  BEI's Motion should therefore be denied.

## IV.  ARGUMENT

Pursuant to Fed. R. Evid. 402, all relevant evidence is admissible.[8]  As set forth by Fed.

R. Evid. 401, "'[r]elevant evidence' means evidence having any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence."  Based upon and incorporating this fundamental

---

[7]*See* (González Aff. at 1-2)(defining these sub-fields of Linguistics), attached at **Tab 6**.

[8]BEI has not made any arguments that Dr. González' testimony should be excluded pursuant to Fed. R. Evid. 403, which can limit Fed. R. Evid. 401.

requirement of relevancy is Fed. R. Evid. 702 which governs expert witness testimony.  Fed. R.

Evid. 702 not only requires that expert testimony be relevant, it provides that where:

> scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training or education, may testify thereto in the form of an
> opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

Thus, in order to be admissible, expert testimony must not only be relevant and assist the jury

with understanding the case, it must be reliable; that is, the testimony must be based upon

sufficient facts or data, a sound methodology, fit the facts of the case and generally exhibit "good

grounds." *See generally* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993);

General Electric Co. v. Joiner, 522 U.S. 136 (1997); Khumo Tire Co., Ltd. v. Carmichael, 526

U.S. 137 (1999).

Although Daubert provided factors to consider in determining whether the expert

testimony is reliable, the inquiry regarding the expert testimony's reliability should not be rigid.

*See* Daubert, at 593-4 (setting forth factors to consider in evaluating validity of expert testimony

but noting that they are not a definitive checklist or test).  In fact, since Daubert, courts have

considered other factors to determine the reliability of expert testimony.  *See* Advisory

Committee Notes, 2000 Amendment, Fed. R. Evid. 702.  In U.S. v. Hall, 974 F.Supp. 1198,

1202-1203 (C.D. Ill. 1997) the Central District Court of Illinois noted factors to apply in

evaluating the reliability of social science testimony.[9]  These factors are:

---

[9]Courts have long relied upon social science testimony when analyzing the effects of
discriminatory practices.  *See e.g.* Brown v. Board of Education, 347 U.S. 483, 490-495 and n. 11
(1954)(social science testimony on effects of segregation); Price Waterhouse v. Hopkins, 490
U.S. 228, 255-256 (1989)(social science testimony on sex stereotypes).

(1) determining whether the reliability of the methods that scientists in that field make their findings; (2) whether the expert published and/or relied upon scholarly articles subjected to peer review; (3) the longevity of the particular field, the amount of literature and peer review on the topic, and the general consensus as to what the data means; and (4) the expert's contribution to the field about which he or she is testifying.

*See* Pease v. Production Workers of Chicago, No. 02 C 6756, 2003 WL 22012678 (N.D. Ill. Aug. 25, 2003), *4. (summarizing Hall factors), attached at **Tab 7**. The different factors used by courts most applicable to the cases before them support the flexibility and, in some cases, inapplicability of the Daubert factors.

The District Court is the "gate-keeper" that determines the admissibility of the expert witness testimony based on an examination of the testimony's relevance and reliability. *See* Khumo Tire, at 147. Once an expert's testimony is admitted, however, the jury is charged with considering the sufficiency and weight of the testimony after the opponent has had the opportunity to challenge the testimony with vigorous cross-examination and the presentation of contrary evidence. *See* Daubert at 596; Wechsler v. Hunt Health Systems, Ltd., No. 94 Civ. 8294(PLK), 2003 WL 22358807, *2 (S.D.N.Y. Oct. 16, 2003) *and cases cited therein*, attached at **Tab 8**. *See also* Butler v. Home Depot, 984 F.Supp. 1257, 1261 (N.D. Ca. 1997)(where an expert's testimony was admissible pursuant to Rule 702, arguments opposing her testimony were more appropriately directed at weight of testimony); Royal Ins. Co. of America v. Joseph Daniel Construction, 208 F.Supp. 2d 423, 426 (S.D.N.Y. 2002)(finding Court not charged with weighing the correctness of an expert's testimony); Zuzula v. ABB Power T&D Co., Inc., 267 F.Supp.2d 703, 712 (E.D. Mich. 2003)("In determining validity, the Court's focus is on principles and methodology, not results.").

"The Rules of Evidence provide a liberal standard for the admissibility of expert

testimony," U.S. v. Dukagjini, 326 F.3d 45, 52 (2nd Cir. 2003), and "any doubts about whether an expert's testimony will be useful should be resolved in favor of admissibility."  Valentin v. New York City, 94 CV 3911 (CLP), 1997 U.S. Dist. Lexis 24059, *53 (E.D.N.Y.  September 9, 1997), attached at **Tab 9**.  *See also* Valentin at * 48 (noting that liberality and flexibility should be the rule in evaluating expert qualifications); Daubert at 588 (noting that Frye standard was at odds with the "liberal thrust" of the Federal Rules and their "general approach to relaxing the traditional barriers to opinion evidence.").  Indeed it has been noted that a review of post-Daubert cases demonstrates that the exclusion of expert testimony is rare.  *See* Royal Ins. Co. of America at 425, *citing Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 702*.

Where, as described in detail below, Dr. González' expert testimony is admissible under the Federal Rules of Evidence and applicable case law, and most if not all of BEI's arguments against the testimony go to its weight and not to its admissibility, the Court should deny BEI's Motion and allow the jury the benefit of Dr. González' testimony.

## A.  DR. GONZÁLEZ IS WELL QUALIFIED TO PROVIDE EXPERT TESTIMONY IN THIS CASE

Dr. González is well and uniquely qualified to provide expert testimony in this case.  Dr. González holds a Ph.D. in Linguistics,[10] a Masters Degree in English as a Second Language and a Bachelor's Degree in English Education, each earned at the University of Arizona, where she has held the position of Full Professor of English since 1990.  Dr. González is also the founder and Director of the National Center for Interpretation Testing, Research and Policy ("NCITRP") at

_____

[10] As she described in her deposition at 33:16-34:10, Dr. González' Ph.D. program was an interdisciplinary Linguistics degree which allowed her to study Linguistics throughout the university.  *See also* (González Aff. at 1-2).

9

the University of Arizona, a research and public service center which has as part of its mission,

"exploring the field of interlingual/intercultural communications from a scholarly and theoretical

perspective," and assisting, "local, state, national and international agencies with the

development of valid language policies (legislative or internal) to meet the needs of limited and

non-English speaking clients."[11]  *See* (NCITRP Mission Statement), attached at **Tab 10**.   In

addition to these exceptional qualifications, she was also the Director and Principal Investigator

for the Federal Court Interpreter and Certification Project from 1985 to 2000, which is

responsible for implementing written and oral interpreter testing, advising the courts and federal

agencies on the federal courts' language accommodation policy, and making recommendations to

the Administrative Office of the U.S. Courts for the certification of all federal court interpreters

who pass the interpreting test pursuant to 28 U.S.C. §1827 (Federal Court Interpreter's Act of

1978).

     Dr. González is well respected by her peers and is well known nationally.  *See* <u>Cota v.</u>

<u>Tuscon Police Dept.</u>, 783 F.Supp. 458, 463, n.6 (D. Ariz. 1992) (recognizing Dr. González as a

nationally known and recognized authority in the area of court interpreting and Linguistics but

finding her testimony unhelpful to the determination of issues in case); <u>Seltzer v. Foley</u>, 502

F.Supp. 600, 604 (S.D.N.Y 1980)(referring to Dr. González as one of the six "outstanding

professionals" providing expert testimony in the case).  She has been selected by her peers to

---

[11]Dr. González also has experience in the work which is within the mission of the NCITRP. (Depo. González, at 221:4-225:10).  Since the mid 19070's beginning with her Ph.D. dissertation, Dr. González has extensive experience in language policy analysis and planning. *See* (González Aff. at 4).  *See also* (Depo. González, at 66:17-68:17)(describing policy analysis done in <u>Sandoval</u>); (Depo. González, at 72:4-12)(describing evaluation of English fluency policy in <u>Provident Life and Accident Insurance</u>).

leadership positions in professional organizations over the course of her career and has been the recipient of numerous honors, awards, and grants for her research.  *See generally Dr. González' Curriculum Vitae*.  In addition, her writing and publication of scholarly books, monographs, and examinations is prolific.  Id.  Dr. González has been previously qualified as an expert witness in both civil and criminal cases and her opinions have been relied upon in the area of Linguistics, Sociolinguistics,[12] Second Language Acquisition, Language Proficiency Assessment, and a variety of issues relating to language interpretation.  Id.  *See also generally e.g.* Seltzer and *see e.g.* Sandoval v. Hagan, 7 F.Supp.2d 1234, 1291, n.66 (N.D. Ala. 1998)(noting Dr. González was qualified as an expert in Sociolinguistics), *aff'd* 197 F.3d 484 (11th Cir. 19999) *rev'd* Alexander v. Sandoval, 532 U.S. 275 (2001).  Given the significant language related issues in this case, Dr. González, a Linguist with over thirty years of expertise in the areas of Linguistics, and its relevant sub-fields, is not only well qualified to testify in this case but will be an asset to the jury.

### B.  DR. GONZÁLEZ' PROPOSED TESTIMONY IS RELEVANT AND RELIABLE

Based on her education, knowledge and experience in Linguistics and its relevant sub-fields, EEOC will offer Dr. González to testify about four matters which will help the jury

---

[12]In its Memorandum, BEI seeks to cast doubt on Sociolinguistics as a young science upon which Dr. González cannot base her testimony.  However, Sociolinguistics, emerging in the 1960's as a subfield of Linguistics - Linguistics a social science which has existed for centuries - has been a respected discipline for over fifty years.  *See* Judith N. Levi, *What is Meaning in Legal Text? A First Dialogue for Law and Linguistics*, 73 Wash. U. L. Q. 771, 772 (1995). Sociolinguistics is a discipline taught in major universities all over the world and the subject of its own social science journals and research.  *See* (Depo. González, 36:21-37:10)(listing a number of leading Sociolinguistics journals).  Codeswitching, which Dr. González has been proposed to testify upon - unopposed by BEI - is an area within Sociolinguistics which has previously been accepted as an area of expert testimony by a federal court.  *See generally*, Premier Operator Services, Inc., *supra* at n. 5.  Dr. González was also previously qualified to testify in the area of Sociolinguistics in Sandoval, *supra*.

understand the impact of the English only policy on Charging Parties and other similarly situated

individuals, and will provide insight into the legality of BEI's English only policy and BEI's

alleged business necessity for the policy.  These four matters are: (1) the English language skills

used and required for carrying out warehouse job duties at BEI; (2) codeswitching - the

unconscious alternation of two languages such as English and Spanish in one linguistic episode

or between linguistic episodes in the same conversation[13] - and the effect of BEI's English only

policy on monolingual Spanish, limited-English proficient, bilingual and monolingual English

speaking workers;[14] (3) an evaluation of whether or not BEI's policy and practice achieved its

purported goals; and, (4) the correlation of language to national origin, and the effect of the

English only policy on Charging Parties and other similarly situated individuals.  (González

Report, at 2).  BEI seeks to exclude all matters upon which Dr. González has been asked to

testify with the exception of Dr. González' expert testimony on codeswitching and the effect of

BEI's English only rule on monolingual Spanish, limited English proficient, bilingual and

monolingual English speaking workers (matter no. 2 above) found in González Report, at 14-31.

---

[13] *See* (Depo. González, at 148:1-20).

[14]Terms which are critical to the understanding of impact in this case such as "non-English speaker," "limited English proficient," and "bilingual," are not within the common knowledge of the average person that frequently makes incorrect determinations of the fluency of an individual based on either that individual's own self-assessment or the person's own misunderstanding of the term in question.  *See* (Depo. González, at 163:1-164:16)(stating that she does not rely upon self-report in determining an individual's level of language proficiency but BEI counsel does not permit an explanation); (González Aff. at 2, n.2) (explaining unreliability of language proficiency self-rating).  *See also* (Depo. González at 185:12-17; 157:12-14)(discussing bilinguals and noting that one can be bilingual without being fluent in both languages); Id. at 152:9- 155:4 (discussing definitions for linguistic terms "non-English speaker," "limited English speaker" and "bilingual").  *See also* Hernandez v. N.Y., 500 U.S. 352, 370 (1991)(citing to Linguistic research and stating that "bilingual" is "a simple word for a more complex phenomenon with many distinct categories and subdivisions.").

(BEI Mem. at 4, n. 5).  The sections below provide the EEOC's summary of Dr. González' testimony on each matter BEI seeks to exclude and a discussion of the reliability and the relevance of the testimony.[15]

The discussion on the reliability of Sections 1, 3 and 4 of Dr. González' Report below highlights the methodology applied by Dr. González in reaching conclusions relevant to each of the respective sections of her Report.  At the outset, it is important to note that Dr. González, read all the depositions in this case (over 40 depositions were taken), all of the substantive pleadings, all of the documentary evidence provided by both parties, and she observed the BEI facility and interviewed Charging Parties and other similarly situated individuals.[16]  (González Report, at 2-3).  She also relied upon a comprehensive set of peer reviewed references cited in her Report, (González Report, at 57-66), other uncited fundamental texts in her areas of expertise

_____

[15] EEOC has not addressed Dr. González' opinion on codeswitching since BEI has not sought to exclude the testimony.  However, should the Court require additional information on this matter, EEOC will address the matter in a supplemental brief or at oral argument.

[16] BEI relies on Rowe Entertainment, Inc. v. The William Morris Agency Inc., No. 98 Civ. 8272 (RPP) 2003 WL 22272587 (S.D.N.Y. Oct. 2, 2003) to state that "[a] reliable expert opinion cannot be based on personal beliefs concerning the credibility of various witnesses."  (BEI Mem. at 22).  Case attached at **Tab 11.**  However, in Rowe, the expert witness solely relied upon the Plaintiff's Amended Complaint and on certain other case materials such as plaintiff's depositions and limited others, provided by plaintiff.  Id., at *7.  Clearly, this is not what Dr. González has done in this case.  Further, EEOC disagrees that Dr. González made any credibility determinations in rendering her opinion as also suggested by BEI.  (BEI Mem. at 21).  Dr. González has also denied this.  See e.g. (Depo. González, at 141:23-142:16; 208:25-209:3).  She also stated she had a responsibility to be fair in writing her Report.  (Depo. González, at 136: 8-11).  Although Dr. González' Report evidently discusses evidence presented by both parties, to the extent that she may have made decisions about which evidence upon to rely, this goes to the weight of her opinion and BEI will have ample opportunity to bring attention to her decision at trial.  See Local 159, et al. v. Nor-Cal Plumbing, Inc., Nos. 96-16172, 96-16284, D.C. No. CV-87-2365-SYJ, 1999 WL 547400, *6 (9th Cir. July 27, 1999)(unpublished opinion), attached at **Tab 12**.

(Depo. González, at 108:10-12) and her vast education, knowledge and experience in the areas of

Linguistics (including research methods)[17] and relevant sub-fields.  *See generally* (González

Aff.).

    Also, Dr. González' testimony is based on reliable principles and methods.[18]   In

---

[17]Dr. González agreed in her deposition that sociolinguistics is a social and empirical science for which methodology is important and a function of its reliability.  (Depo. González at 37:11-38:11).  She has studied research and methodology related to Linguistics and its relevant sub-fields.  (Depo. González at 34:19-35:8); (González Aff., at 2-3).  Although BEI criticizes Dr. González's opinions because she has not conducted any quantitative research, she has stated that qualitative research is central to sociolinguistic inquiry and Sociolinguistics has very few ways of looking at things quantiatively.  (Depo. González 266:18-24).  Methodologically speaking, this is especially true in a *post hoc* research study, where as in this case, implementation of the English only policy has already occurred and policy analysis and linguistic questions are therefore best approached through qualitative measures and analysis.  *See* (González Aff. at 3, n.3).

[18]BEI alleges that Dr. González' Report is unreliable because is it "riddled" with citation errors.  (BEI Mem. at 23-24).  EEOC disagrees with this characterization given that BEI brought at most four typographical errors to her attention (out of her 67-plus page report) at her deposition.  Four typographical errors hardly makes her Report "riddled" with them nor unreliable.  On the topic of citation errors, it is BEI's Memorandum in Support that is "riddled" with citation errors which include, but are not limited to underline incorrect citation to the pages of Dr. González' deposition, *see e.g.* (1) BEI Mem. at 23, n.11 has no citation, should be to 202:21-204:16; (2) BEI Mem. at 25, n.12 should cite to 232:7-15; statements made by BEI unsupported by deposition testimony *see e.g.* BEI Mem. at 10, at the bottom of the page, BEI states that Dr. González "readily admits" that the lawyers explored the subject of talking on the job in their depositions.  There is *nothing* in Depo. González, at 113 which supports this statement; and most strikingly, the omission and addition of deposition testimony which misleads the reader to believe that the testimony is complete (where it is not) or that something was said (when it was not).  *See e.g.* (1) BEI Mem., at 18, omits Depo. González at 189:16-25, all of 190 and 191:1-12; (2) BEI Mem. at 21, omits Depo. González at 207:22-25, all of 208 and 209:1-13; (3) BEI Mem. at 22, omits Depo. González, at 208:8-24; (4) BEI Mem. at 33, Dr. González does not say or admit "[m]orale was not covered in other depositions" and omits, Depo. González at 266:5-11; 266:16-25, and 267:1-13.  *See* The Bluebook, A Uniform System of Citation (17th Ed. 2000), pp.45-47 (omissions).  *Compare* BEI Mem. at 19 where BEI uses correct form to show its omission of approximately one and one half pages of testimony, once.  *See* Gray v. Bisdorf, Civ. A. No. 86-3375. 1988 WL 123728, *8, n.5 and 6 (D.D.C. Nov. 15, 1988), attached at **Tab 13**. (Court cautioning attorney to avoid careless and misleading errors which mislead and inconvenience court).

González' Report at 56, she generally sets forth her methods in this case asserting that they were, "those commonly and widely used by linguists in the production of scientific evidence." Her method was to generate her Report using "an extensive review of relevant articles, citations, and books related to the topics at issue," examining the BEI job descriptions and tasks for their linguistic and communicative properties and, examining job forms using the, "Chall Qualitative Assessment" of text difficulty, among other research activities. Id. She relied on a personal interview technique using a standardized sociolinguistic language use questionnaire in the interview of Charging Parties and other similarly situated individuals and used sociolinguistically accepted role plays with them to elicit language samples. Id.

In her deposition, she also stated that she consulted with one of her peers, Dr. Roger Shuy, "one of the most renowned sociolinguists in the United States" on her research approach, in addition to using various research texts to create the questionnaire based on widely-accepted methods of data collection. (Depo. González, at 77:3-82:24). The language sample elicited from the interviewees was validated through Dr. González' site visit and observation of the BEI workplace, reading and analyzing BEI documents, and BEI management depositions. Id. Based on her extensive education, knowledge, and experience in language testing, Dr. González was also able to arrive at an informal evaluation of the Charging Parties and other similarly situated individuals' language abilities using the OPI (Oral Proficiency Instrument) scale. See (Depo. González at 153:24-25; 164:22-168:21). Her methods used in analyzing BEI's policy were comprehensive and consistent with several widely accepted standards. See (González Aff. 5-6). Finally, Dr. González stated that her opinions in the Report, "are based on my specialized linguistic knowledge and the reliable technical and scientific methods and theories used to

15

generate data by linguists." (González Report, at 56).

### 1.  Summary of Dr. González' testimony on the English language skills used and required for carrying out warehouse job duties at BEI

Dr. González will testify as to the English language skills used and required for carrying out warehouse job duties at BEI.  Section 1 of her Report addresses this matter.  (González Report, at 6-14 and Appendices B, C, D and E).  In Section 1 of her Report, Dr. González concludes that BEI is not a language dependent workplace, meaning the jobs of the Charging Parties and other similarly situated individuals could be carried out through the use of limited language and reliance on non-verbal communication such as matching numbers, use of colors, gestures, and so forth.  She rests this conclusion on her thorough analysis of all of the language skills (reading, writing, speaking and listening) required to do the jobs at BEI, and her additional analysis of all other communicative tasks used and required to do the jobs at BEI, *e.g.* "non-verbal skills such as visual recognition and discrimination and meta-cognitive skills such as understanding the context, purpose, task relatedness and functions of the forms."  (González Report, at 3-4, 6, 8).  *See also generally* Section 1 (identifying other non-verbal/cognitive communicative strategies used on the job such as color coding, demonstration, matching,[19] gestures, memorization, and reliance on numbers to indicate product codes, quantities, dates, product location).  She also concludes that as a result, there is "no linguistic evidence to support the implementation of an English only rule." (González Report, at 3-4).

Through her linguistic complexity analysis, Dr. González found that BEI's job-related documents require a 3rd grade average level of understanding in English (if the reader depended

---

[19]Dr. González states matching is not a language skill but is a cognitive skill.  (Depo. González at 100:9-15).

on product names as opposed to numbers) and noted that work-related documents required "selective" or "transactional" reading of only single words, numbers, and short phrases. (González Report, at 8).  She also noted, as described above, that other cognitive skills - other than reading - were used by employees to "read" the work related forms.  Id.  Through her analysis of the language sample and data, Dr. González also found the writing skills and communicative functions required for the BEI jobs were negligible, requiring nothing beyond the of writing numbers and isolated words or names.  Id.  Dr. González identified the specific language (speaking and understanding) skills required to perform BEI jobs - (1) simple questions; (2) simple commands or requests; (3) simple descriptions, and, (4) simple confirmations of commands, instructions and understanding - and used language samples obtained through interview and deposition testimony to provide examples.  (González Report, at 7-10).  In Section 1 she also notes her finding on the minimal language use frequency at BEI, the goal of the jobs (speed - not language related skills), and briefly touches upon the lack of knowledge that Charging Parties and other similarly situated individuals had about the proficiency requirement of BEI's English only policy.  (González Report, at 8 and 10-11).

### a. Dr. González' testimony on the English language skills used and required for carrying out warehouse job duties at BEI is reliable

In addition to the review of the case materials and her reliance on standard accepted linguistic methods supported by her education, knowledge and experience, as set forth previously, Dr. González relied upon a widely accepted standard sociolinguistic questionnaire which allowed her to collect data about what, if any, language is used to carry out job functions at BEI, and to elicit authentic language samples from the Charging Parties and other similarly

17

situated individuals used specifically to determine the language and communicative tasks at BEI. (González Report, at 2-3 and 6). She relied upon specific peer reviewed texts to conduct her research. (Depo. González, at 105:9-108:15). She also reviewed and analyzed BEI's job descriptions and prepared a chart of job tasks classifying pertinent warehouse job tasks, noting where language skills were necessary as opposed to matching and non-linguistic skills (physical strength, stamina, etc). *See* discussion at sub-section B1, above. This kind of linguistic job analysis is a skill Dr. González has the education, knowledge and experience to perform given that it is based upon well accepted linguistic principles and methods. *See generally* (González Aff.).

BEI over-simplifies Dr. González's investigation and method as to whether "the observance of an English only policy is necessary for a picker to do the job of a picker, for a packer to do the job of a packer, etc." (BEI Mem. at 8). Dr. González did not simply "ask the Charging Parties whether they had to talk very much to do their jobs." Id. While this is part of what she did, (Depo. González, 91:13-92:16), she also elicited language samples, examined and analyzed BEI's job descriptions with her extensive knowledge and educational background in linguistics, reviewed the witness' deposition testimony of both parties for additional language samples and evidence of linguistic skills used at BEI, engaged in personal observation of the jobs at an on-site review, classified each job by language requirements (reading, writing, speaking) and identified other non-language related communication strategies and cognitive skills for the job. *See* (González Report, at 56), and discussion in section B, above.

This kind of exhaustive analysis and observation based on standard, widely accepted linguistic methods is not within the general intelligence, ordinary experience, and common sense

18

of the average juror.[20]  Even if an average juror has some understanding of some of the steps he

or she should take to determine the amount of and difficulty of language necessary to complete

job tasks, the average juror would still require that his or her basic understanding be

supplemented or enhanced by Dr. González' testimony to be fully informed.  *See* Connors v.

University Assoc. in Obstetetrics & Gynecology, Inc., 4 F. 3d 123, 128 (2nd Cir. 1993)

(discussing use of expert to "bridge the gap" between juror's common knowledge and

uncommon knowledge of experts, and distinguishing between the common knowledge of a juror

and the common knowledge held by an expert); U.S. v. Hall, 93 F.3d 1337, 1344 (7th Cir.

1996)(noting that a Court is not compelled to exclude expert testimony that "may overlap with

matters within the jury's experience.");  Tyus v. Urban Search Management, 102 F.3d 256, 263

(7th Cir. 1997)(similarly noting).  No juror would perform the rigorous analysis Dr. González did

in Section 1 of her Report, particularly with respect to the analysis of the complexity of language

and required levels of language proficiency at BEI.

### b. Dr. González' testimony on the English language skills used and required for carrying out warehouse job duties at BEI is relevant

Because BEI's English only policy includes an English proficiency requirement[21] within

---

[20]BEI cites to WBC v. Cosell, 715 F.Supp. 1259, 1264 (S.D.N.Y. 1989) in its opposition to Dr. González' testimony in this section stating that the Court excluded a "linguistics expert" where a layperson was able to perform the same analysis.  However, the proposed expert in WBC was *not* a linguist, she was an expert in "the field of media analysis and communications research" essentially offering her view of defendant's state of mind as he wrote the libelous passage at issue.  This case is completely inapplicable to the case at hand.

[21]EEOC disagrees with BEI's statement in its Memorandum at n. 6 that the EEOC is not challenging what it considers to be a "hiring requirement."  It also disagrees with BEI's assertion that this "hiring requirement" predates its policy on language use during the workday.  EEOC alleges that BEI's English only policy *includes* an English proficiency requirement in reading, writing and speaking which is unnecessary for most of the jobs in the warehouse.

it, requiring that "[a]ll job applicants must be able to read, write and speak English," *see* BEI

English only policy, it is necessary to determine whether the jobs at BEI actually require English

reading, writing and speaking ability, and if so, to what degree.[22]  This determination, which

requires a linguistic analysis of the job functions and requirements at BEI as related to their use

of language (reading, writing, speaking, and listening), will serve to educate the jury as to the

level of and need for English language skills at BEI for job performance.  This information will

assist the jury in evaluating the legality of BEI's English only policy, BEI's alleged business

necessity and EEOC's disparate impact claim.

      BEI has previously argued in this case that its policy is lawful because BEI only hires

people who read, write, and speak English, and that it therefore follows that Charging Parties and

similarly situated individuals are bilinguals who are unaffected by BEI's policy under which they

live every working day.  *See* BEI Mem. in Supp. of Mot. for Prot. Order at 3 and 7 (dated Oct.

25, 2001).  EEOC disputes this as a factual matter.  With this argument, BEI attempts to strike at

EEOC's disparate impact proof and bolster its own business necessity argument.  BEI does this

by implying that it has engaged in some kind of legitimate analysis of the English language skills

of its employees before hire, that this analysis led it to a valid conclusion that they are bilingual,

and ultimately that because they are subject to the English only rule during the workday, that

Charging Parties and other similarly situated individuals must have solid English skills.  This

analysis in turn leads to its argument that its policy could not have had any impact on the

Charging Parties and other similarly situated individuals.  Furthermore, asserting such a hiring

requirement implies that BEI's jobs actually require language-related skills that are utilized on a

---

     [22] This is an inquiry BEI seems to concede as necessary in this case.  (BEI Mem at 9).

daily basis - a disputed point which goes to the business necessity of the rule.

A juror who will be required to consider BEI's English only policy with respect to the claims of disparate impact and the defense of business necessity should be clearly informed as to what the objectively measured language skill requirements are for the jobs at BEI, which Dr. González will provide in direct testimony. With this understanding, a juror can make the determination for him or herself whether based on the language skills necessary for the jobs, (1) an English only rule which prohibits the use of languages other than English at work and essentially requires English proficiency, is in fact a business necessity; (2) provides evidence of the Charging Parties and other similar situated individuals' language abilities for purposes of determining disparate impact; or, (3) otherwise provides evidence of discrimination.

### 2. Summary of Dr. González' evaluation of whether or not BEI's policy and practice achieved its purported goals

Based primarily on her education and experience in language policy and planning, Dr. González will also testify that BEI's English only policy and practice did not achieve its purported goals. (González Report, at 31-42). In Section 3 of her Report, Dr. González concludes that BEI's English only rule is arbitrary, undefined, and subjectively enforced. (González Report, at 32). She also concludes that the policy in actual practice promotes an unsafe and inefficient workplace, serves to escalate racial tension, and inhibits English language learning. Id. In this Section, she reaches her conclusion that the policy is arbitrary based on a number of different findings: (1) BEI's policy was never put in writing until March 2001; (2) when put into writing it did not specify the consequences for non-compliance;[23] (3) despite the

---

[23]Dr. González specifically notes that BEI's disciplinary policy was inconsistently applied where employees violated the rule, also supporting her finding that the rule was arbitrary.

policy's general definition as applying only to time on the job, that employees[24] were disciplined

for Spanish use on personal time; (4) the policy was inconsistently applied by BEI management;

(5) at least part of the application process to work at BEI was conducted in Spanish; (6) the

majority of Charging Parties and other similarly situated individuals were not told of the policy at

their hire; (7) bilingual supervisors/managers regularly violated the policy, and (8) the employees

either received training in Spanish or were required to train others in Spanish. Id., at 31-33.

Dr. González also concludes from these findings that BEI's policy and practice is

subjective, inconsistently applied and undefined. Id., at 33. She comes to this conclusion noting

it is not derived from an empirical standard,[25] that it is not listed in BEI's job descriptions and

that the policy itself acts as a *de facto* subjective punishment. Id., at 33-34. After analyzing the

policy in general, Dr. González specifically addresses BEI's alleged reasons for the policy. She

concludes that the policy undermines workplace harmony based principally upon her finding that

the policy was purportedly implemented after an alleged fight between a Black employee and an

Hispanic employee in the mid-1970s with no investigation as to what caused the fight and

without any discipline to either employee. Id., at 35. She also notes in support of her conclusion

of increased tension, that BEI President discussed interracial tensions that existed in the

warehouse on a radio show after the EEOC lawsuit was filed, and references an article written by

a Black employee against the Hispanics involved in this case, as an example of tension. Id., at

---

[24]In her deposition at 198:9-21, Dr. González indicated that with this statement she meant it happened to some employees and recognized there was a dispute about this.

[25]In her deposition, Dr. González makes mention to an *amicus curiae* brief submitted by BEI to the Supreme Court in Sandoval whereby it alleged that it conducted studies supporting the implementation of its English only policy but that deposition testimony of BEI owner Robert Cohen belied this assertion. (Depo. González at 219:7-220:2).

35-36.  She concludes with a scholarly principle that "the cure for ethnic tension is to show respect, acknowledgment, and tolerance of ethnic minorities' languages, traditions, and customs."  Id., at 37.

In Section 3 Dr. González also concludes that BEI's policy creates an unsafe workplace based upon linguistic evidence and studies that demonstrate linguistic minorities will revert to native language use in a state of panic and that the lag time for an individual whose native language is not English to utter a warning in English may make the warning come too late.  Id. She also notes that the injuries in the record are not related to the inability to speak English, and she concludes that some people may be afraid to report injuries because they are unable to speak sufficient English or because of the hostile workplace.  Id.  Finally, she opines that BEI's policy does not create workplace efficiency because BEI did not provide any documentary evidence of such workplace problems; and, that limited-English speakers who are forced to communicate in their non-dominant language are cognitively stressed and will have slowed communications which will then lead to the slower performance of job tasks.  Id., at 38-39.

Dr. González also reports on her findings of additional negative effects of the policy.  She concludes that the English only policy actually prohibits English acquisition strategies[26] because according to Second Language Acquisition theory, it impedes the second language learners from using their native language to understand and learn the "deep structure" of word concepts.  Id., at 40.  Dr. González also concludes that Charging Parties and other similarly situated individuals are trainable in English but are unable to throw away a life-long, ingrained language-use behavior not subject to constant conscious control.  Id., at 41.  Lastly, Dr. González concludes that BEI's

_____

[26]This is a point about which the average juror could reach the opposite conclusion.

23

policy classified applicants using personal characteristics because it tends to exclude Hispanic/ethnic minorities (on the basis of language and lack of English proficiency).  Id.

### a.  Dr. González' evaluation of whether or not BEI's policy and practice achieved its purported goals is reliable

Dr. González used her education, knowledge and experience in language policy and planning,[27] to conduct a formal policy analysis of BEI's English only policy.  *See* (González Aff., at 5-6).  In so doing, she followed all of the relevant steps required to conduct a policy analysis consistent with those widely adopted in the field of Second Language Acquisition and Testing referred to as "job analysis" (González Aff., at 5) and widely-accepted by professional organizations such as the American Educational Research Association, American Psychological Association, and the National Council on Measurement in Education's 1999, Standards for Psychological and Educational Testing.  She (a) examined BEI's policy for function, use and application; (b) reviewed the articulated goals of the policy; (c) examined the policy's implementation; (d) compared the policy to BEI's actual linguistic needs and conducted linguistic analysis required which included description of language complexity, modes of language in the job setting, proficiency of the speakers and that required for the jobs; (e) gathered data on the frequency and use of language required at BEI; (f) gathered data on whether or not BEI's stated goals have been met and discovered the effects of the policy on the affected population, through interviewing, conducting the site visit and reading case materials; (g) compared the stated goals of the policy with the data collected on the actual effects of the policy

---

[27](Depo. González at 49:24-54:15; 193:13-23; 236:2-237:7)(discussing language policy aspect of Sociolinguistics, its requirements and her education and experience therein).  *See also* n. 11, *supra*.

and (h) reported on accommodations that could be made to better fulfill the stated goals of the policy while lessening any detrimental effects on the persons affected by the policy. *See* (González Aff., at 5-6). *See also* (Depo. González, 126:2-127:2; 132:4-133:13; 236:20-237:7)(also supporting the steps taken to conduct the policy analysis). Where based on widely accepted principles and standards to which she adhered, Dr. González's opinions on BEI's policy are reliable.

### b. Dr. González' evaluation of whether or not BEI's policy and practice achieved its purported goals is relevant

A thorough analysis of BEI's English only policy is relevant to EEOC's national origin discrimination claims, an understanding the legality of BEI's English only policy and of BEI's alleged business necessity for the policy. Dr. González has conducted such an analysis consistent with the linguistic principles and methodology of language policy and planning. The average juror is unlikely to have experience in language policy and planning such that they could conduct the kind of exhaustive analysis that Dr. González has done in this case generally, and specifically as her case study has done in the area of evaluating BEI's policy. While the average juror may find it necessary to look at BEI's articulated reasons for the policy, it may not arrive at the conclusion that the policy has other negative effects as Dr. Gonzàlez has concluded through her analysis or may skip or disregard steps which are essential to a full analysis of the policy. Dr. González' education, experience and knowledge in language policy and planning is therefore important to the jury's understanding of EEOC's discrimination claims, the legality of BEI's English only policy and BEI's defense of business necessity and as such should be admitted.

25

### 3. Summary of Dr. González' testimony on the correlation of language to national origin, and the effect of the English only policy on Charging Parties and other similarly situated individuals

Finally, Dr. González will testify on the correlation between language and national origin, and on the stigmatization and other harmful effects of the English only policy on individuals. (González Report, at 42-56). In Section 4 of her Report, Dr. González concludes that based upon pertinent research there is an "inextricable link between language use and ethnic identity." Id., at 42. In so concluding she relies on linguistic literature that shows a high correlation between the language an individual uses and that individual's national origin self-identification, id, and states that from a sociolinguistic perspective, "language is the most vital characteristic of ethnic/national origins identity." Id., at 44. Dr. González also concludes in Section 4 that BEI's English only policy stigmatizes linguistic minorities and has harmful effects on Charging Parties and other similarly situated individuals. Id., at 46-56. This stigma flows from the constant discipline, disempowerment, humiliation, loss of dignity, social segregation and isolation, the likely exclusion from future employment, high levels of workplace and other forms of stress and the psychic and emotional changes related to those stresses when a linguistic or ethnic minority faces what they perceive to be discrimination based on her or his native language use on the job or in society. Id.

### a. Dr. González' testimony on the correlation of language to national origin, and the effect of the English only policy on Charging Parties and other similarly situated individuals is reliable

Dr. González' conclusions regarding the correlation between language and national origin are based on numerous citations to scholarly books, articles, studies, and U.S. Census information specifically supporting this correlation from the disciplines of Linguistics and

Sociolinguistics. Further, she utilizes examples provided by the Charging Parties of this correlation to show that their reports match the findings that Linguists and Sociolinguists have reported in similar restrictive language situations in the U.S. and internationally.[28] *See* (González Aff. 6-7). Where linguistics has found that "language use influences the formation of ethnic identity, and ethnic identity influences language use," (González Report at 43), a Linguist like Dr. González is particularly suited to testify as an expert on this issue.

As to her conclusion regarding the effects of the BEI policy on Charging Parties and other similarly situated individuals, Dr. González utilized a standard sociolinguistic questionnaire as part of her analysis in this case. Through her analysis and use of this questionnaire she interprets the self-reports of the Charging Parties about the effect of the policy upon them through the lense of the body of literature on this subject.[29] Contrary to BEI's assertion, Dr. González does not purport to provide testimony on a psychological state. Rather, she is reporting on sociolinguistic effects that impinge upon the Charging Parties and other similarly situated individuals, an area within her expertise, and readily admits that these sociolinguistic findings are supported by the literature in her field and have been widely reported on in the peer reviewed literature. (Depo. González at 285:13-17);(González Aff., at 6-7).

---

[28] There are indeed many other examples in the record supporting this correlation. *See e.g.* (Depo. Adorno [BEI night-shift supervisor], 50:4-51:13)(admitting that his Puerto Rican identity ties him to the Spanish language). Relevant page attached at **Tab 14**.

[29] In her deposition at 286:1-13, Dr. González states this correlation is supported by thousands of articles written about self-reports of how people feel under restrictive language policies. *See also* (González Aff., at 3, n. 4)(discussing self-report as one of the most widely used methods in different sciences).

**b. Dr. González' testimony on the correlation of language to national origin, and the effect of the English only policy on Charging Parties and other similarly situated individuals is relevant**

As described above, the correlation of language and national origin is a fundamental issue in this case. Dr. González' testimony will provide relevant and applicable testimony on linguistic research to help make the determination on this issue. In its Memorandum, BEI simplifies and mischaracterizes Dr. González' analysis and conclusion on this point.[30]   (BEI Mem. at 36-37). Dr. González discusses the historical use of language as an instrument of control and how it has been used to maintain power relationships. (González Report, at 43). She also points to a variety of linguistic sub-field research (Sociolinguistics, Ethnolinguistics, Linguistic Anthropology), id., to support the tie between language and national origin. She provides a social science definition of ethnic group and addresses the pride and positive feelings Hispanics report about Spanish as their mother tongue. Id. This testimony is crucial to a juror's understanding of the correlation of language and national origin, which is not common knowledge for individuals - particularly if they are monolingual English speakers.

Dr. González' opinions on the effects of BEI's policy, are also relevant because the trier of fact will want to know whether what the Charging Parties and other similarly situated individuals will report at trial as effects of the policy is something that commonly results from

_____

[30]In its Memorandum, at 37, BEI makes statements that the trier does not need an expert to tell it that the Spanish language is important to Puerto Ricans and generally states that a juror would know this to be the case. However, in over simplifying the issue and misconstruing Dr. González' testimony on this matter, BEI does not concede that language is protected under national origin for purposes of Title VII. The correlation between language and national origin has been a topic of ample discussion and dispute in arguments raised before the courts. *See e.g.* Sandoval v. Hagan, 7 F.Supp. 2d 1234, 1279 (defendant raising argument that language is not equivalent to national origin) and *compare* Spun Steak, at 1487 ("It cannot be gainsaid that an individual's primary language can be an important link to his ethnic culture and identity.")

restrictive language policies.  As stated above, Dr. González does not classify her opinion as one on the psychological states of the Charging Parties and other similarly situated individuals.  It is simply part and parcel of her sociolinguistic case study in this case emanating from her language policy analysis and the self-report of the individuals she interviewed.

## V.  CONCLUSION

BEI has failed to show that Dr. González' expert testimony should be excluded.  Her testimony is relevant to EEOC's discrimination claims, the legality of BEI's English only policy and the defense of business necessity.  In this regard it will be helpful to the jury in determining facts relevant to the  case and generally understanding the evidence as required under Fed. R. Evid. 702.  Dr. González' expert testimony is also reliable, based on sound, generally accepted linguistic methods which include qualitative research and analysis, and are based on all the available facts in the record.  Furthermore, Dr. González' expert testimony is based on over thirty years of education, knowledge and experience in Linguistics and related sub-fields that will inform the jury in reaching its conclusions.  Where Dr. González' testimony is admissible, BEI's arguments go to the weight of her testimony and not to its admissibility, and the weight of her testimony will be for the jury to determine once BEI has had the opportunity to cross-examine Dr. González and present contrary evidence.

For all the foregoing reasons, the Commission respectfully requests that the Court deny BEI's Motion to Exclude the Testimony of Dr. Roseann Dueñas González, Ph.D. and allow the jury the benefit of her expert testimony which is both relevant and reliable, and consistent with the Federal Rules of Evidence and applicable case law.

Respectfully submitted,

_____

R. Liliana Palacios
Trial Attorney
MA BBO 647078; Ct. Fed. Bar. ct22358
EEOC Boston Area Office
JFK Federal Building, Room 475
Boston, MA 02203-0506
Tel: (617) 565-4805; Fax: (617) 565-3196

## CERTIFICATE OF SERVICE

I, R. Liliana Palacios, hereby certify that on this 28th day of May, 2004, I caused a copy of the above document to be mailed, postage prepaid, to:

Julia Morris Paul
Marte, Plepler, Falkenstein, Keith, Meggers & Paul, P.C.
113 East Center St.
Manchester, CT 06040

Barbara E. Gardner, Esq.
843 Main St., Ste. 1-4
Manchester, CT 06040

Richard Robinson, Esq.
Pullman & Comley, LLC
90 State House Square
Hartford, CT 06103-3702

Evette Soto-Maldonado , Esq.
Puerto Rican Legal Defense and Education Fund
99 Hudson St., 14th Floor
NY, NY 10013-0000

_____

R. Liliana Palacios
Trial Attorney

30