## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>                         PLAINTIFF<br><br>   VS.<br><br>BEAUTY ENTERPRISES, INC.,<br>AAA INDUSTRIAL TEMPORARIES, INC.,<br>ESSENTIAL TEMPORARIES, INC.,<br><br>                      DEFENDANT | CIVIL ACTION<br>NO. 3:01-CV-378 (AHN) |
| MIGUEL ANGEL ALVAREZ and<br>WILLIAM TORRES,<br><br>          PLAINTIFF-INTERVENORS,<br><br>v.<br><br>BEAUTY ENTERPRISES, INC.,<br><br>                  DEFENDANT | JUNE 14, 2004 |

## DEFENDANT BEAUTY ENTERPRISES' REPLY BRIEF
## RE: MOTION TO EXCLUDE GONZALEZ TESTIMONY

It would be extraordinarily unfair for a party to be able to sum up twice to the jury, which is why the rules forbid it. It would be even more unfair if one of the summations came from a witness on the stand, especially a witness the court had declared to be an expert in the jury's presence. Without question, the admission of the challenged Gonzalez testimony here would create these conditions and produce for the EEOC a distinctly unfair advantage at trial. BEI moved to exclude this testimony to prevent this unfairness.

The so-called expert testimony BEI seeks to exclude is simply a summation in disguise, an advocate's argument for certain factual conclusions based on the evidence the lawyers

developed in discovery and perhaps, in addition, on work Dr. Gonzalez did that mirrored the lawyers' discovery work and produced the same results. No one could read Dr. Gonzalez' Report and conclude otherwise. The transcript of her deposition confirms this conclusion. And nothing the EEOC has said in its brief even comes close to detracting from it.

Not surprisingly, these fairness concerns find expression in Rule 702 and the Daubert line of cases. This is clear from a case the EEOC cited in its own brief, U.S. v. Hall, 93 F.3d 1337 (7th Cir. 1996). As the Seventh Circuit noted there, an expert's opinion is only helpful (and hence, relevant and admissible) if it draws on the expert's special knowledge; "the opinion must be an *expert* opinion [that is, an opinion informed by the witness's expertise] rather than simply an opinion broached by a purported expert. (citation omitted) Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403." 93 F.3d. at 1342. Where, as here, an expert relies on work that the lawyers in the case planned and executed to make the very argument that one of them will no doubt make, the expert is not doing what an expert is supposed to do or producing something that can properly be considered "expert." She is acting as a lawyer, doing merely what lawyers do. And the jury does not need to hear from another lawyer.

At the same time, if the untrained layman presented with the evidence could decide the issues intelligently and to the best possible degree without the aid of expert testimony, then the testimony is unhelpful for that reason as well and, thus, is irrelevant in Daubert terms. Here, despite the EEOC's unsupported assertions to the contrary, the jury is perfectly capable of hearing the evidence and arguments the lawyers will be presenting and deciding for itself whether the English-only rule promotes harmony, safety and efficiency. Moreover, the jury does

not need a linguistics expert to tell it that the Spanish language is important to a Puerto Rican immigrant's sense of himself in America, and that being a linguistic, as well as an ethnic, minority here is not the most pleasant of circumstances. Common sense teaches that this is generally the case. See, <u>U.S. v. Hall,</u> 93 F.3d at 1344 (discussing exclusion of expert testimony that merely "duplicates the jury's knowledge" in order to avoid the risk of "unduly influencing the jury.") Finally, the jury is quite capable of determining on its own whether employees have to talk very much to do their jobs. After all, it will hear what the employees have to say in this regard, because the lawyers will be asking all the necessary questions at trial, just as they did at the depositions. And, in the final analysis, this is all that Dr. Gonzalez did – take the deposition testimony (and her own duplicative "work") and reach a common sense conclusion on the point based on this testimony. Yet, the reality is that the jury will not have to decide whether employees have to talk very much to do their jobs, because the point is not in issue. The parties all agree that the employees do not need to talk (or to listen) very much to do their jobs. BEI's position on the English-only rule's necessity has never been grounded on the notion that English is necessary to perform the jobs.

<u>U.S. v Hall</u> makes two other points that are particularly pertinent here. The first is that there is a difference between expert testimony that reflects "genuine expertise" and expert testimony "that is nothing more than fancy phrases for common sense." 93 F.3d at 1342. The former may be allowed. The latter never can. Dr. Gonzalez' testimony here – at least those portions that pretend to be expert, as opposed to those where she drops the pretense and simply advocates like a lawyer – is nothing more than the proscribed "fancy phrases for common sense."

The second point is that testimony that rests solely on the expert's acceptance of the "victim's" account amounts to "nothing more than an invitation to the jury to believe his

assessment of the victim's truthfulness" and should be excluded on that basis alone.  Id. at 1344.

Throughout her report, as confirmed in her deposition, Dr. Gonzalez accepted the employees'

accounts of events, at least when they supported the EEOC's position, and rejected all conflicting

testimony regardless of source.  Her testimony, then, just like the testimony mentioned in U.S. v.

Hall, is an attempt to sell her judgment as to the truthfulness of certain people and testimony and,

by necessary implication, the untruthfulness of other people and other testimony.  This is not

something the jury needs to hear.

In sum, allowing the jury to hear the challenged Gonzalez testimony would not only

violate Rule 702 and the Daubert principles that the Rule now incorporates, it would also violate

the particular aspects of those laws that are intended to promote fairness and prevent unfair

advantage.  The testimony must be excluded.

Certain aspects of the EEOC's submission merit further comment.

1.     At pages 9-11 of its opposition brief, the EEOC essentially reiterates Dr.

Gonzalez' extensive CV, sprinkling this reiteration with large doses of laudatory adjectives, all

to create the misimpression that Dr. Gonzalez was assigned a task that required expertise and that

she brought her expertise to bear in performing the task.  Suffice it to say, her credentials have no

bearing on the nature of her assigned task, nor does a recitation of them show that they were

needed or even used in performing it.  Nothing can conceal that the task she performed (at least

concerning her first, third and fourth points) is well within the jury's ken, and that she did

exactly what a reasonably intelligent layperson would have done had he or she been presented

with the issue.

Moreover, repeating her CV cannot create credentials that were never

there.  The use of this diversionary tactic only underscores her total lack of qualification to opine,

4

as she did, on the presence or absence of ethnic tension, on workplace safety and efficiency and on the diagnosis of psychological states.

And while the EEOC cites Cota v. Tucson Police Dept., 783 F.Supp. 458, 463, n. 6 for the proposition that Dr. Gonzalez is a nationally known and recognized authority in court interpreting and linguistics, the court found that her testimony there was not useful or even credible. Id. at 463-64.

2.    At pages 11-16 of its brief, the EEOC introduces its argument that each item of challenged testimony should be admitted with a discussion of Dr. Gonzalez' methodology and analytical approach. Here too the EEOC is attempting to create a misimpression; namely, that everything Dr. Gonzalez claims to have done is what she did to analyze and reach a conclusion on each the items she was asked to address. Specifically, Dr. Gonzalez claims that she reviewed the references that appear on the extensive list she included in Section V of her Report (see Report, p. 3) and relied on standard linguistic fact gathering techniques. Yet, there is not a single citation to any of the Section V references in her discussion of issue 1 (Report pp. 6- 14), nor is there any citation there to some authority indicating that her investigatory technique is standard or accepted in the field. (See Gonzalez Depo., pp. 105-108.) The only references are to deposition testimony and the duplicative information she gathered when she asked the employees the same questions the lawyers did. This is also true with her discussion of issue 3 (Report, pp. 31-42.) Contrast this with her discussion of issue 2 concerning codeswitching, the testimony BEI is not challenging. The discussion there is replete with citations to the Section V references.

The point is apparent: Except for her testimony on codeswitching, and that portion of her testimony on issue 4 where she cites authorities in explaining why the Spanish

language is important to a Puerto Rican immigrant's sense of himself and advises that it is not particularly pleasant to be both a linguistic and an ethnic minority in America (Report, pp. 42-48), her methodology and analytical approach are as BEI described them here and in its opening brief - merely a review of the discovery record and the use of common sense (or, in Dr. Gonzalez' case, a sense of enlightened self-interest) to reach conclusions therefrom. This is not expert-type work.

Nor are the "widely accepted sociolinguistic questionnaire" or her "qualitative, in-depth" interviews of the Charging Parties (which is how she obtained the answers to the questionnaire's questions) examples of expert-type work. Dr. Gonzalez did not have the questionnaire with her at her deposition, but, at BEI's request, she subsequently produced it along with her interview notes. Both the questionnaire and the notes are attached to this Reply Brief at Exhibit A. An examination of these documents makes clear that they are the products of ordinary knowledge and thought, not any specialized knowledge and thought. Were there any doubt concerning BEI's challenge, these documents quickly dispel it.

3.      At page 19 of its brief, the EEOC cites cases to suggest that expert testimony can properly be admitted even though substantial portions of the relevant knowledge is common knowledge within the jury's province. None of these cases helps the EEOC.

The Second Circuit's reference in Connors v. University Assoc. in Obstetrics & Gynecology, Inc., to the use of expert testimony to bridge the juror's knowledge gap, is not, as the EEOC suggests, the sanctioning of expert testimony in an area where lay people have some knowledge, but specialized knowledge is required for the full performance of the task. Rather it is the sanctioning of expert testimony where lay people have no knowledge, and the task cannot be accomplished absent specialized knowledge. 4 F.3d 123 (2d Cir. 1993.)

(The Court there held that a plaintiff in a medical malpractice case could use expert testimony in support of a res ipsa loquitor theory; that the inference of negligence the doctrine permits need not be based on common knowledge or experience, but could come from specialized knowledge or experience.)

While the Seventh Circuit in U.S. v. Hall, supra. did note, as the EEOC writes, that a court is not compelled to exclude expert testimony that may "overlap with matters within the jury's experience," the opinion still makes clear that expert testimony is inadmissible when it merely "duplicates" the jury's knowledge. 93 F.3d at 1344. The principle for which the case really stands is that where expert testimony is offered to refute "common knowledge" (commonly accepted beliefs), it is helpful and, hence, admissible. The Seventh Circuit ruled there that the district court should have allowed a qualified defense expert to testify about the phenomenon of false confessions and the defendant's psychological susceptibility to coercion. "It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making a decision. . . Properly conducted social science research often shows that commonly held beliefs are in error." Id. at 1344.

In this case, Dr. Gonzalez's testimony is not intended to debunk any commonly held beliefs or furnish the jury with information they are unlikely to know.[1] It is thinly disguised advocacy from a factual record – the use of common sense to appeal to the jury's own common sense.

4.    At pages 24 and 25 of its brief, the EEOC declares that Dr. Gonzalez conducted "an exhaustive formal policy analysis" to opine that BEI's English-only rule did not

---

[1] The third case, Tyus v. Urban Search Management, 102 F.3d 256, 263 (7th Cir, 1997) merely cites U.S. v. Hall.

achieve its purpose – to argue, in other words, that she did what no ordinary layperson could have done in this regard. There is no question that Dr. Gonzalez used her deposition to elevate and complicate her work on this issue. She even felt the need to go further and submit a post-deposition, post-Motion to Exclude affidavit to the same effect. (More about this later.) Apparently, she recognized that she did not fare particularly well at her deposition in elevating and complicating. In any event, the proof of the pudding concerning the nature of her work lies in the Report itself – in Section 3. Does that section reflect the application of specialized knowledge or ordinary knowledge? Given that the Section reads like a lawyer's argument and contains hardly a "linguistic" citation, the answer is perfectly plain, and the use of "fancy words" after the fact does not alter this conclusion. This is not an expert doing expert's work here. It is an advocate making a factual argument.

5.    The EEOC never addresses BEI's point that Dr. Gonzalez failed to base her opinions on the record as a whole, that her opinions are based on her accepting those parts of the record that support her client's position and ignoring any others. Moreover, except for explaining why she could not do it, the EEOC fails to address BEI's point that some sort of "with and without" study had to be done to reliably assess the rule's effect on ethnic tension and to account for other possible causes or explanations for its presence or absence. At the same time, the EEOC ignores BEI's point that Dr. Gonzalez lacks the expertise to opine on workplace harmony, business efficiency and the like. And it makes no attempt whatsoever to defend her "morale and attrition" testimony. These failures speak volumes about the merit of BEI's challenge.

6.    On pages 28 and 29 of its brief, the EEOC writes that the jury will "want to know" that the Charging Parties' testimony concerning the rule's effect on them is consistent

with the effects that commonly occur in circumstances such as these. Significantly, the EEOC cites no authority for this curious proposition and assiduously avoids any discussion of the relevance of this point. The reason is plain. There is no authority for the proposition, and the point is irrelevant. The fact in issue here is the effect on the individual Charging Parties, not the effect on others.

Finally, it is necessary to protest Dr. Gonzalez' post-deposition, post-Motion to Exclude affidavit. The EEOC's submission of this affidavit is a blatant attempt to blunt the obviously damaging testimony BEI elicited from this witness at her deposition. But, as explained more fully in BEI's Harper Reply Brief, the submission deeply offends the Federal Rules "discovery from experts" scheme. With care and deliberation, the scheme calls not only for an expert's report, but one that is "complete" so that the opposing party can confidently depose and test whether it can make the points it wishes to make – including those that might support a subsequent motion to exclude. If the party proffering the expert feels the need to rehabilitate the witness, the Rules afford it an opportunity that protects the opposing party's rights – the ability to cross-examine at the deposition itself, where the opposing part can redirect if it wishes to challenge the rehabilitation. A post-deposition, post-Motion to Exclude affidavit not only gives the witness the opportunity to reflect and consult with her client (and its counsel) about rehabilitation, it deprives the other side of its fundamental right of "cross-examination." The Rules do not allow this precisely because it is so fundamentally unfair. The affidavit should be stricken or at least not considered.[2]

---

[2] The EEOC says that an evidentiary <u>Daubert</u> hearing is unnecessary. If the new Gonzalez affidavit is stricken, BEI agrees. The Report, the deposition transcript and the briefs provide an adequate, and in BEI's view, a sufficient, basis for adjudicating the matter. However, if the Court is prepared to consider the affidavit, an evidentiary hearing is necessary to afford BEI at least some sort of opportunity to attack the contents.

## CONCLUSION

For the reasons set forth in this brief, as well as those discussed in its opening brief, BEI's Motion to Exclude should be granted.

THE DEFENDANT
BEAUTY ENTERPRISES, INC.

By: _____
        Richard C. Robinson (ct04321)
        Brian C. Roche (ct17975)
        Pullman & Comley, LLC
        90 State House Square
        Hartford, CT 06103
        Telephone: (860) 541-3333
        Facsimile: (860) 424-4370
        rrobinson@pullcom.com
        broche@pullcom.com

## CERTIFICATION

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on the date hereon to all counsel and pro se parties of record.

***Plaintiff Equal Employment Opportunity Commission:***
Katherine Bissell, Esq.
EEOC - New York District Office
7 World Trade Center, 18th Floor
New York, NY 10048-1102

Rosa Lilliana Palacios, Esq.
EEOC Boston Area Office
JFK Federal Building, Room 475
Boston, MA 02203-0506

Markus L. Penzel, Esq.
EEOC - Boston Area Office
J.F.K. Federal Building, Room 475
Boston, MA 02203-0506

***Intervenors:***

Barbara E. Gardner
843 Main Street, Suite I-4
Manchester, CT  06040

Julia Morris Paul
Marte, Plepler, Falkenstein, Keith, Meggers & Paul, P.C.
113 East Center Street
Manchester, CT  06040

Evette Soto-Maldonado, Esq.
Puerto Rican Legal Defense and Educ. Fund
99 Hudson St., 14th Floor
NY, NY 10013-0000

_____
Brian C. Roche
Richard C. Robinson

HTFD/65094.1/RCR/140591v1

11

Ex. A

*Media*

*Interviews — in ctry group — US/o US — ESL — Interp'd*

ENDIX A:       **LIST OF INTERVIEWED CHARGING PARTIES**

*Rating*

(50) **HAROLD ACOSTA** *Span in interview; forklift; human/computer* — 12 yrs/PR H.S. — NO — YES
*Span TV + Newspaper; Eng catalog*

(80) **MIGUEL ALVAREZ** *forklift exam; if Span in inter; spoken lot* 16 yrs — 4 yrs/H.S. — NO — YES
*Span TV only; Newspapers* 30 yrs — /9th — NO — YES

(04) **MARGARITA APONTE** *She can read but they did* 1 yrs — /9th
*No Am TV/Mag (all Span); breaktime speaks Span, learns them co-workers in Span*

(#) **JULIO BENABE** *learned Eng in the streets; Eng TV; Courant but doesn't like to read; manual labor* 7 yrs — /8th grade — NO — Interp't PRESENT

(2) **BRENDA BERRIOS** *depends on topic whether she speaks; Span in English; childcare drugs; confirmed to interpret* 2 yrs/yr/11th grade 3 months YES
*TV + newspaper = Eng; Spanish Novelas + Music; trained others; products stable* 2nd yr new sometimes YES

**MARIA DE JESUS** *(real names) but read; Span* leyrs — /H.S. GED 6 mons sometimes YES

**EVA DIAZ** *has trouble speaking; to bosses/coworkers Eng; Eng = Am Movies; catalog small; code switched in interview* 40 yrs — /6th grade 2 mons PRESENT

**MARIE GARCIA** *EEO fitted w/ confusion grammar; NO INTENTION* 17 yrs — /Civil Engr HS PhD schola — NO — YES

**JOSE LINARES** *Peruvian; Reading Harry Potter; Newspaper; tell you — lots of stuff about safety/forklift; cartoons, movies, shows in Eng; Span = News* 4 yrs — /University 2 yrs 6 mons some GED Sometimes YES

**RUTH LUGO** *afraid to speak Eng; have to know perfect Eng; "intervene my ct the heirs make them"; no info on media* 12 yrs 3yrs/H.S. — NO — (NO DEPO)

**JORGE MALDONADO** *@ co-workers; read "it" request info* 10 yrs — /H.S. 6 mons Present
*Courany + Eng TV; Courant = Eng; or else Spanish* — /University ESL

**WALESKA MIRANDA** *wanted to speak Span to Alvarez; told not to; Eng + Spanish TV + newspaper* 12 yrs — /9th grade ESL/G.E.D YES

**CECILIA ORTIZ** *Told Russians were speaking English; movies = Eng; Spanish all else; children stories = Eng* 15 yrs — 1st yr/8th grade — NO — YES

**MADELYN PEREZ** *spoke Span; got hit by falling stuff; movies; all else Span; can speak better than read* 2 yrs H.S./8th grade — NO — YES

**GLORIBEL RAMOS** *repeated names outloud & reprimanded; trainer* 6 yrs K-12/2-10 Eng 2nd grade ESL Sometimes YES

**LISETTE SANTOS** *was Eng to defend herself; all memorized Span, fired; other = Spanish* 35 yrs K-2/10th grade Yes, 2 yrs wk (NO DEPO)

**ERIC RIVERA** *Spanish Media; considers Eng best lang; now after 3 months; through HS talking about them; all Eng TV; Eng newspaper; talk Span on breaks* average of 5 yrs 2nd yr H.S. in U.S. NO education US educated Present

**MARIANA RIVERA** *cited in footnote 7; very limited Eng; speaker; no info on media* came when she was 2 yrs old U.S./6th grade SOME G.E.P./US educated (Yes) by Lili PRESENT lots of miscommunication

(04) **ROSA ROJAS** *knows primarily courtesy lang; Eng = weather + movies; Novelas = Span* 30 yrs 11 grade/6 mons relied almost exclusively on interp. YES miscommunication

**WILLIAM TORRES** *understands Eng, but don't speak; relied too good; driver; lots of codeswitching in depo* 3 yrs 1yr/9yrs — NO — YES
*CNN, Channel 3 = Eng; Newspapers = Span/Eng*

1

*Rough ratings — English Prof.*

# LANGUAGE INTERVIEW GUIDE
## (EEOC v. Beauty Inc., Hartford, Connecticut)

Interview date:

Interview Time:

Initials:

**Name:** _____

**Date of birth:** _____

**Country of birth:** _____

1. How long have you been in the US?

2. Highest level of education

    a. in the US

    b. in your native country _____

3. Any form of English instruction in your native country?

4. Any form of English instruction taken in United States?

    a. ESL courses taken in the US:

    b. Adult Basic Education:

    c. K-12 in U.S.:

    d. Junior College, University:

5. What language do you speak with your:

    a. boyfriend/girlfriend?
    b. husband/wife ?
    c. children ?
    d. parents?
    e. close friends?
    f. friends at work?

6. What channels or programs do you watch on American television?

7. What American newspapers or magazines do you read?

8. List the positions you had in the last 2 years of your employment with Beauty starting from the most recent one. Describe each job in detail. What did you have to do? How often did your tasks change?

9. Describe in detail how you received your training with Beauty? Who trained you? What did you read? To whom did you talk? How did you learn to run any machines you use? Were there any manuals you needed to understand?

10. Describe a day in your current working life at Beauty.

11. Describe in detail how you received safety training, and by whom?

12. Describe any machines you use in the course of your daily work. Do they have any warnings or labels on them that you have to read? Do the instructions for use ever change? If so, then how do you learn the new way to run them?

13. How do you utilize your break time? Do you learn anything from co-workers during your break time? Do you learn about Beauties policies or benefits from your co-workers during break time?

14. Who do you talk to at work on a typical working day in order to accomplish your job? Check yes, indicate who initiates, list frequency (often, sometimes, never)

| Who You Talk To | Yes They Initiate | I Initiate | They Ask Questions | Frequency |
|---|---|---|---|---|
| supervisors | | | | |
| co-workers | | | | |
| quality control staff | | | | |
| maintenance/technicians | | | | |
| other | | | | |

15. What English do you speak on the job in order to carry out your job? To whom, and in what setting? Describe some of the conversations you have with the persons you named in Question 15:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

4

16. What forms or documents do you have to read, understand or use to accomplish your job?

17. What other, written or visual, sources of information do you have to understand in order to accomplish your daily job?

    a.  video
    b.  computer screen
    c.  printed instructions (manuals)
    d.  on-line instructions
    e.  other:

18. How often is it necessary for you to use (speak or listen to) English to accomplish your job tasks?

    a.  every day
    b.  four times a week
    c.  three times a week
    d.  two times a week
    e.  once a week

19. How often do you use (speak or listen to) English every day, how often is it necessary?

    a.  7-8 times a day
    b.  5-6 times a day
    c.  3-4 times a day
    d.  2-3 times a day
    e.  once a day
    f.  other:

20. Who gives you instructions or how do you get your daily work assignments? Has this changed over time?

21. Who checks your work?

22. Who do you contact when you have problems or questions?

23. How often do your rotate jobs?

24. Do NS use an adjusted code to accommodate NNS workers in the plant?

25. When do you speak Spanish on the job?

   a. When a Spanish-speaking coworker speaks to me: _____

   b. When I'm talking with a friend about a non-work related topic: _____

   c. When a co-worker who can't speak English very well needs help or an explanation.

   d. When training or helping to train a new co-worker.

   e. Other_____

   _____

26. When you were hired for this job, did anyone tell you how much English is required? Who told you? What were you told?

   Yes          No

   Was your English tested in any way?

   Yes          No

   If yes, how?

27. How did you learn of Beauty's language policy?

28. Did the way the policy was enforced change over time?

29. How were you treated <u>prior to</u> and <u>after</u> the English-Only Rule was implemented by Beauty supervisors and management? Did things change in your work environment?

30. Why do you think the English-Only Rule was implemented?

31. Did your co-workers attitudes or behaviors change towards you when the English-Only Rule was instituted?

32. Do other employees use their native language on the job?

33. In what form are safety instructions presented?

    a. oral presentations
    b. video tapes
    c. printed instructions or manuals
    d. signs
    e. warning labels on machines
    f. posted documents

34. Have you ever been in an accident caused by your inability to understand safety or operation instructions in English?

    Yes        No

35. If yes, could you describe in detail what lack of understanding or misunderstanding led to the accident?

36. Do you know anyone who was in an accident caused by lack of understanding or misunderstanding of safety or operation instructions in English?

    Yes        No

If yes, describe the incident in detail.

37. Have you ever made a significant error on the job because of your lack of understanding in English?

    Yes        No

If yes, describe the incident in detail what happened.