# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BEAUTY ENTERPRISES, INC., AAA INDUSTRIAL TEMPORARIES, INC., and ESSENTIAL TEMPORARIES, INC., <br><br> Defendants <br> ---------------------------------------------------------- <br> MIGUEL ANGEL ALVAREZ, WILLIAM TORRES, HAROLD ACOSTA, and JOSE LINARES <br><br> Plaintiff-Intervenors <br><br> v. <br><br> BEAUTY ENTERPRISES, INC., <br><br> Defendant. <br> LUZ M. ANDUJAR, WALESKA MIRANDA, and EVA DIAZ, <br><br> Plaintiff-Intervenors <br><br> v. <br><br> BEAUTY ENTERPRISES, INC., and ESSENTIAL TEMPORARIES, INC. <br><br> Defendants. | 301CV00378(AHN) <br> July 13, 2007 <br><br><br> **MEMORANDUM IN OPPOSITION TO MOTION TO ENFORCE** |

<u>**MEMORANDUM IN OPPOSITION TO MOTION TO ENFORCE**</u>

Despite plaintiffs' repeated refrain that a binding settlement agreement was reached in this case on May 30, 2006, and that the defendant, Beauty Enterprises, Inc. ("Beauty") is breaching that agreement by refusing to recognize it, the application of the relevant law to the pertinent facts shows that the plaintiffs are flat out wrong and that their Motion to Enforce must be denied.

The relevant law is that "a contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation." *Klein v. Chatfield,* 166 Conn. 76, 80, 347 A.2d 58, 61 (1974). The "something that remains to be done" can be reaching agreement on an open term. It can also be the execution of a formal, written document. *Ciaramella v. Reader's Digest Association, Inc.,* 131 F.3d 320, 322 (2d Cir. 1997). The pertinent facts here are that there were things that remained to be done before the parties intended to be bound. This was so on May 30, 2006, and it was still the case on January 24, 2007 when Beauty terminated the settlement discussions. (See generally, Robinson Affidavit.) Among the things to be done were to obtain the agreement of the involved class member/plaintiffs to the so-called 401(k) alternative and to resolve a disagreement over whether Beauty would pay the bulk of the settlement funds all at once or in two installments over two fiscal years. (Id. paras. 12-22.) Another of the things to be done was to finalize and execute (and perhaps even have the Court enter) a written Consent Decree. (Id., para. 8.) Under these circumstances, as disappointing as it might have been for all of those who worked so hard to resolve this complicated litigation, Beauty had the absolute right to change direction, stop pursuing settlement and insist on a trial.

The ensuing sections of this Memorandum elaborate on these points.

**FACTS**

Beauty disagrees with certain of the factual assertions contained in the Palacios-Baldwin Declaration.  For one it disagrees with the assertion that a final settlement agreement was reached and announced to Judge Fitzsimmons and Judge Nevas on May 30, 2006.  (Palacios-Baldwin Dec., p. 17.)  What happened on that date is that Judge Nevas broke an impasse concerning a major issue that had been separating the parties.  (Robinson Affidavit, para. 5.; Sussman Affidavit., para. 6.)  While Beauty was agreeable to the concept of paying money to settle the case and having the EEOC allocate those funds amongst the twenty-one class members as the EEOC saw fit, it was unwilling to have the four class members still in its employ receive "their" portion of the settlement funds and continue working there.  ((Id.)  Beauty's position was that these individuals could stay at Beauty if they wished, but they would then have to relinquish their claim to any settlement proceeds.  At the same time, if any of these individuals wanted their portion of the settlement proceeds, they could receive it when the former employee class members received theirs, but they would have to leave Beauty to do so.  (Id.)  The EEOC's response was adamant.  It would never agree to such an arrangement.  (Id.)  In its view, the arrangement smacked of unlawful retaliation.   (Id.) Judge Nevas broke the impasse by suggesting that Beauty pay the still employed class members their portion of the settlement funds when they left Beauty's employ whenever that happened to be, via retirement or otherwise.  (Id.) Attorney Palacios-Baldwin refers to this as a "deferred payment."  (Palacios-Baldwin Dec., para 17.)  Both sides immediately embraced the concept.  (Robinson Affidavit., para. 5.)  It enabled them to reach agreement in principle on what seemed to be the major settlement issues.  As we explain in detail below, however, there were significant issues left to be resolved concerning

what Attorney Palacios-Baldwin refers to as the "deferred payment vehicle." (Id.; Sussman Affidavit, para. 6.)

On May 30th, the parties also agreed in principle to the total amount Beauty would pay in settlement - $325,000. (Robinson Affidavit, para. 6.; Sussman Affidavit, para. 7.) ) Beauty maintains that the parties further agreed that day that Beauty could pay the $325,000 in two installments over two successive fiscal years. (Id.) Beauty's Vice-President for Finance, Larry Sussman, explained that this would avoid a dramatic effect on Beauty's bottom line and facilitate the borrowing in which Beauty regularly engages in the ordinary course of its business. (Id.) He also recalls insisting on this "payment in installments" right. (Sussman Affidavit, para. 7.) Plaintiffs apparently disagree with Beauty in this regard. They maintain that they rejected Beauty's demand then and there. Yet, in December 2006, Beauty's counsel discussed the matter with the plaintiff EEOC and was told that the EEOC's unwillingness to accept a two installment payout was simply a function of the time that had elapsed since May without a final conclusion to the settlement process. (Robinson Affidavit, para. 16.) Be that as it may, there are only two potential factual conclusions here neither of which is helpful to the plaintiffs. Either there was an agreement (albeit preliminary in nature) for two installments or the issue remained open. Significantly, the EEOC does not and cannot contend that Beauty accepted its supposed rejection and dropped its demand.

Attorney Palacios-Baldwin says that the parties experienced "some difficulties" in identifying the best Deferred Payment Vehicle. (Palacios-Baldwin Dec., para. 25.) Beauty believes that this substantially understates what happened. At the May 30th conference, Larry Sussman casually suggested that the deferred payment vehicle could be an annuity that Beauty would purchase for each of the still employed class members with their portion of the settlement

funds. (Robinson Affidavit, para. 12.) Beauty disagrees with Attorney Palacios-Baldwin's assertion that the EEOC insisted at this conference on any particular requirements for an acceptable deferred payment vehicle. Beauty's recollection is that the EEOC's requirements – that the money would have to leave Beauty's hands immediately with only the class members' receipt of that money actually being deferred and that the money earn investment-type interest in the interim – came later. (Id.) As things turned out, it was those requirements and an even further requirement that caused the process to languish through the summer and fall of 2006 and proceed into the winter of 2007.

The EEOC took until October to investigate and reject the annuity approach. (Robinson Affidavit, para. 12.) The principal reason for the rejection was what Attorney Palacios-Baldwin dubbed the "constructive receipt problem." (Id.) "Constructive receipt" refers to a tax law concept under which income is treated as received and thus taxed even though it is not actually received – even though the recipient does not currently have beneficial use of the money. With an annuity, the involved individuals would be treated as having received the purchase price of the annuity as income, even though they would have no access to the annuity benefit until they left Beauty's employ. Quite understandably, the EEOC did not want these individuals subjected to an income tax on money they had not actually received and might have to wait years to access. So, the EEOC said that although the annuity concept satisfied two of its requirements – the money being out of Beauty's hands immediately and earning investment-type interest, the parties had to find a vehicle that avoided the constructive receipt problem, that this was now a third requirement. (Id.)

Beauty's counsel then put on the table for discussion purposes, not as a formal offer, the notion of an interest bearing promissory note from Beauty to the individuals along with personal

5

guarantees of BEI's owner and two of its Vice-Presidents, Larry Sussman and Rocco Piccirillo. (Robinson Affidavit, para. 13.)   By that time, counsel understood that the EEOC's insistence that there be no deferral on the money leaving Beauty's hands was to avoid exposing the individuals to the risk of Beauty becoming insolvent at some point no matter how remote that risk might be.  (Id.)  Counsel argued to the EEOC that the note concept avoided the constructive receipt problem and that while some future insolvency risk was theoretically possible, it was still ridiculously remote and mitigated in any event by the personal guarantees.  (Id.)  The EEOC was not persuaded and rejected the note/guaranty vehicle.  (Id.)

Subsequently, after Beauty's counsel asked the EEOC to reconsider its rejection, he floated a new alternative – one that Beauty's Larry Sussman had suggested; namely, enrolling the four (or as it turned out three of the four) still employed class members in the company's already existing 401(k) plan and contributing their respective allocations of the settlement proceeds to the plan for their accounts.[1]  (Robinson Affidavit, para. 14.)  These contributions would be treated as gross income on the employees' W-2 forms, but would be excluded from taxable income.  In other words there would be no constructive receipt issue.  (Id.)  And the money would earn interest or otherwise appreciate depending upon the investment vehicle the employee chose.  (Id.)  The only perceived problem with the 401(k) option was that there was a $20,000 limit on the amount that could be contributed to the plan for an employee in any year, certain of the class members were going to be allocated more than $20,000 from the settlement funds and thus not all the money destined for these employees could leave Beauty's hands immediately.  (Id.)  The EEOC's consideration of the 401(k) option continued until close to

---

[1] Because she was a "temp" – a staffing service employee not on Beauty's payroll, Madelyn Perez was not eligible to participate in Beauty's 401(k) plan.  The other three still employed class members were "permanent" Beauty employees and fully able to participate.

Christmas. (Id., para. 15.) Although Attorney Palacios-Baldwin states that the alternative was accepted on December 21st in telephone conversations she had with Beauty's counsel, it is clear that the EEOC – the lawyers handling the matter for the EEOC and thus representing the class members – had not yet discussed this alternative with their "clients" and needed their approval. (Robinson Affidavit, para. 15.) It is also clear that the EEOC lawyers in the case needed the approval of their superiors at EEOC's headquarters in Washington and not just for the 401(k) alternative, but for the settlement as a whole. (Plaintiff's Exhibit 5.)

It was during the December 21st telephone conversations that Beauty's counsel reminded Attorney Palacios-Baldwin that they had to provide for the payment of the "other" money – the settlement funds allocated to the other class members – in two installments over two fiscal years. Beauty's counsel had forgotten this point. (Robinson Affidavit, para. 16.) Larry Sussman reminded him that this was to be in the contract document. (Id.) Anticipating that there would be no problem with this item (particularly since the EEOC had agreed to it on May 20th) and hoping that the settlement process would conclude quickly and successfully, counsel offered to have Beauty fund the 401(k) contributions for the three involved individuals by the end of 2006. This would have enabled these individuals to begin earning interest quickly on a portion of their settlement monies and would also have prevented them from having to wait until 2008 for the balance to be contributed. (Id., para. 15.) As it makes abundantly clear in its papers, the EEOC had a problem with installment payments for this "other" money.

Later on the 21st, Attorney Palacios-Baldwin wrote to Judge Fitzsimmons stating that the parties were at impasse on what she mis-described as "this newly added term" and seeking her assistance. (Plaintiff's Exhibit 9.) (Beauty's counsel responded in a letter the next day to Judge Fitzsimmons, saying, among other things, that the two installment requirement was not "newly

7

added." [See Robinson Affidavit, para. 17, Exhibit B.])   The court then scheduled the January 24, 2007 conference hoping to put the settlement process back on track.

Attorney Palacios-Baldwin suggests that both parties went to the January 24, 2007 conference to resolve the issues that remained concerning the 401(k) alternative and the two installment issue concerning the other money, and that these issues were resolved before Beauty announced that it had had a change of heart concerning the settlement as a whole and that there would be no settlement.   Beauty's recollection is distinctly different.   Beauty's recollection is that it announced right away before the session actually began that it was ending the settlement discussions and that the remainder of the day became a concerted effort to convince Beauty's owner, Robert Cohen, to change his mind (with the EEOC only then expressing its willingness to accept the notion of installment payments for the other money). (Robinson Affidavit, paras. 19-21.)

Mr. Cohen had never been entirely comfortable with the settlement being discussed, particularly the idea of paying money to the class members.  (Robinson Affidavit, para. 19.)  The class members who had talked to him about the case had always assured him that it was purely a matter of principle on their part, that none of them were "in it" for the money. (Id.)   He also learned that virtually all class members testified to this effect at their depositions.  (Id.)  On October 18, 2006, in an e-mail exchange concerning the 401(k) alternative, Beauty's counsel told Attorney Palacios-Baldwin, "Bob is almost ready to forget settlement and try the case." (Robinson Affidavit, para. 19, Exhibit C.)   The EEOC's reneging in December on the two installments for the "other" money simply fueled an already simmering fire.   Then, in late December 2006 and early January 2007, another incident occurred – and this is the one that broke the proverbial camel's back.  (Robinson Affidavit, para. 19.)

The incident concerned one of the four class members still in Beauty's "employ," Madelyn Perez. (Robinson Affidavit, para. 20, Exhibit D.) "Employ" is in quotes because Ms. Perez is actually a "temp," a staffing agency employee placed at Beauty. (Robinson Affidavit, para. 10.) One of the terms of the settlement in principle was that Beauty would offer Ms. Perez a permanent position when one became available. (Exhibit D.) Near the end of 2006, a permanent position became available, and in anticipation of an ultimate agreement on settlement, Beauty brought the opening to Ms. Perez' attention. (Id.) She told Beauty that she was interested in the position, and Beauty offered it to her subject to her completing an employment application and signing certain other pre-employment documents. (Id.) One of these pre-employment documents was an acknowledgment form in which the applicant confirms that he or she "understands" that Beauty "maintains a Speak only English rule – a rule requiring employees to speak only English while they are working." (Id.) The document also contains a certification by the applicant that he or she is able to read, write, speak and understand English. (Id.) Ms. Perez refused to sign the document. (Id.)

Eager to put to rest the issue of Ms. Perez becoming a permanent employee, Beauty's counsel called Attorney Palacios-Baldwin and asked her to intervene – to tell Ms. Perez that she could sign the document.[2] It quickly became apparent that Attorney Palacios-Baldwin was not going to do this. She asked counsel why Beauty needed Ms. Perez to sign. Counsel responded that Beauty's position throughout the litigation was that Beauty would be enforcing its rule until a court tells it it could not or there is a settlement in which Beauty changes the rule, that consistent with this position, Beauty requires all applicants to sign the subject document and that

---

[2] There is no dispute that by December 2006, if not earlier, Ms. Perez was able to speak, read, write and understand English.

if it "got out" that Beauty hired Ms. Perez despite her failure and refusal to sign, it would negatively affect discipline and morale.  And it also might not be particularly helpful to Ms. Perez, since her colleagues would view her as the recipient of special treatment and subject her to ridicule and contempt.  (Exhibit D.)

Apparently, this explanation failed to satisfy Attorney Palacios-Baldwin.  She told Beauty's counsel that he (Beauty's counsel) would make the document with Ms. Perez' signature Exhibit A in Beauty's case (a pretty strange remark for someone who contends there was a binding settlement agreement back on May 30, 2006).  (Exhibit B; Robinson Affidavit, para. 10.)  Counsel responded that he was still hopeful about settlement and that if she were concerned about the use of this document against Ms. Perez and the EEOC if the case did not settle and had to be tried, he would give her a letter stating that Beauty would never use the document against Ms. Perez or the EEOC in this or any other case.  (Exhibit D.)  For some reason, this was not good enough for the EEOC.  (Exhibit D.)

On January 15, 2007, complying with Judge Fitzsimmons instruction that the parties submit ex parte, confidential letters to her in advance of the January 24th conference, Beauty's counsel wrote to the Judge reciting what appears above regarding the Madelyn Perez incident and stating, "I now have to tell you that Beauty is having second thoughts – serious reservations – about settlement . . ." (Exhibit D.)  Counsel concluded his letter with the following:

> "Beauty will meet with you on the 24th with an open mind.  However, the issue is no longer whether Beauty will pay all at once or in two installments over two (successive ) fiscal years, but whether Beauty will settle at all." (Exhibit D.)

Thereafter, and before January 24th, Beauty decided it would not settle at all. (Robinson Affidavit, para. 21.) And on January 24th, in the courtroom before the conference began, Beauty's counsel told adversary counsel that Beauty had decided not to settle and to go to trial. (Robinson Affidavit, para. 21; Sussman Affidavit, para. 8.)

One additional factual disagreement must be discussed. The EEOC characterizes the preparation and execution of the Consent Decree following May 30 as the mere "memorialization" of the terms of the settlement reached in Court that day. Beauty disagrees with this characterization. Beauty understood that even if agreement were reached on all issues and details, the agreement was entirely preliminary, that there would be no settlement at all, and the parties would not become legally bound, until after the Consent Decree document was finalized, the EEOC in Washington approved it, all parties signed the document and the Court made it its decree. (Robinson Affidavit, paras. 8-11.)

Beauty also believes that despite its current position, the EEOC had the very same understanding. (Robinson Affidavit, paras. 8-11.) Indeed, it is plain that the intent to become bound only by a written document executed by the parties originated with the EEOC. It was the EEOC, after all, that insisted not only on a signed, written document, but on a Consent Decree where the parties would sign to signify their approval "in form and content," and Judge Nevas would "so order, adjudge and decree" by affixing his signature. (Id.) The EEOC's Consent Decree drafts even made certain performance duties arise within a certain number of days "of the entry of the Decree."[3] (See e.g., Plaintiffs' Exhibit 12.) Unable to persuade the EEOC that something less formal would do, Beauty acceded to the Consent Decree format, and the intent to

---

[3] These include Beauty's payment of the settlement funds per paragraph A.5 and its notice posting per paragraph C.14.

become bound only by an executed written Consent Decree document became mutual. (Robinson Affidavit, paras. 8-11.)

Lest there were any doubt that the EEOC did not intend to become bound in the absence of finalized, signed Consent Decree document, a paragraph in Attorney Palacios-Baldwin's June 16, 2006 letter to Beauty's counsel quickly dispels it.

"Finally, I just want to remind you that once the Consent Decree is finalized, it will need to be approved by our headquarters in Washington.  I don't anticipate this will create any major problems – particularly if we are able to resolve the above (eleven) issues to the Agency's satisfaction."

(Plaintiff's Exhibit 5.)

Finally, that the EEOC would express concern in late December 2006 and early January 2007 that Beauty would use the executed Madelyn Perez acknowledgment and confirmation documents as Exhibit A at trial belies its current position and is an additional fact showing that the EEOC's understanding all along was that no one was to be bound until there was a final, signed Consent Decree.

**THE LAW AND ITS APPLICATION TO THE FACTS**

The law as applied to these facts compels the conclusion that there was no binding settlement agreement on May 30, 2006 or at any point thereafter and that Beauty was free to terminate the settlement discussions and insist on a trial.  There are, as previously noted, two separate and independent reasons for this conclusion.  First, on May 30, 2006 there were unresolved items which under the circumstances were essential to a settlement in this matter, and

this remained the case on January 24, 2007, when Beauty announced it was withdrawing from the settlement discussions. Second, the parties did not intend to become contractually bound unless and until the Consent Decree document was finalized and executed, and this never occurred.

Although the parties disagree about certain of the facts, there is no dispute concerning the applicable law. The EEOC's near, but not entirely exhaustive review of the jurisprudence of settlement agreement enforcement makes clear that the question of whether the parties reached a binding settlement agreement is a function of general contract law principles, and that since federal common law and state law on the subject are generally consistent, each can serve as an appropriate source of principles and precedent in any particular case.

As to the effect of the unresolved items, the primary general contract law principle is the one Beauty cited at the beginning of this memorandum – that "a contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation. *Klein v. Chatfield,* 166 Conn. 76, 80, 347 A.2d 58, 61 (1974). As this principle suggests, intent is the critical factor here. See *MD Drilling & Blasting, Inc. v. MLS Construction, LLC,* 93 Conn. App. 451, 454-5, 889 A.2d 850 (2006) (In general terms, the existence of a contract is to be determined from the parties' intent.) On the one hand, "[u]nder the modern law of contract" parties may reach a binding agreement even though one or more terms are left open, so long as the parties intend to be bound despite the lack of agreement on these items. *Willow Funding Co., L.P. v. Grencom Associates,* 63 Conn. App. 832, 844,   A.2d (2001). On the other hand, if the parties do not intend to bound without an agreement on particular terms, they will not be bound absent an agreement on those terms. *Id.* See *Geary v, Wentworth Laboratories*, 60 Conn. App. 622, 627, 760 A.2d 969 (2000) ("So long as any

essential matters are left open for further consideration, the contract is not complete.") See also, Restatement 2d Contracts, § 26 "Preliminary Negotiations" ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reasons to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.")

Intent is a question of fact to be determined by examining the totality of the circumstances. *Ciaremella v. Reader's Digest Association, Inc.,* 131 F.3d 320, 322 (2d Cir. 1997). Here, the relevant circumstances include Beauty's insistence that there would be no agreement absent an acceptable resolution to its issue concerning the four still employed class members. They also include the EEOC's insistence following Judge Nevas' seemingly impasse breaking deferred payment suggestion that there would be no agreement absent an acceptable deferred payment vehicle that the affected class members approved. Clearly, there was no agreement even on the vehicle on May 30, 2006. The parties had just started thinking about this subject at that point. And it was the EEOC, after thinking about the subject, that subsequently established two firm requirements for a vehicle that would be acceptable to it and then later added a third. Nor was there any agreement on January 24, 2007 when Beauty announced that it was withdrawing from the settlement discussions, because even though the EEOC's negotiator had tentatively accepted Beauty's 401(k) plan alternative by then, the EEOC had yet to obtain the approvals of the affected class members.

The relevant circumstances also include the controversy surrounding Beauty's insistence on paying the "other money" in two installments. While Beauty thought the matter had been resolved on May 30th, with the EEOC agreeing to its seemingly unobjectionable two installment demand, it is apparent that there was no longer any agreement on this point in December 2006,

when Beauty raised the issue again, or on January 24, 2007, when Beauty announced its withdrawal.

On this basis alone, the only supportable conclusion is that there was no binding settlement agreement at any point before Beauty withdrew.

As to the separate and independent effect of the not finalized, not executed Consent Decree document, the EEOC's description of the relevant jurisprudence fails to include the following black letter contract law principle. "It is . . . everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed." 1 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts, § 28 (3d ed. 1957), cited in *Ciaramella v. Reader's Digest Association, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997). See also, *Javit v. Marshalls, Inc.,* 1994 Conn. Super. LEXIS 662 (The law is "that even if the parties have had a meeting of the minds on all terms of a contract but intend 'not to be bound until the formal document is executed, there is no contract until its execution by both parties. Corbin on Contracts, Rev. ed. (1993) § 2.9 p. 151."); *Ciarmella,* 131 F.3d supra. at p. 322. (". . if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then.")

The Restatement of Contracts deals with this principle in a comment to a section entitled "Existence of Contract Where Written Memorial Is Contemplated." Restatement of Contracts, Second, § 27 Comment C. "If either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract." As with the effect of the unresolved

items, then, the effect of the not finalized, unsigned Consent Decree is, at its core, a question of intent – and the determinative intent can be that of just one of the parties, so long as the other party knows or has reason to know of that party's intent.

Here, there can be no question that the intent to become bound only by an executed written Consent Decree document originated with the EEOC and came to be Beauty's intent thereafter. As noted, it was the EEOC that demanded a Consent Decree where the parties would sign to signify their approval "in form and content," and Judge Nevas would "so order, adjudge and decree" by affixing his signature. It was the EEOC that in its draft Consent Decree documents timed certain performance duties to arise within so many days "of the entry of the Decree." Even without explicitly making other performances due upon, or within so many days of, the entry of the Decree, the very notion of a Consent Decree implies that no performances are due until the parties sign and the Decree is entered.

One of the so-called *Winston* federal common law factors the Second Circuit considers in assessing whether parties intend to be bound in the absence of an executed contract is whether there has been an express reservation of the right not to be bound without a signed writing. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir 1986). In *Ciarmella,* supra., the Second Circuit found "express reservation" because the document, a Settlement Agreement and General Release, stated that it would not be effective until it was signed and also contained provisions that timed certain performances from the "Effective Date" (the date it was signed by both sides). In this case, the requirement of the Court's signature (following the parties' signature) establishes what must be considered an effective date, and here, as in *Ciarmella,* there are performances timed from the effective date. Without more, these fact compel the "express

reservation" conclusion and confirm the ultimate conclusion that there was no intent to be bound until there was an executed Consent Decree.

There is more, however. While Beauty never formally reserved its right not to be bound in the absence of a signed agreement, the EEOC did. There is no other way to characterize Attorney Palacios-Baldwin's written June 16, 2006 reminder "that once the Consent Decree is finalized, it will need to be approved by our headquarters in Washington." In other words, Beauty can sign, but the EEOC signatories cannot sign and bind the EEOC until Washington reviews the document and authorizes them to sign. And, as Attorney Palacios-Baldwin's June 16th letter suggests, there could be problems securing Washington's approval, perhaps even major problems "if we are [unable] to resolve the above (14) issues to the Agency's satisfaction." Clearly, there is "express reservation" and a mutual intent not to be bound here until at least the parties, duly authorized, signed the Consent Decree. The call on this is not even close.

The other relevant *Winston* factor – part performance - further confirms this conclusion. Part performance, or more accurately, the rendition of part performance, is a *Winston* factor that augers in favor of a "bound before signature" determination. At the same time, the absence of part performance augers against such a conclusion. Beauty did, of course, attempt to perform one of the Consent Decree's terms before there was a signature and a completed settlement (as a gesture of good faith and a good idea apart from the settlement discussions) – the move of Madelyn Perez from her position as a temp to a "permanent" position. However, it would not free Ms. Perez from the English only requirements at the heart of this case even though those requirements would have been considerably relaxed in the settlement the parties were then close to achieving. Beauty's counsel told Attorney Palacios-Baldwin at the time that Beauty would not change its English only rule or any related requirements until the settlement was complete,

17

final and binding.  The EEOC then put the kibosh on Beauty's attempt to perform this one term of the settlement in advance so to speak.  Thus, rather than reflecting an intent to be bound before signature, Beauty's conduct in the Madelyn Perez incident is perfectly consistent with an intent not to be so bound.

There is still another fact that further solidifies the already solid  "no intent to be bound" conclusion for which Beauty is contending.  As previously noted, during the discussions concerning Madelyn Perez in late December 2006 in which Attorney Palacios-Baldwin stated in substance that she would not allow Ms. Perez to sign the acknowledgement document (acknowledging the existence of the English only rule and her ability to speak, read, write and understand English), her stated explanation was that Beauty's counsel would make the signed document Exhibit A in its case if "we" did not settle.  In the final analysis, then, despite the plaintiffs' aggressive pursuit of this Motion, their own chief counsel and often their sole negotiator knew that there was no binding deal, despite any handshakes, hugs or congratulatory statements, until there was at least a fully signed, Washington approved Consent Decree document.

There is nothing to enforce here.  Plaintiffs' Motion must be denied.

**CONCLUSION**

Plaintiffs' claim prejudice because they discontinued their prosecution of the litigation after May 30, 2006.  In fact, they stopped prosecuting the litigation on or about October 25, 2005, some seven months earlier, once the Court issued its ruling on the law regarding their disparate impact claims, they sought a settlement to vacate this ruling and settlement discussions began in earnest.

Be that as it may, parties always expose themselves to risk when for all intents and purposes they stop their litigation activities and obtain postponements of critical events in order to pursue potential settlement. They expose themselves to the risk of failure and its attendant consequences. And the risk increases the longer the pursuit takes. It is fair to say that the plaintiffs might have managed this risk, that they could have appealed the disparate impact ruling and continued to pursue settlement, or they could have imposed a deadline on settlement activities. At the same time, though, it would be unfair to criticize the plaintiffs for failing to do one or the other of these things. After all, both sides were working hard and in good faith towards reaching a final settlement – and the negotiators at least were optimistic, even into late December 2006, that such a settlement could be reached.

Nonetheless, harmful consequences to one party from the exercise of rights by the other does not convert a right to a wrong, nor does it render the harm redressable. In this case, the possibility that either party might exercise their right to walk away from a settlement before it was complete and binding is simply part of the risk that inheres in the process – a risk both plaintiffs and Beauty knowingly and willingly assumed.

And there now can be no doubt that Beauty had the right under the circumstances to walk away. The law – black letter, hornbook, first year contracts class law – explicitly gave it that right, and despite their current posture, plaintiffs knew or at least should have known that this was the case.

This court must follow the law here, reject plaintiffs' misconceived arguments that a settlement agreement exists and deny the present Motion.

                    THE DEFENDANT
                    BEAUTY ENTERPRISES, INC.

                    By:          /s/ Richard C. Robinson
                         Richard C. Robinson (ct04321)
                         Pullman & Comley, LLC
                         90 State House Square
                         Hartford, CT 06103-3702
                         Telephone     860-541-3333
                         Facsimile     860-424-4370
                         rrobinson@pullcom.com
                         Its Attorneys

## <u>CERTIFICATION</u>

I hereby certify that on June 13, 2007, a copy of the foregoing Defendant's Memorandum in Opposition to Motion to Enforce was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ Richard C. Robinson
Richard C. Robinson

Hartford/65094.1/RCR/240079v1