UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>BEAUTY ENTERPRISES, INC., AAA INDUSTRIAL TEMPORARIES, INC., and ESSENTIAL TEMPORARIES, INC.,<br><br>        Defendants<br>------<br>MIGUEL ANGEL ALVAREZ, WILLIAM TORRES, HAROLD ACOSTA, and JOSE LINARES<br><br>        Plaintiff-Intervenors<br><br>v.<br><br>BEAUTY ENTERPRISES, INC.,<br><br>        Defendant.<br>------<br>LUZ M. ANDUJAR, WALESKA MIRANDA, and EVA DIAZ,<br><br>        Plaintiff-Intervenors<br><br>v.<br><br>BEAUTY ENTERPRISES, INC., and ESSENTIAL TEMPORARIES, INC.<br><br>        Defendants. | 301CV00378(AHN)<br>July 13, 2007<br><br>**AFFIDAVIT OF<br>RICHARD C. ROBINSON** |

I, Richard C. Robinson, being duly sworn, do hereby depose and say as follows:

1. I am over the age of eighteen, believe in the obligation of an oath and make this affidavit on the basis of my own personal knowledge.

2. I am counsel of record for the defendant Beauty Enterprises, Inc. in the above-captioned matter.

3. I am making this affidavit to support the factual assertions Beauty is making in its Memorandum in Opposition to Plaintiffs' Motion to Enforce.

4. I was present at the May 30, 2006 conference in court. I understand that plaintiffs maintain that a final settlement agreement was reached and announced to Judge Fitzsimmons and Judge Nevas at that conference. I disagree.

5. What happened that day was that Judge Nevas broke an impasse in the settlement negotiations which the parties had been conducting since the end of October 2005. Before May 30, 2006, the EEOC had demanded that Beauty pay money to the class member/plaintiffs as part of a settlement, and Beauty expressed its willingness to pay some money to these individuals to settle the case. However, Beauty was completely unwilling to have the four class members still in its employ receive any settlement funds and continue working for it. If the class members wanted the money, Beauty was willing to pay them, but only if they left. If the class members wanted to remain in Beauty's employ, they were free to do so, but they would have to forego any claims to the settlement funds. The EEOC was adamant that it would never agree to such an arrangement. In its view, the arrangement seemed like unlawful retaliation. Judge Nevas broke the impasse by suggesting that the four class members remain in Beauty's employ, but simply

2

defer their receipt of the settlement funds to the day they left Beauty, whenever that happened to be, via retirement or otherwise. Both sides quickly embraced the concept.

6.    I also know that at this May 30th conference, the parties agreed in principle to the total amount Beauty would pay in settlement - $325,000. I also recall that Beauty's Larry Sussman, with everyone present, demanded that Beauty be allowed to pay this money in two installments over two successive fiscal years, explaining that this would permit Beauty to avoid a dramatic effect on its bottom line and facilitate the borrowing in which Beauty regularly engages in the ordinary course of its business. My memory is that the EEOC acquiesced to this demand. My notes of the "deal," cryptic as they are, are consistent with my memory. (**Exhibit A** to this affidavit is a true and accurate copy of these notes.)

7.    As a result of the "agreement" on total dollars and the acceptance of Judge Nevas' deferred payment suggestion for the four still employed class members, it appeared that the parties had reached an agreement in principle. I certainly thought that the major issues had been resolved and was optimistic that we would be able to reach agreement on the items that remained opened, including the vehicle for the deferred payment to the four still employed class members. My impression was that everyone else involved felt the same way. I know there were hugs and congratulatory handshakes reflecting those feelings.

8.    Nonetheless, it was never my impression, nor was it Beauty's, that hugs, congratulatory handshakes or agreements in principle would create anything binding between the parties. My firm understanding, and Beauty's as well, was that there was to be no binding contractual relations before the parties finalized and executed a written Consent Decree

3

document and perhaps not until the Court actually entered the Decree – that neither party intended to be bound before these things occurred.

9. The EEOC's insistence on the Consent Decree as the settlement format is what gave me this impression and understanding initially. I had been seeking a much less formal and invasive settlement format, but was unable to persuade the EEOC to change its position. Even the initial drafts of the EEOC's proposed Consent Decree were complex, imposed all sorts of continuing duties, including a ten-year monitoring role for the EEOC over Beauty's human resource function – and clearly, the language ultimately negotiated would be important. Further, the Consent Decree called for the parties to sign to signify their approval in form and content. And, of course, it called for Judge Nevas to sign and thereby "order, adjudge and decree" its contents. Still further, the Consent Decree document made certain performances due within so many days of the date of the entry of the Decree. Clearly, this settlement structure was something entirely different from counsel reading into the record that the defendant would pay X dollars within so many days and thereupon the plaintiff would dismiss the action. Once I – Beauty – accepted the Consent Decree format, we joined with the plaintiffs in intending not to be bound until the document was finalized, signed and perhaps even entered as the Court's decree.

10. Nothing has ever dissuaded me from this impression and understanding and my view that it was the EEOC's intention all along not to become bound until the Consent Decree document was finalized, signed and perhaps even adopted by the Court as its decree. Instead, certain actions by the EEOC during the ensuing months only reinforced these beliefs. For one, the EEOC – Attorney Palacios-Baldwin – told me that once we finalize the Consent Decree document, she would have to send it to EEOC headquarters in Washington for approval. By letter dated June 16, 2006, she reminded me of this, intimating that there could even be problems

4

obtaining this approval. See Plaintiffs' Exhibit 5. Surely, the EEOC was not going to be bound by oral agreements made by its attorneys of record. Further, in late December and early January 2007, when problems surfaced in finalizing the settlement, but I was nevertheless expressing optimism that we could still get "it" done, Attorney Palacios-Baldwin told me that the reason she would not permit Madelyn Perez, one of the four still employed class members, to sign a form that would enable her to change from a "temp" (someone on the payroll of a staffing service and placed at Beauty) to a "permanent" Beauty employee (on Beauty's payroll) is that I would make this signed document (acknowledging, among other things, that she was able to speak, read, write and understand English) "Exhibit A" in this case if we did not settle and the case were tried. Attorney Palacios- Baldwin would not have made such a statement if she truly thought we had a final, binding settlement back on May 30, 2006 or that a binding settlement could be achieved absent a signed Consent Decree document.

11.    We never did finalize and sign the Consent Decree document. I was never told that the EEOC in Washington had approved it or that it was even sent there for approval.

12.    I now will address the items that were open on and after May 30, 2006 and at the time Beauty terminated the settlement discussions. Certainly, the vehicle for the deferred payment to the four still employed class members was open. At the May 30th conference, I know that Larry Sussman suggested that Beauty could purchase annuities for the four individuals with their respective portions of the settlement funds. I do not believe that this was in response to any requirements the EEOC had announced. I know that Beauty had been exploring annuity purchases for certain of its employees upon their retirement and was familiar with the product. I do know that the EEOC investigated the annuity approach and took until October to reject it. It was then, I believe, that I learned, but it could have been earlier, that the EEOC had requirements

for a deferred payment vehicle. One was that the money would have to leave Beauty's hands immediately once the parties were bound, that technically it would not be the payment that was being deferred, only the employee's receipt of the payment. My understanding is that one reason for this requirement was the fear that Beauty could possibly become insolvent at the time the individuals retired or otherwise left. The other requirement was that the money once out of Beauty's hands would have to earn interest or investment-type interest. The annuity device satisfied these requirements, but created an additional problem for the EEOC; namely, that the IRS would treat Beauty's payment of the annuity purchase price as income to the individuals even though the individual's receipt of that money was being deferred perhaps for years. What this would have meant, simply, is that the individuals would have a tax liability on money they had not actually received and would have to pay these taxes from other resources, which might have been a hardship for them. Hence, Attorney Palacios-Baldwin told me in substance that the avoidance of what she dubbed this constructive receipt problem was a third requirement for an acceptable deferred payment vehicle.

13. I then talked with Larry Sussman about what we might do. We talked about a note from Beauty with personal guarantees (from Beauty's owner, Bob Cohen, and its two principal vice-presidents, Sussman and Rocco Piccirillo). The guarantees were to assuage the EEOC's baseless and almost irrational insolvency fear. I was authorized to discuss, not offer, this approach to the EEOC and did discuss it with Attorney Palacios-Baldwin. She quickly responded that the device was unacceptable, that it did not eliminate the admittedly very remote insolvency risk.

14. After I asked the EEOC – Attorney Palacios- Baldwin – to reconsider the note/guaranty device, I told her of Larry Sussman's suggestion that we enroll three of the four

individuals, the permanent employees, in the company's 401(k) plan, with the company contributing their allocation of the settlement proceeds to the plan for their accounts. (We would deal with the plan-ineligible "temp" – Madelyn Perez, who would be receiving a relatively small sum anyway - by paying her with the other, no longer employed class members.) I told her that these contributions would appear as gross income on the employees W-2's, but would be excluded from taxable income. Hence, there would be no constructive receipt problem. Moreover, the money would earn investment-type interest or appreciation while in the individuals' accounts. The only potential problem with the 401(k) device was that there was a $20,000 limit on the amount that could be contributed to the plan for an employee in any year, the three individuals were scheduled to receive more than $20,000 each from the settlement and thus not all the money earmarked for these individuals could leave Beauty's hands immediately.

15. The EEOC's consideration of the 401(k) suggestion continued until close to Christmas. I am not sure that Attorney Palacios-Baldwin ever told me firmly that the suggestion was okay. I do know (because she told me) that she had to discuss it with the clients and needed their approval, and that no one ever told me that the approval had been secured. I know I expected acceptance and approval and, with Beauty's authorization, after discussions with Larry Sussman and in anticipation that we would quickly settle everything and finalize and sign the Consent Decree document, I offered to have Beauty make the contributions for the three individuals involved before the end of the year so they would not have to wait until 2008 for the second contribution and the second contribution could be made shortly after the first of the year in 2007. This was in a phone conversation on December 21, 2006.

16. Something else I said to Attorney Palacios-Baldwin on the 21st seemed to halt the process in its tracks. I reminded her, because Larry Sussman had reminded me, that the payment

7

of the other money – the balance of the settlement funds, those earmarked for the class members no longer in Beauty's employ – was to be in two installments over two fiscal years. I had forgotten this point. Frankly, I did not anticipate that this would cause a problem, particularly since the EEOC had agreed to the two installments on May 20th. Obviously, I was wrong in this regard. I was told simply that too much time had elapsed since May without a final conclusion to the settlement process, and under these circumstances the class members should not have to wait another year to receive half the settlement proceeds.[1]

17.   Following our telephone call on December 21st, Attorney Palacios-Baldwin wrote to Judge Fitzsimmons stating that the parties were at impasse on what she mis-described as "this newly added term" (the installment payments for the other money) and sought her assistance. Plaintiff's Exhibit 9.) The next day I wrote my own letter to the Judge saying, among other things, that the installment payment term was not "newly added.") (**Exhibit B** to this affidavit is a true and accurate copy of this letter.)

18.   Judge Fitzsimmons then scheduled a conference for January 24, 2007.

19.   Before that conference, Beauty's owner, Bob Cohen, made up his mind to terminate the settlement process and go to trial. Mr. Cohen had never been entirely comfortable with the settlement being discussed, particularly the idea of paying money to the class members. The class members who had talked to him about the case had always assured him that it was purely a matter of principle for them, that they were not in it for the money. He also learned that virtually all class members testified to this effect at their depositions. Back on October 18, 2006,

---

[1] Because of the doubt engendered by the EEOC's surprising reaction to the two installment reminder, the EEOC did not ask Beauty to contribute to the 401(k) plan by year end 2006 for the three still employed individuals, and Beauty did not do so.

8

in an e-mail exchange I had with Attorney Palacios-Baldwin, I wrote, "Bob is almost ready to forget the settlement and try the case." (A true and accurate copy of a print out of that e-mail is **Exhibit C** to this affidavit.) I know that the EEOC's reneging in December on the two installments for the other money did not help in the efforts to keep Mr. Cohen in a settlement mode. Then, almost at the same time, another incident occurred that proved to be the last straw.

20.  The incident – the one involving moving Madelyn Perez from temp to permanent – is fully described in the January 15, 2007 confidential, ex parte letter I wrote to Judge Fitzsimmons at her request in connection with the January 24th conference. (A copy of that letter is **Exhibit D** to this affidavit.) The letter also includes my statement, "I now have to tell you that Beauty is having second thoughts – serious reservations – about settlement." It concludes, "Beauty will meet with you on the 24th with an open mind. However, the issue is no longer whether Beauty will pay all at once or in two installments over two (successive) fiscal years, but whether Beauty will settle at all."

21.  My assertion concerning Beauty coming to the conference on the 24th with an open mind proved to be wrong. Before then, Bob Cohen decided that Beauty would not settle. I announced this to adversary counsel when we first gathered in Judge Fitzsimmons court room before we saw Judge Fitzsimmons and the conference began. What happened after that was largely an effort to convince Mr. Cohen that he should change his mind and come back to the settlement. The effort included the EEOC's apparent acceptance of the concept of two installments.

22. Nevertheless, at the moment on the 24th when I announced that Bob Cohen was no longer interested in settlement, the issue of when the settlement proceeds were to be paid was unresolved, as was the acceptance of the 401(k) alternative.

_____
Richard C. Robinson

Subscribed and sworn to before me this 13th day of July, 2007

_____
Commissioner of the Superior Court

Hartford/65094.1/RCR/241069v1

14,000

5,000

5,000 **

- 025K    ½ vyjt. ½
- Deferred payment of $4 [illegible]
  till some new employment.

Confidentiality

[signature]

# PULLMAN & COMLEY, LLC
ATTORNEYS AT LAW

RICHARD C. ROBINSON
90 State House Square
Hartford, CT 06103-3702
p  860 541 3333
f  860 424 4370
rrobinson@pullcom.com
www.pullcom.com

December 22, 2006

The Honorable Holly Fitzsimmons
U.S. District Court – District of Connecticut – Bridgeport
Brien McMahon Federal Building
915 Lafayette Blvd.
Bridgeport, CT 06604

Re:   EEOC, et al. vs. Beauty Enterprises, Inc. et al
      C.A. No. 301-CV-378-AHN

Dear Judge Fitzsimmons:

I just received the December 21st letter that Attorney Palacios-Baldwin sent you and am writing to clarify, or give you our side's perspective, on some of the events she described.

Attorney Palacios-Baldwin makes it seem as if paying the settlement amount in two installments is a new, last minute demand on our part. It is not. In fact, I am not so sure that it is accurate even to characterize this as a demand. Frankly, my client and I thought that the two installment provision had been agreed to at our conference with the court last May. And if actual agreement was not, or never was, reached on the matter, our side has always been insistent on payment in this fashion. Indeed, my understanding is that the EEOC's unwillingness to abide by/agree to a two installment payout is simply a function of the time that has expired since we reached agreement in principle back in May.

I do want to explain what the two installment provision now in question would cover. It would only cover the funds earmarked for the claimants who are no longer employees of Beauty Enterprises. The 401(K) solution for three of the four claimants who continue to be Beauty Enterprises employees will of necessity require a two installment payment because each of these individuals will be receiving the maximum "they" can contribute ("electively defer") to a 401(K) plan under the Internal Revenue Code. The EEOC is not complaining about this. Thus, it is misleading to suggest, as I think Attorney Palacios-Baldwin is doing, that the entire settlement amount of $325,000 is the subject of the two installment payment provision. Our current dispute is really whether Beauty pays approximately $244,000 all at once or in two installments.

I also want to tell you when the installment payments would be due. The first payment would be due at or shortly after the Consent Decree is approved, which would have been December of this year or January of 2007. The second would be due on October 2, 2007, approximately ten months later, on the first day of Beauty's next fiscal year. I am sure that you can infer Beauty's

EXHIBIT B

**PULLMAN & COMLEY, LLC**
ATTORNEYS AT LAW

The Honorable Holly Fitzsimmons
December 22, 2006
Page 2

objective given this payment plan. It is to spread the payments over two fiscal years so that there would not be a substantial adverse affect on profits in a single year.

As you can see, not only has our side worked hard to devise the 401(K) solution for the three claimants, Beauty was ready, willing and able to fund the contributions next Tuesday, the day after Christmas, in anticipation that we would sign a consent decree and the court would approve it. Suffice it to say, Beauty has not had a change of heart about settling. It still wants very much to settle. This should also tell you just how important the two installment provision is to Beauty. I find it hard to understand how the EEOC could walk away from this settlement simply because employees will be getting half "their" money in January, and the other half ten months later.

Very truly yours,


Richard C. Robinson

RCR:vml

cc: The Honorable Judge Alan Nevas
    Valeria Calafiore, Esq.
    Jackson Chin, Esq.
    Barbara Gardner

Hartford/65094.1/RCR/216689v1

**PULLMAN & COMLEY, LLC**
ATTORNEYS AT LAW

2

# Robinson, Richard C.

**To:** ROSA Baldwin
**Subject:** RE: EEOC v. BEI - Your proposal

I don't have an interest rate for you yet. But I have been talking to Larry who suggested that the four enroll in BEI's 401K plan, BEI contributes their portion of the settlement money to the plan for them, there's no tax to them at that point, the money grows tax free, and when they reach 59 and 1/2, they can take the money out without a penalty, but pay a tax then. The only problem I see is that there is a $20K limit on contributions for these folks, according to Larry. We haven't presented this to Bob yet. I have a meeting scheduled with these guys tomorrow to review all of this stuff. Bob is almost ready to forget settlement and try the case. But I'm optimistic that we'll present you with alternatives that are attractive, if not altogether perfect.

-----Original Message-----
From: ROSA Baldwin [mailto:ROSA.Baldwin@EEOC.GOV]
Sent: Wednesday, October 18, 2006 11:02 AM
To: Robinson, Richard C.
Subject: EEOC v. BEI - Your proposal

Hi Rick: Please get back to me when you can on an initial interest rate proposal on the note/guarantee option. FYI - It will be a very hard sell on this option if your client's proposal on interest is equal to or less than that available for CDs right now. Anyway, once I get your proposal, I will float it by our folks. If they agree, great. If they do not agree, I'm going to the judge with a call and letter similar to that which I sent to you outlinining our efforts and a proposal that we have a telephone call/in person meeting to finalize our efforts...its been too long and we all want to know whether this is going or not.
Thanks, Lili

R. Liliana Palacios-Baldwin
Senior Trial Attorney
U.S. Equal Employment Opportunity Commission JFK Federal Building, Room 475 Boston, MA 02203-0506
Tel: (617) 565-3188 - Fax: (617) 565-3196 Rosa.Baldwin@eeoc.gov

Confidentiality Statement:
This message is transmitted to you by R. Liliana Palacios-Baldwin of the United States Equal Employment Opportunity Commission - Boston Area Office.
The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not a designated recipient of this message, please destroy it and notify the sender of the error by reply e-mail or by calling 617-565-3188.
For more information about the U.S. EEOC, please visit us at www.eeoc.gov

# PULLMAN & COMLEY, LLC
## ATTORNEYS AT LAW

RICHARD C. ROBINSON
90 State House Square
Hartford, CT 06103-3702
p 860 541 3333
f 860 424 4370
rrobinson@pullcom.com
www.pullcom.com

January 15, 2007

The Honorable Holly Fitzsimmons
U.S. District Court
Brien McMahon Federal Building
915 Lafayette Boulevard
Bridgeport, CT 06604

Re:  EEOC, et al. v. Beauty Enterprises, Inc., et al
     Civil Action No. 301-CV-378 (AHN)

Dear Judge Fitzsimmons:

I am writing on behalf of our client, Beauty Enterprises, to comply with your instruction that the parties submit to your chambers an ex parte, confidential letter outlining their respective positions regarding the issues in dispute, foreseeable problems, previous positions and any agreements already reached.

What precipitated your most recent involvement is the EEOC's December 21, 2006 letter to you describing the recent breakdown of the settlement efforts over a single issue, Beauty's request to pay in two installments over two different fiscal years the settlement sum destined for the claimants no longer working at Beauty. (All but four of the claimants are in this category.) I wrote to you on December 22, 2006, explaining Beauty's position on this issue. A copy of the December 22nd letter is enclosed for your convenience.

My purpose in writing that letter was not just to explain Beauty's position on the issue, but also to give you our side's perspective on some of the events the EEOC described in its letter, to let you know that the "two payment" demand was nothing new and to emphasize for you just how important this item was to Beauty. At the same time, we tried to assure you that Beauty was committed to the idea of settlement, had worked very hard to devise alternatives that would satisfy the EEOC concerning the deferred payments to the four still employed claimants and was surprised by what it regarded as the EEOC's sudden change of position on this issue.

I now have to tell you that Beauty is having second thoughts – serious reservations – about settlement, particularly the idea of paying money to claimants. As you know, the settlement agreed to in principle called for payments totaling $325,000.

Beauty's owner, Robert Cohen, was never entirely comfortable with the idea of paying money to claimants. Aside from the weakness of the various monetary claims, those claimants who talked

EXHIBIT D

BRIDGEPORT    GREENWICH    HARTFORD    STAMFORD    WESTPORT    WHITE PLAINS

**PULLMAN & COMLEY, LLC**
ATTORNEYS AT LAW

Page 2

to him about the lawsuit always assured him that it was purely a matter of principle on their part, that none of them were "in it" for money. He also learned that virtually all claimants testified to this effect at their depositions.

Surely, the passage of time has allowed this discomfort to fester and grow. The EEOC's inexplicable insistence on a single payment for the claimants no longer with Beauty added fuel to the fire, but it is not the only incident that has produced this effect. Allow me to describe the latest incident for you.

One of the four claimants that remain "employed" at Beauty is Madelyn Perez. I use "employed" in quotes because Ms. Perez is a "temp," a staffing agency employee placed at Beauty. One of the terms of the settlement was that Beauty would offer Ms. Perez a permanent position when one became available. One became available a week ago, and in anticipation of an ultimate agreement on settlement, Beauty brought it to Ms. Perez' attention. She told Beauty that she was interested in the position, and Beauty offered it to her, subject to her completing an employment application and signing certain other pre-employment documents required of all new hires. One of these pre-employment documents is an acknowledgment form in which the applicant confirms that he or she "understands" the Beauty "maintains a Speak only English rule — a rule requiring employees to speak only English while they are working." The document also contains a certification by the applicant that he or she is able to read, write and speak English. Ms. Perez refused to sign this document.

Because I was eager to put to rest the issue of Ms. Perez becoming a permanent employee, I called the EEOC's counsel Lilly Palacios-Baldwin and asked her to intervene -- to tell Ms. Perez that she could sign the document. I did not emerge from our conversations on the topic with a good understanding of who was driving the decision, whether it was Ms. Perez or the EEOC.

Attorney Palacios-Baldwin did suggest that I waive the requirement, asking me, in substance, why Beauty needed Ms. Perez to sign the document. I told Attorney Palacios-Baldwin that our position throughout the litigation has been that Beauty will be maintaining its rule until a court tells it that it cannot or there is some settlement in which Beauty changes the rule, that consistent with this position, Beauty requires all applicants to sign the subject document and that if it were to "get out" that Beauty hired Ms. Perez given her refusal and failure to sign, it would negatively affect discipline and morale. It also would be unhelpful to Ms. Perez because her colleagues would view her as the recipient of special treatment.

Attorney Palacios-Baldwin told me that I would make the document with Ms. Perez' signature Exhibit A in my case. I responded that I was still optimistic about settlement (I was then) and that if she were concerned about use of this document against Ms. Perez and the EEOC if the case did not settle and were tried, I would give her a communication stating that Beauty would

**PULLMAN & COMLEY, LLC**
ATTORNEYS AT LAW

Page 3

never use the document against Ms. Perez or the EEOC in this case or in any other proceeding. For some reason, this was not good enough.[1]

I reported this to Beauty, and it was viewed there as the last straw, as the EEOC pushing too much, too far and too long.

Beauty will meet with you on the 24th with an open mind. However, the issue is no longer whether Beauty will pay all at once or in two installments over two (successive) fiscal years, but whether Beauty will settle at all.

Very truly yours,

Richard C. Robinson

Enclosure

cc:   Mr. Robert Cohen
      Mr. Rocco Picirrillo
      Mr. Larry Sussman

Hartford/65094.1/RCR/218633v1

---

[1] I know that the EEOC is contending in the lawsuit that Ms. Perez had virtually no English language skills in 2000, when the events began that led to this case. Even if this contention were correct (and Beauty disputes it), Ms. Perez now has sufficient English language skills to make the requested acknowledgment, and neither she, nor the EEOC are contending, to my knowledge, that the refusal to sign is because she does not read, write and speak English.