UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EQUAL EMPLOYMENT OPPORTUNITY    :
COMMISSION, et al.,             :
    Plaintiffs,                 :
                                :
       v.                      :         No. 3:01CV378(AHN)
                                :
BEAUTY ENTERPRISES, INC.,       :
    Defendant.                  :

RULING ON MOTION TO ENFORCE SETTLEMENT AGREEMENT

Plaintiff EEOC and individual intervenor-plaintiffs (collectively "the plaintiffs") filed a motion to enforce a settlement agreement they allegedly reached with defendant Beauty Enterprises, Inc. ("BEI") [doc. # 174]. The plaintiffs argue that the parties entered into a binding, enforceable settlement agreement. BEI counters that the parties did not intend to be bound by the terms of their negotiations absent a formal, signed and entered Consent Decree. Counsel for the parties filed affidavits and exhibits in support of their positions and the court heard oral argument on the motion on August 30, 2007. For the reasons that follow, the plaintiffs' motion is denied.

BACKGROUND

This case involves an "English only" policy that BEI instituted in 1980. The policy instructs that BEI's employees must speak only English at its Hartford, Connecticut warehouse. In March 2001, the Equal Employment Opportunity Commission ("EEOC") brought this action on behalf of 23 current and former BEI employees alleging that BEI's "English only" rule violates

Title VII of the Civil Rights Act of 1964.  Seven of those
current or former employees have also intervened as plaintiffs
and filed individual claims against BEI under various state and
federal laws.

Trial of this case was set to begin in September 2005, but
after an unsuccessful jury selection, the court reset the trial
date for January 2006.[1]  During that time, settlement
negotiations between the parties began in earnest.  These
negotiations culminated in a settlement conference held on May
30, 2006 before Judge Nevas and Magistrate Judge Fitzsimmons, at
which BEI agreed in principle that it would pay $325,000 to
settle the case, subject to several issues that remained
outstanding.  At that time, the main unresolved issues were: (1)
how to defer payment of the settlement amounts to the employees
who were still working for BEI;[2] (2) the content of a revised
language policy; and (3) the hiring of an outside
trainer/consultant.

After the settlement conference, the parties continued to

_____

[1] The plaintiffs also informed the court that, prior to
trial, they planned to take an interlocutory appeal from the
court's ruling on a disparate impact jury instruction.  The court
gave them leave to do so.  See EEOC v. Beauty Enters., Inc., No.
3:01-cv-378, 2005 WL 2764822, at *11-13 (D. Conn. Oct. 25, 2005).

[2] BEI made clear during negotiations that it did not want
plaintiffs who were current employees of BEI to receive a direct
settlement payment until they left the company.  (Def.'s Aff. ¶
5).  The plaintiffs agreed to this condition.  (Pl.'s Aff. ¶ 17).

propose and discuss a proper deferred payment vehicle for current
employee-plaintiffs at BEI.  Many ideas were discussed, but on or
about December 21, 2006, the parties seemed to agree that the
acceptable solution was for BEI to deposit the settlement amounts
into 401(k) plans for each current employee-plaintiff.[3]  Both
sides understood that BEI planned to make two separate 401(k)
disbursements over the course of two fiscal years because the
settlement amount for each current employee exceeded the maximum
allowable yearly contribution.

After the May 2006 conference, another issue arose between
the parties, namely the employment status of Madelyn Perez, a
temporary employee at BEI.  BEI wanted Perez to become a full-
time employee, but to do this, BEI stated that she would have to
sign the "English only" policy and the EEOC would not allow this
to occur.

In addition, BEI informed the plaintiffs in December 2006
that the payment of the remaining settlement amount (minus the
amount earmarked for the 401(k) accounts of current employees),
approximately $244,000, would be split between two fiscal years.
BEI was under the impression that the parties agreed to this term
at the May 30, 2006 conference, but the plaintiffs adamantly deny
that they agreed to a division of the remaining settlement

---

[3] The defendant states, however, that he was uncertain
whether all of the individual plaintiffs had approved the 401(k)
plan concept.  (Def's Aff. ¶ 15).

amount.  The parties continued to communicate regarding the terms
of the settlement until January 24, 2007, when counsel for BEI
announced at a follow-up settlement conference before Magistrate
Judge Fitzsimmons that his client no longer wished to settle and
wanted instead to proceed to trial.

DISCUSSION

The plaintiffs argue that as a result of the May 30, 2006
conference, the parties had an "oral settlement agreement" that
was later memorialized in an exchange of draft consent decrees
and other letters and emails.  The plaintiffs now seek to enforce
the terms of that agreement.  BEI, on the other hand, argues that
the parties had no intent to be bound by anything less than a
signed writing, and that all negotiations until that point were
just that - negotiations - and did not amount to an enforceable
contract.

A.  Governing Law

To determine whether an enforceable agreement exists between
the parties, the court must establish whether federal common law
or Connecticut law applies.  The Second Circuit, much like many
other circuit courts of appeal, has not clarified which law
governs when a court must decide whether to enforce a settlement

agreement in a case arising under federal question jurisdiction.[4]

In fact, the court has utilized two different sets of factors based on three different sets of laws.  One set of factors, expressed in Winston v. Mediafare Entertainment Corp., 777 F.2d 78 (2d Cir. 1986), uses New York law and Restatement Second of Contracts to determine the parties' intent to be bound by a contract.[5]  The Second Circuit then used a different set of factors in Omega Engineering, Inc. v. Omega, S.A., 432 F.3d 437

---

[4] See Omega, 432 F.3d at 444 (holding that in a case based on diversity jurisdiction, it will apply state law to determine if an enforceable agreement was reached); cf. Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997) (holding in a case with ERISA, ADA and New York employment law claims that "[b]ecause we find that there is no material difference between the applicable state law or federal common law standard, we need not decide this question [of what law to apply] here.").  Other circuits have struggled with this issue and have reached varied conclusions.  See Hayes v. Nat'l Serv. Indus., 196 F.3d 1252, 1254 (11th Cir. 1999)(applying state law to determine if settlement existed between two private parties); cf. Brewer v. Muscle Shoals Bd. of Educ., 790 F.2d 1515, 1519 (11th Cir. 1986) (applying federal common law to determine if settlement existed where the United States was a party).  Several circuits have held that when an oral settlement agreement is in dispute in a Title VII case, federal common law applies.  See, e.g., Stroman v. West Coast Grocery Co., 884 F.2d 458, 461 (9th Cir. 1989)(applying federal law to all aspects of settlement in a Title VII action); Taylor v. Gordon Flesch Co., Inc., 793 F.2d 858, 862 (7th Cir. 1986)(applying federal law to determine validity of an oral settlement agreement in a Title VII case); Fulgence v. J. Ray McDermott Co., 662 F.2d 1207, 1209 (5th Cir. 1981)(same).

[5] The court in Winston did not state whether the case arose under federal question or diversity jurisdiction.  See generally Winston, 777 F.2d 78 (2d Cir. 1986).

(2d Cir. 2005), based on Connecticut law.[6]   The court noted that in _Omega_ this was appropriate because the district court's jurisdiction was based on the diversity of the parties, not on a federal claim.

This case was brought pursuant to Title VII of the Civil Rights Act and hence jurisdiction is based on a federal question. Though the factors in _Omega_ and _Winston_ are very similar, the plaintiffs argue that only Connecticut law applies.  They argue that _Winston_ is based on New York law and therefore provides no authority in this case.

On the one hand, the Second Circuit stated in _Omega_ that the factors in _Winston_ are actually "common law," presumably _federal_ common law.  _Omega_, 432 F.3d at 444; see Board of Trustees v. VIC Constr. Corp., 825 F. Supp. 463, 466 (E.D.N.Y. 1993) (holding that in an ERISA case, federal common law applied to determine whether the parties reached an enforceable settlement agreement and using the _Winston_ factors in its analysis).

On the other hand, in its most recent opinion on the enforcement of settlement agreements, the Second Circuit stated that because New York law and federal common law were "indistinguishable," it chose not to decide whether state or

---

[6] The court went on to note that the Restatement Second of Contracts (on which the _Winston_ factors are based in part) is a source of law that Connecticut courts have also looked to for guidance.  _Omega_, 432 F.2d at 444.

federal law would apply in a federal question case.  See Powell
v. Omnicom, 497 F.3d 124 (2d Cir. 2007).  In Powell, the court
stated:

> It is unclear whether the settlement of federal claims
> is governed by New York law or federal common law.  In
> Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320 (2d
> Cir. 1997), we declined to decide this question because
> New York law and federal common law were materially
> indistinguishable.  Id. at 322; see also Monaghan v.
> SZS 33 Assocs., 73 F.3d 1276, 1283 n.3 (2d Cir. 1996)
> ("[T]he federal rule regarding oral stipulations does
> not differ significantly from the New York rule.").
> The same is true here; therefore, we will apply New
> York and federal common law interchangeably.

Powell, 497 F.3d at 129 n.1.  The court went on to apply the
Winston factors.  Id. at 129.  In the absence of clear guidance
on this issue, the court will apply both the factors developed
from Connecticut law and those from federal common law.
Fortunately, as applied to this case, both sets of laws produce
the same outcome.

B.    Is There an Enforceable Agreement?

The plaintiffs assert that the parties agreed to all of the
material terms of the settlement and that BEI simply had a change
of heart and therefore no longer wishes to go forward with the
settlement.  BEI counters that neither party intended to be bound
by terms that the parties had not yet fully negotiated and had
not memorialized in a mutually agreeable writing.

1.    The Parties' Intent

The plaintiffs strenuously argue that the parties entered

into an oral settlement agreement at the May 30, 2006 settlement conference before this court.[7]  Under Connecticut law, the "intention of the parties manifested by their words and acts" determines whether the parties reached a settlement agreement. Hess v. Dumouchel Paper Co., 154 Conn. 343, 347 (1966).  Federal law also follows this principle.  See, e.g., Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir. 1981) ("Federal law does not require . . . that the settlement be reduced to writing.  Absent a factual basis rendering it invalid, an oral agreement to settle . . . is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute.").  To determine the parties' intent, the court may consider "oral testimony or correspondence or other preliminary or partially complete writings."  Winston, 777 F.2d at 81; Omega, 432 F.3d at 444 (citing Restatement (Second) of Contracts § 27 cmt. c (1981)).

If the parties intended to agree to the material terms of the settlement, they cannot repudiate the agreement, even if it is not in writing.  See Millgard Corp. v. White Oak Corp., 224 F. Supp. 2d 425, 432 (D. Conn. 2002).  The court in Millgard explained, "the only essential prerequisite for a valid

---

[7] At the hearing on the motion, the plaintiffs stated that the terms of the agreement were finalized sometime in December 2006, instead of at the May 30, 2006 conference.  (Tr. 15).

settlement agreement is that the parties mutually assent to the terms and conditions of the settlement." Id.  An important caveat to the binding effect of an oral settlement is that parties may specify through words and actions that they will not be bound until all of the terms are in writing to both parties' satisfaction.  See Lambert Corp. v. Evans, 575 F.2d 132 (7th Cir. 1978)(federal law); Aquarion Water Co. v. Beck Law Prods. & Forms, LLC, 98 Conn. App. 234, 239 (2006) (Connecticut law).  It is a long-standing principle of contract law that "if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed."  1 Samuel Williston & Walter H. E. Jaeger, A Treatise on the Law of Contracts § 28 (3d ed. 1957).  In such situations, parties "can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction.  The matter is merely one of expressed intention."  1 Arthur L. Corbin, Corbin on Contracts § 30 p.98 (1963).

Accordingly, the court must examine the parties' intent and it will apply both the Winston and Klein factors in its analysis.

2. Winston Factors

To determine whether the parties intended to enter into a binding oral settlement agreement, the court will first apply the factors the Second Circuit established in Winston: "(1) whether

9

there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." <u>Winston</u>, 777 F.2d at 80.

     a.  <u>Express reservation</u>

The plaintiffs admit that they insisted from the outset of negotiations that the settlement agreement had to be entered with the court in the form of a Consent Decree instead of some other more informal format.[8]  (Pl.'s Aff. ¶¶ 6-8; Def.'s Aff. ¶¶ 8-9). BEI ultimately agreed to this condition.  (Def.'s Aff. ¶ 9). This speaks to the first <u>Winston</u> factor: the plaintiffs expressly reserved the right not to be bound in the absence of a writing and convinced BEI to agree to this condition.[9]  But this is not the only indication that the plaintiffs did not and could not assent to an oral settlement agreement.

The plaintiffs argue that because BEI never expressly

_____

[8] In addition, at the May 30, 2006 conference in which the plaintiffs insist an oral settlement agreement was reached, the undersigned instructed the parties to reduce their agreement to writing due to the complexity of the case.

[9] Because both parties agreed that a consent decree would be the format for their settlement, each draft of the settlement agreement was entitled "Consent Decree."  The court therefore will use the term "Consent Decree" or "draft Decree" to identify the document the parties drafted that contained the terms of their alleged agreement.

reserved the right to be bound only with a written agreement, that it is "legally irrelevant" that the plaintiffs required that the EEOC's headquarters approve a written version of the agreement "to ensure that it reflected the terms of the May 2006 Settlement." (Pl.'s Reply Br. 4). On the contrary, the Second Circuit has stated that if "either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." Winston, 777 F.2d at 80 (emphasis added). The need for the EEOC to approve the content of the parties' draft consent decree before execution is therefore highly relevant to when and whether the parties intended to be bound.

In addition, throughout the parties' correspondence after the May 30, 2006 conference, the plaintiffs demonstrated that they conditioned a final settlement on the parties' ability to reach an agreement on the remaining outstanding issues, and that a settlement could not be finalized before the parties resolved those issues. The emails and letters between the parties' attorneys are rife with conditional language. In a letter dated June 16, 2006 from the EEOC's attorney Liliana Palacios-Baldwin to BEI's attorney Rick Robinson, she stated: "I am writing to confirm our conversation yesterday about a number of remaining issues that we need to resolve before we can finalize the Consent

11

Decree in this case." (Pl.'s Ex. 5 at 1). She concluded the letter with the following statement: "I just want to remind you that once the Consent Decree is finalized, it will need to be approved by our headquarters in Washington. I don't anticipate this will create any major problems - particularly if we are able to resolve the above [eleven] issues to the Agency's satisfaction." (Pl.'s Ex. 5 at 2). In an email dated August 29, 2006, Palacios-Baldwin stated to the other plaintiffs' attorneys and Robinson: "I [don't] anticipate any problems 'closing the deal' [and] both parties [are] still actively involved in trying to close two different parts of the Decree." (Pl.'s Ex. 7). Then, in an email on December 11, 2006 from Palacios-Baldwin to the other attorneys, she stated: "Rick had mentioned wanting to discuss some issues on the Consent Decree prior to execution." (Pl.'s Ex. 8). Finally, in her letter on December 21, 2006 to Magistrate Judge Fitzsimmons regarding changes in "settlement negotiations" and BEI's "newly added material term" regarding the payment of the remaining settlement amount divided over two fiscal years, Palacios-Balwin stated: "[U]nfortunately if [this issue] remains unresolved, the entire settlement is at risk." (Pl.'s Ex. 9 at 2). The language that the EEOC's counsel uses throughout the parties' correspondence after the May 30, 2006 conference indicates that the parties were not yet prepared to enter a final agreement with the court.

12

In addition to the numerous examples of the plaintiffs' conditional language, BEI also expressed that it intended to be bound only after the parties signed the draft Decree and it was entered with the court.  In its letter to Magistrate Judge Fitzsimmons on December 22, 2006, BEI states that it "was ready, willing and able to fund the [401(k)] contributions next Tuesday, the day after Christmas, in anticipation that we would sign a consent decree and the court would approve it."  (Pl.'s Ex. 10). Notably, BEI did not fund the 401(k) plans as it stated in its letter to Magistrate Judge Fitzsimmons because the parties did not sign a finalized Decree.

Indeed, even the language of the draft Decree conditioned many of the parties' duties and the timing of the performance of those duties on the court's entry of the Consent Decree, which could not occur until the parties approved, signed and presented a final draft Decree to the court.  For instance, the draft Decree states: "BEI shall pay the allocated amounts . . . within fourteen days of the entry of this Decree."  (Pl.'s Ex. 13 at 5); "No later than thirty days after the entry of this Decree, BEI shall post . . . a copy of a notice . . . attached hereto as Exhibit C."  (Pl.'s Ex. 13 at 8); "This [diversity] training shall take place within one year of the entry of this Decree." (Pl.'s Ex. 13 at 10); "Nothing in this Decree shall be construed to preclude the EEOC from enforcing this Decree in the event that

any of the Defendants fail to perform the promises and representations contained herein." (Pl.'s Ex. 13 at 13). Neither party removed or objected to these provisions that conditioned performance on the parties' presentation of a final, signed agreement to the court.[10]

Accordingly, the parties expressed an intent not to be bound absent a writing and thus they satisfy the first Winston factor.

> b. Partial performance

The fact that BEI did not fund the employee-plaintiffs' 401(k) plans is also important to establish the second Winston factor, namely whether there was partial performance of the agreement. Indeed, no money changed hands and no other action was taken to perform any part of the settlement. In addition, in December 2006 or January 2007, the parties were still involved in discussions regarding how to make plaintiff Madelyn Perez a full-time employee so that she too would be eligible for the 401(k) plan disbursement. BEI insisted that to become a full-time employee, Perez would have to sign the "English only" policy because it was still in effect; BEI had made no efforts to adopt or implement a revised language policy. (Def.'s Aff. ¶ 10). There is some indication that BEI began a search for an independent consultant as outlined in the draft Decree, but there

---

[10] The most recent version of the draft Decree contains the provisions outlined above. (Pl.'s Aff. Ex. 13).

is no evidence to support a finding that a consultant was retained. (Pl.'s Ex. 6). As such, the evidence taken as a whole demonstrates that the parties did not perform any of the terms of the draft Decree.[11]

    c.  Agreement on all terms

The third Winston factor seeks to determine whether the parties agreed to all of the terms of the alleged settlement agreement. It is clear from the disputed and outstanding issues outlined above that the parties were in disagreement about many important terms, such as the timing of BEI's disbursement of the settlement amount, Madelyn Perez's status as an employee of BEI, and whether the class members that were current BEI employees accepted the 401(k) plan as an appropriate repository for their settlement disbursement.

Moreover, though the plaintiffs argue in their papers that the parties reached an agreement on May 30, 2006, at the hearing on the motion, the plaintiffs stated that a final agreement was not reached until sometime in December 2006. (Tr. 25, 62-63). Even at the hearing, the plaintiffs offered to modify the most

---

[11] One provision of the settlement even involved the court's performance - namely, the plaintiffs asked that the court vacate its order regarding the disparate impact jury instruction. See EEOC v. Beauty Enters., Inc., No. 3:01-cv-378, 2005 WL 2764822 (Oct. 25, 2005). BEI and the court acquiesced to this term, but because the parties never reported that they had reached a final settlement, the court did not vacate the order.

recent draft of the Decree to reflect BEI's request to divide
payment of the settlement amount not subject to the 401(k)
contributions between two fiscal years.  Evidently, that term
remained in dispute even after the "final draft" of the Decree
was circulated in December 2006.  Accordingly, the parties had
not agreed to all of the terms of the settlement in May 2006 or
at any time thereafter.

>    d.  Normally in writing

The fourth and final Winston factor that the court must
examine is whether the agreement is one that would normally be
reduced to writing.  Many courts have enforced oral settlement
agreements, therefore settlement agreements by their very nature
need not be in writing.  See, e.g., Brown v. Nationscredit
Commercial, No. 3:99-CV-592(EBB), 2000 WL 888507, at *2 (D. Conn.
2000)(enforcing an oral settlement agreement).  The agreement in
this case, however, is complex.  The draft Consent Decree,
without exhibits, is 14 pages long.  It involves 23 plaintiffs, a
training program led by an independent consultant, a $325,000
settlement amount that must be apportioned to each plaintiff, and
four 401(k) plans to be funded over the course of two fiscal
years.  The parties circulated at least four different drafts of
the Consent Decree.  When parties believe, as they do here, that
the language and the terms of an agreement are sufficiently
complex to require that they repeatedly redraft it, it follows

that it is an agreement of the sort that would normally be reduced to writing.  <u>See</u> <u>Winston</u>, 777 F.2d at 83.  The court in <u>Winston</u> elaborated as follows:

> Where, as here, counsel insist on continually redrafting the specific terms of a proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution and consummation of the agreement.  Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner because they wish to create a writing that is satisfactory to both sides in every respect.  It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered.  For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

<u>See</u> <u>id.</u>  The parties demonstrated through their repeated redrafting that the agreement was complex.  They wanted the terms of the agreement to reflect precisely what they intended and nothing less.  Based on the four <u>Winston</u> factors, the parties intended to be bound only by a fully executed contract, not an oral agreement.  Therefore the parties never reached a final, enforceable agreement.

3.  <u>Klein/Omega Factors</u>[12]

The court now will examine whether, under Connecticut law,

---

[12] As mentioned above, the factors were first developed by the Connecticut Supreme Court in <u>Klein</u> and the court examines the factors as the Second Circuit applied them in <u>Omega</u>.  The court hereinafter shall use "<u>Klein</u>" or "<u>Omega</u>" interchangeably to describe the factors.

17

the plaintiffs and BEI reached a binding contract to settle the case. In 2005, the Second Circuit examined the factors listed in Klein v. Chatfield, 166 Conn. 76, 80 (1974), to determine whether parties to a patent infringement dispute reached an enforceable settlement agreement. See Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005). The court noted that the parties cited to the Winston "common law" factors in their briefs, but it explained that because the case had been brought based on diversity jurisdiction, the Klein factors, based on Connecticut law, provided more appropriate guidance. Id. Those factors determine the parties' intent from the "[1] the language used, [2] the circumstances [surrounding the transaction] and [3] the motives . . . and the purposes which [the parties] sought to accomplish." Klein, 166 Conn. at 80; see Omega, 432 F.3d at 444.

The plaintiffs cite a total of 41 cases in an attempt to convince the court that there was an enforceable settlement agreement. Most of these cases involved situations where the parties reported to the court that the case conclusively settled or the parties read the agreement into the record in open

court.[13]  In <u>Omega</u>, the parties reported to the court that they settled the case and drafted a complete agreement in writing to which all of the parties consented.  See <u>Omega</u>, 432 F.2d at 441. The only remaining issue was whether the parties intended for the written agreement to be signed before it became binding.  See <u>id.</u> at 442.

First, under <u>Klein</u>, the court in <u>Omega</u> considered the language used in the agreement, and stated that while it provided some support for the defendant's argument that it envisioned having a signed agreement, the performance of the terms of the agreement was not <u>contingent</u> upon signing.  See <u>id.</u> at 444. Conversely, in several letters from counsel for the EEOC to counsel for BEI, she makes clear that "once the Consent Decree is finalized, it will need to be approved by our headquarters in

---

[13] The plaintiffs cite to the following cases in support of their position that this court should enforce the settlement agreement, but unlike the current case, the parties in these cases reported to the court that they reached a settlement: <u>EEOC v. Kidman</u>, Nos. 04-17005, 04-17489, 2007 WL 1187962, at *1 (9th Cir. 2007); <u>Pozzo v. Basic Machinery Co., Inc.</u>, 463 F.3d 609, 611 (7th Cir. 2006); <u>Omega Engineering, Inc. v. Omega, S.A.</u>, 432 F.2d 437, 445 (2d Cir. 2005); <u>Acot v. New York Medical College</u>, 99 Fed. Appx. 317, 318 (2d Cir. 2004); <u>Doi v. Halekulani Corp.</u>, 276 F.3d 1131, 1134 (9th Cir. 2002); <u>Foster v. City of New York</u>, No. 96-Civ-9271, 2000 WL 145927, at *2 (S.D.N.Y. 2000); <u>In re Dragone</u>, 318 B.R. 33, 35 (D. Conn. 2004); <u>Vari-O-Matic Machine Corp. v. New York Sewing Machine Attachment Corp.</u>, 629 F. Supp. 257, 259 (S.D.N.Y. 1986); <u>Maharishi School of Vedic Sciences, Inc. v. Connecticut Constitution Assoc., L.P.</u>, 260 Conn. 598, 602 (2002); <u>Acquarion Water Co. v. Beck Law Products & Forms LLC</u>, 98 Conn. App. 234, 239-40 (2006); <u>Sicaras v. City of Hartford</u>, 44 Conn. App. 771, 772 (1997).

Washington." (Pl.'s Ex. 5 at 2). This indicates that even if the parties assented to the agreement's terms, the EEOC in Washington had to "sign off" on the draft Decree before the court could enter it and before the parties would be obligated to perform. It is clear from the numerous email exchanges detailed in the preceding section and from the language of the draft Decree itself that performance of the terms of the settlement was contingent upon finalizing an agreement that all of the parties would approve and sign.

The court noted that under the second Klein factor, the parties' motive when they negotiated the agreement was to avoid a trial. Of course, this is also the motive for almost every party that negotiates a settlement agreement. In Omega, however, this was especially relevant because the parties prepared the settlement agreement literally on the eve of trial. There, the parties affirmatively reported to the court that the case had settled and the court postponed the trial that was set to begin the following morning. Omega, 432 F.2d at 441. The settlement agreement allowed the parties to avoid "being under the gun of imminent trial." Id. at 445. This was not the case here. The court set the trial in this case for September 2005 and postponed it because of an unsuccessful jury selection. The parties began to discuss settlement at that time. After almost seven months had passed from the date of the May 2006 settlement conference,

the parties continued to distribute drafts of the Decree, while the parties in Omega borrowed a computer in the courthouse to type up their agreement that same day. See Omega, 414 F. Supp. 2d 138, 142 (D. Conn. 2004).

In addition, this court issued a ruling in October 2005 regarding the EEOC's request for a disparate impact jury instruction and stated that it would certify the issue to the Second Circuit on the motion of a party. See EEOC v. Beauty Enters., Inc., No. 3:01-cv-378, 2005 WL 2764822, at *11-13 (D. Conn. Oct. 25, 2005). The EEOC stated that it planned to seek that appeal. Undoubtedly, the interlocutory appeal of the ruling would have delayed the trial of this matter by several months. Thus, the parties' motive here was to avoid a trial but they were not "under the gun" to finalize the agreement.

Third, under Klein, the court must examine the circumstances under which the parties created the agreement. In Omega, the court noted that the parties reported to the court that they settled the case and reduced their agreement to writing, and that the parties viewed the execution of the agreement as merely a "ministerial" act. See Omega, 432 F.2d at 445. As discussed above, that was not the case here. The docket sheet reveals that the parties did not report to either Magistrate Judge Fitzsimmons or to the undersigned that the case was conclusively settled at the May 30, 2006 conference or at any time thereafter. EEOC's

counsel stated that the agency's Washington headquarters had to approve the agreement before the parties could submit it to the court for its approval and be bound by its terms.  Neither party signed the draft Decree and the plaintiffs admit that the last copy that it circulated to BEI still needed to be modified. (Tr. 25, 29-30, 62-63).  Accordingly, under the <u>Klein</u> factors, the parties did not enter into a binding settlement agreement.

B.    <u>Promissory Estoppel</u>

The plaintiffs advance another theory under which they argue that the court should enforce the settlement agreement, namely promissory estoppel.  For the plaintiffs to succeed on a claim of promissory estoppel, they must show that BEI made a "clear and definite promise . . . calculated or intended to induce [the plaintiffs] to believe that certain facts exist and to act on that belief;" and the plaintiffs must have relied on those facts and incurred an injury.  <u>See</u> <u>Wellington Sys., Inc. v. Redding Group, Inc.</u>, 49 Conn. App. 152, 162 (1998).  However, the court has already determined that the parties conditioned their promise on a written, signed agreement, and therefore a clear and definite promise does not exist on which the plaintiffs could reasonably rely.  <u>See</u> <u>R.G. Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 78-79 (2d Cir. 1984)("[T]he entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written

22

contract. Under those circumstances there never was 'a clear and unambiguous promise' to plaintiffs.").  Because they are unable to meet the first element of promissory estoppel, the plaintiffs' argument is without merit.

<u>CONCLUSION</u>

For the foregoing reasons, the plaintiffs' motion to enforce the settlement agreement [doc. # 174] is DENIED.

SO ORDERED this the 31st day of October 2007, at Bridgeport, Connecticut.

                    _____/s/_____
                    Alan H. Nevas
                    United States District Judge