UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION )<br>)<br>Plaintiff )<br>)<br>vs. )<br>)<br>BEAUTY ENTERPRISES, INC., ET AL. )<br>)<br>Defendant ) | CASE NO. 3:01CV00378(AHN)<br><br>June 26, 2008 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF-INTERVENORS' MOTION FOR LEAVE TO DEPOSE ROBERT WINKLER DE BENE ESSE AND TO CONDUCT A DISCOVERY DEPOSITION OF STARLIFT EQUIPMENT CO; REPLY TO PLAINTIFF-INTEVERVENOR'S MOTION TO DEPOSE SHERRY BAKER-LAWRENCE DE BENE ESSE**

I. The Requested De Bene Esse Deposition of Ms. Lawrence

It is necessary to respond to a particular assertion plaintiff-intervenors made in their June 10th Reply concerning this matter. Plaintiff-intervenor's assert that "Defendant's counsel told the Court last week that he is working on a possible claim against Ms. Lawrence that would strongly discourage her from testifying at trial." (pp. 1&2.) Plaintiff-intervenors state further that their counsel, Ms. Calafiore, subsequently advised Ms. Lawrence of defense counsel's supposed statement, that the statement supposedly frightened Ms. Lawrence, and that "presently," she will testify only if subpoenaed. (Id.)

Since defense counsel never made the subject statement either to the Court or to anyone else, defense counsel phoned Ms. Calafiore and asked her what she was referring to. According to Ms. Calafiore her reference was to defense counsel's ruminating in chambers that **for the hearing on the motion for Ms. Lawrence's de**

***bene esse deposition,*** he might research whether he could argue that Robert Cohen's[1] statements to Ms. Lawrence were somehow privileged and/or protected by privacy rights given the relationship these individuals had, thus providing yet another reason the Court must deny the motion (that any testimony concerning Mr. Cohen statements to her would be inadmissible). How Ms. Calafiore could have interpreted this as a threat on counsel's part to sue Ms. Lawrence is difficult, if not impossible, to comprehend. Defense counsel expressed this sentiment to Ms. Calafiore in no uncertain terms in their phone conversation and assured her that there never was, nor is there any threat or intent to sue Ms. Lawrence or even to "work on a claim" against her. Ms. Calafiore apologized for the misunderstanding.

Presumably, when Ms. Calafiore informs Ms. Lawrence that she misunderstood defense counsel's rumination, Ms. Lawrence will once again be willing to testify at trial without a subpoena – and this manufactured claim of unavailability, the only claim of unavailability ever asserted, will quickly disappear.

It is also necessary to respond to plaintiff-intervenor's discussion of the law concerning de bene esse depositions. The cornerstone of this discussion is the assertion that "for over a century," the "applicable legal standard" for de bene esse depositions has included the witnesses's living more than 100 miles from the place of trial; in other words, if the witness lives more than 100 miles from the courthouse, the movant is automatically entitled to depose that person de bene esse. (p. 2.) The citation for this proposition is a 1904 United States Supreme Court decision, *Hanks Dental Ass'n,* and the specific language plaintiff-intervenor's extract from this case is

---

[1] Robert Cohen, of course, owns the defendant Beauty Enterprises.

from a statute providing that a de bene esse deposition "may" be taken and received as proof at trial if the witness lives more than 100 miles from the courthouse. 194 U.S. 303, 305, 24 S. Ct. 700, 48 L.Ed. 989! Unfortunately for the plaintiff-intervenors, this statute no longer exists.

This undoubtedly explains why in 2000, the Southern District of New York failed to cite *Hanks* or this repealed statute when it described the "applicable legal standard" for de bene esse depositions. *Donk v. Miller*, 2000 U.S. Dist. LEXIS 1871, at 4 (S.D.N.Y. 2000) (cited in this defendant's original Opposition). According to the court in *Donk,* the applicable legal standard is impossibility for the witness to appear due to circumstances beyond his or her control. Id. For some reason, the plaintiff-intervenors do not address *Donk.* They opt instead to discuss the case *Donk* cites for its statement expressing the applicable standard, *Bregman v. District of Columbia,* 1998 U.S. Dist. LEXIS 22793 (D.D.C. 1998) - and the discussion is an attempt to distinguish that case from the present case. Suffice it to say, the attempt fails.

According to plaintiff-intervenors, what distinguishes *Bregman* from this case is that the witness there was a party defendant who wished to move to Europe and asked to be deposed in lieu of appearing at his own trial, while the witness here is a non-party individual who lives in Florida and is not asking to be deposed. Contrary to plaintiff-intervenor's assertion, however, the witness in *Bregman* was not a party defendant in the case, nor was it the witness who requested the deposition there. The witness in *Bregman* was a police officer who worked for the defendant, the District of Columbia. Apparently, the plaintiff's claim against the District concerned police misconduct that the witness allegedly committed. After the lawsuit began, the officer informed the District

that he was resigning from its police force and moving to Europe. The District then moved to take his deposition de bene esse and use it at trial in lieu of live testimony. The court rejected the motion, expressing the concern that to do otherwise would be to reward the officer for abandoning "the clear obligation he has to his employer to assist in its defense of his behavior."

If the court in *Bregman* were willing to prevent the defendant from taking a de bene esse deposition of a retiring police officer who was moving out of the country and obviously did not want to wait around or return to testify in person at trial,[2] this court should have no difficulty in denying the plaintiff-intervenor's request to depose de bene esse a young[3], healthy Florida resident who is perfectly ready, willing and able, indeed, anxious to come to Connecticut to testify against the defendant.

And plaintiff-intervenors continue in refusing to state what evidence would be lost if Ms. Lawrence were not deposed de bene esse and how this loss would hurt them. As noted in our original Opposition, absent a convincing case in this regard, a de bene esse deposition that the defendant opposes is completely out of the question. *United States v. International Longshoremen's Assoc.,* 2007 U.S. Dist. LEXIS 70686, at 5 (E.D.N.Y. 2007.)

---

[2] There is nothing in the *Bregman* opinion that suggests a relationship between the litigation and the officer's decision to retire and move to Europe. There is also nothing in the opinion to suggest that the District had any power effectively to enforce the officer's "clear duty" by preventing him from resigning and moving, or at least from moving. It is easy to envision how the Court's concern with rewarding the officer in some fashion could have put the defendant in a horrible position.

[3] For present purposes, "young" means under sixty.

2. <u>The Requested De Bene Esse Deposition of Robert Winkler</u>

This same failure – the failure to identify the evidence that would be lost if the witness were not deposed de bene esse and to explain the prejudice that would arguably ensue – also mandates the rejection of plaintiff-intervenors' request to depose Robert Winkler de bene esse.

This is not the only reason the request must be denied.  Plaintiff-intervenors seek to depose Winkler because Winkler, a Florida resident, supposedly "informed" them that he is a "former business associate" of Robert Cohen and "has knowledge of facts that are relevant, material, and have bearing on important issues in this case."  (Plaintiff-Intervenors' June 10th Motion, p. 2.)  Winkler is indeed a "former business associate" of Robert Cohen's, but not in Beauty Enterprises.  The association was in an entirely different business.  Winkler was never associated with Beauty Enterprises, nor was he in a position to observe activity at Beauty.  Clearly, he has no information concerning Beauty's English only rule, the work environment at Beauty for Hispanic employees or whether Beauty retaliated against any of the plaintiff-intervenors (or for that matter, any of the Charging Parties) for exercising their Title VII rights.  These are the relevant subjects in this case, and Winkler was never in a position to gather any information or to make any relevant observations in this regard.  Similarly, he has no knowledge of Beauty's finances, nor was he ever in a position to learn a thing about Beauty's finances.  Thus, even if the plaintiff-intervenors specified what Winkler claims to know, which they have utterly failed to do, there is no way Winkler's claims could be considered credible and worthy of preservation via a de bene esse deposition.

For all these reasons, the request to depose Robert Winkler de bene esse must be denied.

    3.    <u>The Discovery Deposition of Starlift Equipment, Co.</u>

Finally, plaintiff-intervenors seek to depose a representative of Starlift Equipment Co. because Starlift is Beauty's forklift vendor and has arguably relevant information concerning one of plaintiff Harold Acosta's retaliation claims; specifically, information concerning forklift driver exams Acosta took and failed *in 2001*.  While Starlift did not administer these tests, as plaintiff-intervenors erroneously recite (Motion, p.3), it did play a role in connection with the tests.  In response to a Beauty inquiry, it told Beauty that written testing was the way Beauty must certify forklift drivers to comply with OSHA regulations.  Lack of relevant information, then, is not the reason plaintiff-intervenors are not entitled to depose Starlift.  Instead, the reason is that the EEOC and the plaintiff-intervenors exhaustively explored this entire Acosta retaliation claim in the original discovery they conducted before the aborted trial in this case.  Starlift and its role were fully disclosed and extensively examined during this discovery.  Any of the plaintiffs could have deposed Starlift during the original discovery period had they wished to do so.  They failed to do so, however, and this was clearly a considered decision on their part.  Plaintiff-intervenors new counsel (Ms. Calafiore) obviously disagrees with that decision and is seeking long after the discovery period expired to conduct the very discovery her predecessors deliberately chose not to conduct.  It is plain, however, that successor counsel's disagreement with her predecessors' discovery decisions furnishes no justification – none whatsoever – for reopening discovery on this subject now.  The only justification for any discovery now is to explore developments that arose after the

aborted trial or at least after the original depositions. Plaintiff-intervenor's Motion must be denied.

Plaintiff-intervenors cannot dispute that the Acosta retaliation claim and Starlift's participation in the underlying facts were fully examined in the "original" discovery. By way of background, Acosta was a forklift driver at Beauty who claims that he was retaliated against for engaging in protected activities. Pertinent here is his claim that he was demoted and forced to resign following the administration of forklift driver's examinations.

The events that led to this claim began on August 3, 2001 when OSHA conducted a surprise inspection at Beauty. Ironically, the inspection took place because Acosta had complained to OSHA about certain conditions at Beauty. On August 27, 2001, OSHA cited Beauty for two violations, but not for the conditions about which Acosta had complained. The pertinent citation here is for violating the OSHA standard at 29 CFR 1910.178(1)(4)(iii) – a standard requiring employers to evaluate the performance of their "powered industrial truck (forklift) operators" at least once every three years so they can certify that their drivers are competent to drive safely. Beauty was not in compliance with this standard at the time and had to "abate" – remedy – this violation to meet its obligations under the Occupational Safety and Health Act. The first step it took in this regard was to determine what it had to do to comply – how an employer should evaluate its operators' performance so as to satisfy OSHA's requirements. To this end, the Company called Starlift.

Beauty supervisor Tom Buonocore made the call. As he explained during his April 11, 2003 deposition, Starlift told him that Beauty had to administer a written test.

Buonocore further explained that Beauty had a forklift driving training kit in-house with a video, along with written tests – materials Starlift previously provided.  On August 22, 2001, he brought all the forklift drivers to Beauty's auxiliary warehouse on Elliot Street in Hartford, showed them the video, pausing it at the end of each 'chapter' to review the questions that appeared on the screen.  Once this training was completed, he administered the test.  Buonocore then collected the tests and scored them.  He knew either from the test manual or from Starlift that 70% was the passing grade.  Acosta failed.  His score was 66%.

Buonocore further testified that sometime between August 22, 2001 and August 31, 2001, Starlift told him that the first test was not "compliant" with OSHA.  Starlift then sold him (Beauty) a new, compliant test, along with the associated manual and training materials.  Before he administered this second test to the forklift drivers, Buonocore repeated the process of showing the video (the new video), pausing it after each chapter and reviewing the questions that appeared on the screen.  Acosta failed again. This time he scored only 50%.[4]

The EEOC and plaintiff-intervenors explored what happened next in both the Buonocore deposition and in their depositions of Beauty supervisors Hector "Jimmy" Adorno and Paul Lopes and Beauty vice-president Rocco Picirrillo.  What they learned was that Beauty management believed it could not certify Acosta as competent based on these test scores and that Beauty would thus violate OSHA if it allowed Acosta to continue driving.  Beauty's management considered terminating Acosta at that point, but Mr. Cohen knew that Acosta was a Charging Party and that any adverse action the

---

[4] It is worth noting that another of the Charging Parties, Miguel Alvarez, a plaintiff-intervenor not represented by the Puerto Rican Legal Defense Fund and Ms. Calafiore, took the tests and passed them.

company took against him would be heavily scrutinized; thus he wanted to ensure that the company acted fairly and without discrimination. More importantly, Mr. Cohen knew that Acosta was a long term employee with a very sick wife and was loathe to deprive him of his employment and the health benefits his family needed. The decision, therefore, was to find the best available job for him (the most highly compensated job) within his sphere of expertise – or if no such job existed, to create one for him. Beauty supervisors subsequently reviewed the various jobs in the warehouse and concluded that Acosta had no experience doing anything other than a forklift driver's job. Moreover, were they to transfer him to one of these other jobs, the company could only pay him entry level wages – close to the minimum wage. Otherwise, it would destroy the integrity of its wage scale and cause havoc in the workforce. Consequently, Beauty created a new job for Acosta, a general maintenance position, paying him $9.30 an hour (he was making $12.32 an hour driving a forklift) -- and Acosta accepted the new position.

  Discovery further revealed that Beauty placed Acosta in this new position on September 6, 2001, a Thursday. The next day, he stayed out of work, taking a vacation day. The following Monday, September 10, 2001, Acosta delivered a doctor's note to Beauty, stating that he would be out of work until September 28, 2001 for some unspecified medical reason. Mr. Acosta never returned to work. By letter dated October 1, 2001, he resigned his employment.

  The deposition exhibits include the two tests Acosta took and failed. The EEOC also obtained the file OSHA created after Acosta filed a separate retaliation claim with it (under Section 11 of the OSHA statute). The file contained the fruits of OSHA's

investigation of Acosta's retaliation claim. On information and belief, the EEOC obtained the test manuals through this source. And as the discovery revealed, the EEOC and plaintiff-intervenors developed their attack on Beauty's position based on the discovery and investigation they conducted, as well as on interviews with Acosta and others. Among other things, the attack includes assertions that written tests were not required to meet OSHA standards, that Acosta was a long time forklift driver with a good record and no accidents and that the company failed to re-test Acosta right away.[5] Significantly, there was no attempt to build an attack that centered around Starlift or included a claim that Starlift's advice to Buonocore was not as Buonocore described it.

Under these circumstances, re-opening discovery to allow plaintiff-intervenor's new counsel to have a second bite at the discovery apple with Starlift would be wholly unjustified.

Undaunted by all of this, plaintiff-intervenors suggest that there are two bases for allowing the requested discovery. First, they say that documents Beauty produced in April 2008 (voluntarily in Beauty's view in connection with unauthorized written discovery requests to which Beauty objected in their entirety) "paint a far from complete picture regarding the factual allegations." (Motion, p. 3.) Characteristically, plaintiff-intervenors fail to identify the documents or explain what they show and do not show. Just as significantly, they fail to demonstrate how deposing a Starlift representative could complete the picture for them. Indeed, they fail even to articulate what is missing from the picture. Nevertheless, the short answer here is that no documents paint a complete picture "regarding the factual allegations." And this is why the EEOC and

---

[5] Beauty. of course, has responses to these attacks, none of which are relevant here.

plaintiff-intervenor's predecessor counsel chose to depose Beauty's supervisors and management personnel – to learn facts that were not set forth in any documents, but resided solely in the minds and memories of these individuals. So much for the first "basis."

The second so-called basis is plaintiff-intervenors' assertion that they need to depose Starlift so that "they may conduct the upcoming trial in an orderly fashion and avoid calling [the Starlift representative] for the first time at trial." (Motion, p. 3.) This assertion is not the product of plaintiff-intervenors' creativity. The Court made this assertion during a recent oral argument on the parties' ongoing discovery dispute – and the plaintiff-intervenors plainly believe that it is good strategy to argue to the Court what the Court has already argued to the parties.

The problem with that approach here is that the argument would effectively negate the Court's case management orders. It would do so by sanctioning a method by which a party seeking late discovery could always avoid an expired, court-established discovery deadline. The party could simply say, "Your Honor, if you don't give me permission to depose this individual, I'll just subpoena him to trial and examine him for the first time there. It won't go smoothly. It won't be orderly. And I know it won't make you happy, but you're leaving me with no choice." In other words, the party could threaten the judge.

Notwithstanding plaintiff-intervenors' threats, the Court's interest in the fair administration of justice, the very interest discovery deadlines promote, should easily prevail here – certainly given the unique circumstances this case presents. So long as plaintiff-intervenors had a fair opportunity to depose Starlift during the now expired

discovery period, as they so clearly did, they should not be allowed to do now what they failed to do then.

    The Motion to depose Starlift should be denied.

                              DEFENDANT, BEAUTY ENTERPRISES, INC.

By:   /s/ Richard C. Robinson
        Richard C. Robinson (ct04321)
        Christine Collyer  (ct26859)
        Janee Woods Weber
        Pullman & Comley, LLC
        90 State House Square
        Hartford, CT  06103-3702
        Telephone 860 541-3333
        Facsimile 860 424 4370
        E-mail:  rrobinson@pullcom.com
        Its Attorneys

## **CERTIFICATION**

I hereby certify that on June 26, 2008 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Richard C. Robinson
Richard C. Robinson (ct04321)

Hartford/65094.1/RCR/307547v1